SEWARD & KISSEL LLP
Attorneys for Defendant
NAKANISHI KIKAI KOGYOSHO CO., LTD.
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 574-1200/Facsimile: (212) 480-8421
Bruce G. Paulsen (BP 9563)
Wayne A. Parker (WP 6661)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| INTERMARE TRANSPORT GMBH,<br><br>Plaintiffs,<br><br>- against –<br><br>NAMIREI-SHOWA CO., LTD., NAKANISHI KIKAI, AND SN NAVIGATION PANAMA a/k/a SN NAVIGATION S.A. OF PANAMA,<br><br>Defendants. | Civil Action No.<br>08 Civ. 3181 (WHP)<br>**DECLARATION PURSUANT**<br>**TO 28 U.S.C. § 1746** |

MASAMI NAKANISHI, hereby declares pursuant to 28 U.S.C. § 1746, that:

1. I am the Representative Director for defendant Nakanishi Kikai Kogyosho Co., Ltd. ("Nakanishi").

2. This declaration has been prepared solely for the benefit of Nakanishi.

3. I am familiar with the facts of this case.

4. According to the Verified Complaint (the "Complaint") filed on or about March 31, 2008, Plaintiff, Intermare Transport GmbH ("Intermare" or "Plaintiff") asserted claims against inter alia Nakanishi related to alleged breaches of two charter parties (each a "Charter Party" and together, the "Charter Parties"). A copy of the Complaint is attached hereto as Exhibit A. Intermare alleges that Nakanishi, defendant Namirei-Showa Co., Ltd. ("Namirei") or defendant SN Navigation S.A. of Panama ("SN Navigation"), as guaranteed nominee of Namirei

and/or Nakanishi, as owners, entered into the Charter Parties with Intermare, as charterer, for use of two 12,500 dwt bulk carriers TBN 1 ("TBN 1") and TBN 2 ("TBN 2", together, the "Vessels").  Intermare further alleges that Nakanishi and the other Defendants subsequently refused to perform and repudiated the Charter Parties.  Intermare requested the Court issue an Order (the "Attachment Order") directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.  It is my understanding this Court issued the requested Attachment Order on or about April 4, 2008.  Intermare subsequently served the Attachment Order on various banks within the Southern District of New York.

5. On May 12, 2008, Sumitomo Mitsui Bank attached electronic funds transferred by Nakanishi in the amount of $3,600.00 pursuant to the Attachment Order.  It is evident that additional funds belonging to Nakanishi are in danger of being attached pursuant to the Attachment Order if transferred through intermediary banks in New York City.

6. On June 11, 2008, Nakanishi filed its Verified Answer to the Complaint.

7. Nakanishi is a corporation organized and existing under the laws of Japan and engaged in the business of shipbuilding in China for prospective shipowners.  Nakanishi's registered office is at 8-41, Fukuzaki 2-chome, Minato-ku, Osaka, Japan.  Nakanishi's shareholders include my immediate family members, relatives and myself.  Over the most recent fifteen years, Nakanishi has developed interests in shipyards in China through shares held in a Chinese shipyards, including Hangzhou Nakanishi Shipyard.

8. Upon information and belief, Namirei-Showa is a company based in Sakai City, Osaka Prefecture, Japan.  Namirei-Showa specializes in manufacturing air conditioning and refrigeration units.  In Japan, Namirei-Showa was a dominant manufacturer of air conditioning

units for ships.  As far as I am aware, before 2005 Namirei-Showa had not previously been involved in the shipbuilding industry.

9. Upon information and belief, SN Navigation is an Panamanian corporation wholly owned by Namirei with its registered office at 15th Floor, Banco General Tower, Aquilino De La Guardia Street, Marbella, Panama City, Republic of Panama.

10.    I wish to stress that Nakanishi and Namirei-Showa do not have any capital ties, direct or indirect, nor do they share any common directors or officers.  Similarly, Nakanishi and SN Navigation do not have any capital ties, direct or indirect, nor do they share any common directors or officers.

11.    In July 2006, I initially consulted with Mr. Tsuchiya, President of Namirei-Showa, and Mr. Chuji Fujihara, Managing Director of Namirei-Showa, to discuss the idea of finding ordering parties and buyers for two 12,500 dwt vessels that Nakanishi planned to build.  In October 2006, I was invited by Mr. Fujihara to attend a meeting in Singapore to discuss a plan to place an order for construction of ships with Nakanishi.  I attended the meeting, which was also attended by Mr. Fujihara, Mr. Ishii of Fairfield Japan (Namirei-Showa's shipbroker) and several individuals representing Alfred C. Toepfer International GmbH ("Toepfer").  Since the meeting was conducted in English and I speak almost no English, I relied on Mr. Fujihara and Ishii to translate and explain what was discussed.  As explained by Mr. Fujihara and Ishii the discussions centered on construction of larger sized vessels of 30,000 dwt.  I discussed 12,500 dwt vessels.  On November 7, 2006, I was informed by Mr. Ishii that Toepfer was indeed interested in the construction of two vessels and was asked to submit technical specifications for them.  Nakanishi had already prepared technical specifications for two standard types, 29,200

dwt and 12,500 dwt, and these were submitted to Toepfer. On November 17, 2006, I was informed by Mr. Fujihara that Toepfer had accepted the basic specifications for the vessels.

12.     Unfortunately, after several attempts to obtain the necessary financing to build the two vessels Nakanishi had to inform Namirei-Showa that it could not obtain the financing necessary to proceed with construction. Namirei-Showa was able to procure financing and decided to build the vessels on their own at a different shipyard without the involvement of Nakanishi. Mr. Tsuchiya of Namirei-Showa informed me of this decision around January or February 2007 and asked Nakanishi to step down from participation in the construction of these two vessels. Copies of the construction and sale contracts (the "Construction Contracts") for the two vessels are attached hereto as Exhibit B. The Construction Contracts clearly state the parties thereto are Namirei-Showa, as builder, and SN Navigation, as buyer. Nakanishi is not a party to either of these Construction Contracts.

13.     As events turned out, the shipbuilder chosen by Namirei-Showa was experiencing difficulties. In November or December 2007, I received an inquiry from Mr. Fujihara as to whether Hangzhou Nakanishi Shipyard could build the vessels. Initially I had hoped that the parties could agree to terms for such a transaction but in the end the parties could not reach agreement on the terms.

14.     My first knowledge of any claim by Intermare against Nakanishi based on the Charter Parties came from an article in Tradewinds dated April 11, 2008, attached hereto as Exhibit C. I was told about the article by two of Nakanishi's important customers, JFE Trading Co., Ltd. and Shinwa Kaiun Kaisha Ltd., who had seen the article and faxed it to my office. I had never known of the existence of the Charter Parties and had never seen copies of them.

15.    After reviewing copies of the Charter Parties obtained by my Japanese counsel, I noted that although they are purported to be signed on behalf of owners, who are described as "Namirei-Showa or Nakanishi Kikai or their guaranteed nominee", the signature on both Charter Parties is that of Mr. Shuzo Watanabe.  Mr. Watanabe at that time was Managing Director of Namirei-Showa.

16.    I must make it clear that at no time did Mr. Watanabe have authority to sign the Charter Parties on behalf of Nakanishi.  No approval from Nakanishi's Board of Directors has ever been granted to him or any other person to enter into these Charter Parties.  In short, Nakanishi was never a party to either of the Charter Parties.

17.    Mr. Watanabe himself confirmed that he did not have authority to execute either of the Charter Parties on behalf of Nakanishi in a letter dated June 3, 2008.  That letter is attached hereto as Exhibit D.  In that letter, Mr. Watanabe confirmed that Nakanishi was not a party to either of the Charter Parties and that he did not have the authority to bind Nakanishi to the terms of the Charter Parties.

18.    I have also been shown a copy of the Complaint with all Exhibits thereto filed by Intermare.  I note that Exhibit 1 is a performance guarantee with attached cover letter from a shipbroker offered to support Intermare's allegation that Namirei-Showa was a performance guarantor of SN Navigation under both of the Charter Parties.  The performance guarantee letter signed by Mr. Fujihara as Managing Director of Namirei-Showa, and guarantees the full performance of SN Navigation "for the charter party dated 16[th] April, 2007".  <u>See</u> Complaint, Exhibit 1, pg. 2.  This document is neither signed by nor addressed to Nakanishi.

19.    Exhibit 2 is an e-mail from Intermare's shipbroker with an attached original e-mail message (dated February 13, 2008) at the bottom of the page from Namirei-

Showa.  See Complaint, Exhibit 2.  The original e-mail message from Namirei-Showa confirms it will not be able to perform its duties "as per the agreed Charter Parties" and invites comments as to how the parties should deal with possible cancellation of the Charter Parties.  That original e-mail message is from "C. Fujihara", the same Namirei-Showa officer who signed the performance guarantee included in Exhibit 1.  I note that this original message was also not addressed to Nakanishi.

20.    Exhibit 3 is a telefax dated February 25, 2008 from Intermare clearly addressed to Namirei-Showa, SN Navigation and the respective brokers.  In this document Intermare accepted Namirei-Showa's repudiation and terminated the Charter Parties.  Nakanishi is not an addressee to the telefax nor is it named anywhere in the document.  This is a curious omission as Intermare alleges that Nakanishi is a party to the Charter Parties and yet did not deem it necessary to inform Nakanishi of this crucial development.

21.    I was informed by my attorneys that Intermare asserts it did not know that Nakanishi was not a party to the Charter Parties.  However, I believe they did in fact know that Nakanishi was not a party to the Charter Parties.  In particular, I refer to the power of attorney granted by Intermare to Mr. Johannes Adrichem, authorizing him to execute the Charter Parties on Intermare's behalf (attached hereto as Exhibit E).  The power of attorney clearly states that Mr. Adrichem is authorized to "specifically act on our Intermare's behalf in order to enter into a) long term charter parties for two 12,500 dwt single screw bulk carriers with Messrs SN Navigation S.A.; b) a separate agreement with SN Navigation S.A. for a purchase option in respect of the aforementioned vessels."  This document clearly shows Intermare knew it was entering into the Charter Parties in respect of the Vessels with SN Navigation S.A and not with Nakanishi.

22.     I must emphasize that Nakanishi never had any ownership or other legal interest in either of the Vessels.  More specifically, Nakanishi never negotiated with Intermare or any other party the terms of any charter party in respect of either of the two Vessels, much less executed and agreed to be bound by the terms of the Charter Parties.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 26, 2008.

By: _____

Mr. Masami Nakanishi

SK 25666 0001 899075 v2

7

# EXHIBIT A

08 CV 3181

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
INTERMARE TRANSPORT GMBH

                                                   Plaintiff,

          - against -

NAMIREI-SHOWA CO., LTD., NAKANISHI KIKAI,
and SN NAVIGATION PANAMA a/k/a
SN NAVIGATION S.A. OF PANAMA

                                                   Defendants.
-------------------------------------------------------X



08 cv

ECF CASE

## VERIFIED COMPLAINT

Plaintiff, INTERMARE TRANSPORT GmbH (hereinafter referred to as "Intermare" or

"Plaintiff") by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its

Verified Complaint against the Defendants, NAMIREI-SHOWA CO., LTD. (hereinafter

"Namirei-Showa"), NAKANISHI KIKAI (hereinafter "Nakanishi") and SN NAVIGATION

PANAMA a/k/a SN NAVIGATION S.A. OF PANAMA (hereinafter "SN Navigation")

(collectively referred to as "Defendants") alleges, upon information and belief, as follows:

1.       This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the

breach of maritime contracts of charter. This matter also arises under the Court's federal

question jurisdiction within the meaning of 28 United States § 1331 and the New York

Convention on the Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et

seq.*) and/or the Federal Arbitration Act (9 U.S.C. § 1 *et. seq.*).

2.       At all times material to this action, Intermare was, and still is, a foreign

corporation, or other business entity organized and existing under the laws of Germany.

3.    Upon information and belief, Namirei-Showa was, and still is, a foreign corporation, or other business entity, organized under and existing by virtue of the laws of Japan.

4.    Upon information and belief, Nakanishi was, and still is, a foreign corporation, or other business entity, organized under and existing by virtue of the laws of Japan.

5.    Upon information and belief, SN Navigation was, and still is, a foreign corporation, or other business entity, organized under and existing by virtue of foreign law.

6.    At all times material to this action, Plaintiff was the charterer of the motor vessel "TBN 1" (hereinafter "Vessel TBN 1") and the motor vessel "TBN 2" (hereinafter "Vessel TBN 2").[1]

7.    At all times material to this action, Namirei-Showa and/or Nakanishi and/or SN Navigation, as guaranteed nominee of Namirei-Showa and/or Nakanishi, were the owners of the Vessels.

8.    By a time charter party dated April 16, 2007, Intermare chartered the Vessel TBN 1 from the Defendants for a long term charter of seven years, with charterer's option to further extend the charter party for an eighth, ninth, or tenth year.

9.    By a time charter party dated April 16, 2007,[2] Intermare chartered the Vessel TBN 2 from the Defendants for a long term charter of seven years, with charterer's option to further extend the charter party for an eighth, ninth, or tenth year.

10.    At all times material to this action, Namirei-Showa was the performance guarantor of SN Navigation, and fully guaranteed the full performance of SN Navigation for the period of the charter parties. *See performance guarantee attached hereto as Exhibit 1.*

---

[1] Hereinafter, "Vessel TBN 1" and "Vessel TBN 2" are collectively referred to as "the Vessels".
[2] Hereinafter, the charter parties for charter of TBN 1 and TBN 2 are collectively referred to as "the charter parties".

11.     At the time the parties entered into the charter parties, construction of the Vessels had not yet begun.

12.     Pursuant to the terms of the charter parties, Intermare agreed to charter the Vessels from the Defendants with an option to purchase the Vessels at any time at either the end of seventh year, eighth year, ninth year or tenth year at a pro rata agreed upon price.

13.     The Vessels were to be approximately 12,500 deadweight and to be built at the shipyards of Yangzhou Ryuwa Shipbuilding Co. Ltd. or Yangzhou Longchuan Shipbuilding Co., Ltd. (hereinafter collectively referred to as "the shipyards").

14.     Several months after the parties executed the charter parties, the Defendants informed Intermare that they were encountering difficulties with the shipyards. Specifically, the Shipyards were seeking to unilaterally withdraw from their contractual obligations to build the Vessels. The Defendants later confirmed to Intermare that the Shipyards were in fact refusing to perform. The Defendants were unable to secure an alternative shipyard in which to build the Vessels. As a result, the Defendants became unable to perform under the charter parties.

15.     On February 13, 2008, Defendants provided Intermare with written notice of their repudiation of the charter parties by evincing a clear and unequivocal intention not to perform their duties under the charter parties. *A copy of this written notice is attached hereto as Exhibit 2.*

16.     Intermare accepted Defendants' repudiation by facsimile dated February 25, 2008. *A copy of this facsimile is attached hereto as Exhibit 3.*

17.     Intermare has suffered damages as a result of the Defendants' repudiation of the charter parties.

18.     Specifically, the terms of the charter parties provided for daily hire of $6,900. The relevant market hire rate for a vessel of comparable size and specifications as of the date of Defendant's repudiation is $11,000.  *See Shipbroker's Hire Estimate dated March 3, 2008, attached hereto as Exhibit 4.*

19.     As a result of Defendants' repudiation of the charter parties, Intermare has suffered damages relating to additional hire costs of a substitute charter party in the amount of $29,930,000.[3]

20.     Pursuant to the charter parties, all disputes are to be submitted to arbitration in London with English law to apply.

21.     Intermare has commenced arbitration against the Defendants in London. This action is brought to obtain jurisdiction over the Defendants and also to obtain security for Intermare's claims and in aid of arbitration proceedings.

22.     Interest, costs and attorneys' fees are routinely awarded to the prevailing party in proceedings subject to English Law.

23.     As best as can now be estimated, Intermare expects to recover the following amounts in the Final Arbitration Award(s):

|  |  |  |
|---|---|---|
| A. | Principal claim:<br>Hire costs of a substitute charter party due to Defendants' repudiation of the charter parties | $ 29,930,000 |
| B. | Interest on claims:<br>2 years at 8%, compounded quarterly | $ 5,045,068 |
| C. | Estimated attorneys' fees: | $    400,000 |

---

[3] Intermare's damages are calculated as follows: $11,000 daily market hire rate for comparable vessel as of date of Defendants' repudiation, less $6,900 hire rate pursuant to terms of charter parties, multiplied by 365 days per year, multiplied by ten years, the term of the charter parties.
$11,000 - $6,900 x 365 x 10= $14,965,000 in damages per vessel, for two vessels, totaling $29,930,000.

D.     Estimated arbitration fees:                                    $      80,000

Total                                                          $  35,455,068

24.     The Defendants cannot be found within this District within the meaning of

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal

Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during

the pendency of this action, assets within this District and subject to the jurisdiction of this Court,

held in the hands of one or more garnishees which are believed to be due and owing to the

Defendants.

25.     The Plaintiff seeks an order from this court directing the Clerk of Court to

issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental

Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States

Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendants held by

the aforesaid garnishee for the purpose of obtaining personal jurisdiction over the Defendants,

and to secure the Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A.     That process in due form of law issue against the Defendants, citing them to

appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.     That the Court retain jurisdiction to compel the Defendants to arbitrate in

accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

C.     That since the Defendants cannot be found within this District pursuant to

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue

an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment

pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also

pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee within the District which are due and owing to the Defendant(s), in the amount $35,455,068 calculated to date to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

     D.     That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

     E.     That in the alternative, this Court enter judgment against the Defendants on the claims set forth herein;

     F.     That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

     G.     That this Court award Plaintiff its attorney's fees and costs of this action; and

     H.     That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated: March 31, 2008
      New York, NY

The Plaintiff,
INTERMARE TRANSPORT GMBH

By: _Anne C. LeVasseur_
Patrick F. Lennon
Anne C. LeVasseur
LENNON, MURPHY & LENNON, LLC
The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – phone
(212) 490-6070 – fax
pfl@lenmur.com
acl@lenmur.com

7

## ATTORNEY'S VERIFICATION

State of Connecticut )
                 )    ss.:    Town of Southport
County of Fairfield )

1.     My name is Anne C. LeVasseur.

2.     I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.     I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the Plaintiff.

4.     I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.     The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.     The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.     I am authorized to make this Verification on behalf of the Plaintiff.

Dated:       March 31, 2008
              Southport, CT

                            _____
                            Anne C. LeVasseur

EXHIBIT 1

# MAERSK BROKER

Toepfer International
Ferdinandstrasse 5
D-20095
Hamburg
Germany
Att: Juergen Werner

5 December 2007
SNM/kid

Dear Sirs,

**RE: MV "12,500 TBN 1 & 12,500 TBN 2" – CHARTER PARTY DD 16TH APRIL 2007**

Please find enclosed the performance guarantee for the above named vessel for your files.

Yours faithfully,
for MAERSK BROKER (UK) LTD

Simon Masters

Encl.

MAERSK BROKER (UK) LIMITED
New Loom House, Suite 1.03, 101 Back Church Lane, London E1 1LU, United Kingdom
Phone: +44 20 7481 5002, Fax +44 20 7481 4626, E-mail: admin.uk@maerskbroker.com
www.maerskbroker.com    Reg. No. 01744130

AIR CONDITIONING & REFRIGERATION
**NAMIREI-SHOWA CO., LTD.**

KANTO OFFICE
4-91-12 Mukodai,
Tsurumiku-ku Yokohama
560-0036 Japan
Phone:81-3-5822-5581
Fax  :81-3-5822-5580

OSAKA OFFICE
4-14-5 Hamadera
Ishidzucholshi, Sakai
592-8333 Japan
Phone:81-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
Fax  :81-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

KYUSHU OFFICE
3F Takara Bldg.12-1
Motofunamachi Nagasaki
850-037 Japan
Phone:81-95-818-3121
Fax  :81-95-818-3125

To:   Intermare Transport GMBH Hamburg or their guaranteed nomines,

We, Messrs Namirei-Showa Co.,Ltd of Osaka Japan do hereby irrevocably gunrantee the full performance of SN Navigation S.A. of Panama for the entire charter party period, including all optional years (if declared), of charter party dated 16th April 2007 between : -

Owners     :   Namirei-Showa or Nakanishi Kikai or their guaranteed nomines

Charterers :   Intermare Transport GMBH Hamburg or their guaranteed nomines which always to be guaranteed by Alfred C. Toepfer International GMBH

This guarantee shall be governed by English law.

Yours sincerely

NAMIREI-SHOWA CO.,LTD

Chuji Fujihara / Managing Director,
Shipbuilding Project Team

BY THIS POWER OF ATTORNEY given on the 7th day of May, 2007, We, SN NAVIGATION S.A. (C/O NAMIREI-SHOWA CO., LTD.), a corporation organized and existing under the laws of Panama, having its registered office at ARIAS B.Y ASOCIADOS P.O. Box 0316-01110, Panama 5, Panama 15th Floor, Banco General Tower, Aquilino De la Guardia Street, Marbella, Panama, Rep. of Panama (C/O NAMIREI-SHOWA CO., LTD. 4-14-8 Hamadera Ishizucho-nishi, Nishi-ku, Sakai city, Osaka, Japan) (hereinafter called "the Company"), HEREBY APPOINT Mr. SHUZO WATANABE and/or Mr. TAKURO FUJIMOTO and/or Mr. CHUJI FUJIHARA (hereinafter called "the Attorney(s)") to be the true and lawful Attorney(s) of the Company for and in the name of the Company, severally, to do or execute all or any of the acts, deeds and things hereinafter mentioned, that is to say:

1. To execute, sign and to enter into, acknowledge, perform and do all such deeds, documents, agreements, instruments and things as shall be requisite for or in relation to Time Charter contract of the 12,500 ton deadweight bulk carrier to bear Hull No. RW-101 and Hull No. RW-102 in Intermare Transport GMBH Hamburg or their guaranteed nominee which to be always guaranteed by Alfred C. Toepfer International GMBH Hamburg (hereinafter called the "Toepfer") including but not limited to time charter of the Vessel to be executed with CHARTERER any addendum or addenda thereto.

2. To perform all other necessary acts to effectuate the aforesaid.

AND IT IS HEREBY DECLARED THAT:

(i)      the Company hereby ratifies and confirms and agrees to ratify and confirm whatsoever any of the Attorneys shall have done, shall do or purport to do by virtue of this Power of Attorney;

(ii)      the Company hereby agrees to be bound by the acts and deeds of any of the Attorneys so that and to the intent that any act or deed of any of the Attorneys made pursuant to this Power of Attorney shall be deemed to be the acts of the Company;

This Power of Attorney shall be irrevocable for a period six (6) months from the date of its issuance.

IN WITNESS whereof the Company has executed this Power of Attorney the day and year first above written.

SN NAVIGATION S.A.

MR. SHUZO WATANABE
President

EXHIBIT 2

Federica Cozzani

From:           Werner, Jürgen [WernerJ@toepfer.com]
Sent:           13 February 2008 10:49
To:             SRM; Fuchs, Hartwig; Senior Freight Team; Adrichem, Hans van
Subject:        ACTI/12,500 DWT

Good morning,

below received fm MB, which is certainly not what we would like to hear but ...

Suggest now to involve our lawyers as well as to evaluate the opportunity losses we are
facing  incl lost purchase opportunity.

Plsd to hear.

Thks
Juergen Werner


-----Ursprüngliche Nachricht-----
Von: Simon Masters [mailto:drycargo.uk@maerskbroker.com]
Gesendet: Mittwoch, 13. Februar 2008 11:19
. . drycargo.uk@maerskbroker.com
Betreff: ACTI/12,500 DWT



Maersk Broker (UK) Ltd.


Juergen + Hanfried/Simon


re: Toepfer / Nantong Nikka 12,500dwt units.

Good Morning,


We have today recieved the following very unfortunate and very unexpected information
from Fairfield, which will call you to discuss. .
============

: Yano - san,

RE: Toepfer - 12,500dwt

It is regrettable that we have received the following comment from Namirei-Showa which
please forward to the Charterers.

=QT=
Dear Sirs,

As discussed in our meeting back in November together, we have been working extremely
hard towards finding a suitable shipyard to build the 12,500dwt units.

Despite our various efforts, we now - with deep regret - have to conclude that it will
not be possible for us to get these newbuildings constructed.

This also means that we regrettably are forced to inform you that we do not see any
possibility for us to perform our duties as per the agreed Charter Parties, and we hereby
invite Toepfer's comments/ideas in respect of how we should deal with a possible
cancellation of the Charter Parties.

Best regards,

Namirei - Showa Co., Ltd.
C.Fujihara
TEL:(072)243-1022 FAX:(072)243-0552
E-mail:c.fujihara@namirei-showa.co.jp
=UNQT=

Best regards,
Ishii
Fairfield Japan Ltd.

=====

regards
Simon Masters

dir line: 44 207 481 6006
mobile : 44 7771 667 435
home : 44 208 960 2271
email : handy.uk@maerskbroker.com

2

EXHIBIT 3

 INTERMARE TRANSPORT GmbH

P.O.B.: 16 61 20 · D-20042 Hamburg · Address: Ferdinandstraße 5 · D-20095 Hamburg · Germany
Phone: (+49) 40 3013-0 · Telex: 2 1956-0 · Telefax: (+49) 40 3013-884 · E-mail: mail@intermare.de

**TELEFAX**

To:    To:     Namirei-Showa Co., Ltd Osaka
       Attn:   Mr Chuji Fujihara
       Fax     +81 72 243 0552

       Cc.     SN Navigation S.A. Panama
       C/o     Namirei-Showa Co., Ltd Osaka
       Attn:   Mr Shuzo Watanabe / Mr Takuro Fujimoto / Mr Chuji
       Fujihara
       Fax     +81 72 243 0259

       Cc.     Maersk Broker (UK) Ltd. London
       Attn:   Mr Simon Masters
       Fax     +44 207481 4888

       Cc.     Fairfield Japan Ltd. Tokyo
       Attn:   Yoshi Y. Ishii
       Fax     +81 33434 8479

from:  A.Beale/SRM dept               phone: 040-3013386

date:  25-2-2008                      pages: 1

---

<u>M.V. "12,500 DWT SINGLE SCREW BULK CARRIER LOGS FITTED TBN 2"
CHARTERPARTY DATED 16.04.08</u>

We refer to your formal written notice dated 13 February 2008 in relation to the above charterparty.

In your notice, you stated that "it will not be possible for us to get these newbuildings constructed" and that, as a consequence, you "do not see any possibility for us to perform our duties as per the agreed Charter Party".

You have evinced a clear and unequivocal intention not to perform your duties under the Charterparty. We treat your conduct as a repudiation of the Charterparty, which we accordingly accept.

We hereby terminate the Charterparty.

All our rights whatsoever are reserved.

Yours sincerely

INTERMARE TRANSPORT GMBH

Geschäftsführer: Hartwig Fuchs, Robert Bruns
Sitz der Gesellschaft: Hamburg · Handelsregister AG Hamburg HRB 77552

EXHIBIT 4

Paul Taylor

| | |
|---|---|
| From: | chartering@interseebulk.com |
| Sent: | 03 March 2008 11:44 |
| To: | Werner, Jürgen |
| Subject: | Re: 12,500 nb |

Doc-No. 124609  3/MAR/2008  12:43 (UTC +0100) CVE

to toepfer - attn jurgen + joerg + stefan cc intersee - axel

juergen/chris

we have looked at this matter and we reckon that the ships would be worth ard 10-11000 usd daily in the market for the whole period of 7-10 years.

as to the purchase option, although we cannot really put a price on it, we believe the price to be rather favourable for you.

fyg altho mv nanbu is a different type of vessel being mpp it gives us a good direction of a 7 year old vsl

v nanbu '11800dw blt 01 in japan
general cargo 1x60 + 3x20-30t cr sold to skorean buyers at usd 21 mio

furthermore below vessel has more similarity with your vessels it again gives us a good indication :

mv woody heart 9762dw blt 98 in japan
general cargo  3 x 25t cr
sold to unnamed buyers at usd 13.5 mio
---

hope to be of assistance, and apologize again for the delay in reply which due to travelling, etc...

best regards
chris

-----------Original message--------------

Good morning Chris and Axel,

any chance to figure out the present market value as well as period evaluation plus value of purchase option?

Plsd to hear.

Thks

Juergen

Intersee Bulk N.V.
Phone +32 3 450.01.01
Fax   +32 3 450.01.09

EXHIBIT B

CONTRACT

FOR

CONSTRUCTION AND SALE

OF

A DEADWEIGHT 12,500 DWT BULK CARRIER
(HULL NO. RW-102)

BETWEEN

SN NAVIGATION S.A.
AS BUYER

AND

NAMIREI SHOWA CO., LTD.
AS BUILDER,

24TH MARCH 2007,
YANGZHOU, CHINA

73

<u>INDEX</u>

| | Page |
|---|---|
| PREAMBLE | 1 |
| | |
| ARTICLE I - DESCRIPITON AND CLASS | |
| 1. Description | 2 |
| 2. Dimensions and Characteristics | 2 |
| 3. Classification, Rules and Regulations | 3 |
| 4. Registration | 4 |
| | |
| ARTICLE II - CONTRACT PRICE AND TERMS OF PAYMENT | |
| 1. Contract Price | 5 |
| 2. Currency | 5 |
| 3. Terms of Payment | 5 |
| 4. Method of Payment | 5 |
| | |
| ARTICLE III - ADJUSTMENT OF CONTRACT PRICE | |
| 1. Delivery | 7 |
| 2. Speed | 8 |
| 3. Fuel Consumption | 9 |
| 4. Deadweight | 9 |
| 5. Effect of Rescission | 10 |
| | |
| ARTICLE IV - APPROVAL OF PLANS AND DRAWINGS AND INSPECTION DURING CONSTRUCTION | |
| 1. Approval of Plans and Drawings | 11 |
| 2. Appointment of the BUYER's Representative | 12 |
| 3. Inspection by the Representative | 12 |

74

4. Facilities                                                  13
5. Liability of the BUILDER                                    13
6. Responsibility of the BUYER                                 14


ARTICLE V – MODIFICATIONS
1. Modifications of Specifications                             15
2. Change in Class, etc.                                       15
3. Substitution of Materials                                   16
ARTICLE VI – TRIALS
1. Notice                                                      18
2. Weather Condition                                           18
3. How Conducted                                               19
4. Method of Acceptance or Rejection                           19
5. Effect of Acceptance                                        20
6. Disposition of Surplus Consumable Stores                    21


ARTICLE VII – DELIVERY
1. Time and Place                                              22
2. When and How Effected                                       22
3. Documents to be Delivered to the BUYER                      22
4. Tender of the VESSEL                                        24
5. Title and Risk                                              24
6. Removal of the VESSEL                                       24


ARTICLE VIII - DELAYS AND EXTENTION OF TIME FOR DELIVERY
                (FORCE MAJEURE)
1. Causes of Delay                                             25
2. Notice of Delay                                             26


ARTICLE IX - WARRANTY OF QUALITY
1. Guarantee                                                   28
2. Notice of Defects                                           28
3. Remedy of Defects                                           28

75

4.  Extent of the BUILDER's Responsibility                                30

ARTICLE X - RESCISSION BY THE BUYER
1.  Notice                                                                32

ARTICLE XI - THE BUYER'S DEFAULT
1.  Definition of Default                                                 33
2.  Interest and Charge                                                   33
3.  Effect of Default                                                     33

ARTICLE XII — INSURANCE
1.  Extent of Insurance Coverage                                          36
2.  Application of Recovered Amount                                       36
3.  Termination of the BUILDER's Obligation to Insure                     37

ARTICLE XIII — ARBITRATION                                                38

ARTICLE XIV - RIGHT OF ASSIGNMENT                                         40

ARTICLE XV - TAXES, DUTIES AND INTEREST
1.  Taxes and Duties in Japan                                             41
2.  Taxes and Duties outside Japan                                        41
3.  Interest                                                              41

ARTICLE XVI - PATENTS, TRADEAMRKS, COPYRIGHTS, ETC.
1.  Patents, Trademarks and Copyrights                                    42
2.  General Plans, Specifications and Working Drawings                    42

ARTICLE XVII - THE BUYER'S SUPPLIES
1.  Responsibility of the BUYER                                           43
2.  Responsibility of the BUILDER                                         44

76

ARTICLE XVIII – NOTICE
1. Address                                    45
2. Language                                   45

ARTICLE XIX – INTERPRETATION
1. Laws Applicable                            46
2. Discrepancies:                             46
3. Entire Agreement                           46

END OF CONTRACT                               47

THIS CONTRACT, made this 24th day of ,March 2007, in Yangzhou, China made by and between NAMIREI SHOWA CO., LTD., Japan a corporation organized and existing under the laws of Japan, having its registered office at 4-14-8 Hamadera Ishizucho-nishi, Nishi-ku, Sakai city, Osaka, Japan (hereinafter called the "BUILDER"), the party of the first part, and SN Navigation S.A. a corporation organized and existing under the laws of Republic of Panama, having its registered office at 15th Floor, Banco General Tower, Aquilino De La Guardia Street, Marbella, Panama City, Republic of Panama (hereinafter called the "BUYER"), the party of the second part

## WITNESSETH:

In consideration of the mutual covenants herein contained, the BUILDER agrees to build , launch, equip and complete at Yangzhou RYUWA Shipbuilding Co.,Ltd. a corporation duly organized and existing under the laws of China, having its principal office at Shipping Industry Belt, Yangtze Riverside Development Zone, Jiangdu, Yangzhou City, Jiangsu, China, (hereinafter called the "SHIPYARD") and to sell and deliver to the BUYER one (1) DEADWEIGHT 12,500 TON TYPE BULK CARRIER more fully described in Article I hereof (hereinafter called the "VESSEL"), and the BUYER agrees to purchase and take delivery of the VESSEL from the BUILDER and to pay for the same, all upon the terms and conditions hereinafter set forth.

78

## ARTICLE I – DESCRIPTION AND CLASS*

1.  Description:

    The VESSEL shall have the BUILDER's Hull No. RE-101 and shall be constructed, equipped and completed in accordance with the provisions of this Contract, and the Specifications, makers list and the General Arrangement Plan dated 24th March, 2007 attached hereto and signed by each of the parties hereto (such Specifications, makers list and General Arrangement Plan hereinafter collectively called the "Specifications"), which Specifications are made an integral part hereof.

2.  Dimensions and Characteristics:

    | | |
    |---|---|
    | Length, overall | abt 122.00 m |
    | Length, between perpendiculars | 115.00 m |
    | Breadth, moulded | 20.60 m |
    | Depth, moulded | 11.00 m |
    | Designed draft, moulded | 8.29 m |
    | Scantling draft, moulded | 8.30 m |
    | Gross tonnage | abt 7,400 tons |

    Propelling Machinery:

    One (1) set of Diesel Engine 7UEC37LA Max. cont. output 3,640kW

    Deadweight, guaranteed:

    12,500 metric tons at scantling draft of 8.29 meters

    Trial speed, guaranteed

    14.5 knots in normal ballast condition at max. cont. output of main engine with clean bottom at deep sea.

    Fuel consumption

    178.5 gr/kW-h at maximum rating on the basis of fuel lower calorific value of

79

42,700kj/kg and ISO standard reference condition. This consumption figure to be subject to a tolerance of 3%.

The details of the above particulars as well as the definitions and method of measurements and calculations are as indicated in the Specifications.

3.  Classification, Rules and Regulations:

The VESSEL, including its machinery, equipment and outfittings shall be constructed in accordance with the rules (the edition and amendments thereto being in force as of the date of this Contract) of and under special survey of Nippon Kaiji Kyokai, or American Bureau of Shipping (hereinafter called the "Classification Society") or , and shall be distinguished in the register by the symbol of "NS,MNS*" ,or "ABS+A(E),Bulk Carrier, +AMs, +ACCU" single screw bulk carrier as described in the specification. Decision of the Classification Society as to compliance or non-compliance with the classification rules and regulations shall be final and binding upon both parties hereto.

The VESSEL shall also comply with the rules, regulation and requirements of other regulatory bodies as described in the Specifications which are in effect as of the date of this Contract unless otherwise specified in the Specifications. The VESSEL shall be constructed in accordance with BUILDER's standard shipbuilding and inspection practices and shall also comply with the rules and regulations being necessary for the registration of the VESSEL under the laws of Panama.

All fees and charges incidental to the classification and with respect to compliance with the above referred rules, regulations and requirements shall be for account of the BUILDER.

The BUILDER shall arrange that the classification society assigns classification Surveyor(s) to the SHIPYARD for supervision of the construction of the VESSEL.

80

4.  Registration

The VESSEL shall be registered by the BUYER at its own cost and expense under the laws of Panama with its home port of Panama at the time of its delivery and acceptance hereunder.

(End of Article)

81

## ARTICLE II – CONTRACT PRICE AND TERMS OF PAYMENT

1.  Contract Price:

    The contract price of the VESSEL is Japanese Yen One Billion and Four Hundred Fifty
    Million (¥1,450,000,000.-), net receivable by the BUILDER (hereinafter called the
    "Contract Price"), which is exclusive of the BUYER's Supplies as provided in Article
    XVII hereof and shall be subject to upward or downward adjustment, if any as
    hereinafter set forth in this Contract.

2.  Currency:

    Any and all payments by the BUYER to the BUILDER under this Contract shall be made
    in Japanese Yen.

3.  Terms of Payment:

    The Contract Price plus any increase or minus any decrease due to adjustment of the
    Contract Price hereunder , shall be paid by the BUYER to the BUILDER upon delivery
    of the VESSEL.

4.  Method of Payment:

    The BUYER shall, at least one(1) Banking Days prior to the scheduled delivery date of
    the VESSEL, make cash deposit in the name of the BUYER or to its order with the Bank,
    available or releasable to the BUILDER against a signed copy of the Protocol of
    Delivery and Acceptance of the VESSEL as set forth in Paragraph 3 of Article VII
    hereof.

    No payment under this Contract shall be delayed or withheld or set-off by the BUYER on
    account of any dispute or disagreement of whatever nature arising between the parties

- 5 -

82

hereto.

(End of Article)

- 6 -

83

## ARTICLE III – ADJUSTMENT OF CONTRACT PRICE

The Contract Price shall be subject to adjustment, as hereinafter set forth, in the event of the following contingencies (it being understood by both parties that any reduction of the Contract Price is by way of liquidated damages and not by way of penalty):

1.  Delivery:

    (a)  No adjustment shall be made and the Contract Price shall remain unchanged for the first sixty (60) days of delay in delivery of the VESSEL beyond the Delivery Date as defined in Article VII hereof (ending as of twelve o'clock midnight of the sixtieth (60th) day of delay).

    (b)  If the delivery of the VESSEL is delayed more than sixty (60) days of delay after the Delivery Date, then, in such event, beginning with twelve o'clock midnight of the sixtieth (60th) day after the Delivery date, the Contract Price shall be reduced by deducting therefrom the sum of one-ten thousandth (1/10,000) of the Contarct Price for each full day of delay thereafter.

    (c)  But, if the delay in delivery of the VESSEL should continue for a period of ninety (90) days counting from midnight of the sixty-first (61st) day after the Delivery Date, then in such event, and after such period has expired, the BUYER may at its option rescind this Contract in accordance with the provisions of Article X hereof. I
    the BUILDER may, at any time after the expiration of the aforementioned ninety (90) days of delay in delivery, if the BUYER has not served notice of rescission as provided in Article X hereof, demand in writing that the BUYER shall make an election, in which case the BUYER shall, within fifteen (15) days after such

- 7 -

84

demand is received by the BUYER, notify the BUILDER of its intention either to rescind this Contract, or to consent to the acceptance of the VESSEL at such future date as notified by the BUILDER at a reduction in the Contract Price as hereinabove provided; it being understood by the parties hereto that, if the VESSEL is not delivered by such future date, the BUYER shall have the same right of rescission upon the same terms and conditions as hereinabove provided.

(d)  For the purpose of Article , the delivery of the VESSEL shall be deemed to be delayed when and if the VESSEL, after taking into full account all postponements of Delivery Date by reason of permissible delays as defined in Article VIII and/or any other reasons under this Contract, is not delivered by the date upon which delivery is required under the terms of this Contract.

2.  Speed:

(a)  The Contract Price shall not be affected or changed by reason of the actual speed, as determined by the trial run, being less than three-tenths (3/10) of one (1) knot below the guaranteed speed of the VESSEL.

(b)  However, commencing with and including such deficiency of three-tenths (3/10) of one (1) knot in actual speed below the guaranteed speed of the VESSEL, the Contract Price shall be reduced by the sum of the money equivalent of one-one thousand (1/1,000) of the Contract Price for each one tenth (1/10) of one (1) knot (but disregarding fractions of one tenth (1/10) of a knot).

(c)  If the deficiency in actual speed of the VESSEL upon trial run is more than seven-tenths (7/10) full knot below the guaranteed speed of the VESSEL, then the BUYER may, at its option, reject the VESSEL and rescind this Contract in

85

accordance with the provisions of Article X hereof, or may accept the VESSEL at a reduction in the Contract Price as above provided for seven-tenths (7/10) full knot only, that is, at a total reduction of four-one thousandth (4/1,000) of the Contract Price being the maximum.

3.  Fuel Consumption:

(a)  The Contract Price shall not be affected or changed by reason of the fuel consumption of the VESSEL, as determined by shop trial as per the Specifications, being more than the guaranteed fuel consumption of the VESSEL, if such excess is not more than three percent (3%) over the guaranteed fuel consumption.

(b)  However, commencing with and including an excess of three percent (3%) in the actual fuel consumption over the guaranteed fuel consumption of the VESSEL, the Contract Price shall be reduced by the sum of one-thousandth of the Contract Price for each full one percent (1%) increase in fuel consumption above said three percent (3%) (but disregarding fractions of one percent (1%)), up to maximum of seven percent (7%) over the guaranteed fuel consumption of the VESSEL.

(c)  If such actual fuel consumption exceeds seven percent (7%) of the guaranteed fuel consumption of the VESSEL, the BUYER may at its option reject the VESSEL and rescind this Contract in accordance with the provisions of Article X hereof, or may accept the VESSEL at a reduction in the Contract Price as above provided, unless mutually agreed otherwise.

4.  Deadweight:

(a)  In the event that the actual deadweight of the VESSEL as determined in accordance with the Specifications is less than the guaranteed deadweight of the

- 9 -

86

VESSEL, the Contract Price shall be reduced by the sum of money equivalent of one-ten thousandth (1/10,000) of the Contract Price for each full metric ton of such deficiency being more than One Hundred Fifty (150) metric tons as the case may be (but disregarding fraction of one (1) metric ton).

(b)  If the deficiency in the actual deadweight of the VESSEL being Four percent (4%) below the guaranteed Deadweight of the VESSEL, then the BUYER, at its option, may reject the VESSEL at the reduction of the Contract Price as agreed by the parties hereto.

5.  Effect of Rescission:

It is expressly understood and agreed by the parties hereto that in any case, if the BUYER rescinds this Contract under this Article, the BUYER shall not be entitled to any liquidated damages and the BUILDER shall not be answerable for such rescission of this Contract.

(End of Article)

- 10 -

87

## ARTICLE IV – APPROVAL OF PLANS AND DRAWINGS

## AND INSPECTION DURING CONSTRUCTION

1. Approval of Plans and Drawings:

    (a)  The BUILDER shall submit to the BUYER three (3) copies each of the plans and drawings to be submitted thereto for its approval at its address as set forth in Article XVIII hereof. The BUYER shall, within fourteen (14) days after receipt thereof, return to the BUILDER one (1) copy of such plans and drawings with the BUYER's approval or comments if any written thereon. A list of the plans and drawings to be so submitted to the BUYER with intended date of submission shall be mutually agreed upon between the parties hereto.

    (b)  When the Representative as defined in Paragraph 2 of this Article is sent by the BUYER to the SHIPYARD in accordance with Paragraph 2 of this Article, then after his arrival at the SHIPYARD the BUILDER may submit (subject always to the BUYER's prior written approval)   the plans and drawings in the agreed list, which have not been submitted to the BUYER, to the Representative for his approval. The Representative shall, within seven (7) days after receipt thereof, return to the BUILDER one (1) copy of such plans and drawings with his approval or comments if any written thereon. Approval by the Representative of the plans and drawings duly submitted to him shall be deemed to be the approval thereof by the BUYER for all purposes of this Contract.

    (c)  In the event that the BUYER or the Representative shall fail to return to the BUILDER the submitted plans and drawings within the time limit as hereinabove provided, such plans and drawings shall be deemed to have been approved without any comment.

- 11 -

88

2.  Appointment of the BUYER's Representative:

The BUYER may send to and maintain at the SHIPYARD, at the BUYER's own cost and expense, one or more representatives (hereinafter called the "Representative") and his assistant(s). The Representative shall be duly authorized in writing by the BUYER to act on behalf of the BUYER in connection with modification of the Specification, adjustments of the Contract Price, approval of the plans and drawings, attendance to the tests and inspections relating to the VESSEL, its machinery, equipment and outfitting and any other matters of which he is specifically authorized by the BUYER.

3.  Inspection by the Representative:

The necessary inspections of the VESSEL, its machinery, equipment and outfittings shall be carried out by the Classification Society, other regulatory bodies and/or an inspection team of the BUILDER throughout the entire period of construction, in order to ensure that the construction of the VESSEL is duly performed in accordance with this Contract and the Specifications.

The Representative and his assistant(s) shall have, during construction of the VESSEL, the right to attend such tests and inspections of the VESSEL, its machinery and equipment as are mutually agreed between the BUYER and the BUILDER in accordance with the BULIDER's standard shipbuilding and inspection practices. The BUILDER shall give a notice to the Representative reasonably in advance of the date and place of such tests and  inspections to be attended by him for his convenience. Failure of the Representative or his assistant(s) to be present at such tests and inspections after due notice to him as above provided shall be deemed to be a waiver of his right to be present.

In the event that the Representative discovers any construction or material or workmanship which does not conform to the requirements of this Contract and/or the Specifications, the Representative shall promptly give the BUILDER a notice writing as

- 12 -

89

to such non-conformity. Upon receipt of such notice from the Representative, the BUILDER shall correct such non-conformity, if the BUILDER agrees to his view. If the BUILDER does not agree, the BUILDER shall notify the Representative in writing of the extent to which the BUILDER does not agree. In the event of a difference of opinion between the parties hereto, the BUILDER or the BUYER may request resolution of the matter in accordance with Article XIII hereof.

In all working hours during the construction of the VESSEL until delivery thereof, the Representative and his assistant(s) shall be given free and ready access to the VESSEL, its engines and accessories, and to any other place where work is being done, or materials are being processed or stored, in connection with the construction of the VESSEL, including the yards, workshops, stores and offices of the BUILDER and the premises of subcontractors of the BUILDER, who are doing work or storing materials in connection with the VESSEL's construction.

4. Facilities:

The BUILDER shall furnish the Representative and his assistant(s) with adequate office space, Lodging (for only one superintendent) and necessary transportation during the construction period, and such other reasonable facilities according to the BUILDER's practice at, or in the immediate vicinity of, the Shipyard as may necessary to enable them effectively carry out their duties.

5. Liability of the BUILDER:

The Representative and his assistant(s) shall at all times be deemed to be the employees of the BUYER and not of the BUILDER. The BUILDER shall be under no liability whatsoever to the BUYER, the Representative or his assistant(s) for personal injuries, including death, suffered during the time when he is on the VESSEL, or within the premises of either the BUILDER or its subcontractors, or are otherwise engaged in

- 18 -

90

and about the construction of the VESSEL, unless, however, such personal injuries, including death, were caused by a gross negligence of the BUILDER as the case may be, or of any of its employees or agents or subcontractor. Nor shall the BUILDER be under any liability whatsoever to the BUYER, the Representative or his assistant(s) for damage to, or loss or destruction of property in China of the BUYER or of the Representative or his assistant(s), unless such damage, loss or destruction were caused by a gross negligence of the BULDER, as the case may be, or of any of its employees or agents or subcontractors.

6.  Responsibility of the BUYER:

The BUYER shall undertake and assure that the Representative shall carry out his duties hereunder in accordance with BUILDER's standard shipbuilding and inspection practice and in such a way as to avoid any unnecessary increase in building cost, delay in the construction of the VESSEL, and/or any disturbance in the construction schedule of the BUILDER.

The BUILDER has the right to request the BUYER to replace the Representative who is deemed unsuitable and unsatisfactory for the proper progress of the VESSEL's construction.

The BUYER shall investigate the situation by sending its representative(s) to the Shipyard, if so requested by the BUILDER, and if the BUYER shall considers that the BUILDER's request for such replacement is justified, the BUYER shall effect such replacement as soon as practically possible.

(End of Article)

- 14 -

91

## ARTICLE V – MODIFICATIONS

1. Modifications of Specifications:

   The Specifications may be modified and/or changed by written agreement of the parties hereto, provided that such modifications and/or changes will not, in the BUILDER's judgment, adversely affect the BUILDER's planning or program in relation to the BUILDER's other commitments, and provided, further, that the BUYER shall first agree, before such modifications and/or changes are commenced out, to alterations in the Contract Price, the Delivery Date and other terms and conditions of this Contract and the Specifications to be occasioned by or to result from such modifications and/or changes.

   Such agreement as to the alterations may be effected by exchange of letters signed by the authorized representatives of the parties or by telefax confirmed by letters manifesting agreements of the parties and shall constitute amendments to this Contract and/or the Specifications.

2. Change in Class, etc.:

   In the event that, after the date of this Contract, any requirements as to class or as to rules and regulations, to which the construction of the VESSEL is required to conform, are altered or changed by the Classification Society or the other regulatory bodies authorized to make such alterations or changes, the following provisions shall apply:

   (a) If such alterations or changes are compulsory for the VESSEL, either of the parties hereto, receiving information as to the alterations or changes from the Classification Society or other regulatory bodies, shall promptly transmit the same to the other in writing, and the BUILDER shall incorporate such alterations or into the construction of the VESSEL, provided that the BUYER shall first agree to adjustments required by the BUILDER in the

92

Contract Price, the Delivery Date and other terms and conditions of this Contract and the Specifications to be occasioned by or to result from such alterations or changes.

(b) If alterations or changes are not compulsory for the VEESEL, but the BUYER desired to incorporate such alterations or changes into the construction of the VESSEL, then, the BUYER shall notify the BUILDER of such intention. The BUILDER may accept such alterations or changes will not, in the judgment of the BUILDER, adversely affect the BUILDER's planning or program in relation to the BUILDER's other other commitments, and provided, further, that the BUYER shall first agree to adjustments required by the BUILDER in the Contract Price, the Delivery Date and other terms and conditions of this Contarct and Specifications to be occasioned by or to result from such alterations or changes.

Agreement as to the alterations or changes under this Paragraph may be made in the same manner as provided in Paragraph 1 of this Article for modifications or changes to the Specifications.

2.  Substitution of Materials:

In the event that any of the materials required by the Specifications or otherwise under this Contract for the construction of the VESSEL cannot be procured in time or are in short supply to maintain the Delivery Date of the VESSEL, the BUILDER may, provided that the BUYER shall so agree in writing, supply other materials capable of meeting the requirements of the Classification Society and of the rules, regulations and requirements with which the construction of the VESSEL must comply. Any agreement as to the substitution of materials may be effected in the manner provided in Paragraph 1 of this Article, and shall, likewise, include alterations in the Contract Price and other terms and conditions of this Contract, if any, to be occasioned by or to result from the substitution.

93

(End of Article)

94

## ARTICLE VI – TRIALS

1. Notice:

The BUYER shall receive form the BUILDER at least fourteen (14) days prior notice in writing or by telefax confirmed in writing of the time and place of the trial run of the VESSEL, and the BUYER shall promptly acknowledge receipt of such notice. The BUYER shall have the Representative on board the VESSEL to witness such trial run. Failure in attendance of the Representative of the BUYER at the trial run of the VESSSEL for any reason whatsoever after due notice to the BUYER as above provided shall be deemed to be a waiver by the BUYER of its right to have the Representative on board the VESSEL at the trial run, and the BUILDER may conduct the trial run without the Representative of the BUYER being present, and in such case the BUYER shall be obligated to accept the VESSEL on the basis of a certificate of the BUILDER that the VESSEL, upon trial run, is found to conform to this Contract and the Specifications.

2. Weather Condition:

The trial run shall be carried out under the weather condition, which is deemed favorable enough by the reasonable judgment of the BUILDER. In the event of unfavorable weather on the date specified for the trial run, the sale shall take place on the first available day thereafter that the weather condition permits. It is agreed that, if during the trial run of the VESSEL, the weather should suddenly become so unfavorable that orderly conduct of the trial run can no longer be continued, the trial run shall be discontinued and postponed until the first favorable day next following, unless the BUYER shall assent in writing to acceptance of the VESSEL on the basis of the trial run already made before such discontinuance has occurred.

Any delay of trial run caused by such unfavorable weather condition shall operate to postpone the Delivery Date by the period of delay involved and such delay shall be

- 18 -

95

deemed as a permissible delay in the delivery of the VESSEL.

3.  How Conducted:

(a)  All expenses in connection with the trial run are to be for the account of the BULDER and the BUILDER shall provide at its own expense the necessary crew to comply with conditions of safe navigation. The trial run shall be conducted in the manner prescribed in the Specifications, and shall prove fulfillment of the performance requirements for the trial run as set forth in the Specifications. The course of trial run shall be determined by the BUILDER.

(b)  The BUILDER shall provide the VESSEL with the required quantity of fuel oil and the BUYER shall provide lubricating oil and grease and the BUILDER shall provide fresh water and other stores necessary for the trials, as prescribed in the Specifications.

The necessary ballast (sea water and other ballast as may be required) to bring the VESSEL to the trial load drafts as specified in the Specifications, shall be for the BUILDER's account.

4.  Method of Acceptance or Rejection:

(a)  Upon completion of the trial run, the BUILDER shall give the BUYER a notice by telefax  confirmed in writing of completion of the trial run, as and if it is considered that the results of the trial run indicate conformity of the VESSEL to this Contract and the Specifications, and the BUYER shall, within three (3) days after receipt of such notice form the BUILDER, notify the BUILDER by telefax confirmed in writing of its acceptance or rejection of the VESSEL.

96

(b) However, should the results of the trial run indicate that the VESSEL, or any part or equipment thereof, does not conform to the requirements of this Contract and/or the Specifications, then the BUILDER shall take necessary steps to correct such non-conformity.

Upon successful completion of correction of such non-conformity and re-trial, if necessary, the BUILDER shall give the BUYER a notice thereof by telefax confirmed in writing. The BUYER shall, within two (2) banking days after receipt of such notice from the BUILDER, notify the BUILDER of its acceptance or rejection of the VESSEL.

(c) In the event that the BUYER rejects the VESSEL, the BUYER shall indicate in its notice of rejection in what respect the VESSEL or any part or equipment thereof does not conform to this Contract and/or the Specifications.

(d) In the event that the BUYER fails to notify the BUILDER by telefax confirmed in writing of its rejection of the VESSEL together with the reason therefor within the period as provided in the above Sub-paragraph (a) or (b), the BUYER shall be deemed to have accepted the VESSEL.

(e) The BUILDER may dispute the rejection of the VESSEL by the BUYER under this Paragraph, in which case the matter shall be submitted for final decision by arbitration in accordance with Article XIII hereof.

5.  Effect of Acceptance:

Acceptance of the VESSEL as above provided shall be final and binding so far as conformity of the VESSEL to this Contract and the Specifications is concerned and shall preclude the BUYER from refusing formal delivery of the VESSEL as hereinafter

97

provided, if the BUILDER complies with all other procedural requirements for delivery as provided in Article VII hereof.

6.  Disposition of Surplus Consumable Stores:

Lubricating oil and grease for trial runs shall be supplied by the BUYER and the BUILDER shall pay for the quantity of consumed lubricating oil up to the time of acceptance of the VESSEL at the original purchase price.

Fuel oil for trial runs shall be supplied by the BUILDER according to agreement with the BUYER at the time the fuel oil is required. Fuel oil consumed up to the time of acceptance of the VESSEL shall be for the account of the BUILDER, and balance left and also any other consumable stores remaining on board the VESSEL shall be taken over by the BUYER at the original purchase price if paid by the BUILDER. Any payment by the BUILDER and/or the BUYER in connection with this Paragraph shall be settled through the BUILDER by adjusting the installment due upon delivery of the VESSEL accordingly.

(End of Article)

98

## ARTICLE VII – DELIVERY

1. Time and Place:

   The VESSEL shall be delivered by the BUILDER to the BUYER at the SHIPYARD on or before 31st August 2007, except that, in the event of delays in the construction of the VESSEL or any performance required under this Contract due to causes which under the terms of this Contract permit postponement of the date for delivery, the aforementioned date for delivery of the VESSEL shall be postponed accordingly. The aforementioned date, or such later date to which the delivery is postponed pursuant to such terms, is hereunder called the "Delivery Date".

2. When and How Effected:

   Provided that the BUYER shall have fulfilled all of its obligations stipulated under this Contract, delivery of the VESSEL shall be effected forthwith by the concurrent delivery by each of the parties hereto to the other of the PROTOCOL OF DELIVERY AND ACCEPTANCE, acknowledging delivery of the VESSEL by the BUILDER and acceptance thereof by the BUYER.

3. Documents to be Delivered to the BUYER:

   Upon delivery and acceptance of the VESSEL, the BUILDER or the SHIPYARD shall deliver to the BUYER the following documents, which shall accompany the PROTOCOL OF DELIVERY AND ACCEPTANCE:

   (a) PROTOCOL OF TRIALS of the VESSEL made pursuant to the Specifications.

   (b) PROTOCOL OF INVENTORY of the equipment of the VESSEL including spare parts and the like, all as specified in the Specifications.

99

(c)   PROTOCOL OF STORES OF CONSUMABLE NATURE referred to under Paragraph 6 of Article VI hereof, together with copies of the original invoices covering the purchase price thereof.

(d)   ALL CERTIFICATES including the BUILDER's CERTIFICATE, which are to be issued by the BUILDER. It is agreed that if, through no fault on the part of the BUILDER, the classification certificate and/or other certificates are not available at the time of delivery of the VESSEL, provisional certificates shall be accepted by the BUYER, provided that the BUILDER shall furnish the BUYER with the formal certificates as promptly as possible after such provisional certificates have been issued.

(e)   DECLARATION OF WARRANTY of the BUILDER that the VESSEL is delivered to the BUYER free and clear of any liens, charges, claims, mortgages, or other encumbrances upon the BUYER's title thereto, and in particular, that the VESSEL is absolutely free of all burdens in the nature of imposts, taxes or charges imposed by the Japanese and the Chinese governmental authorities, as well as of all liabilities of the BUILDER to its subcontractors, employees and crew, and of all liabilities arising from the operation of the VESSEL in trial runs, or otherwise prior to delivery.

(f)   DRAWINGS AND PLANS pertaining to the VESSEL as stipulated in the Specifications.

(g)   COMMERCIAL INVOICE

- 23 -

*100*

(h) BILL OF SALE from the BUILDER to the BUYER all duly notarized and apostilled accompanied by the authorization documents of the BULDER.

4. Tender of the VESSEL:

If the BUYER fails to take delivery of the VESSEL after completion thereof according to this Contract and the Specifications without any justifiable reason, the BULDER shall have the right to tender delivery of the VESSEL after compliance with all procedural requirements as above provided.

5. Title and Risk:

Title to and risk of loss of the VESSEL shall pass to the BUYER only upon delivery and acceptance thereof having been completed as stated above; it being expressly understood that, until such delivery is effected, title to and risk of loss of the VESSEL and her equipment shall be in the BUILDER.

6. Removal of the VESSEL:

The BUYER shall take possession of the VESSEL immediately upon delivery and acceptance thereof and shall remove the VESSEL form the premises of the SHIPYARD within three (3) days after delivery and acceptance thereof is effected. If the BUYER shall not remove the VESSEL form the premises of the SHIPYARD within the aforesaid three (3) days, then, in such event the BUYER shall pay to the BUILDER the reasonable mooring charges of the VESSEL.

(End of Article)

*101*

## ARTICLE VIII – DELAYS AND EXTENSION OF
## TIME FOR DELIVERY (FORCE MAJEURE)

1. Causes of Delay:

If, at any time before the actual delivery, either the construction of the VESSEL or any performance required as a prerequisite to delivery of the VESSEL is or may be delayed due to Acts of God; acts of princes or rulers; requirements of government authorities; war or other hostilities or preparations therefor; blockade; revolution, insurrections, mobilization, civil war, civil commotion or riots; plague, typhoons, hurricanes, storms; earthquakes; tidal waves; landslides; fires, explosions, collisions or strandings; embargoes; delays or failure in transportation; shortage of materials, machinery or equipment; import restrictions; inability to obtain delivery or delays in delivery of materials, machinery or equipment, or of any items to be supplied by the BUILDER or at the request of the BUYER to be purchased form abroad by the BUILDER for use in the construction of the VESSEL, provided that at the time of ordering the same could reasonably be expected by the BUILDER to be delivered in time; prolonged failure, shortage or restriction of electric current, oil or gas; defects in materials, machinery or equipment which could not have been detected by the BUILDER using reasonable care; casting or forging defect(s) or there like not due to negligence of the BUILDER or its subcontractors; delays caused by the Classification Society or other bodies whose documents are required; destruction of or damages to the Shipyard or works of the BUILDER, its subcontractors or suppliers, or of or to the VESSEL or any part thereof, by any causes herein described; provided that the event could not be reasonable foreseen at the day of signing of this Contract and prevented or avoided by the BUILDER and, further, provided that the BUILDER has taken immediate steps within his reasonable means to overcome or minimize any delay; then and in any such case, the Delivery Date shall be postponed for a period of time which shall not exceed the total

102

accumulated time of all such delays.

2. Notice of Delay:

Within ten (10) days after the date of occurrence of any cause of delay, on account of which the BUILDER claims that it is entitled under this Contract to a postponement of the Delivery Date, the BUILDER shall notify the BUYER in writing or by telefax or e-mail confirmed in writing of the date such cause of delay occurred. Likewise, within ten (10) days after the date of ending of such cause of delay, the BUILDER shall notify the BUYER in writing or telefax or e-mail confirmed in writing of the date such cause of delay ended. The BUILDER shall also notify the BUYER of the period, by which the Delivery Date is postponed by reason of such cause of delay, with all reasonable dispatch after it has been determined. Failure of the BUEYR to object to the BUILDER's claim for postponement of the Delivery Date within ten (10) days after receipt by the BUYER of such notice of claim shall be deemed to be a waiver by the BUYER of its right to object such postponement of the Delivery Date.

3. Definition of Permissible Delay:

Delays on account of such causes as specified in Paragraph 1 of this Article and any other delays of a nature which under the terms of this Contract permits postponement of the Delivery Date shall be understood to be permissible delays and are to be distinguished from unauthorized delays on account of which the Contract Price is subject to adjustment as provided for in Article III hereof.

4. Right to Rescind for Excessive Delay:

If the total accumulated time of all delays on account of the cause specified in paragraph 1 of this Article, excluding(i) delays due to arbitration as provided for in Article XIII hereof or due to defaults in performance by the BUILDER, (ii) delays due to

103

Article V, (iii) delays in delivery of the BUYER's supplied items, or (iv) delays of a nature which, under the terms of this Contract, permit postponement of the date for delivery, amount to Two Hundred and Ten (210) days or more, then, in such event, the BUYER may rescind this Contract in accordance with the provisions of Article X hereof, provided however that the BUILDER shall not be liable for any damage which may sustain as a result of such rescission of the Contract. The Builder may, at any time after the accumulated time of the aforementioned delays justifying rescission by the BUYER, demand in writing that the BUILDER shall make an election, in which case the BUYER shall, within twenty (20) days after such demand is received by the BUYER, either notify the BUILDER of its intention to rescind this Contract, or consent to a postpone of the Delivery Date to a specific future date; it being understood and agreed by the parties hereto that, if any further delay occurs beyond such specific future date, The BUYER shall have the same right of rescission upon the same terms as hereinabove provided. In case that the VESSEL is constructed within such extend sphere of the Delivery Date, the BUILDER shall not be liable for any damage which the BUILDER may sustain as a result of delay in delivery of the VESSEL beyond the originally agreed Delivery Date.

(End of Article)

104

## ARTICLE IX – WARRANTY OF QUALITY

1.  Guarantee:

    Subject to the provisions hereinafter set forth, the BUILDER undertakes to remedy, free of charge to the BUYER, any defects in the VESSEL which are proved to be due to defective material and/or poor workmanship on the part of the BUILDER and/or its subcontractors, provided that a notice in respect of the defects is duly received by the BUILDER as hereinafter provided within the period up to thirty (30) days after the expiry of the guarantee period of twelve (12) months counting from the date of delivery of the VESSEL, and in case of absence of notice within the aforesaid twelve (12) months period the BUILDER shall be fully relieved of its liability for any defects in the VESSEL, even if any.

    For the purpose of this Article, the VESSEL shall include her hull, machinery, equipment and gear, but excludes any parts for the VESSEL which have been supplied by or on behalf of the BUYER.

2.  Notice of Defects:

    The BUYER shall notify the BUILDER in writing, or by telefax or e-mail confirmed in writing, of any defects for which claim is made under this guarantee as promptly as possible after discovery thereof. The BUYER's written notice shall describe the nature and extent of the defects. The BUILDER shall have no obligation for any defects, unless notice of such defects is received by the BUILDER not later than thirty (30) days after the expiry date of the said twelve (12) months guarantee period.

3.  Remedy of Defects:

    (a)  The BUILDER shall remedy, at its risk and expense, any defects, against which the VESSEL is guaranteed under this Article, by making all necessary repairs or

- 28 -

105

replacements at a Shipyard in China, which the BUILDER may determine.

(b) However, if it is impractical to bring the VESSEL to the Shipyard chosen by the BUILDER, the BUYER may cause the necessary repairs or replacements to be made elsewhere which is deemed suitable for the purpose, provided that, in such event, the BUILDER may forward or supply replacement parts ore materials to the VESSEL, unless forwarding or supplying thereof to the VESSEL would impair or delay the operation or working schedule of the VESSEL.

In the event that the BUYER proposes to cause the necessary repairs or replacements to be made to the VESSEL at any other shipyard or works than the Shipyard determined by the BUYER, the BUYER shall first, but in any event as soon as possible, give the BUILDER 30 days minimum notice in writing or telefax or e-mail confirmed in writing of the time and place such repairs will be made, and if the VESSEL is not thereby delayed, or her operation or working schedule is not thereby impaired, the BUILDER shall have the right to verify by its own representative(s) the nature and extents of the defects complained of. The BUILDER shall, in such case, promptly advise the BUYER by telefax confirmed in writing after such examination has been completed, of its acceptance or rejection of the defects under the guarantee herein provided. Upon the BUILDER's acceptance of the defects as justifying remedy under this Article, or upon award of the arbitration so determining, the BUILDER shall immediately pay to the BUYER for such repairs ore replacements a sum equal to the average estimation quoted by two Chinese similar class shipyards of sub-contractor one appointed by the BUILDER and one by the BUYER respectively for making the same repairs or replacements at the Shipyard, however, in any event such sum shall not be more than the actual cost borne by the BUYER.

- 29 -

106

(c) In any case, the VESSEL shall be taken at the BUYER's cost and responsibility to the place elected, ready in all respects for the repairs or replacements necessitated.

(d) Any dispute under this Article shall be referred to arbitration in accordance with the provisions of Article XIII hereof.

4. Extent of the BUILDER's Responsibility:

(a) The BUILDER shall have no responsibility or liability for any other defects whatsoever in the VESSEL than the defects specified in Paragraph 1 of this Article. Nor the BUILDER shall in any circumstances be responsible or liable for any consequential or special losses, damages or expense including, but not limited to, loss of time, loss of profit or earning or detention of the VESSEL directly or indirectly occasioned or resulted to the BUYER by reason of the defects specified in Paragraph 1 of this Article or due to repairs or other works done to the VESSEL to remedy such defects.

(b) The BUILDER shall not be responsible for any defects in any part of the VESSEL which may subsequent to delivery of the VESSEL have been replaced or in any way repaired by any other contractor, or for any defects which have been caused or aggravated by omission or improper use and maintenance of the VESSEL on the part of the BUYER, its servants or agents or by ordinary wear and tear.

(c) The guarantee contained as hereinabove in this Article replaces and excludes any other liability, guarantee, warranty and/or condition imposed or implied by the law, customary, statutory or otherwise, by reason of the construction and sale of the

- 30 -

*107*

VESSEL by the BUILDER for and to the BUYER.

(End of Article)

108

## ARTICLE X – RESCISSION BY THE BUYER

1.  Notice

    If the BUYER intends to exercise its right of rescission of this Contract, the BUYER shall

    notify the BUILDER to such effect in writing or by telefax or e-mail confirmed in writing.

                                                              (End of Article)

- 32 -

*109*

## ARTICLE XI – THE BUYER'S DEFAULT

1. Definition of Default:

    The BUYER shall be deemed to be in default of performance of its obligations under this Contract in the following cases:

    (a)  If the BUYER fails to pay the to the BUILDER concurrently with the delivery of the VESSEL by the BUILDER to the BUYER as provided in Article II hereof; or

    (b)  If the BUYER fails to take delivery of the VESSEL, within three (3) banking days after the VESSEL is duly tendered for delivery by the BUILDER under the provisions of Article VII hereof.

2. Interest and Charge:

    If the BUYER is in default of payment as to any installment as provided in Paragraph 1 (a) of this Article or any other amount due to the BUILDER form the BUYER under this Contract, the BUYER shall pay interest on such installment or any other overdue amount at the rate of Five percent (5%) per annum form the due date thereof to the date of payment to the BUILDER of the full amount plus accrued interest; in case the BUYER shall fail to take delivery of the VESSEL as provided in Paragraph 1 (b) of this Article, the BUYER shall be deemed to be in default of payment and shall pay interest thereon at the same rate as aforesaid from and including the day on which the VESSEL is tendered for delivery by the BUILDER.

3. Effect of Default:

    (a)  If any default by the BUYER occurs as provided hereinbefore, the Delivery Date shall be automatically postponed for a period of continuance of such default by

*110*

BUYER.

(b) If any default by the BUYER continues for a period of Fifteen(15)days, the BUILDER may, at its option, rescind this Contract by giving notice of such effect to the BUYER by cable confirmed in writing. Upon receipt by the BUYER of such notice of rescission, this Contract shall forthwith become null and void and any of the BUYER's Supplies shall become the sole property of the BUILDER. In the event of such retain any installment or installments theretofore paid by the BUYER to the BUILDER on account of this Contract.

(c) By the BUYER

If any default by the BUYER as defined Paragraph 1(a), (b) or (c) of this Article continues for a period of twenty(20)days, the BUILDER may, at its option, rescind this Contract by giving notice of such effect to the BUYER by telefax confirmed in writing.

Upon receipt of such written notice of rescission by the BUYER, this Contract shall be forthwith rescinded and cancelled, and any interest or property rights which the BUYER may have in or to the VESEL and to any material or parts acquired for construction of the VESSEL, but not yet utilized for such purpose shall forthwith cease and the VESSEL and materials and parts thereof shall become the sole property of the BUILDER and the BUILDER shall have full right and power to dispose of the same in any manner whatsoever as the BUILDER may think fit au its sole and absolute discretion. In addition, the BUILDER shall be entitled to be paid the amount equivalent to twenty percent(20%) of the Contract Price as liquidated damages for the rescission of the Contract, and for that purpose any and all amounts paid by the BUYER to the BUILDER as installments of the Contract Price of otherwise may be applied by the BUILDER to cover the payment of the aforesaid

- 84 -

*111*

liquidated damages, and any surplus remaining, if any, shall be returned to the BUYER without any interest thereon, and the BUYER shall be fully released and no further damages shall be claimed by the BUILDER.

(End of Article)

112

## ARTICLE XII - INSURANCE

1.  Extent of Insurance Coverage:

    From the time of keel-laying of the VESSEL until the same is completed, delivered to and accepted by the BUYER, the BUILDER shall, at the BUILDER's own cost and expense, to keep the VESSEL and all machinery, materials, equipment, appurtenances and outfit, delivered to the Shipyard for the VESSEL or built into, or installed in or upon the VESSEL, including the BUYER's Supplies, fully insured with first class Japanese insurance companies under coverage corresponding to the Japanese Builder's Risks Insurance Clause.

    The amount of such insurance coverage shall, up to the date of delivery of the VESSEL, be in an amount at least equal to, but not limited to, the aggregate of the payment made by the BUYER to the BUILDER including the value of the BUYER's Supplies.

    The policy covering such insurance shall be taken out in the name of the BUILDER and all losses under such policy shall be payable to the BUILDER for distribution by it to itself and its assignee and the BUILDER as their respective interests may appear as provided for in the Paragraph 2 hereof.

2.  Application of Recovered Amount:

    (a)  Partial Loss:

         In the event the VESSEL shall be damaged by any insured cause whatsoever prior to acceptance thereof by the BUYER and in the further event that such damage shall not constitute an actual or a constructive total loss of the VESSEL, the BUILDER shall apply the amount recovered under the insurance policy referred to in Paragraph 1 of this Article to the repair of such damage satisfactory to the Classification Society, and the BUYER shall accept the VESSEL under this Contract if completed in accordance with this Contract and Specifications.

- 36 -

*113*

(b)  Total Loss:

However, in the event the VESSEL is determined to be an actual or constructive total loss, the BUILDER shall by the mutual agreement between the parties hereto, either:

i ) proceed to reconstruction of the VESSEL in accordance with the terms of this Contact, in which case the amount recovered under said insurance policy shall be applied to the reconstruction of the VESSEL, provided that the parties hereto shall have first agreed in writing as to such reasonable postponement of the Deliveri Date; or

ii ) Refund immediately to the BUYER the amount of all installments paid to the BUILDER under this Contract as provided for in this Contract, whereupon this Contract shall be deemed to be terminated and all rights, duties, liabilities and obligations of each of the parties to the other shall terminate forthwith without any party hereto having any right to claim the other party hereto with respect to its damage which it may sustain as a result of total loss of the VESSEL or termination of this Contract thereby.

3.  Termination of the BUILDER's Obligation to Insure:

The BUILDER's obligation to insure the VESSEL hereunder shall cease and terminate forthwith upon delivery of the VESSEL and acceptance by the BUYER hereunder.

(End of Article)

- 87 -

114

## ARTICLE XIII - ARBITRATION

1. Unless otherwise provided for herein, any dispute arising or by virtue of this Contract of any difference of opinion between the parties hereto concerning their rights and obligations under this Contract which cannot be mutually resolved shall be submitted to arbitration.

   Unless the parties in a particular case should otherwise agree in writing, the arbitration to settle such dispute or disputes arising before and after the delivery of the VESSEL shall be held in London according to the English Arbitration Act, 1996, as amended, by reference to three arbitrators, one to be appointed by each party and the third to be appointed by the two appointed by the parties. In the event of the failure by one of the parties hereto to appoint an arbitrator within seven(7)days from the date a demand for such an appointment has been made by the other party, then such other party shall appoint such second arbitrator in accordance with this Paragraph.

2. The award of the arbitration as to any questions referred to the arbitrators as hereinabove provided shall be final, binding, conclusive upon and enforceable against the parties hereto and their respective successors and assigns and each party agrees to abide by such a decision.

3. In the event of arbitration of any dispute or disputes arising or occurring prior to the Delivery of the VESSEL to or acceptance by the BUYER of the VESSEL the award by the Arbitration Board of said dispute or disputes shall include a finding as to whether or not the Delivery Date of the VESSEL involved is in any way altered thereby.

   Notwithstanding the preceding provisions of this Paragraph, it is recognized that in the event of any dispute or difference of opinion arising prior to the Delivery of the VESSEL in regard to the construction of the VESSEL, her machinery and equipment, or

115

concerning the quality of materials or workmanship thereof or thereon or in regard to interpretation of the Specifications or other technical matters, such dispute may by mutual agreement of the parties be referred to the Classification Society's regional office in Japan, for final resolution which shall be binding upon both parties. The cost and expense or reference of dispute to resolution of such party shall be borne by the party against whom the dispute is resolved.

(End of Article)

- 39 -

*116*

## ARTICLE XIV – RIGHT OF ASSIGNMENT

Neither of the parties hereto shall assign this Contract to a third party unless prior consent of the other party is given in writing.

In case of assignment by the BUYER, the BUYER shall remain liable under this Contract. This Contract shall enure to the benefit of and shall be binding upon the lawful successors or the legitimate assigns of either of parties hereto.

(End of Article)

*117*

## ARTICLE XV – TAXES, DUTIES AND INTEREST

1.  Taxes and Duties in China:

    The BUILDER shall bear and pay all taxes and duties imposed in China in connection with execution and/or performance of this contract, excluding any taxes and duties imposed in China upon the BUYER's Supplies.

2.  Taxes and Duties outside China:

    The BUYER shall bear and pay all taxes and duties imposed outside China in connection with execution and/or performance of this Contract, except for taxes and duties imposed upon those items to be procured by the BUILDER for construction of the VISSEL.

3.  Interest:

    Where any rate on interest is stipulated in this Contract, the rate so specified shall be the net amount receivable in the hands of the party to whom the interest is paid.

(End of Article)

*118*

## ARTICLE XVI – PATENTS, TRADEMARKS, COPYRIGHTS, ETC.

1.  Patents, Trademarks and Copyrights:

    Machinery and equipment of the VESSEL may bear the patent number, trademarks or trade names of the manufacturers.

    The BUILDER shall defend and save harmless the BUYER from patent liability or claims of patent infringement of any nature of kind, including costs and expenses for, or on account of any patented or patentable invention made or used in the performance of this Contract and also including costs and expenses of litigation, if any.

    Nothing contained herein shall be construed as transferring any patent or trademarks rights or copyright in equipment covered by this Contract, and all such rights are hereby expressly reserved to the true and lawful thereof. The BUILDER's warranty hereunder does not extend to the BUYER's Supplies.

2.  General Plans, Specifications and Working Drawings:

    The BUILDER retains all rights with respect to the Specifications, and plans and working drawings, technical descriptions, calculations, test results and other date, information and documents concerning the design and construction of the VESSEL, and the BUYER undertakes therefore not to disclose the same or divulge any information contained therein to any third parties, without the prior written consent of the BUILDER, excepting where it is necessary for usual operation, repair and maintenance of the VESSEL.

                                                                            (End of Article)

119

## ARTICLE XVII – THE BUYER'S SUPPLIES

1.  Responsibility of the BUYER

    (a)  The BUYER shall, at its own risk, cost and expense, supply and deliver to the BUILDER all of the items to be furnished by BUYER as specified in the Specifications(herein called the"BUYER's Supplies") at warehouse or other storage of the Shipyard in the proper condition ready for installation in or on the VESSEL, in accordance with the time schedule designated by the BUILDER.

    (b)  In order to facilitate installation by the BUILDER of the BUYER's Supplies in or on the VESSEL, the BUYER shall furnish the BUILDER with necessary specifications, plans, drawings, instructions books, manuals, test reports and certificates required by the rules and regulations. If necessary, the BUYER, if so requested by the BUILDER, shall, without any charge to the BUILDER, cause the representatives of the manufacturers of the BUYER's Supplies to assist the BUILDER in installation thereof by themselves or to make necessary adjustments thereof at the Shipyard.

    (c)  Any and all of the BUYER's Supplies shall be subject to the BUILDER's reasonable right of rejection, as and if they are found to be unsuitable or in improper condition for installation. However, if so requested by the BUYER, the BUILDER may repair or adjust the BUYER's Supplies without prejudice to the BUILDER's other rights hereunder and without being responsible for any consequence therefrom.

    In such case, the BUYER shall reimburse the BUILDER for all costs and expenses incurred by the BUILDER in such repair or adjustment and the Delivery Date shall be automatically postponed for a period of time necessary for such repair or replacement.

- 43 -

1 20

(d)    Should the BUYER fail to deriver any of the BUYER's Supplies within the time designated, the Delivery Date shall automatically extended for a period of such delay in delivery.    In such event , the BUYER shall be responsible and pay to the BUILDER for all losses and damages , if any , incurred by the BUILDER by reason of such delay in delivery of the BUYER's Supplies and such payments shall be made upon delivery of the VESSEL. If delay in delivery of any of the BUYER's Supplies exceeds thirty(30)days, then the BUILDER shall be entitled to proceed with construction of the VESSEL without installation thereof in or on the VESSEL , without prejudice to the BUILDER's other rights as hereinabove provided , and the BUYER shall accept and take delivery of the VESSEL so constructed.

2.   Responsibility of the BUILDER:

The BUILDER shall be responsible for storing and handling with reasonable care of the BUYER's Supplies after delivery thereof at Shipyard , and shall , at its own cost and expense , install them in or on the VESSEL , unless otherwise provided herein or agreed by the parties hereto , provided , always that the BUILDER shall not be responsible for quality , efficiency and/or performance of any of   the BUYER's Supplies.

(End of Article)

- 44 -

12/

**ARTICLE XVIII – NOTICE**

1.  Address:

    Any and all notices and communications in connection with this Contract shall be
    addressed as follows:

    To the BUYER:

    SN Navigation S.A.

    C/O Namirei-Showa Co.,Ltd.

    4-14-8, Hamadera Ishizuchonishi, Nishi-ku, Sakai, Osaka, 592-8333, Japan

    E-mail        :c.fujihara@namirei-showa.co.jp

    Phone No.     :072-243-1022

    Telefax No.   :072-243-0552

    To the BUILDER

    Namirei-Showa Co.,Ltd.

    4-14-8, Hamadera Ishizuchonishi, Nishi-ku, Sakai, Osaka, 592-8333, Japan

    E-mail        :c.fujihara@namirei-showa.co.jp

    Phone No.     :072-243-1022

    Telefax No.   :072-243-0552

2.  Language:

    Any and all notices and communications in connection with this Contract shall be
    written in the English language.

                                                                 (End of Article)

122

## ARTICLE XIX – INTERPRETATION

1.  Laws Applicable:

    The parties hereto agree that the validity and intereperation of this Contract and of each Article and the part thereof shall be governed by English law.

2.  Discrepancies:

    All general language or requirements embodied in the Specifications are intended to amplify , explain and implement the requirements of this Contract. However,in the event that any language or requirements so embodied permit of an interpretation inconsistent with any provisions of this Contract, then ,in each and every such event , the applicable provisions of this Contract shall prevail and govern.   The Specifications and Plan are also intended to explain each other, and anything shown on the Plan and not stipulated in the Specifications or stipulated in the Specifications and not shown on the Plan shall be deemed and considered as if embodied in both.   In the event of conflict between the Specifications and Plan , the Specifications shall prevail and govern.

3.  Entire Agreement :

    This Contract contains the entire agreement and understanding between the Parties hereto and supersedes all prior negotiations , representations, undertakings and agreements on any subject matter of this Contract.

                                                      (End of Article)

123

IN WITNESS WHEREOF, the parties hereto have caused this Contract to be duly

Executed by the duly authorized representatives the day and year first above written.


BUYER:                                                    BUILDER:

SN Navigation S.A.                                        Namirei-Showa Co.,LTD.


*H. Tsuchiya*                                             *土屋 八寳*

By   : Hatusmi Tsuchiya                                   By   :Hatumi Tsuchiya

Title : President                                         Title : President

124

CONTRACT

FOR

CONSTRUCTION AND SALE

OF

A DEADWEIGHT 12,500 DWT BULK CARRIER

(HULL NO. RW-101)

BETWEEN

SN NAVIGATION S.A.

AS BUYER

AND

NAMIREI SHOWA CO., LTD.

AS BUILDER,

24TH MARCH 2007,

YANGZHOU, CHINA

## INDEX

| | Page |
|---|---|
| PREAMBLE | 1 |
| | |
| ARTICLE I - DESCRIPITON AND CLASS | |
| 1. Description | 2 |
| 2. Dimensions and Characteristics | 2 |
| 3. Classification, Rules and Regulations | 3 |
| 4. Registration | 4 |
| | |
| ARTICLE II - CONTRACT PRICE AND TERMS OF PAYMENT | |
| 1. Contract Price | 5 |
| 2. Currency | 5 |
| 3. Terms of Payment | 5 |
| 4. Method of Payment | 5 |
| | |
| ARTICLE III - ADJUSTMENT OF CONTRACT PRICE | |
| 1. Delivery | 7 |
| 2. Speed | 8 |
| 3. Fuel Consumption | 9 |
| 4. Deadweight | 9 |
| 5. Effect of Rescission | 10 |
| | |
| ARTICLE IV - APPROVAL OF PLANS AND DRAWINGS AND INSPECTION DURING CONSTRUCTION | |
| 1. Approval of Plans and Drawings | 11 |
| 2. Appointment of the BUYER's Representative | 12 |
| 3. Inspection by the Representative | 12 |

22

4. Facilities                                          13
5. Liability of the BUILDER                            13
6. Responsibility of the BUYER                         14


ARTICLE V – MODIFICATIONS
1. Modifications of Specifications                     15
2. Change in Class, etc.                               15
3. Substitution of Materials                           16
ARTICLE VI – TRIALS
1. Notice                                              18
2. Weather Condition                                   18
3. How Conducted                                       19
4. Method of Acceptance or Rejection                   19
5. Effect of Acceptance                                20
6. Disposition of Surplus Consumable Stores            21


ARTICLE VII – DELIVERY
1. Time and Place                                      22
2. When and How Effected                               22
3. Documents to be Delivered to the BUYER              22
4. Tender of the VESSEL                                24
5. Title and Risk                                      24
6. Removal of the VESSEL                               24


ARTICLE VIII - DELAYS AND EXTENTION OF TIME FOR DELIVERY
                    (FORCE MAJEURE)
1. Causes of Delay                                     25
2. Notice of Delay                                     26


ARTICLE IX - WARRANTY OF QUALITY
1. Guarantee                                           28
2. Notice of Defects                                   28
3. Remedy of Defects                                   28

23

4.   Extent of the BUILDER's Responsibility                                        30

ARTICLE X - RESCISSION BY THE BUYER
1.   Notice                                                                              32

ARTICLE XI - THE BUYER'S DEFAULT
1.   Definition of Default                                                          33
2.   Interest and Charge                                                           33
3.   Effect of Default                                                               33

ARTICLE XII – INSURANCE
1.   Extent of Insurance Coverage                                            36
2.   Application of Recovered Amount .                                     36
3.   Termination of the BUILDER's Obligation to Insure           37

ARTICLE XIII – ARBITRATION                                                   38

ARTICLE XIV - RIGHT OF ASSIGNMENT                                 40

ARTICLE XV - TAXES, DUTIES AND INTEREST
1.   Taxes and Duties in Japan                                               41
2.   Taxes and Duties outside Japan                                       41
3.   Interest                                                                             41

ARTICLE XVI - PATENTS, TRADEAMRKS, COPYRIGHTS, ETC.
1.   Patents, Trademarks and Copyrights                                42
2.   General Plans, Specifications and Working Drawings         42

ARTICLE XVII - THE BUYER'S SUPPLIES
1.   Responsibility of the BUYER                                            43
2.   Responsibility of the BUILDER                                         44

24

ARTICLE XVIII – NOTICE
1.  Address                                          45
2.  Language                                         45

ARTICLE XIX – INTERPRETATION
1.  Laws Applicable                                  46
2.  Discrepancies:                                   46
3.  Entire Agreement                                 46

END OF CONTRACT                                      47

25

THIS CONTRACT, made this 24th day of ,March 2007, in Yangzhou, China made by and between NAMIREI SHOWA CO., LTD., Japan a corporation organized and existing under the laws of Japan, having its registered office at 4-14-8 Hamadera Ishizucho-nishi, Nishi-ku, Sakai city, Osaka, Japan (hereinafter called the "BUILDER"), the party of the first part, and SN Navigation S.A. a corporation organized and existing under the laws of Republic of Panama, having its registered office at 15th Floor, Banco General Tower, Aquilino De La Guardia Street, Marbella, Panama City, Republic of Panama (hereinafter called the "BUYER"), the party of the second part

WITNESSETH:

In consideration of the mutual covenants herein contained, the BUILDER agrees to build , launch, equip and complete at Yangzhou RYUWA Shipbuilding Co.,Ltd. a corporation duly organized and existing under the laws of China, having its principal office at Shipping Industry Belt, Yangtze Riverside Development Zone, Jiangdu, Yangzhou City, Jiangsu, China, (hereinafter called the "SHIPYARD") and to sell and deliver to the BUYER one (1) DEADWEIGHT 12,500 TON TYPE BULK CARRIER more fully described in Article I hereof (hereinafter called the "VESSEL"), and the BUYER agrees to purchase and take delivery of the VESSEL from the BUILDER and to pay for the same, all upon the terms and conditions hereinafter set forth.

- 1 -

26

## ARTICLE I – DESCRIPTION AND CLASS*

1. Description:

   The VESSEL shall have the BUILDER's Hull No. RE-101 and shall be constructed, equipped and completed in accordance with the provisions of this Contract, and the Specifications, makers list and the General Arrangement Plan dated 24th March, 2007 attached hereto and signed by each of the parties hereto (such Specifications, makers list and General Arrangement Plan hereinafter collectively called the "Specifications"), which Specifications are made an integral part hereof.

2. Dimensions and Characteristics:

   | | |
   |---|---|
   | Length, overall | abt 122.00 m |
   | Length, between perpendiculars | 115.00 m |
   | Breadth, moulded | 20.60 m |
   | Depth, moulded | 11.00 m |
   | Designed draft, moulded | 8.29 m |
   | Scantling draft, moulded | 8.30 m |
   | Gross tonnage | abt 7,400 tons |

   Propelling Machinery:

   One (1) set of Diesel Engine 7UEC37LA Max. cont. output 3,640kW

   Deadweight, guaranteed:

   12,500 metric tons at scantling draft of 8.29 meters

   Trial speed, guaranteed

   14.5 knots in normal ballast condition at max. cont. output of main engine with clean bottom at deep sea.

   Fuel consumption

   178.5 gr/kW-h at maximum rating on the basis of fuel lower calorific value of

- 2 -

27

42,700kj/kg and ISO standard reference condition. This consumption figure to be subject to a tolerance of 3%.

The details of the above particulars as well as the definitions and method of measurements and calculations are as indicated in the Specifications.

3.   Classification, Rules and Regulations:

The VESSEL, including its machinery, equipment and outfittings shall be constructed in accordance with the rules (the edition and amendments thereto being in force as of the date of this Contract) of and under special survey of Nippon Kaiji Kyokai, or American Bureau of Shipping (hereinafter called the "Classification Society") or , and shall be distinguished in the register by the symbol of "NS,MNS*" ,or "ABS+A(E),Bulk Carrier, +AMs, +ACCU" single screw bulk carrier as described in the specification. Decision of the Classification Society as to compliance or non-compliance with the classification rules and regulations shall be final and binding upon both parties hereto.

The VESSEL shall also comply with the rules, regulation and requirements of other regulatory bodies as described in the Specifications which are in effect as of the date of this Contract unless otherwise specified in the Specifications. The VESSEL shall be constructed in accordance with BUILDER's standard shipbuilding and inspection practices and shall also comply with the rules and regulations being necessary for the registration of the VESSEL under the laws of Panama.

All fees and charges incidental to the classification and with respect to compliance with the above referred rules, regulations and requirements shall be for account of the BUILDER.

The BUILDER shall arrange that the classification society assigns classification Surveyor(s) to the SHIPYARD for supervision of the construction of the VESSEL.

28

4. Registration

The VESSEL shall be registered by the BUYER at its own cost and expense under the laws of Panama with its home port of Panama at the time of its delivery and acceptance hereunder.

(End of Article)

29

## ARTICLE II – CONTRACT PRICE AND TERMS OF PAYMENT

1.  Contract Price:

    The contract price of the VESSEL is Japanese Yen One Billion and Four Hundred Fifty Million (¥1,450,000,000.-), net receivable by the BUILDER (hereinafter called the "Contract Price"), which is exclusive of the BUYER's Supplies as provided in Article XVII hereof and shall be subject to upward or downward adjustment, if any as hereinafter set forth in this Contract.

2.  Currency:

    Any and all payments by the BUYER to the BUILDER under this Contract shall be made in Japanese Yen.

3.  Terms of Payment:

    The Contract Price plus any increase or minus any decrease due to adjustment of the Contract Price hereunder , shall be paid by the BUYER to the BUILDER upon delivery of the VESSEL.

4.  Method of Payment:

    The BUYER shall, at least one(1) Banking Days prior to the scheduled delivery date of the VESSEL, make cash deposit in the name of the BUYER or to its order with the Bank, available or releasable to the BUILDER against a signed copy of the Protocol of Delivery and Acceptance of the VESSEL as set forth in Paragraph 3 of Article VII hereof.

    No payment under this Contract shall be delayed or withheld or set-off by the BUYER on account of any dispute or disagreement of whatever nature arising between the parties

30

31

## ARTICLE III – ADJUSTMENT OF CONTRACT PRICE

The Contract Price shall be subject to adjustment, as hereinafter set forth, in the event of the following contingencies (it being understood by both parties that any reduction of the Contract Price is by way of liquidated damages and not by way of penalty):

1. Delivery:

    (a)  No adjustment shall be made and the Contract Price shall remain unchanged for the first sixty (60) days of delay in delivery of the VESSEL beyond the Delivery Date as defined in Article VII hereof (ending as of twelve o'clock midnight of the sixtieth (60th) day of delay).

    (b)  If the delivery of the VESSEL is delayed more than sixty (60) days of delay after the Delivery Date, then, in such event, beginning with twelve o'clock midnight of the sixtieth (60th) day after the Delivery date, the Contract Price shall be reduced by deducting therefrom the sum of one-ten thousandth (1/10,000) of the Contarct Price for each full day of delay thereafter.

    (c)  But, if the delay in delivery of the VESSEL should continue for a period of ninety (90) days counting from midnight of the sixty-first (61st) day after the Delivery Date,  then in such event, and after such period has expired, the BUYER may at its option rescind this Contract in accordance with the provisions of Article X hereof. I
    the BUILDER may, at any time after the expiration of the aforementioned ninety (90) days of delay in delivery, if the BUYER has not served notice of rescission as provided in Article X hereof, demand in writing that the BUYER shall make an election, in which case the BUYER shall, within fifteen (15) days after such

- 7 -

32

demand is received by the BUYER, notify the BUILDER of its intention either to rescind this Contract, or to consent to the acceptance of the VESSEL at such future date as notified by the BUILDER at a reduction in the Contract Price as hereinabove provided; it being understood by the parties hereto that, if the VESSEL is not delivered by such future date, the BUYER shall have the same right of rescission upon the same terms and conditions as hereinabove provided.

(d)   For the purpose of Article , the delivery of the VESSEL shall be deemed to be delayed when and if the VESSEL, after taking into full account all postponements of Delivery Date by reason of permissible delays as defined in Article VIII and/or any other reasons under this Contract, is not delivered by the date upon which delivery is required under the terms of this Contract.

2.   Speed:

(a)   The Contract Price shall not be affected or changed by reason of the actual speed, as determined by the trial run, being less than three-tenths (3/10) of one (1) knot below the guaranteed speed of the VESSEL.

(b)   However, commencing with and including such deficiency of three-tenths (3/10) of one (1) knot in actual speed below the guaranteed speed of the VESSEL, the Contract Price shall be reduced by the sum of the money equivalent of one-one thousand (1/1,000) of the Contract Price for each one tenth (1/10) of one (1) knot (but disregarding fractions of one tenth (1/10) of a knot).   .

(c)   If the deficiency in actual speed of the VESSEL upon trial run is more than seven-tenths (7/10) full knot below the guaranteed speed of the VESSEL, then the BUYER may, at its option, reject the VESSEL and rescind this Contract in

33

accordance with the provisions of Article X hereof, or may accept the VESSEL at a reduction in the Contract Price as above provided for seven-tenths (7/10) full knot only, that is, at a total reduction of four-one thousandth (4/1,000) of the Contract Price being the maximum.

3.  Fuel Consumption:

   (a)  The Contract Price shall not be affected or changed by reason of the fuel consumption of the VESSEL, as determined by shop trial as per the Specifications, being more than the guaranteed fuel consumption of the VESSEL, if such excess is not more than three percent (3%) over the guaranteed fuel consumption.

   (b)  However, commencing with and including an excess of three percent (3%) in the actual fuel consumption over the guaranteed fuel consumption of the VESSEL, the Contract Price shall be reduced by the sum of one-thousandth of the Contract Price for each full one percent (1%) increase in fuel consumption above said three percent (3%) (but disregarding fractions of one percent (1%)), up to maximum of seven percent (7%) over the guaranteed fuel consumption of the VESSEL.

   (c)  If such actual fuel consumption exceeds seven percent (7%) of the guaranteed fuel consumption of the VESSEL, the BUYER may at its option reject the VESSEL and rescind this Contract in accordance with the provisions of Article X hereof, or may accept the VESSEL at a reduction in the Contract Price as above provided, unless mutually agreed otherwise.

4.  Deadweight:

   (a)  In the event that the actual deadweight of the VESSEL as determined in accordance with the Specifications is less than the guaranteed deadweight of the

34

VESSEL, the Contract Price shall be reduced by the sum of money equivalent of one-ten thousandth (1/10,000) of the Contract Price for each full metric ton of such deficiency being more than One Hundred Fifty (150) metric tons as the case may be (but disregarding fraction of one (1) metric ton).

(b)  If the deficiency in the actual deadweight of the VESSEL being Four percent (4%) below the guaranteed Deadweight of the VESSEL, then the BUYER, at its option, may reject the VESSEL   at the reduction of the Contract Price as agreed by the parties hereto.

5.  Effect of Rescission:

It is expressly understood and agreed by the parties hereto that in any case, if the BUYER rescinds this Contract under this Article, the BUYER shall not be entitled to any liquidated damages and the BUILDER shall not be answerable for such rescission of this Contract.

(End of Article)

- 10 -

35

## ARTICLE IV – APPROVAL OF PLANS AND DRAWINGS

## AND INSPECTION DURING CONSTRUCTION

1.  Approval of Plans and Drawings:

    (a)  The BUILDER shall submit to the BUYER three (3) copies each of the plans and drawings to be submitted thereto for its approval at its address as set forth in Article XVIII hereof. The BUYER shall, within fourteen (14) days after receipt thereof, return to the BUILDER one (1) copy of such plans and drawings with the BUYER's approval or comments if any written thereon. A list of the plans and drawings to be so submitted to the BUYER with intended date of submission shall be mutually agreed upon between the parties hereto.

    (b)  When the Representative as defined in Paragraph 2 of this Article is sent by the BUYER to the SHIPYARD in accordance with Paragraph 2 of this Article, then after his arrival at the SHIPYARD the BUILDER may submit (subject always to the BUYER's prior written approval)  the plans and drawings in the agreed list, which have not been submitted to the BUYER, to the Representative for his approval. The Representative shall, within seven (7) days after receipt thereof, return to the BUILDER one (1) copy of such plans and drawings with his approval or comments if any written thereon. Approval by the Representative of the plans and drawings duly submitted to him shall be deemed to be the approval thereof by the BUYER for all purposes of this Contract.

    (c)  In the event that the BUYER or the Representative shall fail to return to the BUILDER the submitted plans and drawings within the time limit as hereinabove provided, such plans and drawings shall be deemed to have been approved without any comment.

- 11 -

36

2.    Appointment of the BUYER's Representative:

The BUYER may send to and maintain at the SHIPYARD, at the BUYER's own cost and expense, one or more representatives (hereinafter called the "Representative") and his assistant(s). The Representative shall be duly authorized in writing by the BUYER to act on behalf of the BUYER in connection with modification of the Specification, adjustments of the Contract Price, approval of the plans and drawings, attendance to the tests and inspections relating to the VESSEL, its machinery, equipment and outfitting and any other matters of which he is specifically authorized by the BUYER.

3.    Inspection by the Representative:

The necessary inspections of the VESSEL, its machinery, equipment and outfittings shall be carried out by the Classification Society, other regulatory bodies and/or an inspection team of the BUILDER throughout the entire period of construction, in order to ensure that the construction of the VESSEL is duly performed in accordance with this Contract and the Specifications.

The Representative and his assistant(s) shall have, during construction of the VESSEL, the right to attend such tests and inspections of the VESSEL, its machinery and equipment as are mutually agreed between the BUYER and the BUILDER in accordance with the BULIDER's standard shipbuilding and inspection practices. The BUILDER shall give a notice to the Representative reasonably in advance of the date and place of such tests and   inspections to be attended by him for his convenience. Failure of the Representative or his assistant(s) to be present at such tests and inspections after due notice to him as above provided shall be deemed to be a waiver of his right to be present.

In the event that the Representative discovers any construction or material or workmanship which does not conform to the requirements of this Contract and/or the Specifications, the Representative shall promptly give the BUILDER a notice writing as

37

to such non-conformity. Upon receipt of such notice from the Representative, the BUILDER shall correct such non-conformity, if the BUILDER agrees to his view. If the BUILDER does not agree, the BUILDER shall notify the Representative in writing of the extent to which the BUILDER does not agree. In the event of a difference of opinion between the parties hereto, the BUILDER or the BUYER may request resolution of the matter in accordance with Article XIII hereof.

In all working hours during the construction of the VESSEL until delivery thereof, the Representative and his assistant(s) shall be given free and ready access to the VESSEL, its engines and accessories, and to any other place where work is being done, or materials are being processed or stored, in connection with the construction of the VESSEL, including the yards, workshops, stores and offices of the BUILDER and the premises of subcontractors of the BUILDER, who are doing work or storing materials in connection with the VESSEL's construction.

4.  Facilities:

The BUILDER shall furnish the Representative and his assistant(s) with adequate office space, Lodging (for only one superintendent) and necessary transportation during the construction period, and such other reasonable facilities according to the BUILDER's practice at, or in the immediate vicinity of, the Shipyard as may necessary to enable them effectively carry out their duties.

5.  Liability of the BUILDER:

The Representative and his assistant(s) shall at all times be deemed to be the employees of the BUYER and not of the BUILDER. The BUILDER shall be under no liability whatsoever to the BUYER, the Representative or his assistant(s) for personal injuries, including death, suffered during the time when he is on the VESSEL, or within the premises of either the BUILDER or its subcontractors, or are otherwise engaged in

and about the construction of the VESSEL, unless, however, such personal injuries, including death, were caused by a gross negligence of the BUILDER as the case may be, or of any of its employees or agents or subcontractor. Nor shall the BUILDER be under any liability whatsoever to the BUYER, the Representative or his assistant(s) for damage to, or loss or destruction of property in China of the BUYER or of the Representative or his assistant(s), unless such damage, loss or destruction were caused by a gross negligence of the BULDER, as the case may be, or of any of its employees or agents or subcontractors.

6.  Responsibility of the BUYER:

The BUYER shall undertake and assure that the Representative shall carry out his duties hereunder in accordance with BUILDER's standard shipbuilding and inspection practice and in such a way as to avoid any unnecessary increase in building cost, delay in the construction of the VESSEL, and/or any disturbance in the construction schedule of the BUILDER.

The BUILDER has the right to request the BUYER to replace the Representative who is deemed unsuitable and unsatisfactory for the proper progress of the VESSEL's construction.

The BUYER shall investigate the situation by sending its representative(s) to the Shipyard, if so requested by the BUILDER, and if the BUYER shall considers that the BUILDER's  request for such replacement is justified, the BUYER shall effect such replacement as soon as practically possible.

(End of Article)

39

## ARTICLE V – MODIFICATIONS

1. Modifications of Specifications:

   The Specifications may be modified and/or changed by written agreement of the parties hereto, provided that such modifications and/or changes will not, in the BUILDER's judgment, adversely affect the BUILDER's planning or program in relation to the BUILDER's other commitments, and provided, further, that the BUYER shall first agree, before such modifications and/or changes are commenced out, to alterations in the Contract Price, the Delivery Date and other terms and conditions of this Contract and the Specifications to be occasioned by or to result from such modifications and/or changes.

   Such agreement as to the alterations may be effected by exchange of letters signed by the authorized representatives of the parties or by telefax confirmed by letters manifesting agreements of the parties and shall constitute amendments to this Contract and/or the Specifications.

2. Change in Class, etc.:

   In the event that, after the date of this Contract, any requirements as to class or as to rules and regulations, to which the construction of the VESSEL is required to conform, are altered or changed by the Classification Society or the other regulatory bodies authorized to make such alterations or changes, the following provisions shall apply:

   (a) If such alterations or changes are compulsory for the VESSEL, either of the parties hereto, receiving information as to the alterations or changes from the Classification Society or other regulatory bodies, shall promptly transmit the same to the other in writing, and the BUILDER shall incorporate such alterations or into the construction of the VESSEL, provided that the BUYER shall first agree to adjustments required by the BUILDER in the

- 15 -

40

Contract Price, the Delivery Date and other terms and conditions of this Contract and the Specifications to be occasioned by or to result from such alterations or changes.

(b) If alterations or changes are not compulsory for the VEESEL, but the BUYER desired to incorporate such alterations or changes into the construction of the VESSEL, then, the BUYER shall notify the BUILDER of such intention. The BUILDER may accept such alterations or changes will not, in the judgment of the BUILDER, adversely affect the BUILDER's planning or program in relation to the BUILDER's other other commitments, and provided, further, that the BUYER shall first agree to adjustments required by the BUILDER in the Contract Price, the Delivery Date and other terms and conditions of this Contarct and Specifications to be occasioned by or to result from such alterations or changes.

Agreement as to the alterations or changes under this Paragraph may be made in the same manner as provided in Paragraph 1 of this Article for modifications or changes to the Specifications.

2.  Substitution of Materials:

   In the event that any of the materials required by the Specifications or otherwise under this Contract for the construction of the VESSEL cannot be procured in time or are in short supply to maintain the Delivery Date of the VESSEL, the BUILDER may, provided that the BUYER shall so agree in writing, supply other materials capable of meeting the requirements of the Classification Society and of the rules, regulations and requirements with which the construction of the VESSEL must comply. Any agreement as to the substitution of materials may be effected in the manner provided in Paragraph 1 of this Article, and shall, likewise, include alterations in the Contract Price and other terms and conditions of this Contract, if any, to be occasioned by or to result from the substitution.

- 16 -

41

(End of Article)

42

## ARTICLE VI – TRIALS

1.  Notice:

    The BUYER shall receive form the BUILDER at least fourteen (14) days prior notice in writing or by telefax confirmed in writing of the time and place of the trial run of the VESSEL, and the BUYER shall promptly acknowledge receipt of such notice. The BUYER shall have the Representative on board the VESSEL to witness such trial run. Failure in attendance of the Representative of the BUYER at the trial run of the VESSSEL for any reason whatsoever after due notice to the BUYER as above provided shall be deemed to be a waiver by the BUYER of its right to have the Representative on board the VESSEL at the trial run, and the BUILDER may conduct the trial run without the Representative of the BUYER being present, and in such case the BUYER shall be obligated to accept the VESSEL on the basis of a certificate of the BUILDER that the VESSEL, upon trial run, is found to conform to this Contract and the Specifications.

2.  Weather Condition:

    The trial run shall be carried out under the weather condition, which is deemed favorable enough by the reasonable judgment of the BUILDER. In the event of unfavorable weather on the date specified for the trial run, the sale shall take place on the first available day thereafter that the weather condition permits. It is agreed that, if during the trial run of the VESSEL, the weather should suddenly become so unfavorable that orderly conduct of the trial run can no longer be continued, the trial run shall be discontinued and postponed until the first favorable day next following, unless the BUYER shall assent in writing to acceptance of the VESSEL on the basis of the trial run already made before such discontinuance has occurred.

    Any delay of trial run caused by such unfavorable weather condition shall operate to postpone the Delivery Date by the period of delay involved and such delay shall be

- 18 -

43

deemed as a permissible delay in the delivery of the VESSEL.

3. How Conducted:

    (a)  All expenses in connection with the trial run are to be for the account of the BULDER and the BUILDER shall provide at its own expense the necessary crew to comply with conditions of safe navigation. The trial run shall be conducted in the manner prescribed in the Specifications, and shall prove fulfillment of the performance requirements for the trial run as set forth in the Specifications. The course of trial run shall be determined by the BUILDER.

    (b)  The BUILDER shall provide the VESSEL with the required quantity of fuel oil and the BUYER shall provide lubricating oil and grease and the BUILDER shall provide fresh water and other stores necessary for the trials, as prescribed in the Specifications.

The necessary ballast (sea water and other ballast as may be required) to bring the VESSEL to the trial load drafts as specified in the Specifications, shall be for the BUILDER's account.

4. Method of Acceptance or Rejection:

    (a)  Upon completion of the trial run, the BUILDER shall give the BUYER a notice by telefax confirmed in writing of completion of the trial run, as and if it is considered that the results of the trial run indicate conformity of the VESSEL to this Contract and the Specifications, and the BUYER shall, within three (3) days after receipt of such notice form the BUILDER, notify the BUILDER by telefax confirmed in writing of its acceptance or rejection of the VESSEL.

44

(b) However, should the results of the trial run indicate that the VESSEL, or any part or equipment thereof, does not conform to the requirements of this Contract and/or the Specifications, then the BUILDER shall take necessary steps to correct such non-conformity.

Upon successful completion of correction of such non-conformity and re-trial, if necessary, the BUILDER shall give the BUYER a notice thereof by telefax confirmed in writing. The BUYER shall, within two (2) banking days after receipt of such notice from the BUILDER, notify the BUILDER of its acceptance or rejection of the VESSEL.

(c) In the event that the BUYER rejects the VESSEL, the BUYER shall indicate in its notice of rejection in what respect the VESSEL or any part or equipment thereof does not conform to this Contract and/or the Specifications.

(d) In the event that the BUYER fails to notify the BUILDER by telefax confirmed in writing of its rejection of the VESSEL together with the reason therefor within the period as provided in the above Sub-paragraph (a) or (b), the BUYER shall be deemed to have accepted the VESSEL.

(e) The BUILDER may dispute the rejection of the VESSEL by the BUYER under this Paragraph, in which case the matter shall be submitted for final decision by arbitration in accordance with Article XIII hereof.

5. Effect of Acceptance:

Acceptance of the VESSEL as above provided shall be final and binding so far as conformity of the VESSEL to this Contract and the Specifications is concerned and shall preclude the BUYER from refusing formal delivery of the VESSEL as hereinafter

45

provided, if the BUILDER complies with all other procedural requirements for delivery as provided in Article VII hereof.

6.  Disposition of Surplus Consumable Stores:

Lubricating oil and grease for trial runs shall be supplied by the BUYER and the BUILDER shall pay for the quantity of consumed lubricating oil up to the time of acceptance of the VESSEL at the original purchase price.

Fuel oil for trial runs shall be supplied by the BUILDER according to agreement with the BUYER at the time the fuel oil is required. Fuel oil consumed up to the time of acceptance of the VESSEL shall be for the account of the BUILDER, and balance left and also any other consumable stores remaining on board the VESSEL shall be taken over by the BUYER at the original purchase price if paid by the BUILDER. Any payment by the BUILDER and/or the BUYER in connection with this Paragraph shall be settled through the BUILDER by adjusting the installment due upon delivery of the VESSEL accordingly.

(End of Article)

- 21 -

46

## ARTICLE VII – DELIVERY

1. **Time and Place:**

   The VESSEL shall be delivered by the BUILDER to the BUYER at the SHIPYARD on or before 31st July 2007, except that, in the event of delays in the construction of the VESSEL or any performance required under this Contract due to causes which under the terms of this Contract permit postponement of the date for delivery, the aforementioned date for delivery of the VESSEL shall be postponed accordingly. The aforementioned date, or such later date to which the delivery is postponed pursuant to such terms, is hereunder called the "Delivery Date".

2. **When and How Effected:**

   Provided that the BUYER shall have fulfilled all of its obligations stipulated under this Contract, delivery of the VESSEL shall be effected forthwith by the concurrent delivery by each of the parties hereto to the other of the PROTOCOL OF DELIVERY AND ACCEPTANCE, acknowledging delivery of the VESSEL by the BUILDER and acceptance thereof by the BUYER.

3. **Documents to be Delivered to the BUYER:**

   Upon delivery and acceptance of the VESSEL, the BUILDER or the SHIPYARD shall deliver to the BUYER the following documents, which shall accompany the PROTOCOL OF DELIVERY AND ACCEPTANCE:

   (a) PROTOCOL OF TRIALS of the VESSEL made pursuant to the Specifications.

   (b) PROTOCOL OF INVENTORY of the equipment of the VESSEL including spare parts and the like, all as specified in the Specifications.

- 22 -

47

(c)   PROTOCOL OF STORES OF CONSUMABLE NATURE referred to under Paragraph 6 of Article VI hereof, together with copies of the original invoices covering the purchase price thereof.

(d)   ALL CERTIFICATES including the BUILDER's CERTIFICATE, which are to be issued by the BUILDER. It is agreed that if, through no fault on the part of the BUILDER, the classification certificate and/or other certificates are not available at the time of delivery of the VESSEL, provisional certificates shall be accepted by the BUYER, provided that the BUILDER shall furnish the BUYER with the formal certificates as promptly as possible after such provisional certificates have been issued.

(e)   DECLARATION OF WARRANTY of the BUILDER that the VESSEL is delivered to the BUYER free and clear of any liens, charges, claims, mortgages, or other encumbrances upon the BUYER's title thereto, and in particular, that the VESSEL is absolutely free of all burdens in the nature of imposts, taxes or charges imposed by the Japanese and the Chinese governmental authorities, as well as of all liabilities of the BUILDER to its subcontractors, employees and crew, and of all liabilities arising from the operation of the VESSEL in trial runs, or otherwise prior to delivery.

(f)   DRAWINGS AND PLANS pertaining to the VESSEL as stipulated in the Specifications.

(g)   COMMERCIAL INVOICE

48

(h)   BILL OF SALE from the BUILDER to the BUYER all duly notarized and apostilled accompanied by the authorization documents of the BULDER.

4.   Tender of the VESSEL:

If the BUYER fails to take delivery of the VESSEL after completion thereof according to this Contract and the Specifications without any justifiable reason, the BULDER shall have the right to tender delivery of the VESSEL after compliance with all procedural requirements as above provided.

5.   Title and Risk:

Title to and risk of loss of the VESSEL shall pass to the BUYER only upon delivery and acceptance thereof having been completed as stated above; it being expressly understood that, until such delivery is effected, title to and risk of loss of the VESSEL and her equipment shall be in the BUILDER.

6.   Removal of the VESSEL:

The BUYER shall take possession of the VESSEL immediately upon delivery and acceptance thereof and shall remove the VESSEL form the premises of the SHIPYARD within three (3) days after delivery and acceptance thereof is effected. If the BUYER shall not remove the VESSEL form the premises of the SHIPYARD within the aforesaid three (3) days, then, in such event the BUYER shall pay to the BUILDER the reasonable mooring charges of the VESSEL.

(End of Article)

- 24 -

49

## ARTICLE VIII – DELAYS AND EXTENSION OF
## TIME FOR DELIVERY (FORCE MAJEURE)

1.  Causes of Delay:

    If, at any time before the actual delivery, either the construction of the VESSEL or any performance required as a prerequisite to delivery of the VESSEL is or may be delayed due to Acts of God; acts of princes or rulers; requirements of government authorities; war or other hostilities or preparations therefor; blockade; revolution, insurrections, mobilization, civil war, civil commotion or riots; plague, typhoons, hurricanes, storms; earthquakes; tidal waves; landslides; fires, explosions, collisions or strandings; embargoes; delays or failure in transportation; shortage of materials, machinery or equipment; import restrictions; inability to obtain delivery or delays in delivery of materials, machinery or equipment, or of any items to be supplied by the BUILDER or at the request of the BUYER to be purchased form abroad by the BUILDER for use in the construction of the VESSEL, provided that at the time of ordering the same could reasonably be expected by the BUILDER to be delivered in time; prolonged failure, shortage or restriction of electric current, oil or gas; defects in materials, machinery or equipment which could not have been detected by the BUILDER using reasonable care; casting or forging defect(s) or there like not due to negligence of the BUILDER or its subcontractors; delays caused by the Classification Society or other bodies whose documents are required; destruction of or damages to the Shipyard or works of the BUILDER, its subcontractors or suppliers, or of or to the VESSEL or any part thereof, by any causes herein described; provided that the event could not be reasonable foreseen at the day of signing of this Contract and prevented or avoided by the BUILDER and, further, provided that the BUILDER has taken immediate steps within his reasonable means to overcome or minimize any delay; then and in any such case, the Delivery Date shall be postponed for a period of time which shall not exceed the total

- 25 -

50

accumulated time of all such delays.

2. Notice of Delay:

Within ten (10) days after the date of occurrence of any cause of delay, on account of which the BUILDER claims that it is entitled under this Contract to a postponement of the Delivery Date, the BUILDER shall notify the BUYER in writing or by telefax or e-mail confirmed in writing of the date such cause of delay occurred. Likewise, within ten (10) days after the date of ending of such cause of delay, the BUILDER shall notify the BUYER in writing or telefax or e-mail confirmed in writing of the date such cause of delay ended. The BUILDER shall also notify the BUYER of the period, by which the Delivery Date is postponed by reason of such cause of delay, with all reasonable dispatch after it has been determined. Failure of the BUEYR to object to the BUILDER's claim for postponement of the Delivery Date within ten (10) days after receipt by the BUYER of such notice of claim shall be deemed to be a waiver by the BUYER of its right to object such postponement of the Delivery Date.

3. Definition of Permissible Delay:

Delays on account of such causes as specified in Paragraph 1 of this Article and any other delays of a nature which under the terms of this Contract permits postponement of the Delivery Date shall be understood to be permissible delays and are to be distinguished from unauthorized delays on account of which the Contract Price is subject to adjustment as provided for in Article III hereof.

4. Right to Rescind for Excessive Delay:

If the total accumulated time of all delays on account of the cause specified in paragraph 1 of this Article, excluding(i) delays due to arbitration as provided for in Article XIII hereof or due to defaults in performance by the BUILDER, (ii) delays due to

- 26 -

5/

Article V, (iii) delays in delivery of the BUYER's supplied items, or (iv) delays of a nature which, under the terms of this Contract, permit postponement of the date for delivery, amount to Two Hundred and Ten (210) days or more, then, in such event, the BUYER may rescind this Contract in accordance with the provisions of Article X hereof, provided however that the BUILDER shall not be liable for any damage which may sustain as a result of such rescission of the Contract. The Builder may, at any time after the accumulated time of the aforementioned delays justifying rescission by the BUYER, demand in writing that the BUILDER shall make an election, in which case the BUYER shall, within twenty (20) days after such demand is received by the BUYER, either notify the BUILDER of its intention to rescind this Contract, or consent to a postpone of the Delivery Date to a specific future date; it being understood and agreed by the parties hereto that, if any further delay occurs beyond such specific future date, The BUYER shall have the same right of rescission upon the same terms as hereinabove provided. In case that the VESSEL is constructed within such extend sphere of the Delivery Date, the BUILDER shall not be liable for any damage which the BUILDER may sustain as a result of delay in delivery of the VESSEL beyond the originally agreed Delivery Date.

(End of Article)

52

## ARTICLE IX – WARRANTY OF QUALITY

1. Guarantee:

   Subject to the provisions hereinafter set forth, the BUILDER undertakes to remedy, free of charge to the BUYER, any defects in the VESSEL which are proved to be due to defective material and/or poor workmanship on the part of the BUILDER and/or its subcontractors, provided that a notice in respect of the defects is duly received by the BUILDER as hereinafter provided within the period up to thirty (30) days after the expiry of the guarantee period of twelve (12) months counting from the date of delivery of the VESSEL, and in case of absence of notice within the aforesaid twelve (12) months period the BUILDER shall be fully relieved of its liability for any defects in the VESSEL, even if any.

   For the purpose of this Article, the VESSEL shall include her hull, machinery, equipment and gear, but excludes any parts for the VESSEL which have been supplied by or on behalf of the BUYER.

2. Notice of Defects:

   The BUYER shall notify the BUILDER in writing, or by telefax or e-mail confirmed in writing, of any defects for which claim is made under this guarantee as promptly as possible after discovery thereof. The BUYER's written notice shall describe the nature and extent of the defects. The BUILDER shall have no obligation for any defects, unless notice of such defects is received by the BUILDER not later than thirty (30) days after the expiry date of the said twelve (12) months guarantee period.

3. Remedy of Defects:

   (a) The BUILDER shall remedy, at its risk and expense, any defects, against which the VESSEL is guaranteed under this Article, by making all necessary repairs or

- 28 -

53

replacements at a Shipyard in China, which the BUILDER may determine.

(b)  However, if it is impractical to bring the VESSEL to the Shipyard chosen by the BUILDER, the BUYER may cause the necessary repairs or replacements to be made elsewhere which is deemed suitable for the purpose, provided that, in such event, the BUILDER may forward or supply replacement parts ore materials to the VESSEL, unless forwarding or supplying thereof to the VESSEL would impair or delay the operation or working schedule of the VESSEL.

In the event that the BUYER proposes to cause the necessary repairs or replacements to be made to the VESSEL at any other shipyard or works than the Shipyard determined by the BUYER, the BUYER shall first, but in any event as soon as possible, give the BUILDER 30 days minimum notice in writing or telefax or e-mail confirmed in writing of the time and place such repairs will be made, and if the VESSEL is not thereby delayed, or her operation or working schedule is not thereby impaired, the BUILDER shall have the right to verify by its own representative(s) the nature and extents of the defects complained of. The BUILDER shall, in such case, promptly advise the BUYER by telefax confirmed in writing after such examination has been completed, of its acceptance or rejection of the defects under the guarantee herein provided. Upon the BUILDER's acceptance of the defects as justifying remedy under this Article, or upon award of the arbitration so determining, the BUILDER shall immediately pay to the BUYER for such repairs ore replacements a sum equal to the average estimation quoted by two Chinese similar class shipyards of sub–contractor one appointed by the BUILDER and one by the BUYER respectively for making the same repairs or replacements at the Shipyard, however, in any event such sum shall not be more than the actual cost borne by the BUYER.

- 29 -

54

(c) In any case, the VESSEL shall be taken at the BUYER's cost and responsibility to the place elected, ready in all respects for the repairs or replacements necessitated.

(d) Any dispute under this Article shall be referred to arbitration in accordance with the provisions of Article XIII hereof.

4. Extent of the BUILDER's Responsibility:

(a) The BUILDER shall have no responsibility or liability for any other defects whatsoever in the VESSEL than the defects specified in Paragraph 1 of this Article. Nor the BUILDER shall in any circumstances be responsible or liable for any consequential or special losses, damages or expense including, but not limited to, loss of time, loss of profit or earning or detention of the VESSEL directly or indirectly occasioned or resulted to the BUYER by reason of the defects specified in Paragraph 1 of this Article or due to repairs or other works done to the VESSEL to remedy such defects.

(b) The BUILDER shall not be responsible for any defects in any part of the VESSEL which may subsequent to delivery of the VESSEL have been replaced or in any way repaired by any other contractor, or for any defects which have been caused or aggravated by omission or improper use and maintenance of the VESSEL on the part of the BUYER, its servants or agents or by ordinary wear and tear.

(c) The guarantee contained as hereinabove in this Article replaces and excludes any other liability, guarantee, warranty and/or condition imposed or implied by the law, customary, statutory or otherwise, by reason of the construction and sale of the

- 30 -

55

VESSEL by the BUILDER for and to the BUYER.

(End of Article)

56

## ARTICLE X – RESCISSION BY THE BUYER

1. Notice

   If the BUYER intends to exercise its right of rescission of this Contract, the BUYER shall

   notify the BUILDER to such effect in writing or by telefax or e-mail confirmed in writing.

(End of Article)

57

## ARTICLE XI – THE BUYER'S DEFAULT

1. Definition of Default:

   The BUYER shall be deemed to be in default of performance of its obligations under this Contract in the following cases:

   (a)  If the BUYER fails to pay the to the BUILDER concurrently with the delivery of the VESSEL by the BUILDER to the BUYER as provided in Article II hereof; or

   (b)  If the BUYER fails to take delivery of the VESSEL, within three (3) banking days after the VESSEL is duly tendered for delivery by the BUILDER under the provisions of Article VII hereof.

2. Interest and Charge:

   If the BUYER is in default of payment as to any installment as provided in Paragraph 1 (a) of this Article or any other amount due to the BUILDER form the BUYER under this Contract, the BUYER shall pay interest on such installment or any other overdue amount at the rate of Five percent (5%) per annum form the due date thereof to the date of payment to the BUILDER of the full amount plus accrued interest; in case the BUYER shall fail to take delivery of the VESSEL as provided in Paragraph 1 (b) of this Article, the BUYER shall be deemed to be in default of payment and shall pay interest thereon at the same rate as aforesaid from and including the day on which the VESSEL is tendered for delivery by the BUILDER.

3. Effect of Default:

   (a) If any default by the BUYER occurs as provided hereinbefore, the Delivery Date shall be automatically postponed for a period of continuance of such default by

- 33 -

58

BUYER.

(b) If any default by the BUYER continues for a period of Fifteen(15)days, the BUILDER may, at its option, rescind this Contract by giving notice of such effect to the BUYER by cable confirmed in writing. Upon receipt by the BUYER of such notice of rescission, this Contract shall forthwith become null and void and any of the BUYER's Supplies shall become the sole property of the BUILDER. In the event of such retain any installment or installments theretofore paid by the BUYER to the BUILDER on account of this Contract.

(c) By the BUYER

If any default by the BUYER as defined Paragraph 1(a), (b) or (c) of this Article continues for a period of twenty(20)days, the BUIDER may, at its option, rescind this Contract by giving notice of such effect to the BUYER by telefax confirmed in writing.

Upon receipt of such written notice of rescission by the BUYER, this Contract shall be forthwith rescinded and cancelled, and any interest or property rights which the BUYER may have in or to the VESSEL and to any material or parts acquired for construction of the VESSEL, but not yet utilized for such purpose shall forthwith cease and the VESSEL and materials and parts thereof shall become the sole property of the BUILDER and the BUILDER shall have full right and power to dispose of the same in any manner whatsoever as the BUILDER may think fit au its sole and absolute discretion. In addition, the BUILDER shall be entitled to be paid the amount equivalent to twenty percent(20%) of the Contract Price as liquidated damages for the rescission of the Contract, and for that purpose any and all amounts paid by the BUYER to the BUILDER as instalments of the Contract Price of otherwise may be applied by the BUILDER to cover the payment of the aforesaid

- 34 -

59

liquidated damages, and any surplus remaining, if any, shall be returned to the BUYER without any interest thereon, and the BUYER shall be fully released and no further damages shall be claimed by the BUILDER.

(End of Article)

60

## ARTICLE XII - INSURANCE

1. Extent of Insurance Coverage:

   From the time of keel-laying of the VESSEL until the same is completed, delivered to and accepted by the BUYER, the BUILDER shall, at the BUILDER's own cost and expense, to keep the VESSEL and all machinery, materials, equipment, appurtenances and outfit, delivered to the Shipyard for the VESSEL or built into, or installed in or upon the VESSEL, including the BUYER's Supplies, fully insured with first class Japanese insurance companies under coverage corresponding to the Japanese Builder's Risks Insurance Clause.

   The amount of such insurance coverage shall, up to the date of delivery of the VESSEL, be in an amount at least equal to, but not limited to, the aggregate of the payment made by the BUYER to the BUILDER including the value of the BUYER's Supplies.

   The policy covering such insurance shall be taken out in the name of the BUILDER and all losses under such policy shall be payable to the BUILDER for distribution by it to itself and its assignee and the BUILDER as their respective interests may appear as provided for in the Paragraph 2 hereof.

2. Application of Recovered Amount:

   (a) Partial Loss:

   In the event the VESSEL shall be damaged by any insured cause whatsoever prior to acceptance thereof by the BUYER and in the further event that such damage shall not constitute an actual or a constructive total loss of the VESSEL, the BUILDER shall apply the amount recovered under the insurance policy referred to in Paragraph 1 of this Article to the repair of such damage satisfactory to the Classification Society, and the BUYER shall accept the VESSEL under this Contract if completed in accordance with this Contract and Specifications.

- 86 -

6/

(b) Total Loss:

However, in the event the VESSEL is determined to be an actual or constructive total loss, the BUILDER shall by the mutual agreement between the parties hereto, either:

i ) proceed to reconstruction of the VESSEL in accordance with the terms of this Contact, in which case the amount recovered under said insurance policy shall beapplied to the reconstruction of the VESSEL, provided that the parties hereto shall have first agreed in writing as to such reasonable postponement of the Deliveri Date;or

ii ) Refund immediately to the BUYER the amount of all installments paid to the BUILDER under this Contract as provided for in this Contract, whereupon this Contract shall be deemed to be terminated and all rights, duties, liabilities and obligations of each of the parties to the other shall terminate forthwith without any party hereto having any right to claim the other party hereto with respect to its damage which it may sustain as a result of total loss of the VESSEL or termination of this Contract thereby.

3. Termination of the BUILDER's Obligation to Insure:

The BUILDER's obligation to insure the VESSEL hereunder shall cease and terminate forthwith upon delivery of the VESSEL and acceptance by the BUYER hereunder.

(End of Article)

62

## ARTICLE XIII - ARBITRATION

1. Unless otherwise provided for herein, any dispute arising or by virtue of this Contract of any difference of opinion between the parties hereto concerning their rights and obligations under this Contract which cannot be mutually resolved shall be submitted to arbitration.

   Unless the parties in a particular case should otherwise agree in writing, the arbitration to settle such dispute or disputes arising before and after the delivery of the VESSEL shall be held in London according to the English Arbitration Act, 1996, as amended, by reference to three arbitrators, one to be appointed by each party and the third to be appointed by the two appointed by the parties. In the event of the failure by one of the parties hereto to appoint an arbitrator within seven(7)days from the date a demand for such an appointment has been made by the other party, then such other party shall appoint such second arbitrator in accordance with this Paragraph.

2. The award of the arbitration as to any questions referred to the arbitrators as hereinabove provided shall be final, binding, conclusive upon and enforceable against the parties hereto and their respective successors and assigns and each party agrees to abide by such a decision.

3. In the event of arbitration of any dispute or disputes arising or occurring prior to the Delivery of the VESSEL to or acceptance by the BUYER of the VESSEL the award by the Arbitration Board of said dispute or disputes shall include a finding as to whether or not the Delivery Date of the VESSEL involved is in any way altered thereby.

   Notwithstanding the preceding provisions of this Paragraph, it is recognized that in the event of any dispute or difference of opinion arising prior to the Delivery of the VESSEL in regard to the construction of the VESSEL, her machinery and equipment, or

- 38 -

63

concerning the quality of materials or workmanship thereof or thereon or in regard to interpretation of the Specifications or other technical matters, such dispute may by mutual agreement of the parties be referred to the Classification Society's regional office in Japan, for final resolution which shall be binding upon both parties. The cost and expense or reference of dispute to resolution of such party shall be borne by the party against whom the dispute is resolved.

(End of Article)

64

## ARTICLE XIV – RIGHT OF ASSIGNMENT

Neither of the parties hereto shall assign this Contract to a third party unless prior consent of the other party is given in writing.

In case of assignment by the BUYER, the BUYER shall remain liable under this Contract.

This Contract shall enure to the benefit of and shall be binding upon the lawful successors or the legitimate assigns of either of parties hereto.

(End of Article)

65

## ARTICLE XV – TAXES, DUTIES AND INTEREST

1.  Taxes and Duties in China:

    The BUILDER shall bear and pay all taxes and duties imposed in China in connection with execution and/or performance of this contract, excluding any taxes and duties imposed in China upon the BUYER's Supplies.

2.  Taxes and Duties outside China:

    The BUYER shall bear and pay all taxes and duties imposed outside China in connection with execution and/or performance of this Contract, except for taxes and duties imposed upon those items to be procured by the BUILDER for construction of the VISSEL.

3.  Interest:

    Where any rate on interest is stipulated in this Contract, the rate so specified shall be the net amount receivable in the hands of the party to whom the interest is paid.

(End of Article)

66

## ARTICLE XVI – PATENTS, TRADEMARKS, COPYRIGHTS, ETC.

1. Patents, Trademarks and Copyrights:

   Machinery and equipment of the VESSEL may bear the patent number, trademarks or trade names of the manufacturers.

   The BUILDER shall defend and save harmless the BUYER from patent liability or claims of patent infringement of any nature of kind, including costs and expenses for, or on account of any patented or patentable invention made or used in the performance of this Contract and also including costs and expenses of litigation, if any.

   Nothing contained herein shall be construed as transferring any patent or trademarks rights or copyright in equipment covered by this Contract, and all such rights are hereby expressly reserved to the true and lawful thereof. The BUILDER's warranty hereunder does not extend to the BUYER's Supplies.

2. General Plans, Specifications and Working Drawings:

   The BUILDER retains all rights with respect to the Specifications, and plans and working drawings, technical descriptions, calculations, test results and other date, information and documents concerning the design and construction of the VESSEL, and the BUYER undertakes therefore not to disclose the same or divulge any information contained therein to any third parties, without the prior written consent of the BUILDER, excepting where it is necessary for usual operation, repair and maintenance of the VESSEL.

(End of Article)

67

## ARTICLE XVII – THE BUYER'S SUPPLIES

1.  Responsibility of the BUYER

    (a)  The BUYER shall, at its own risk, cost and expense, supply and deliver to the BUILDER all of the items to be furnished by BUYER as specified in the Specifications(herein called the"BUYER's Supplies") at warehouse or other storage of the Shipyard in the proper condition ready for installation in or on the VESSEL, in accordance with the time schedule designated by the BUILDER.

    (b)  In order to facilitate installation by the BUILDER of the BUYER's Supplies in or on the VESSEL, the BUYER shall furnish the BUILDER with necessary specifications, plans, drawings, instructions books, manuals, test reports and certificates required by the rules and regulations. If necessary, the BUYER, if so requested by the BUILDER, shall, without any charge to the BUILDER, cause the representatives of the manufacturers of the BUYER's Supplies to assist the BUILDER in installation thereof by themselves or to make necessary adjustments thereof at the Shipyard.

    (c)  Any and all of the BUYER's Supplies shall be subject to the BUILDER's reasonable right of rejection, as and if they are found to be unsuitable or in improper condition for installation. However, if so requested by the BUYER, the BUILDER may repair or adjust the BUYER's Supplies without prejudice to the BUILDER's other rights hereunder and without being responsible for any consequence therefrom.

    In such case, the BUYER shall reimburse the BUILDER for all costs and expenses incurred by the BUILDER in such repair or adjustment and the Delivery Date shall be automatically postponed for a period of time necessary for such repair or replacement.

68

(d) Should the BUYER fail to deriver any of the BUYER's Supplies within the time designated, the Delivery Date shall automatically extended for a period of such delay in delivery.   In such event , the BUYER shall be responsible and pay to the BUILDER for all losses and damages , if any , incurred by the BUILDER by reason of such delay in delivery of the BUYER's Supplies and such payments shall be made upon delivery of the VESSEL. If delay in delivery of any of the BUYER's Supplies exceeds thirty(30)days, then the BUILDER shall be entitled to proceed with construction of the VESSEL without installation thereof in or on the VESSEL , without prejudice to the BUILDER's other rights as hereinabove provided , and the BUYER shall accept and take delivery of the VESSEL so constructed.

2.  Responsibility of the BUILDER:

The BUILDER shall be responsible for storing and handling with reasonable care of the BUYER's Supplies after delivery thereof at Shipyard , and shall , at its own cost and expense , install them in or on the VESSEL , unless otherwise provided herein or agreed by the parties hereto , provided , always that the BUILDER shall not be responsible for quality , efficiency and/or performance of any of   the BUYER's Supplies.

(End of Article)

69

**ARTICLE XVIII – NOTICE**

1.   Address:

Any and all notices and communications in connection with this Contract shall be addressed as follows:


To the BUYER:

    SN Navigation S.A.

    C/O Namirei-Showa Co.,Ltd.

    4-14-8, Hamadera Ishizuchonishi, Nishi-ku, Sakai, Osaka, 592-8333, Japan

    E-mail        :c.fujihara@namirei-showa.co.jp

    Phone No.    :072-243-1022

    Telefax No.   :072-243-0552


To the BUILDER

    Namirei-Showa Co.,Ltd.

    4-14-8, Hamadera Ishizuchonishi, Nishi-ku, Sakai, Osaka, 592-8333, Japan

    E-mail        :c.fujihara@namirei-showa.co.jp

    Phone No.    :072-243-1022

    Telefax No.   :072-243-0552


2.   Language:

Any and all notices and communications in connection with this Contract shall be written in the English language.

                                                        (End of Article)

70

**ARTICLE XIX – INTERPRETATION**

1.   Laws Applicable:

The parties hereto agree that the validity and intererpretation of this Contract and

of   each Article and the part   thereof shall be governed by English law.


2.   Discrepancies:

All general language or requirements embodied in the Specifications are

intended to amplify , explain and implement the requirements of this Contract.

However,in the event that any language or requirements so embodied permit of

.an interpretation inconsistent with any provisions of this Contract, then ,in each

and every such event , the applicable provisions of this Contract shall prevail and

govern.   The Specifications and Plan are also intended to explain each other,

and anything shown on the Plan and not stipulated in the Specifications or

stipulated in the Specifications and not shown on the Plan shall be deemed and

considered as if embodied in both.    In the event of conflict between the

Specifications and Plan , the Specifications shall prevail and govern.


3.   Entire Agreement :

This Contract contains the entire agreement and understanding between the

Parties hereto and supersedes all prior negotiations , representations,

undertakings and agreements on any subject matter of this Contract.



(End of Article)


- 46 -

IN WITNESS WHEREOF, the parties hereto have caused this Contract to be duly

Executed by the duly authorized representatives the day and year first above written.


BUYER:                                          BUILDER:

SN Navigation S.A.                              Namirei-Showa Co.,LTD.


H. Tsuchiya                                     土屋 八寶

By  : Hatusmi Tsuchiya                          By   :Hatumi Tsuchiya

Title : President                               Title : President


- 47 -

72

# EXHIBIT C

11 April 2008 TradeWinds 25

**NEWS**

# Order collapse sparks dispute

## A Toepfer group company has initiated arbitration against two Japanese owners.

Bob Rust and Hans Henrik Thaulow
*Stamford and Shanghai*

The collapse of a two-ship order with Sino-Japanese joint venture Nantong Nikka has left Germany's Toepfer group fighting a $35m legal battle against fledgling Japanese shipowners over two vessels that will never get built.

Hamburg bulker operator Intermare Transport GmbH has initiated a London arbitration with damage claims to that amount against the Panamanian owning entity. It had chartered the unbuilt ships to Intermare with performance guarantees from Osaka-based manufacturers Nakanishi Kikai Kogyosho and Namirei-Showa.

Intermare is part of the Toepfer group, controlled by agribusiness giant Archer Daniels Midland (ADM).

The unbuilt ships at the centre of the present dispute are two 12,500-dwt logs-fitted bulkers to have been built at China's

Yangzhou Ryuwa or Yangzhou Longchuan yard for the Japanese parties. Bareboat charters to Toepfer were to run for up to 10 years at $6,500 per day with favourably priced purchase options.

An official of Namirei-Showa told TradeWinds the problem is not on the yard side. He said: "The problem is with the financing of the construction and the problem stems from the owners who ordered the ships."

Both the Japanese companies are manufacturers with substantial maritime or shipbuilding-related interests and are said to have been interested in breaking into Chinese shipbuilding.

Namirei-Showa, which makes cooling equipment for vessels from cruiseships to LNG carriers, emerged last year as a partner in Nantong Nikka, which was reported to have an orderbook of 29,000-dwt bulkers for several international owners.

The other Japanese manufacturer, Nakanishi Kikai Kogyosho,



JAPAN: Two fledgling shipowners are said to have been interested in breaking into the Chinese shipbuilding arena.
*Photo: Bloomberg News*

is listed with a 29,000-dwt bulker on order at Nantong Nikka for 2008 delivery. TradeWinds has previously identified STX Pan Ocean, NYK, JB Ugland and CMB as ordering 29,000-dwt bulkers from Nantong Nikka.

Correspondence that Trade-Winds has seen refers to the 12,500-dwt Toepfer ships as a Nantong Nikka project. But the relations between the Chinese yards mentioned above is unclear.

One well-informed Japanese source, who does not wish to be named, comments that many aspects of the Sino-Japanese shipbuilding venture are obscure even to an insider.

Legal filings record that Intermare's Jurgen Werner received bad news about the project on 13 February in an e-mail transmitted through Nmerxk Broker (UK), whose Simon Mestecz described the news as "very unfortunate and very unexpected".

Namirei-Showa's Chuji Fujihara wrote: "Despite our various efforts, we now with deep regret

have to conclude that it will not be possible for us to get these newbuildings constructed... [We] hereby invite Toepfer's commendufidess in respect of how we should deal with a possible cancellation of the charter parties."

But Toepfer's ideas on the subject took shape quickly without any further consultation with Namirei-Showa.

Werner wrote to his staff the same morning: "Suggest now to involve our lawyers as well as to evaluate the opportunity losses [including] lost purchase opportunity."

Within two weeks, Namirei-Showa was formally notified that its appeal for discussions was regarded as a repudiation of the charter.

Toepfer's principal claim of just under $30m is based on an estimate by Belgian specialist broker intmess Bulk of a $11,000-a-day market-hire rate over 10 years minus the bareboat rate times two ships. It does not include the value of the purchase options.

# Private-equity house Apollo files for IPO

Apollo Management — the private-equity house that has shelled out billions in circular industry investments — has filed for a listing on the New York Stock Exchange.

The New York-based firm plans a potentially $413m initial public offering (IPO) of more than 28.6 million shares, according to a filing with the US Securities and Exchange Commission.

The shares on offer represent 30.6% of the company's more than 97.3 million Class A shares. Apollo managing partners hold the one Class B share, which carries 86.5% of the voting power.

The money raised, however, will not go into the firm's coffers. Rather, the shares to be sold are already in the hands of so-far unnamed shareholders that picked up stock in private offerings.

Founded by Leon Black in 1990, the firm has invested in an array of interests, ranging from retailer Linens 'n Things to real-estate firm Realogy Corp.

Black is the former managing director of Drexel Burnham Lambert, which collapsed in 1990 over junk-bond investments. Last year, the billions sold off 18% of Apollo for $1.2bn.

Early this year, Apollo Management closed a deal to invest $1bn in Miami-based NCL Corp, the parent of Norwegian Cruise Line and NCL America. It holds a 50% stake but has a majority of the director seats.

The firm also dropped $850m for Oceania Cruises and paid $1bn for Minneapolis-based Carlson's Regent Seven Seas Cruises.

The IPO filing warns investors that Apollo may invest against the grain, describing its style as "value-oriented", "contrarian" and focused on long-term results.
(*More details on www.trade-winds.no*)

---

# Syndication for Excel acquisition of Quintana nears completion

Joe Brady
*Stamford*

A bank syndication supporting Excel Maritime's $2.45bn acquisition of fellow public owner Quintana appears to be nearing a happy conclusion for the company, despite persistent rumours to the contrary.

TradeWinds understands that Excel has managed to syndicate a sufficient chunk of the $1.4bn in bank debt so as to avoid the declaration of so-called "market flex" provisions.

Lead arranging banks in a syndication can invoke market flex when they are having trouble selling the debt under the original terms negotiated with the borrower, in this case Excel. In such a scenario, the borrowing company can be subjected to a higher interest margin over the benchmark London interbank offered rate (Libor), made to accept tougher covenants or otherwise inconvenienced.

But in this case, Excel will retain the original terms negotiated with its lenders: 125 basis points (bps) over Libor on a $1bn term loan and a $400m revolving cred-

it facility. Nordea leads a large lending group featuring DVB, Deutsche Bank and GE Capital as lead arrangers with National Bank of Greece and Credit Suisse as co-arrangers.

Nordea had cited hopes to place some $600m to $700m of the debt in the general syndication, which is being closely watched because it is among the biggest of its kind since the credit market seized up last year.

TradeWinds reported on 19 March that a London bank meeting convened to stoke lender interest had gone well in the view of Nordea and Excel chairman Gabriel "Villy" Panayotides, who called the session "a big vote of confidence".

Nonetheless, there have been growing market rumours that the financing might be in trouble, either because of the overall "credit crunch" squeezing bank liquidity or particular concerns about the Excel-Quintana marriage.

Company and bank officials were not immediately available for comment at TradeWinds's press time.

The Excel loan is fully underwritten, Excel's lenders had a right to alter terms if 60% of the debt could not be placed in syndication, according to public filings in the US.

However, it is understood that arrangers would not push for market flex so long as each was able to reduce its holding to a maxi-

mum figure agreed in advance.

The two Greece-based bulker owners announced their deal in January. Excel is using shares for about half the acquisition price, which valued Quintana at $27 per share at the announcement but, because of a weakening Excel share, had dipped to about $25 by one analyst's calculation last week.

Quintana shareholders are to vote next week on a transaction that would create one of the market's largest owners with 47 vessels on the water and eight capsize bulkers on order.

The combined operation is to be headed by Quintana Maritime chief executive officer Stamatis Molaris and chaired by Panayotides.

---



**Marine hose couplings**

AGENTS WORLDWIDE
Web site: http://www.mmcind.com • E-mail: mmcimd@aol.com • 1-800-645-7359



**MMC**

MMC INTERNATIONAL CORP (USA)
Tel: 1-516-371-3134
MMC EUROPE, LTD. (UK)
Fax: (01670-738289)
MMC ASIA, LTD. (JAPAN)
Fax: 076-252-0265



**KIRIBATI Ship Registry**
*A Flag of Pride and Distinction*

*The Registry for ShipOwners*

www.kiribaship.com

10 Anson Road #25-02, International Plaza, Singapore 079903
Tel: +65 6225 0555, Fax: +65 6225 0550, Email: info@kiribaiship.com

EXHIBIT D

<u>English Translation</u>

Date: June 3, 2008

To: Mr. Masami Nakanishi, Representative Director
Nakanishi Kikai Kogyosho Co., Ltd.
2-8-41, Fukuzaki, Minato-ku, Osaka-city, Osaka-pref., Japan


Mr. Shuzo Watanabe, Representative Director [sealed]
Showa Namirei Co., Ltd.
4-14-8 Hamadera Ishizu-cho Nishi, Nishi-ku,
Sakai-city, Osaka-pref., Japan


<u>Re: Time Charterparty with Intermare Transport GMBH of two 12500 DWT cargo vessels</u>

Referring to the above time charterparty dated April 16, 2007, we hereby acknowledge that;-

although the name of the Owner is referred as "Namirei-Showa or Nakanishi Kikai or their guaranteed nominee" in the above time charterparty,
We hereby confirm that :_-

(1) we did not obtain your consent to describe "Nakanishi Kikai" in the above time charterparty and you are not related to the above time charterparty, therefore

(2) the Owners under the above time charterparty is "Namirei-Showa or their guaranteed nominee" and we have designated SN Navigation S.A., a Panamanian corporation fully owned by us, as "guaranteed nominee", and

(3) you are able to assert that you are not a party to the above time charterparty.

APM112/アーバン・中西契約解除スキーム/ナミレイ→中西　英訳

再送 08-06-09;11:43AM;                                              ;0335683558        # 25/ 39

From: (株) 中西機械工業所          06 6573 4087          2008/06/03 17:54    #203 P.001/002

2008年 6月 3日

大阪市港区福崎 2-8-41
株式会社中西機械工業所
代表取締役　中西　政己

大阪府堺市西区浜寺石津町西 4-14-8
昭和ナミレイ株式会社 
代表取締役　渡邊　修三

**Intermare Transport GMBH との 12500DWT貨物船 2隻の定期用船契約の件**

貴社益々ご清栄のこととお慶び申し上げます。

さて、2007年 4月 16日付けの掲題定期用船契約に関しまして、船主名（Ｏｗ
ｎｅｒ）が、Namirei-Showa or Nakanishi Kikai or their guaranteed nominee
となっておりますが、

(1)「Nakanishi Kikai」の表記について貴社の了解を取っていたわけではなく、
貴社㈱中西機械工業所は本定期用船契約と無関係であること、従って
(2) 本定期用船契約上の船主は「Namirei-Showa or their guaranteed
nominee」であり、当社は当社 100%パナマ子会社 SN Navigation S.A.を
「guaranteed nominee」として定期用船契約者に対し指定したこと、及び
(3) 貴社は同定期用船契約の当事者でないことを主張しうること
を確認致します。

以上

EXHIBIT E

# INTERMARE TRANSPORT
## GMBH

 

20095 HAMBURG
Ferdinandstraße 5
20042 HAMBURG
Postbox 10 61 20
Telephone: 32 46 56
Telex: 2 19 56-0
Telefax: 30 13 - 684

<u>TO WHOM IT MAY CONCERN</u>

## SPECIAL POWER OF ATTORNEY

We, the undersigned Company Intermare Transport GmbH, a company duly organized under the laws of Germany and having its corporate seat at Ferdinandstrasse 5, 20095 Hamburg, Germany, registered with Hamburg Commercial Register under number: HRB 77662, legally represented by its managing director Hartwig Fuchs and its authorized officer Hans-Friedrich Schröder, hereby empower

Mr. Johannes Theodorus van Adrichem

Dutch citizen, identified with Identity Card no. BA0238448, issued on 17 September 2004 by the Ambassador of the Kingdom of the Netherlands in Singapore. to act on our behalf in order to enter into

a) long-term charter parties for two 12,500 dwt single screw bulk carriers with Messrs, SN Navigation S.A.;

b) a separate agreement with SN Navigation S.A. for a purchase option in respect of the aforementioned vessels.

Hamburg, dated this 23rd day of May 2007.

INTERMARE TRANSPORT GmbH

(Hartwig Fuchs)          (Hans-Friedrich Schröder)

