UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
INTERMARE TRANSPORT GMBH                            :
                                                    :
                                                    :
                            Plaintiff,              :        08 cv 3181 (WHP)
                                                    :
        - against -                                 :        ECF CASE
                                                    :
NAMIREI-SHOWA CO., LTD., NAKANISHI KIKAI,           :
and SN NAVIGATION PANAMA a/k/a                      :
SN NAVIGATION S.A. OF PANAMA                        :
                                                    :
                            Defendants.             :
--------------------------------------------------------------------X

### DECLARATION OF PAUL TAYLOR

PAUL TAYLOR hereby declares pursuant to 28 U.S.C. § 1746 as follows:

1.      I am Paul Taylor, a partner in the firm of Middleton Potts, 3 Cloth Street,

Barbican, London, EC1A 7NP. I am qualified as a solicitor and represent Intermare

Transport GmbH (hereinafter "Intermare") in London arbitration commenced by Intermare in

this matter and in the declaratory action filed by defendant Nakanishi Kikai (hereinafter

"Nakanishi Kikai") in the English High Court.

2.      I am authorized to make this statement on behalf of Intermare in opposition to

Nakanishi Kikai's Motion to Vacate Supplemental Rule B Attachment and to Dismiss

Plaintiff's Complaint.

3.      I have been requested by Intermare and its US attorneys, Messrs. Lennon

Murphy & Lennon LLC, to provide this Declaration.

4.    The information contained in this Declaration is true to the best of my knowledge and the opinions I express herein are correct.

5.    I have read Nakanishi Kikai's Memorandum of Law in Support of its Motion to Vacate Supplemental Rule B Attachment and have reviewed the Declaration of Masami Nakanishi, Representative Director of Nakanishi Kikai.

6.    The matters to which I speak in this Declaration are within my own personal knowledge, or based on information given to me by Jurgen Werner of Intermare and/or Hans Adrichem of Alfred C Toepfer International and/or Chris Earp of Maersk Broker and/or the documents annexed to this statement.

7.    The Charter Parties state that they are between, *"Namirei-Showa or Nakanishi Kikai or their guaranteed nominee"* as owners and Intermare as charterers.

8.    Intermare's understanding at all material times was that their contractual counterparties were Namirei Showa Ltd ("Namirei Showa") and Nakanishi Kikai and, by the time of signing, SN Navigation SA Panama ("SN Navigation") which was the company in which legal ownership would vest, nominated by Namirei Showa and representing and/or nominated expressly or impliedly by Nakanishi Kikai. It was Intermare's understanding at all material times that each of the 3 companies just mentioned (together "the Owners") would be liable as principal parties to the charterparties.

9.    The charterparties were signed on behalf of the Owners by a Mr. Watanabe. For the reasons given below, at all material times Intermare understood that Mr. Watanabe had actual authority to sign the charterparties on behalf of each of the 3 Owners, including Nakanishi Kikai. Mr. Nakanishi now alleges in his Declaration (paragraph 16) that Mr. Watanabe did not have actual authority to sign the charterparties on behalf of Nakanishi Kikai. Mr. Nakanishi relies on a letter from Mr. Watanabe dated 3 June 2008 which he say

2

confirms this and that he (Watanabe) had no authority to bind Nakanishi Kikai. This assertion will have to be tested in the light of full disclosure from Nakanishi Kikai in due course and in the context of the arbitration proceedings and English High Court proceedings currently pending in London.

10.     However, even if it should emerge that Mr. Watanabe did not have actual authority to sign the charterparties on behalf of Nakanishi Kikai then, for the reasons set out below, he certainly had ostensible or apparent authority to do so.

11.     It should be noted that the letter from Mr. Watanabe does *not* say that Mr. Watanabe did not have authority to bind Nakanishi Kikai (as Mr. Nakanishi alleges).    What it says is that, *"We,"* (presumably Namirei-Showa) did not obtain Nakanishi Kikai's consent to, *"describe "Nakanishi Kikai" in the above terms [ie as Owner] in the above time charterparty."* This is not inconsistent (or at least not necessarily so) with Mr. Watanabe having ostensible authority to bind Nakanishi Kikai. Mr Watanabe does not say that he does not have authority to bind Nakanishi Kikai for one very important reason. SN Navigation SA is a member of Nakanishi Kikai's group of companies. *At Exhibit 1 hereto are extracts from Lloyd's Register.*

12.     *Page 1 of Exhibit 1* provides details of Nakanishi Kikai's ownership structure. 3 companies appear in Nakanishi Kikai's group - Phoenix Line Corp SA, Royal Novelty Shipping and SN Navigation SA.

13.     SN Navigation was, until 24 June 2008, the registered owner of the vessel SNK Lucky, built at Nantong shipyard. The beneficial owner was Nakanishi Kikai. It is perhaps unsurprising that on 25 June 2008 (before Nakanishi Kikai commenced the declaratory proceedings in London and before it filed its motion in New York), SN Navigation divested itself of ownership of the SNK Lucky in favour of Phoenix Line Corp

SA. Phoenix is still part of the Nakanishi Kikai group. As can be seen from *page 8 of Exhibit 1*, Nakanishi Kikai is beneficial owner of 3 vessels registered in Phoenix's name.

14.    SN Navigation, as part of Nakanishi Kikai's group, acted on Nakanishi Kikai's behalf and required no authority or Power of Attorney. Alternatively, SN Navigation had at the very least ostensible authority to act for its principal in light of the representation by Nakanishi Kikai that SN Navigation was to be registered owner off the vessels on behalf of Nakanishi Kikai as beneficiary, as evidenced by information then publicly available from Lloyd's Register. The attempt to identify SN Navigation as a company connected with Namirei-Showa is a fiction created by Nakanishi Kikai with the intention, if the deal to build the 2 vessels was to go sour, to evade liability. Additionally, subject to disclosure of documents and exchange of witness statements to take place in the English High Court proceedings, the Claimant will argue that SN Navigation was expressly or impliedly nominated by Nakanishi Kikai.

15.    Furthermore, as at 16 November 2006 all main terms of the Charter parties between Intermare Transport, Namirei-Showa and Nakanishi Kikai were agreed. *A recap of the agreed terms appears at Exhibit 2 hereto*. The recap evidenced a binding agreement, concluded through the broking channel, whereby Maersk Broker acted for Intermare Transport and Fairfield acted for Namirei-Showa and Nakanishi Kikai. As a matter of English law, a recap represents a binding agreement between parties prior to drawing up and signing a charterparty. The agreement to charter the vessels to Intermare Transport was thus reached long before Nakanishi Kikai attempted to interpose SN Navigation as a screen for Nakanishi Kikai's continued involvement.

16.    Further, by its conduct after the signing of the charter parties Nakanishi Kikai ratified them.

4

17.    Intermare Transport was initially contacted by Maersk Broker with proposals for entering into long term business with Japanese Owners.

18.    At a meeting held on 30 October 2006 in Singapore, where representatives of Intermare Transport and Maersk Broker met Fairfield and Nakanishi Kikai to learn more about Nakanishi Kikai's operations, Intermare had no doubts that Fairfield were acting on Nakanishi Kikai's behalf. It was also the understanding of Maersk Broker that Fairfield was acting for both Namirei-Showa and Nakanishi Kikai given the clear information flow from both these companies through Fairfield. Discussions at that first meeting centered on two sets of vessels - two 29,200 DWT bulk carriers and two smaller 12,500 DWT bulk carriers. Furthermore, Maersk Broker understood that both companies would be obtaining finance for these vessels.

19.    Detailed negotiations in relation to vessels took place between brokers, with Maersk Broker acting for Intermare and Fairfield Japan acting for both Namirei-Showa and Nakanishi Kikai.    Fairfield was represented by Mr Ishii.

20.    First of all it was understood that Namirei-Showa and Nakanishi Kikai would be Owners of both sets of vessels but then Intermare learnt that these Japanese companies would also be building the vessels. There was no separate broker for each of these companies and, as can be seen from the correspondence between the brokers leading up to the charter party recap of 16 November 2006, there was no doubt that terms were agreed through Fairfield on behalf of both Namirei-Showa and Nakanishi Kikai.

21.    By 14 November 2006, Namirei Showa and Nakanishi Kikai made a firm offer to Intermare, albeit with various subjects remaining. *A copy of this offer is annexed hereto as Exhibit 3.*    As can be seen, the offer was headed *"Offer- Nakanishi Kikai 12,500*

5

*dwt- Toepfer."* The Owners were stated to be *"Namirei-Showa or Nakanishi Kikai or their guaranteed nominee."* Further, the broker's comments stated inter alia:

> *"We understand that Nakanishi Kikai Tokyo will be handling the specification (Kagoshima-san) discussions- he is renound [sic] for very thorough (read longwinded). In whcih [sic] case if a change of specification is required then negociations [sic] will be lengthy.*
>
> *Like Nantong Nikka the Ownership of the vessels will now be shared among Namirei Showa and Nakanishi Kikai to aid fainancing [sic], this will not change our discussions; owners are determined to conclude these ships with Toepfer."*

22.    Therefore, as at that date, it was clear to Intermare that Nakanishi Kikai was to be a contractual counterparty and was to have an ownership interest in the two vessels under discussion.

23.    This was confirmed when, on 16 November 2006, a binding agreement was reached on behalf of Namirei Showa and Nakanishi Kikai, as evidenced by the recap of the agreed terms of the charter party for the two 12,500 DWT vessels; *See Exhibit 2.*

24.    At this time, negotiations were concluded for the chartering of the two larger 29,200 DWT vessels. *At Exhibit 4* is one of two identical charter parties dated 1 December 2006 in respect of the 29,200 DWT bulk carriers. As can be seen, Owners are described exactly as in the recap charter party for the two 12,500 DWT vessels – *"Namirei Showa or Nakanishi Kikai or their guaranteed nominee."*

25.    There was nothing which was subsequently said or done by Nakanishi Kikai and/or Namirei Showa and/or Fairfield which gave Intermare any reason to doubt that

6

Nakanishi Kikai remained a contractual counterparty with an ownership interest in both sets of vessels.

26.    On the contrary, the messages coming to Intermare through the broking chain reiterated Nakanishi Kikai's close involvement in the project. For example, in early December 2006 there was discussion about various changes to the vessels' specification. Nakanishi Kikai was directly involved with this- see the broker's message dated 14 December 2006. *A copy of this message is annexed hereto as Exhibit 5.*

> *"Basically, the yard is very well established and therefore reluctant to amend their tried and tested designs. We understand that Nakanishi-san is pushing hard for the above amendments however, currently the owners are not yet in a position to agree to such ammendments [sic]. This does not mean that it will not be changed in the future but, Nakanishi-san does not want to deliver false promises to Toepfer."*

27.    On or about 12 January 2007, via the broking chain, *"the Owners,"* asked for an extension of the subjects on the existing offer. *A copy of this message is annexed hereto as Exhibit 6.* This was clearly a request emanating from Nakanishi Kikai as well as from Namirei Showa:

> *"Owners were at pains today to highlight that they hope to be able to conclude all the necessary outstanding points before the 15th Feb- Nakanishi are pushing the Imabari based Ship Designer and are confident to see design ammendments [sic] etc in the near future."*

28.    A further message through the broking chain dated 22 January 2007 indicated that Nakanishi Kikai was still directly involved with the project. *A copy of this message is annexed hereto as Exhibit 7.*

> *"As mentioned Isshi-san met with Nakanishi-san this weekend and discussed*
> *the below points…"*

29.    The position remained the same in late February 2007. *A copy of the broker's message dated 26 February 2007 is annexed hereto as Exhibit 8.*

> *"We have received the following from Fairfield…*
>
> *qte//*
>
> *Thanks for the Charterers' acceptance of the delivery of the vessel through the*
> *additional charter rate to be discussed which have informed Namirei-Showa*
> *and Nakanishi Kikai."*

30.    Mr. Nakanishi says in paragraph 11 of his Declaration that Nakanishi Kikai were unable to obtain finance to build the vessels and that he informed Mr. Fujiwara (of Namirei Showa) of that.  He says that:

> *"Around January or February 2007, I heard from Mr. Tsuchiya that Namirei*
> *Showa had successfully procured finance and would build the vessels*
> *themselves.  Therefore I was told that Nakanishi Kikai should step down from*
> *the shipbuilding."*

31.    This evidence is contradicted by the brokers' message to which I have just referred.

32.    In subsequent brokers' communications, Nakanishi Kikai continued to be named as Owners. *See for example the clean recap dated 13 April 2007 annexed hereto as Exhibit 9.*  Indeed, this message is headed, *"Nakanishi Kikai 12,500 dwt- Toepfer."*

33.    The only outstanding matters to discuss prior to the signing ceremony for the charterparties related to loading of ammonium nitrate and great lakes trading.  These were resolved through discussions on 16 April 2007 when Ishii-san traveled to Osaka.

34.     Nakanishi Kikai's case seems to be that the references to Nakanishi Kikai were left in the documents (and ultimately the charterparties themselves) by oversight. However, it seems incredible that in circumstances where Nakanishi Kikai had been taking the lead in dealing with, for example, the detailed specifications for the vessels, they should simply disappear from the picture without that being communicated to Intermare or their brokers. And, of course, by arranging for its subsidiary, SN Navigation, to perform the charter parties and become registered owner of the vessels to be built, Nakanishi Kikai was still very much a party to the charterparties.

35.     The charterparties were signed at a signing ceremony on 28 May 2007.

36.     It remained Intermare's understanding and belief that Nakanishi Kikai was a counterparty to the charterparties. *See, for example, the message dated 21 May 2007 annexed hereto as Exhibit 10.*

37.     SN signed the charterparties on Namirei-Showa's behalf, pursuant to the Power of Attorney, and on Nakanishi Kikai's behalf as its subsidiary and/or its express or implied nominee. As SN Navigation was acting on behalf of both companies and was the party performing the charterparties, it was perfectly logical for Intermare to grant a power of attorney in favour of Hans Adrichem to enter into charterparties and a purchase option agreement with SN Navigation SA. The fact that only SN Navigation was referred to in the power of attorney in no respect changed the understanding and intention of the parties, namely that SN Navigation entered into the charterparties on behalf of both Namirei-Showa and Nakanishi Kikai.

38.     Following the signing of the charterparties, Intermare's understanding remained that Nakanishi Kikai was a party to the charterparties and was involved in the project.

39.    For example, in November 2007 Intermare first became aware of problems with the two vessels which are the subject of this dispute, and also the 29,200DWT vessels. This is evidenced by messages from Maersk dated 15 November 2007. *Copies of these messages are annexed hereto as Exhibit 11.*

40.    As can be seen, both messages are headed, *"Toepfer/ Nantong Nikka 28,900 dwts & 12,500 dwts."*

41.    There can be no doubt that Nakanishi Kikai were involved as owners in relation to the 29,200DWT vessels and no distinction was drawn between the two projects in this regard.

42.    Under the sub-heading for the 12,500DWT vessels, the messages states:

> *"Owners now feel they have to look at an alternative yard."*

43.    Intermare understood that "Owners" was being used in same sense as in the charterparties- that is, that it included Nakanishi Kikai.

44.    This messages further states:

> *"Of course Nakanishi-Kikai and Namirei-Showa have a contract with the yard...*
>
> *Nakanishi-Kikai inform us that they are now in the process of sourcing a new yard..."*

45.    While this is under the sub-heading of the larger vessels, it certainly reflects Intermare's understanding in relation to the 12,500 DWT vessels also.

46.    Intermare, via the broking chain received a message from Namirei Showa on 20 November 2007. *A copy of this message is annexed hereto as Exhibit 12.* This message still refers to, *"Namirei-Showa and Nakanishi Kikai and its guaranteed nominee, as owners,"* and indeed is said to be on behalf of all three parties. This is plainly inconsistent with Mr.

10

Nakanishi's evidence. It clearly suggests that as at 20 November 2007 Namirei Showa (and Fairfield, since they forwarded the email without comment) believed that Nakanishi Kikai was a contracting party. Also, as this was a new email (responding to a request dated 16 November 2007) not based on some earlier draft document, it is inconsistent with the theory that Nakanishi Kikai's name was only left in the charterparty documents as an "oversight".

47.    On 28 December 2007 a further message was received via the broking chain, which again confirmed Nakanishi Kikai's continued involvement. *A copy of this message is annexed hereto as Exhibit 13.* It states, inter alia:

> *"12,500 BC*
>
> *This vessel will construct Nakanishi Shipyard where Mr. Nakanishi have purchased...*
>
> *...*
>
> *Comment:*
>
> *Anyway details of Nakanishi Shipyard and delivery timing for the both vessel which have to check with Namirei and Nakanishi in the early next year.*
>
> *...*
>
> *Understand Ishii-can have been trying to chase both Namirei and Nakanishi during Christmas holidays in Europe... "*

48.    And again, by message dated 9 January 2008, *a copy of which is annexed hereto as Exhibit 14*:

> *"Toepfer/ Nantong Nikka- 29,000dwts + 12,500dwts*
>
> *====*
>
> *We have received address of Nakanishi Shipbuilding."*

11

49.    And again, by message dated 11 January 2008, *a copy of which is annexed hereto as Exhibit 15*:

> *"Furthermore, MB and Fairfield will keep giving pressure to both Namirei and Nakanishi ... "*

50.    A further message dated 18 January 2008, *a copy of which is annexed hereto as Exhibit 16,* confirmed that Fairfield was still speaking directly to Mr. Nakanishi:

> *"Toepfer/ Nantong Nikka- 29,200dwts+12,500dwts*

=====

> *Just talked to Ishii-san on the phone who is on biz trip, and learned that he managed to talk with Nakanishi-san who is in China now.*

> *We learned Nakanishi-san's comment which is summarized as follow.*

> *...*

> *-Nakanishi-san is kindly asking Toepfer to understand the situation."*

51.    In the premises Nakanishi Kikai's conduct after the signing of the charterparties constituted a ratification of those contracts.

52.    I note that Mr Nakanishi says that the idea for constructing two 12,500DWT vessels was initially his. That being so, it seems rather remarkable he should simply accept Namirei Showa's apparent instruction that, *"Nakanishi Kikai should step down from the shipbuilding."*

12

53.    I find it surprising that Mr. Nakanishi makes no mention of Nakanishi Kikai's undoubted continuing involvement with the 29,200DWT vessels

54.    Furthermore, it is incorrect for Mr Nakanishi to state, as he does at paragraph 14 of his statement, that he first learnt of the London proceedings in an article in Tradewinds of 11 April 2008. Nakanishi Kikai was served with two arbitration notices dated 10 March 2008 which were successfully transmitted by fax (*copies of which appear at Exhibit 17*).

55.    For all of the above reasons and on the basis of the documents exhibited to my statement, I do respectfully request the Court to find that the Claimant most clearly has a *prima facie* case that Nakanishi Kikai is a contractual party to the Charterparties. Not only does the Claimant consider that it has a *prima facie* case but it intends to prevail in proving in pending prior proceedings brought by NKK before the English High Court that NKK is indeed a party to the Charterparties.

56.    I wish to make clear that the Claimant is required, in the pending English High Court proceedings, to file a defence by 11 September 2008. The Claimant is still preparing that defence. In light of the tight timetable laid down in these New York proceedings necessitating the filing of this Statement 6 days before the defence on the very same question is filed in London, the Claimant reserves the right to add to this Statement (through further oral submissions at the hearing on 11 September and/or by lodging a further Statement on 11 September) insofar as any further matters, raised in the Claimant's defence in the English proceedings, need to be addressed.

13

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed at this ___4th___ day of September at  London, England.

_Paul Taylor_

EXHIBIT 1



The leader in global maritime information

## Ownership Structure

- Nakanishi Kikai Kogyosho Co. Ltd Commercial Operator: 7 Registered: 3 Technical Manager: 7
  - Phoenix Line Corp. S.A. Registered: 3
  - Royal Novelty Shipping Registered: 1
  - SN Navigation S.A.

If this data is incorrect, click here to provide feedback

© 2008 Informa plc, All rights reserved.

Terms & Conditions | Privacy Statement

Lloyd's and the crest are the registered trade marks
of the Society incorporated by the Lloyd's Act 1871 by the name of Lloyd's

This site is owned and operated by Informa plc ("Informa") whose registered office is Mortimer House,

37-41 Mortimer Street, London, W1T 3JH.
Registered in England and Wales Number 3099067

**LLOYD'S MIU**
The leader in global maritime information

Company Overview: SN Navigation S.A.

## Company Reports:

There are no credit reports currently available.

Order Credit Report

## Incidents:

- Inspections:
  Registered
  Owner: 1

## Company Roles:

- Former Owner/Operator of Dry Cargo Vessels

## Offices:

- Panama City  Panama  Tel: *Not Available*  Fax: *Not Available*

If this data is incorrect, click here to provide feedback

© 2008 Informa plc, All rights reserved.

Terms & Conditions | Privacy Statement

Lloyd's and the crest are the registered trade marks
of the Society incorporated by the Lloyd's Act 1871 by the name of Lloyd's

This site is owned and operated by Informa plc ("Informa") whose registered office is Mortimer House,

37-41 Mortimer Street, London, W1T 3JH.
Registered in England and Wales Number 3099067



**LLOYD'S MIU**
The leader in global maritime information

## Vessel Overview: SNK Lucky

| Summary | | | | |
|---|---|---|---|---|
| Name | SNK Lucky since 01 May 2008 | | | |
| Registration | **IMO** | **Call Sign** | **MMSI** | **Port of Registry** |
| | 9466178 | 3ERE6 | 370 022000 | Panama |
| Flag | Flag: Panama | | | |
| Tonnages | **Gross** | **Net** | **DWT** | **Formula DWT** |
| | 2086 | 895 | 3609 | 3401 |
| | View Tonnage History | | | |
| Vessel Details | Type: **General Cargo** Built: **2008** Status: **Live** | | | |
| Societies | Class: Vessel has *no current class*   [View Class History] | | | |
| Clubs | P & I: *n/a* | | | |
| Owners / Managers | Contact: **Kum Jin Shipping Co. Ltd** | | | |
| ISM | Vessel has no current ISM | | | |
| ISPS | Vessel has no current ISPS | | | |
| Hull Type | Single | | | |
| History | | | | |
| Construction | Yard Number: LC-717 Builder: **Nantong Yahua Shipbuilding Co. Ltd** At: **Nantong** Ordered: **Before 01 Jan 2007** Scheduled: In the year of **01 Jan 2008** Construction start: **After 01 Jan 2007** Construction end: **Before 24 May 2008** | | | |
| Launch | Launched: **01 Jan 2008** First Movement: *n/a*   [View Movements] | | | |
| Dimensions | | | | |
| Breadth | Extreme: **13m** Moulded: **13m** | | | |
| Depth / Draught | Depth: **7.5m** Draft: **3.97m** Freeboard: **3530mm** | | | |
| Length | Length Between Perpendiculars: **79.02m** Length Registered: *n/a* Length Overall: **84.9m** | | | |

If this data is incorrect, click here to provide feedback

© 2008 Informa plc, All rights reserved.

Terms & Conditions | Privacy Statement

Lloyd's and the crest are the registered trade marks
of the Society incorporated by the Lloyd's Act 1871 by the name of Lloyd's

This site is owned and operated by Informa plc ("Informa") whose registered office is Mortimer House,
37-41 Mortimer Street, London, W1T 3JH.
Registered in England and Wales Number 3099067



**LLOYD'S MIU**

The leader in global maritime information

## Vessel Inspections for Registered Owner

- View Summary

| Vessel | * No Longer Owned | | | Inspections | Deficiencies | Times Detained | View Inspections | |
|--------|---|------|------|-------------|--------------|----------------|------------------|------------------|
| | IMO | Flag | | | | | | |
| SNK Lucky | * | 9466178 |  Panama | 1 | 0 | 0 | For Owner | All Inspections |

If this data is incorrect, click here to provide feedback

© 2008 Informa plc, All rights reserved.

Terms & Conditions | Privacy Statement

Lloyd's and the crest are the registered trade marks
of the Society incorporated by the Lloyd's Act 1871 by the name of Lloyd's

This site is owned and operated by Informa plc ("Informa") whose registered office is Mortimer House,
37-41 Mortimer Street, London, W1T 3JH.
Registered in England and Wales Number 3099067



The leader in global maritime information

Inspections: SNK Lucky

View:
- **Inspections: 1**
- Detentions: 0
- Casualties: 0

| Date | Place | | Vessel Name At Time | Registered Owner At Time | Beneficial Owner At Time | Detained | MOU |
|------|-------|--|---------------------|--------------------------|--------------------------|----------|-----|
| 9 Jun 2008 | ● | Kashima (JPN) | Snk Lucky | SN N. | Nakanishi | | Tokyo |

Please Note - All inspection records are supplied by one of the following MOU's:

- Black Sea
- Indian Ocean
- Paris
- Tokyo
- United States Coastguard

None of the above bodies will accept responsibility for any error or inconsistency in the data supplied.

If this data is incorrect, click here to provide feedback

© 2008 Informa plc, All rights reserved.

Terms & Conditions | Privacy Statement

Lloyd's and the crest are the registered trade marks
of the Society incorporated by the Lloyd's Act 1871 by the name of Lloyd's

This site is owned and operated by Informa plc ("Informa") whose registered office is Mortimer House,
37-41 Mortimer Street, London, W1T 3JH.
Registered in England and Wales Number 3099067



The leader in global maritime information

## Owner History: SNK Lucky

- View Current Owners
- View Owner History

Key: Current Owner  No Owner  Previous Owner

| Date | Beneficial Owner | Commercial Operator | Registered Owner | Technical Manager | Third Party Operator | Nominal Owner |
|------|------------------|---------------------|------------------|-------------------|----------------------|---------------|
| Before 25-Jun-2008 | Kum Jin Shipping Co. Ltd<br>From Before 25-Jun-2008 Until Present | Kum Jin Shipping Co. Ltd<br>From Before 25-Jun-2008 Until Present | Phoenix Line Corp. S.A.<br>From Before 25-Jun-2008 Until Present | | | |
| 01-Jan-2008 | Nakanishi Kikai Kogyosho Co. Ltd<br>From 01-Jan-2008 Until 24-Jun-2008 | Nakanishi Kikai Kogyosho Co. Ltd<br>From 01-Jan-2008 Until 24-Jun-2008 | SN Navigation S.A.<br>From 01-Jan-2008 Until 24-Jun-2008 | | | |

If this data is incorrect, click here to provide feedback

© 2008 Informa plc, All rights reserved.

Terms & Conditions | Privacy Statement

Lloyd's and the crest are the registered trade marks
of the Society incorporated by the Lloyd's Act 1871 by the name of Lloyd's

This site is owned and operated by Informa plc ("Informa") whose registered office is Mortimer House,
37-41 Mortimer Street, London, W1T 3JH.
Registered in England and Wales Number 3099067



**LLOYD'S MIU**
The leader in global maritime information

## Fleet Details: Nakanishi Kikai Kogyosho Co. Ltd

Fleet:

- Beneficial Owner: 7
- Commercial Operator: 7
- Registered Owner: 3
- Technical Manager: 7
- Third Party Operator: 0
- Nominal Owner: 0

View:

- Details
- Movements
- History

| Vessel | IMO | | Flag | Built | Status | Registered Owner | Type | Gross | DWT |
|--------|-----|--|------|-------|--------|------------------|------|-------|-----|
| Hoju | 9424352 | ● | Japan | .. | Live | Nakanishi Kikai Kogyosho Co. Ltd | General Cargo | 0 | 1675 |
| Ningbohaii 1803 | 9309332 | ● | Japan | 2003 | Live | Nakanishi Kikai Kogyosho Co. Ltd | Tug | 182 | 305 |
| No.8 Kouei Maru | 9424340 | ● | Japan | .. | Live | Nakanishi Kikai Kogyosho Co. Ltd | General Cargo | 498 | 1679 |

If this data is incorrect, click here to provide feedback

© 2008 Informa plc, All rights reserved.

Terms & Conditions | Privacy Statement

Lloyd's and the crest are the registered trade marks
of the Society incorporated by the Lloyd's Act 1871 by the name of Lloyd's

This site is owned and operated by Informa plc ("Informa") whose registered office is Mortimer House,
37-41 Mortimer Street, London, W1T 3JH.
Registered in England and Wales Number 3099067



**LLOYD'S MIU**
The leader in global maritime information

## Fleet Details: Nakanishi Kikai Kogyosho Co. Ltd

Fleet:

- Beneficial Owner: 7
- Commercial Operator: 7
- Registered Owner: 3
- Technical Manager: 7
- Third Party Operator: 0
- Nominal Owner: 0

View:

- Details
- Movements
- History

| Vessel | IMO | | Flag | Built | Status | Registered Owner | Type | Gross | DWT |
|--------|-----|---|------|-------|--------|------------------|------|-------|-----|
| Hoju | 9424352 | ● | Japan | .. | Live | Nakanishi Kikai Kogyosho Co. Ltd | General Cargo | 0 | 1675 |
| Ningbohail 1803 | 9309332 | ● | Japan | 2003 | Live | Nakanishi Kikai Kogyosho Co. Ltd | Tug | 182 | 305 |
| No.8 Kouei Maru | 9424340 | ● | Japan | .. | Live | Nakanishi Kikai Kogyosho Co. Ltd | General Cargo | 498 | 1679 |
| R.Novelty No.8 | 9244348 | ● | Panama | 2001 | Live | Royal Novelty Shipping | Pusher Tug | 282 | 149 |
| S&B No.11 | 9511739 | ● | Panama | 2008 | Live | Phoenix Line Corp. S.A. | General Cargo | 2050 | 3500 |
| S&B No.13 | 9511741 | ● | Panama | 2008 | Live | Phoenix Line Corp. S.A. | General Cargo | 2050 | 3500 |
| SNK Lady | 9466166 | ● | South Korea | 2008 | Live | Phoenix Line Corp. S.A. | General Cargo | 2086 | 3606 |

If this data is incorrect, click here to provide feedback

© 2008 Informa plc, All rights reserved.

Terms & Conditions | Privacy Statement

Lloyd's and the crest are the registered trade marks
of the Society incorporated by the Lloyd's Act 1871 by the name of Lloyd's

This site is owned and operated by Informa plc ("Informa") whose registered office is Mortimer House,
37-41 Mortimer Street, London, W1T 3JH.
Registered in England and Wales Number 3099067

# LLOYD'S MIU

The leader in global maritime information

## Fleet Details: Nakanishi Kikai Kogyosho Co. Ltd

Fleet:

- **Beneficial Owner:** 7
- **Commercial Operator:** 7
- **Registered Owner:** 3
- **Technical Manager:** 7
- **Third Party Operator:** 0
- **Nominal Owner:** 0

View:

- **Details**
- **Movements**
- **History**

| Vessel | IMO | | Flag | Built | Status | Registered Owner | Type | Gross | DWT |
|--------|-----|---|------|-------|--------|------------------|------|-------|-----|
| Hoju | 9424352 | ● ⌐ | Japan | .. | Live | Nakanishi Kikai Kogyosho Co. Ltd | General Cargo | 0 | 1675 |
| Ningbohail 1803 | 9309332 | ● ⌐ | Japan | 2003 | Live | Nakanishi Kikai Kogyosho Co. Ltd | Tug | 182 | 305 |
| No.8 Kouei Maru | 9424340 | ● ⌐ | Japan | .. | Live | Nakanishi Kikai Kogyosho Co. Ltd | General Cargo | 498 | 1679 |
| R.Novelty No.8 | 9244348 | | Panama | 2001 | Live | Royal Novelty Shipping | Pusher Tug | 282 | 149 |
| S&B No.11 | 9511739 | | Panama | 2008 | Live | Phoenix Line Corp. S.A. | General Cargo | 2050 | 3500 |
| S&B No.13 | 9511741 | | Panama | 2008 | Live | Phoenix Line Corp. S.A. | General Cargo | 2050 | 3500 |
| SNK Lady | 9466166 | | South Korea | 2008 | Live | Phoenix Line Corp. S.A. | General Cargo | 2086 | 3606 |

If this data is incorrect, click here to provide feedback

© 2008 Informa plc, All rights reserved.

Terms & Conditions | Privacy Statement

Lloyd's and the crest are the registered trade marks
of the Society incorporated by the Lloyd's Act 1871 by the name of Lloyd's

This site is owned and operated by Informa plc ("Informa") whose registered office is Mortimer House,
37-41 Mortimer Street, London, W1T 3JH.
Registered in England and Wales Number 3099067

hipowner Online

Company Information printed from Lloyd's Register - Fairplay's Shipowner Online. © Copyright Lloyd's Register - Fairplay Ltd.

| | |
|---|---|
| Company Code | 4125177 |
| Full Company Name | SN Navigation SA |
| Address | c/o Nakanishi Kikai Kogyosho Co Ltd<br>8-41, Fukuzaki 2-chome,<br>Minato-ku,<br>Osaka-fu,<br>Japan. |
| Country | Japan |

EXHIBIT 2

```
================================================================
16/11/2006 12:23:41 (GMT) by TIW        RefNum:TIW40180700
  From/To: Werner, Juergen/Alfred C. Toepfer (private)
================================================================
```

REF : SNM40180699
DATE: 16-11-2006
TIME: 12:23:39 (GMT)

MAERSK BROKER (UK) LTD.

Juergen/Simon

Re: Toepfer / 12,500dwt x 2 NB - 2007/2008 -

Nakanishi Kikai 12,500 dwt - Toepfer
-------------------------------------

We are very pleased to recap the mainterms as agreed below:-

- All negotiations and eventual fixture, if any, to be kept strictly
private and confidential among the parties directly involved.

- Owners : Namirei-Showa or Nakanishi Kikai or their guaranteed
  nominee.

- Charterers : Intermare Transport GMBH Hamburg or their guaranteed
               nominee which to be always guaranteed by Alfred C.
               Toepfer International GMBH Hamburg

- Vessel : Two(2)units of 12,500 DWT  Single Screw Bulk Carriers; logs
fitted. Outline particulars as attached except that on page h-5 should
read 2 x 30t cranes and 1 x 30t derrick (exact specifications for
vessels gear to be mutually agreed.)

- Time Charter Period : Trading via safe port(s) safe anchorage(s)
safe berth(s) for a firm period of 7 years with 2 months more or less
in Charterers' option.

-chopt further 11-13 Months (8th year)
-chopt further 11-13 Months (9th year)
-chopt further 11-13 Months (10th year)

   If declared, optional periods to commence on 1st day of 84th, 96th
   and 108th months respectively after delivery. Optional periods to be
   declared latest by the end of the 82nd, 94th and 106th months after
   delivery respectively, however Charterers to give minimum 60 days
   redelivery notice (in other words, if by the end of 82nd month of
   the charter period, Charterers have not exercised their option for
   the 8th year, they cannot redeliver the vessel until the end of the
   84th month).

- Hire : USD 6,300 pd less 2.5pct total for each vessel(1.25pcts to
Fairfield, and 1.25pcts to Maersk Broker Japan, No address commision)

The charter hire and purchase price are based on the attatched
specifications only, if Charterers intend to amend the specifications
then this will of course impact on both the charter hire and purchase
price. If specifications are to be amended then both the charter hire
and purchase price are to be re-negocatied accordingly.

- Delivery :

1st vessel - 1st Nov/31st Dec.2007 to be narrowed to a 30 days spread
at a mutually agreeable date ex.Shipyards (Owners'intention : November
2007)

4

                                        Message Continues...

2nd vessel - 1st Mar 2008/31st April 2008 to be narrowed to a 30 days spread at a mutually agreeable date ex.Shipyards (Owners'intention : March 2008)

- Cargo and Trading area: to be mutually agreed

- Purchase option

Charterers to have the option to purchase the vessel at any time after the end of the 7th year of the CP period at the following prices:
At the end of the 7th year: USD 9.35 Million incl 2pct ttl brokerage
At the end of the 8th year: USD 8.65 Million incl 2pct ttl brokerage
Charterers have the option to purchase the vessel any time between the end of 7th and the end of 8th year at the pro rata price between USD 9.35 Million and USD 8.65 Million.

Thereafter at prices reducing by USD 0.8 Million per annum or pro rata during the balance of the C/P including optional periods.
Charterers to give minimum 3 months notice of exercising such option.
Charterers may not exercise the option so as to take delivery of the vessel within 6 months after completion of any scheduled drydocking(DD or SS).

- Subject to Owners'BOD approval to be lifted by 20th Dec.2006 COB Japan.

- Subject to Charterers'BOD approval to be lifted by 20th Dec.2006 COB Japan.

- Subject to conclusion of shipbuilding contract which declarable by 20th Dec 2006.

- Subject to owners' Financiers' approval which declarable by 20th Dec 2006.

- Subject to other usual terms and condition to be mutually agreed.

- Subject agreement of MOA terms which are to be negotiated at the same time as C/P terms. Intermare Transport GMBH Hamburg or their guaranteed nominee will be intended buyer.

Technical Remarks which to be part of negos:

Cranes: Noted that Owners intend to fit the vessel with 2 cranes @ 30 ts swl each. In addition to mount 1 derrick to the crane house to serve hold 1 at 30 ts.

Is there any poss to at least equip the vessel with one 60 ts crane preferably the one serving hold no 2 and 3 and in addition to place a traverse on board to run both cranes in twin operations to increase the swl to 90 mts? This would be certainly an improvement in vsl's specs. If same is not possible Owners are kindly requested to advise/ confirm that the vessel will be equipped with a traverse to use both cranes in twin operation with a lifting capacity of swl 60 mts.

Hold design: Owners are pls to confirm that the holds are box shaped and open hatch design in order to avoid any understow etc.

Hachtcovers: Owners are pls to advise the hatch cover design and the operation of same.

Noted that the vessel will be equipped with fixed/collapsible stanchions. Owners pls to confirm that the vsl will be delivered with full set of lashing material according to the latest regulations incl Canada.

Is the vessel designed for the carriage of containers and if so please advise capacity nominal/14 ts homogenious.

5

------------------------------------------------------------------------

is the bulkhead between the main engineroom and hold number 3 is an
A60 bulkhead enabling chrtrs to load Amm Nitrate/PKE alo in hold No.3

Owners have understood the charterers upgrading items of the vessel
above and will revert with upgrading costs and availability.

end technical comments

+++

-----END-----

Thank you very much for your excellent support so far and please
reconfirm that above recap in line with your notes.

regards
Simon Masters

dir line: 44 207 481 6006
mobile  : 44 7771 667 435
home    : 44 208 960 2271
email   : handy.uk@maerskbroker.com

--------------- End of Message ---------------

6

EXHIBIT 3

```
===============================================================
14/11/2006 09:00:32 (GMT) by TIW    RefNum:TIW40051645
  From/To: Maersk Broker Japan/Chartering/Dry Cargo
===============================================================
```

ReplyTo: Chris Earp <drycargo.jp@maerskbroker.com>
From: Chris Earp <drycargo.jp@maerskbroker.com>
To: <drycargo.jp@maerskbroker.com>
Subject: Toepfer / 12,500dwt x 2 NB - 2007/2008 - FIRM OFFER
Date: Tue, 14 Nov 2006 09:00:21 +0000


FROM: MAERSK BROKER JAPAN
DATE: 14-11-2006      TIME: 09:00:21 (GMT)      REF : CEA40051620

SUBJECT : Toepfer / 12,500dwt x 2 NB - 2007/2008 - FIRM OFFER



Simon/Chris
cc: cph

SUBJECT : Toepfer / 12,500dwt x 2 NB - 2007/2008 - FIRM OFFER

Offer - Nakanishi Kikai 12,500 dwt - Toepfer
-------------------------------------------------

As per our discussions we are now pleased to proceed on the
newbuilding 12,500 dwt vessels, please find the  below firm offer
which Chrtarters are to reply by 09:00hrs tokyo time on 15th Nov (Wed)
2006.


----START-----

- All negotiations and eventual fixture, if any, to be kept strictly
private and confidential among the parties directly involved.

- Owners : Namirei-Showa or Nakanishi Kikai or their guaranteed
  nominee.

- Charterers : Intermare Transport GMBH Hamburg or their guaranteed
               nominee which to be always guaranteed by Alfred C.
               Toepfer International GMBH Hamburg

- Vessel : Two(2)units of 12,500 DWT  Single Screw Bulk Carriers; logs
fitted. Outline particulars as attatched (exact specifications for
vessels gear to be mutually agreed.)


- Time Charter Period : Trading via safe port(s) safe anchorage(s)
safe berth(s) for a Firm period of 7 years with 2 months more or less
in Charterers' option.

-chopt further 11-13 Months (8th year)
-chopt further 11-13 Months (9th year)
-chopt further 11-13 Months (10th year)

  If declared, optional periods to commence on 1st day of 84th, 96th
  and 108th months respectively after delivery. Optional periods to be
  declared latest by the end of the 82nd, 94th and 106th months after
  delivery respectively, however Charterers to give minimum 60 days
  redelivery notice (in other words, if by the end of 82nd month of
  the charter period, Charterers have not excercised their option for - - - - -
  the 8th year, they cannot redeliver the vessel until the end of the
  84th month).
```

1

Case 1:08-cv-03181-WHP    Document 17-4    Filed 09/04/2008    Page 3 of 4

Page:2
---------------------------------------------------------------
RefNum:40051645
---------------------------------------------------------------

- Hire : USD 6,450 pd less 2.5pct total for each vessel(1.25pcts to Fairfield, and 1.25pcts to Maersk Broker Japan, No address commsion)

The charter hire and purchase price are based on the attatched specifications only, if Charterers intend to amend the specifications then this will of course impact on both the charter hire and purchase price. If specifications are to be amended then both the charter hire and purchase price are to be re-negocatied accordingly.

- Delivery :

1st vessel - 1st Nov/31st Dec.2007 to be narrowed ex.Shipyards (Owners'intention : November 2007)

2nd vessel - 1st Mar 2008/31st April 2008 to be narrowed  ex.Shipyards (Owners'intention : March 2008)

- Cargo and Trading area: to be mutually agreed

- Purchase option

Charterers to have the option to purchase the vessel at any time after the end of the 7th year of the CP period at the following prices:
At the end of the 7th year: USD 10 Million incl 2pct ttl brokerage
At the end of the 8th year: USD 9.2 Million incl 2pct ttl brokerage
Charterers have the option to purchase the vessel any time between the end of 7th and the end of 8th year at the pro rata price between USD 10 Million and USD 9.2 Million.

Thereafter at prices reducing by USD 0.8 Million per annum or pro rata during the balance of the C/P including optional periods.
Charterers to give minimum 3 months notice of exercising such option.
Charterers may not exercise the option so as to take delivery of the vessel within 6 months after completion of any scheduled drydocking(DD or SS).

- Subject to Owners'BOD approval to be lifted by 20th Dec.2006 COB Japan.

- Subject to Charterers'BOD approval to be lifted by 20th Dec.2006 COB Japan.

- Subject to conclusion of shipbuilding contract which declarable by 20th Dec 2006.

- Subject to owners' Financiers' approval which declarable by 20th Dec 2006.

- Subject to other usual terms and condition to be mutually agreed.

- Subject agreement of MOA terms which are to be negotiated at the same time as C/P terms. Intermare Transport GMBH Hamburg or their guaranteed nominee will be intended buyer.

-----END-----

Broker's comments:

We understand that Nakanishi Kikai Tokyo will be handling the specification (Kagoshima-san) discussions - he is renound for very thorough (read longwinded). In whcih case if a change of specification is required then negociations will be lengthy.

Like Nantong Nikka the Ownership of the vessels wil now be shared among Namirei-Showa and Nakanishi Kikai to aid fainancing, this will not change our discussions; owners are determined to conclude these ships with Toepfer.

2

--------------------------------------------------------------------

Simon please bring Topefer along for our opening tommorrow.

Kind Regards,

Chris Earp  : Maersk Broker Japan
Direct phone: +81-3-5213-2196 - Fax +81-3-5213-2162
Mobile phone: +81-90-5414-5227
E-mail     : drycargo.jp@maerskbroker.com
Website    : www.maerskbroker.com


--------------------------------------------------------------------
This message (including all attachments) is confidential and is
intended only for the above addressee(s). If you are not the intended
recipient, you must not read, print, retain, copy, distribute, or use
any of the information herein. If you receive this message in error,
please delete it and immediately notify the sender.


Although we have taken reasonable care to ensure that any attachments
to this e-mail are free of viruses, we make no representation and give
no warranty in this regard. You should accordingly scan any
attachments with appropriate up to date software.
--------------------------------------------------------------------


[A Mime Part ( - attachment; filename="12500DW OUTLINE PARTICULARS1.pdf") was
detected here]


-------------- End of Message ---------------

EXHIBIT 4

2. APR. 2007  15:22    US 44 20 79914781    NO.238    P.1/36



# Time Charter

## GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party**, made and concluded in London ................................ 1st ...... day of December ........ 19..

2  Between *Namikai Skewas or Nakanishi Kikai or their guaranteed nominees*

3  Owners of the good ........................................ **Steamship/Motorship M.V. Nanting Nikke IBN I (See Clause no. 51) of** ................

4  of ........................ tons gross register, and ........................ tons net register, having engines of ........................ indicated horse p

5  and with hull, machinery and equipment in a thoroughly efficient state, and classed ........................

6  at ........................ of about ........................ cubic feet bale capacity, and about ........................ tons of 2240 lbs.

7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capa

8  allowing a minimum of fifty tons) on a draft of ........................ feet ........................ inches meters on ........................ Summer salt water freeboard, inclusive of permanent bun

9  which are of the capacity of about ........................ tons of fuel, and capable of steaming, fully laden, under good wea

10  conditions unexceeding beaufort 4 about ........................ knots on a consumption of about ........................ tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,

*figures in the description are "about" the figures given are shipyard's designed figures only which are believe to be correct subject to re-conformation at or soon after new building delivery and speed/consumption figure are also subject re-conformation.*

11  now ........................

12  .... and *Intermare Transport GMBH Hamburg or their guaranteed nominees which to be always guaranteed by Alfred C. Toep International GMBH* Charterers of the City of Hamburg, Germany;

13  **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery,

14  about *(See Clause No. 36)* ........................

15  ........................

16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible

17  the fulfillment of this Charter Party.

18  Vessel to be placed at the disposal of the Charterers, at *(See Clause No. 85)*

19  ........................

20  in such dock or at such place (where she may safely lie always afloat) at all times of tide, except as otherwise provided in clause No. 6

21  the Owners may direct If such dock, wharf or place be not available prior to count as provided for in clause No. 6, Vessel on her delivery arrival at f load port after delivery to be

22  ready to receive *Charterers intended* cargo with clean-swept holds *(See Clause No. 31)* and tight, staunch, strong and in every way fitted for the ser having water ballast, winches and

23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler than other power sufficient to run all the winches at one and the s

24  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merch

25  dise, including petroleum or its products, in proper containers, excluding *(See Clause No. 55)* ........................

26  (except in case to be employed in the service of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their

27  all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port or safe ports in British N

28  America and/or United States of America and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, an

29  Mexico, and/or South America ........................ and/or Eu

30  and/or Asia, and/or Africa, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence bet

31  October 31st and May 15th, Hudson Bay and all ports, place, excluding White Sea, Black Sea and the s

32  *Within Institute Warranty Limits (See Clause No. 35)* excluding *(See Clause No. 41)* via safe berth(s), safe port(s), sa

33  anchorages(s), always afloat, always accessible ........................

34  ........................

35  as the Charterers or their Agents shall direct, on the following conditions:

36  1.  That the Owners shall provide and pay for all provisions, wages, immigration and consular shipping and discharging fees of the Crew; shall pay

for insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, (including boiler water and maintain her class and k

37  the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.

38  2.  That whilst on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages except Great B

39  *English Channel, German Bight, Malacca Straits, Sunda Strait* Agencies, Commissions, Tallymen,

Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts i

a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because

40  fitness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while in employed under

41  charter to be for Charterers account. All other fumigations to be for Charterers accounts after vessel has been on charter for a continuous per

42  of six months or more.

43  Charterers are to provide necessary dunnage and shifting boards; also any extra fittings requisite for a special trade or unusual cargo,

44  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting bo

45  for dunnage, they making good any damage thereto.

46  3.  That the Charterers, at the port of delivery, and the Owners at the port of re-delivery, shall take over and pay for all fuel remaining

47  board the vessel at the current prices in the respective ports, the vessel to be redelivered with not less then ........................ tons and not more th

48  ........................ tons and to be re-delivered with not less then ........................ tons and not more than ........................ tons *(As per Clause No. 5*

49  

50

2.APR.2007  15:24    02 44 20 74814781                                    NO.238    P.2/36

51    4.  That the Charterers shall pay for the use and hire of the said Vessel at the rate of USD 11,500 per day plus 2.5 pct to
52    ........................ United States Currency per ton on capacity total deadweight carrying capacity .......................
53    ............ summer freeboard, per Calendar Month, commencing on and from the day of her delivery, ....................
54    and after the same rate for any part of a month day, hire to continue until the hour of the day of her re-delivery in like good order
55    wear and tear excepted, to the Owners (unless lost) on an dropping last outward sea pilot Singapore - Japan range any day or on
56    Sundays and Holidays included, unless otherwise mutually agreed. Charterers are to give Owners not less than 60/30 .......
57    notice of vessels expected date of re-delivery, and port, and probable port 5/3/2/1 days definite notice of redelivery.

58    5.  Payment of said hire to be made in New-York (See Clause No. 78) in cash in United States Currency, semi-monthly in advance but first
          payment including bunkers on delivery to be effected 15 days after vessel's delivery into time charter period, and for the last
          month or
59    part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60    due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of
61    hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Cl
62    ............ without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working
63    following Due .......... whilst written notice of readiness has been given to Charterers or their Agents before 4 p.m. but if required by Charterers, t
64    to have the privilege of paying vessel at above such time need to count to hire.
65          Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, sub
66    to 2 1/2% commission and such advance shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the applicat
67    of such advances.

68    6.  That the cargo or cargoes be laden and/or discharged in any safe dock or at any safe wharf or safe place that Charterers or their Agents
69    direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to
70    lie aground.

71    7.  That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), t
72    accommodations for the Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, cr
73    tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodation allow, Charte
74    paying Owner ......................... per day per passenger for accommodations and meals. However, it is agreed that in case any fine or more expense
75    incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense. No passengers.

76    8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew a
77    boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment a
78    agency; and Charterers are to load, stow, and trim and discharging, lash, secure, dunnage the cargo at their expense under the supervision of
          Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

79    9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall
80    receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments. (See Clause No. 3
81    10.  That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosec
82    with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying a
83    rate of $10.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tu
84    Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal for all such victualling. (See Clause No. 56)
85    11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and
86    Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Ca
87    brows, their Agents or Supercargo, when required, with a true copy of daily Logs in English, showing the course of the vessel and distance run and the co
88    sumption of fuel.
89    12.  That the Captain shall use diligence in caring for the ventilation of the cargo.
90    13.  That the Charterers shall have the option of continuing this charter for a further period of ....................
91    ......................................................................................................................
92    on giving written notice thereof to the Owners or their Agents ............ days previous to the expiration of the first named term, or any declared opt
93    14.  That if required by Charterers, time not to commence before (See Clause No. 85) ..................................... and should ves
94    not have given written notice of readiness on or before ............................................................... but not later than 4 p.m. Charterers
95    their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

96    15.  That in the event of the loss of time from deficiency and/or default of men or stores, Strike of officer and/or crew fire, breakdown
97    damages to hull, machinery or equipment,
98    grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cau
99    preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced
100   defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequen
101   thereof, and all directly incurred extra expenses shall be deducted from the hire.
102   16.  That should the Vessel be lost, moneys paid in advance and not earned (reckoning from the date of loss or being last heard of) shall
103   returned to the Charterers at once. The Act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Se
104   Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105       The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for t
106   purpose of saving life and property.
107   17.  That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons in London or New Yo
108   one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and
109   the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be shipping commercial men and members of
      MAA arbitration in London according to L.M.A.A. rules, English Law London arbitration to apply.
110   18.  That the Owners shall have a lien upon all cargoes, and all sub-freights and/or sub-hires for any amounts due under this Charter, including Gene
      Aver-
111   age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or exce
112   deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, whi
113   might have priority over the title and interest of the owners in the vessel.

2.APR.2007  15:24    DB 44 20 74814781                    NC.239   P.3/36

19. That all derelicts and salvage shall be for Owners and Charterers usual benefit after deducting Owners and Charterers Crew's proportion. General Average shall be adjusted, stated and settled in London, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, York-Antwerp Rules 1974 and any amendments thereto 1924, at such port or place in the United States as may be selected by the ...

Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. It is understood that ... Charter hire is not to contribute to General Average.

30. Fuel used by the vessel while off hire ... Bunkers used by the vessel while off-hire is to be for Owners' account.

31. ... [See Clause No. 77] ...

21. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks cranes) capable of handling lifts upto maximum capacity in accordance with description clause (See Clause No. 52) up to three tons ... providing ropes, falls, slings and blocks as on board. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear crane, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owner also to provide on the vessel sufficient lights as onboard night work and maintain same in efficient working order ...

23. (See Clause No. 53) Vessel to work night and day, if required by Charterers and all winches to be at Charterers' disposal during loading/discharging ...

24. ...

U.S.A. Clause Paramount

Both to Blame Collision Clause

United States, Canadian and General Clause Paramount as attached approximate in all Bills of Lading issued hereunder to be incorporated.

25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be withdrawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter port or to get out after having completed loading or discharging. Vessel not to be required to force ice nor follow ice breaker when iced bound.

26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owner to remain responsible for navigation of the vessel, acts of pilots and tugboats, insurance, crew, and all other matters, same as when trading for their own account.

27. A commission of 1.25 3 3/4 per cent is payable by ... Owners to Fairfield and 1.25 pct to Maersk Broker (UK) L... All commission is payable by Charterers ...

28. An address commission of 3 3/4 per cent payable to ... on the hire earned and paid under this Char...

Rider Clauses No. 29 to 92 both inclusive and additional clauses (from NEW BOTH TO BLAME COLLISION CLAUSE

2.APR.2007  15:25      20 44 20 74814701                    NO.238    P.4/36

*BUNKER FUEL SULPHUR CONTENT CLAUSE) in pages 23 to 32, as attached hereto, are to be conside*
*part of this Charter Party.*

*OWNERS:*                                                    *CHARTERERS:*

~~This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of S~~
~~Brokers & Agents (U.S.A.) Inc. using software which is the copyright of Strategic Software Limited.~~

~~It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or~~
~~insertion of new characters, each alteration being clearly highlighted by underlining or use of colour or use of a larger font and marked as have~~
~~been made by the licensee or end user as appropriate and not by the editor.~~

2.APR.2007  15:25    03 44 22 74814701                          NO.239    P.5/36



## RIDER CLAUSES TO
## M.V. "NANTONG NIKKA TBN 1"
## CHARTER PARTY DATED 1ˢᵗ December 2006

### Clause No.29 Stevedore Damage

Charterers are not to be responsible for stevedore damage or other damage to the Vessel unless notified in writing by the Master at the time of occurrence of damage or as soon as possible thereafter, but within 48 hours from occurrence except in case of hidden damage which to be notified as soon as possible after discovery, but in any case not later than upon completion of the voyage and/or discharge during which the damage was incurred. Master shall cooperate with Charterers or their agents to obtain a written acknowledgment by the responsible parties causing damage unless the damage should have been made good, in the meantime, Owners to settle stevedore damages directly with stevedores but the Charterers to remain ultimately responsible. Although stevedores to be servants of the Charterers.

Charterers have the option of redelivering the Vessel without repairing stevedore damage which to be approved by independent surveyor provided such damage may remain for occasional repair when the ship is to dock for Owners account and same is to be done simultaneously with Owners work that Charterers pay the actual cost of repair for stevedore damage, not the time used. All damages affecting Class seaworthiness and Vessels trading capabilities to be repaired by Charterers at Charterers' time and cost. The repair must be done up to Master's and Class surveyor's satisfaction.

### Clause No.30 Bunker Clause

Bunkers on delivery to be as on board but vessel to have on board sufficient bunkers to safely reach Singapore or equidistance at the Owners' actual purchase price, and bunkers on redelivery to be as on board but sufficient to reach nearest bunkering port at the Charterers' contract price. The Charterers are allowed to replenish bunkers before delivery at Charterers' expenses, and the Owners are allowed to replenish bunkers before redelivery at Owners' expenses subject to the Charterers' prior approval which not to be unreasonably withheld.

Wherever the word "fuel" appears in this Time Charter Party, same is understood to mean "bunkers".

Fuel Oil to confirm with ISO 8217 RMG 35, or RMH 35 in case RMG 35 is not physically available at the considered bunkering place.

Diesel Oil to confirm with ISO 8217 DMB,

Charterers have the option to supply RMF 180 CST in ports where no IFO 380CST is available,

### Clause No.31 Hold Cleaning

Hold Cleanness

On arrival at first loading port after delivery of dockyard Vessel's holds, to be clean, washed down by fresh water and dried up so as to receive/carry Charterers intended cargo in all respects free of salt, rust scale and previous cargo residues to satisfaction of the independent surveyors, should Vessel not be approved by

- 1 -

2.APR.2007  15:26        29 44 22 74814791                                    NO.228    P.6/35

### RIDER CLAUSES TO
### M.V. "NANTONG NIKKA TBN 1"
### CHARTER PARTY DATED 1st December 2006

surveyor then the Vessel to be placed off-hire from the failure of inspection until Vessel is fully accepted and directly related expenses including bunkers consumed during off-hire incurred thereby to be for Owners account.

Intermediate Hold Cleaning

Provided local regulations/weather safely/time permit and if so required by Charterers, crew are to perform intermediate hold cleaning in Charterers time. Charterers to pay USD500 per hold if used payable to Master.

The crew will do such cleaning to the best of their ability with available equipment on board but totally without guarantee that the cargo holds will be accepted at the subsequent loadport(s). In case holds are not passed, Owners/Vessel shall not be responsible for any consequences arising therefrom and Vessel to remain on hire throughout. Fresh water used for washing down holds to be for Charterers account.

### Clause No.32 Watchmen
Watchmen hired from shore for cargo to be for Charterers' account, for Vessel to be for Owners' account provided specifically ordered by Master. Compulsory watchmen to be for Charterers account.

### Clause No.33 On-Hire/Off-Hire Surveys
A joint on-hire and off-hire to be carried upon delivery and redelivery to ascertain Vessel's conditions on delivery/redelivery and bunkers' quantity remaining on board on delivery/redelivery by a surveyor acceptable to both parties. Time for on-hire survey to be for Owners' account and for off-hire for Charterers' account but costs to be equally shared between both parties.

### Clause No.34 Redelivery
A. It is agreed that Owners at port of redelivery are to take over the Vessel immediately ready, day or night Saturdays, Sundays included, on dropping last outward sea pilot. With reference to Clause 4, it is understood that redelivery notice(s) will be given by Time-Charterers in good faith and based upon information given to them.

B. If Vessel will load next cargo at same port as redelivery port, then redelivery to be when/where ready provided no hold cleaning to take place and provided loading can take place at the same berth immediately after completion.

### Clause No.35 Insurance
All taxes on cargo and voyage freights to be for Charterers' account.
Ref. Line 32 and Clause 41 of "Trading Exclusion", Basic war insurance premium for worldwide trading shall be for Owners' account and premium for Hull and Machinery and officers/crew and crew war bonus, if any, due to Vessel's trading to the

- 2 -

2.APR.2007  15:26      30 44 20 74814721                                          NO.228   P.7/56

## RIDER CLAUSES TO
## M.V. "NANTONG NIKKA TBN 1"
## CHARTER PARTY DATED 1st December 2006

restricted areas shall be for Charterers' account, but such trading always to be
subject to Owners' prior approval. Insurance/extra insurance not to exceed official
quotation by Lloyds underwriters, London, however, if such insurance is not
obtainable commercially or through a government, the Owner shall have the right
to refuse Vessel entering into war zone. In case a war risk situation develops after
the Vessel has loaded a cargo, the terms of "CONWARTIME 2004" War clause to be
applied. Any premium for blocking and trapping in war areas to be for Charterers'
account.

Charterers have the right to break Institute Warranty Limits subject to Owners'
prior approval which not to be unreasonably withheld. Charterers to reimburse
extra insurance premium incurred thereby but not higher than quoted by Lloyds
London and only payable against original invoice.

### Clause No.36 Agents
Charterers will have their agents to attend Owners' minor/normal husbandry affairs
without charging separate agency fees, however should there be an extraordinary
matter such as dry-dock, crew change, special survey, major repair, general
average work for Owner's account, Owners shall employ Charterers' agents as
Owners husbandry agents and pay agency as per local recognized tariff or Owners
at their option shall appoint own husbandry agents at their expense.

### Clause No.37 Grace Period
If there is any failure in punctual payment due to oversight or negligence or error
or omission of Charterers' employees, Bankers or agents otherwise for any reason
when there is absence of intention to fail to make payments as set out, Charterers
shall be given by Owners three banking working days written notice to rectify the
failure and when so rectified, the payment shall stand as punctual payment but if
Charterers fail to rectify the payment within three banking working days, Owners to
hold the option put Charterers on notice that they are going to withdraw the Vessel
from the service.

### Clause No.38 Warranties
Owners further warrant that this Vessel has not entered Cuban ports or place since
1st November 1962 nor will enter such port or place prior to delivery under this
Charter Party. It is further understood that this Vessel is not blacklisted by Arab
countries and also that Vessel has full bunkering privileges in the United States
ports and in not restricted due to previous trading.
Vessel is not blacklisted by Canada/U.S.A. in relation to recent Yugoslavia etc.
Owners guarantee Vessel has not traded C.I.S. Pacific ports in the past 2 years.

### Clause No.39 Master's Instructions
The Master is to conform with Charterers' or their representatives' or their agents'
instructions and to execute the voyage(s) with the same due care and diligence as

- 3 -

## RIDER CLAUSES TO
## M.V. "NANTONG NIKKA TBN 1"
## CHARTER PARTY DATED 1ST December 2005

if he was trading for Owners' own account. Charterers to furnish Master with voyage report forms and other relevant documents which the Master to return to Charterers reporting about voyages performed including log abstracts. Such documents to be written in English.

### Clause No.40 Condition Inspection
Charterers to have the option of holding a condition inspection including hose testing for checking hatchsealing integrity at any time during currency of this Charter Party, the Owners and Master giving every facility and assistance to carry out this inspection which to be carried out without interrupting the working of the Vessel and without incurring expenses for the Owners.

### Clause No.41 Trading Exclusion (Areas)
Trading area to be worldwide within IWL but excluding Israel, all Russian Pacific ports except see clause 89, Iraq, Cambodia, Kampuchea, Cuba, Salvador but Acajutla is allowed, Congo (Brazzaville), Somalia, Yemen, Liberia, North Korea, war or warlike zones and any countries banned/boycotted by U.S.A. or U.N,.

Should political situation and practices of international shipping change, Charterers and Owners may discuss in a bonafide spirit to agree to include or exclude any countries.

Charterers have the option to break IWL subject to Owners prior consent, which not to be unreasonably withheld and Charterers to pay all extras as charged by vessel's insurance company against Owners' underwriters' net invoice, which not to exceed premia charged at Lloyds of London,

### Clause No.42 Return Premium
Charterers to have the benefit of any return insurance premium received by Owners from Underwriters as and when received from the Underwriters by reason of Vessel being in port for minimum of thirty (30) days provided Vessel is on-hire for such time. But Owners not to be held responsible for any deficiency in speed/consumption due to foul bottom as a result of prolonged stay in port. In case Vessel is off-hire for more than thirty (30) days consecutive days, Owners and Charterers mutually discuss and find amicable settlement as to how to perform the remaining period of this Charter Party.

### Clause No.43 Deviation/Off-Hire Clause
In the event of the Vessel deviating (which expression includes putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or for any purpose, unless caused by acts or omission or default of the Charterers, the hire shall be suspended as from the commencement of such deviation until the time when the Vessel is again ready and in as efficient

- 4 -

2.APR.2007  15:27    AC 44 20 74814781    NO.236   P.9/36

## RIDER CLAUSES TO
## M.V. "NANTONG NIKKA TBN 1"
## CHARTER PARTY DATED 1st December 2006

state to resume her service from a position not less favorable to Charterers than that at which the deviation commenced. In the event of Vessel for any cause or for any purpose aforesaid, putting, onto any port other than the port for which she is bound on the instructions of Charterers, the port charge, pilotage and other expenses at such port shall be borne by Owners.

### Clause No.44 Certificates
Vessel to be in possession of the necessary certificates, including deratization certificate, to comply with safety and health regulations and all current requirements at all ports of call during the currency of this Charter Party. Vessel will comply with and be maintained in accordance with the requirements of the Commonwealth of Australia loading and unloading safety measure regulations, including Commonwealth of Australia Navigation regulations, order No. 12 of 1986, including regulations dated 8.8 1986 and all cargo gear to be approved by Australian Waterside Workers Federation. Vessel to be in possession of a valid and approved cargo gear certificates in accordance with American Cargo Gear regulations. Any time lost or expenses involved by not having or in obtaining such as valid or approved certificate to be for Owners' account. Owners assure Charterers that conditions aboard this Vessel conform with SOLAS 1974 (pertains to loading grain cargoes at United States' ports and the Vessels capacity plan should so indicate and refer to untrimmed hold ends) Vessel to have on board as approved grain loading certificate from the Vessels country of registry.

### Clause No.45 Safety Regulations
It is understood that Vessel will comply with any safety regulations and/or requirements in effect at all ports of loading and/or discharging, a particular reference is the United State Department of Labour safety and Health Regulations including as set forth in part III of the Federal Register. Should the Vessel not meet safety rules and regulations Owners will make immediate corrective measure and any stevedore standby time and other expenses involved including off-hire will be for the Owners' account.

### Clause No.46 Boycott Clause
Should the vessel be captured, seized, detained, arrested, or boycotted by any authority or by any legal process during the currency of this Charter Party, the payment of hire shall be suspended until the time of her release, and any extra expenses incurred by and/or during the above capture or seizure or detention or arrest shall be for Owners' account, unless such capture or seizure or detention or arrest is occasioned by any personal act or omission or default of the Charterers or their agents or by reason of cargo or calling port or trading under this Charter.

### Clause No.47 Oil Pollution clause-P and I Group Recommended Clause
Financial responsibility in respect of Oil Pollution

- 5 -

2.FFR.2007  15:27    00 44 20 74814701    NO.239    P.10/36

## RIDER CLAUSES TO
## M.V. "NANTONG NIKKA TBN 1"
## CHARTER PARTY DATED 1st December 2006

1. Owners warrant that throughout the currency of this Charter they will provide the Vessel with following certificates.

    A) Certificates issued pursuant to section 311(P) of the U.S. Federal Water Pollution Control Act, as amended (title 33 U.S. Code section 1321(p)

    B) Deleted

2. Notwithstanding anything whether printed or herein to the contrary.

    A) Save as required for compliance with paragraph 1 hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the Vessel lawfully to enter, remain in or leave any country, state or territory in performance of this Charter.

    B) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability, or expenses (including but not limited to the cost of any delay incurred by the Vessel as a result of any failure by Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of the Vessels inability to perform as aforesaid).

    C) Owners shall not be liable for any loss, damage, liability or expenses whatsoever and howsoever arising which Charterers and/or the holders of any Bill(s) of Lading issued pursuant to this may sustain by reason of the Vessel inability to perform as aforesaid.

3. Charterers warrant that the terms of this clause will be incorporated effectively into any Bill(s) of Lading issued pursuant to this Charter.

### Clause No.48 Grab Suitability

The Vessel will not be equipped with any grabs. Charterers may install grabs at their expenses and time. Charterers to have the right to use mechanical grabs for discharging cargoes, always within Vessel's crane lifting capacity and Master's approval which not to be unreasonably withheld. Charterers to pay to the Master lumpsum USD200 per month per grab for maintenance thereof by crew.

Charterers also have the right to use bulldozers in Vessel's holds as deemed necessary by custom of the port, always subject within Vessel's tank top strength and Master's approval which not to be unreasonably withheld.

### Clause No.49 Protective Clause

The New Both-to-Blame Collision, The New Jason Clause and Voy War 2004, P and I Nuclear Clause, as applicable, are all to be considered as part of this Charter Party and Bill(s) of Lading shall be subject to all said clause. The U.S.A. and Canada, Clause Paramount as applicable, or the Hague Rules as enacted in countries other than the U.S.A. and Canada, as applicable, to be incorporated in all Bill(s) of Lading and this Charter.

- 6 -

## RIDER CLAUSES TO
## M.V. "NANTONG NIKKA TBN 1"
## CHARTER PARTY DATED 1st December 2006

### Clause No.50 Bill(s) of Lading

"No through Bill(s) of Lading to be issued.

Neither the Charterers nor their agents permit the issue of any Bill(s) of Lading, Way Bill(s) or other documents evidencing a contract of carriage (whether or not signed on behalf of the Owners, or on the Charterers' behalf, or on behalf of any sub-Charterers) incorporating, whether or not compulsorily applicable, the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules. The Charterers shall indemnify the Owners against liability loss or damage which may result from any breach of the foregoing provisions of the clause"

Owners/Master to authorize Charterers and/or their agents to sign/release original Bill(s) of Lading if required by Charterers, but always in accordance to the mate receipts and tally receipt. Charterers to have option to use seawaybills if required by head Charterers. And Charterers hereby indemnify Owners for above.

### Clause No.51 Radio Clause

To be advised later.

### Clause No.52 Vessel's Description (figures all about).

Vessel : Two(2)units of 29,200 DWT  Single Screw Bulk Carriers.
(Principal Particulars and General Arrangement of provided by Builder Ref No.m17009r, dated Jun 06, 2006) which to be fully co2 fitted in the holds.

(Principal Particulars as per attached)

### Clause No.53 Australian Hold Ladders/Cranes

Vessel to be fitted with hold ladders in accordance with Australian Navigation Act on delivery and Owners to maintain same in efficient order during the currency of this Charter Party. Cranes to be constructed and maintained in accordance with Australian navigation Act.

### Clause No.54 Cargo Claims

Any liability to third parties for cargo claims be borne by Owners/Charterers in accordance with the Interclub NYPE agreement dated May 1984 and any subsequent amendments.

### Clause No.55 Cargo Exclusions

The vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous, injurious, flammable or corrosive nature unless carried in accordance with the requirements or recommendations of the competent authorities of the country of the vessel's registry and of ports of shipment and discharge and of any

- 7 -

2. APR. 2007  19:29    CO 44 28 74814721

NO.239   P.12/36

### RIDER CLAUSES TO
### M.V. "NANTONG NIKKA TBN 1"
### CHARTER PARTY DATED 1st December 2006

intermediate countries or ports through whose waters the vessel must pass.

Notwithstanding provisions of above paragraph, Charterers have the option to load dangerous / injurious or inflammable goods upto 500 mt per voyage, provided same is packed/labeled/loaded/lashed and discharged in accordance with IMO as well as local/international regulations and always excluding IMO Class 1 and 7. Without prejudice to the generality of the foregoing, in addition the following are specifically excluded:

Livestock of any description, arms, ammunition, explosives (black powder, blasting caps, loaded bombs, detonators, dynamite, TNT), nuclear and radioactive materials and its waste, tar in bulk, turnings and motor blocks, hot briquetted iron, petroleum and it's by-products, pitch in bulk, borax in bulk, bitumen, quebracho, sodium sulphate, calcium hydrochlorida, bonemeal, charcoal, turpentine, ferro silicon, resin, cotton, nitrate,  lime, Chilean nitrate, copra, pond coal, pebbles, brown coal, Indian coal (well understood that it means coal loaded in India), sponge iron, asphalt,  ammonium nitrate (but fertilizer grade which does not require $CO_2$ or inert gas system in cargo hold is permitted), naphtha and its products, direct reduced iron, direct reduced iron ore pellets, asbestos, fishmeal, wet hides, creosoted goods, calcium carbide, motor spirits, industrial waste, acids, logs, lumber but Charterers have the option to load under deck and any other cargoes (except coal and sulphur) listed in Appendix B to BC Code.

The vessel is able to carry the following cargoes.
1) Coal - all cargo tanks
   (UN No.010)
2) Brown coal (Lignite) Briquettes - all cargo tanks
   (UN No.002)
3) Alminium Ferrosilicon Powder - can load in No.2 and No.4
   (UN No.1395)
4) Alminium Silicon Powder, Uncoated - can load in No.2 and No.4
   (UN No.1398)
5) Ferrosus metal Boring, Shaving,
   Turning or Cutting - all cargo tanks
   (UN No.2793)
6) Ammonium Nitrate - not able to carry for all cargo tanks

– 3 –

## RIDER CLAUSES TO
## M.V. "NANTONG NIKKA TEN 1"
## CHARTER PARTY DATED 1st December 2006

(UN No.1942)

7) Ammonium Nitrate Fertilizers - can load in No.1, 2, 3and No.4
   (UN No. 2026-70)

8) Ammonium Nitrate Fertilizers - can load in No.1, 2, 3and No.4
   (UN No.2071)

9) Seed Cake (a), containing vegetable oil, Meal,
   Oil Cake, Seed Expellers - all cargo tanks
   (UN No.1386)

10) Seed Cake (b), containing vegetable oil, Meal,
    Oil Cake, Seed Expellers (Mechanical) - all cargo tanks
    (UN No. 1386)

11) Seed Cake (b), containing vegetable oil, Meal,
    Oil Cake, Seed Expellers (Solvent) - can load in No.1, 2, 3 and
    No.4
    (UN No. 1386)

12) Seed Cake (c), containing vegetable oil, Meal,
    Oil Cake, Seed Expellers (Mechanical) - all cargo tanks
    (UN No. 2217)

13) Seed Cake (c), containing vegetable oil, Meal,
    Oil Cake, Seed Expellers (Solvent) - can load in No.1, 2, 3, and
    No.4
    (UN No. 2217)

14) Sulphur (lump or coarse grained) - all cargo tanks
    (UN No. 1350)

15) Zinc Ashes, Zinc Dross, Zinc Residues,
    Zinc Skimmings - No.2 and No.4
    (UN No. 1435)

16) logs, lumber, Chrts have the option to load under deck.

### In case of loading Salt

Maximum two (2) cargoes of salt per year, but shall not be consecutive voyages and shall not be last voyage before redelivery which is to be loaded, stowed, carried and discharged strictly in accordance with applicable national/international regulations and/or IMO Code and recommendations at Charterers'risk and expense. If lime coating/washing of holds is required by Shippers and Owners, Charterers to arrange following at the Charterers' time and expenses. To coat holds with lime

- 9 -

## RIDER CLAUSES TO
## M.V. "NANTONG NIKKA TBN 1"
## CHARTER PARTY DATED 1st December 2006

which is supplied by Charterers to Master's satisfaction prior to loading salt and to arrange removal of the same to Master's satisfaction .Charterers may request the vessel's crew to perform above removal of lima paying lumpsum USD 400 bonus per hold in addition to regular intermediate hold cleaning fee, subject Owners and vessel shall not guarantee that holds will be sufficiently cleaned/accepted at next loading port.

### In case of loading Cement

Maximum two (2) cargoes of cement per year, but shall not be consecutive voyages and shall not be last voyage before redelivery. Charterers may request the vessel's crew to perform hold cleaning paying lumpsum USD 400 bonus per hold in addition to regular intermediate hold cleaning fee, subject Owners and vessel shall not guarantee that holds will be sufficiently cleaned/ accepted at next loading port. Charterers shall provide the vessel with one set each of a Water-Tobey and submerged pump to facilitate such extra works by the vessel's crew. Owners to seal all hatches where such cargo loaded by marine tape or similar tape if required by Charterers, but cost of such tape to be reimbursed by Charterers upon completion of loading. The vessel's bilge line will not be customarily used for discharge of bilge water after hold cleaning of cement.

### In case of loading Scrap

Charterers to have the option to load a maximum of two (2) cargoes of scrap per each trading year, but shall not be consecutive voyages and shall not be last voyage before redelivery, provided however that:

(1)     The scrap mentioned herein is only limited to HMS 1 + 2 and shredded scrap specifically non-oily and always excluding motor blocks, turnings, metal borings and cuttings.

(2)     Charterers undertake to use as few holds as possible provided the vessel's stability and stress permit.

(3)     Charterers undertake that the first layer of scarp to be loaded is not to be released until touching the tanktop and not to be dumped/dropped during loading. The first layer of scrap to be loaded, stowed, trimmed to Master's satisfaction before loading the balance of the cargo.

– 10 –

### RIDER CLAUSES TO
### M.V. "NANTONG NIKKA TBN 1"
### CHARTER PARTY DATED 1st December 2006

In case of loading Sulphur

Maximum two (2) cargoes of sulphur per year, but shall not be consecutive voyages and shall not be last voyage before redelivery which is to be loaded, stowed, carried, and discharged strictly in accordance with applicable national/ international regulations and/or IMO Code and recommendations at Charterers' risk and expense. If lime coating/washing of holds is required by Shippers and Owners, Charterers to arrange following at the Charterer's time and expenses.  To coat holds with lime which is supplied by Charterers to Master's satisfaction prior to loading sulphur and to arrange removal of the lime to Master's satisfaction .Charterers may request the vessel's crew to perform above removal of lime paying lumpsum USD 400 bonus per hold in addition to regular intermediate hold cleaning fee, subject Owners and vessel shall not guarantee that holds will be sufficiently cleaned/accepted at next loading port.

In case of loading Petcoke

Charterers have the liberty of carrying max 3 cargoes of non oily petroleum coke (whether it be full or part cargo), each year if exercised on following conditions:

a) The petroleum coke mentioned herein is only limited to the type of non-hazardous/non-dangerous green delayed type and/or calcined type.
b) If Charterers exercise such options, Charterers undertake to use the least number  of holds possible, provided vessel's stability trim and stress permitting.
c) Such cargo to be loaded/stowed/trimmed/discharged strictly according latest IMO and/or any other latest regulations/rules applicable to such cargo.
d) Should any additional/special wash down of holds before loading be reasonably recommended/proposed/required by Master, Charterers undertake to arrange the same at their expense/time, however, Master and crew to always cooperate with Charterers.
e) After discharging Charterers to arrange at their expense/time any additional/special wash down of holds carrying such cargo by chemicals as Master reasonably considers if necessary, however, Master and crews to always cooperate with Charterers.
f) Such cargo not to be last cargo prior redelivery.
g) Any extra expenses resulting there from/incurred thereby and any detention

2.APR.2007  15:29    DE 44 20 74814701                                          NO.229    P.16/35

## RIDER CLAUSES TO
## M.V. "NANTONG NIKKA TBN 1"
## CHARTER PARTY DATED 1ˢᵗ December 2006

through any of the above causes to be for Charterers' account.

### Clause No.56 Captain's Conduct

It is understood that if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers or Engineers, the Owners shall on receiving particulars of the complain, investigate same and if necessary make a change in the appointment but this provision does not affect the Charterers' rights to advance any claims or require arbitration under Clause No.17 of disputes regarding the conduct of the Master in prosecution of voyages and in carrying out the orders and directions of the Charterers.

### Clause No.57 Itinerary

Owners to keep Charterers regularly advised of Vessels' position, and particularly any changes to same, upto the time of delivery. In addition to the above general advise Owners are to give ETA of the vessel's delivery area/port on fixing and thereafter 3 days and 48/24 hours notice to Charterers.

### Clause No.58 Breakdown of Cargo Gear

Vessel's cargo gear and all other equipment shall comply with the regulations of the countries in which the Vessel will be employed and Owners are to ensure that the Vessel is at all times in possession of valid and up-to-date certificates of efficiency to comply with such regulations. If stevedores, longshoremen or other workmen are not permitted or refuse to work due to failure of Master and/or Owners and/or Owner's agents to comply with aforementioned regulations or because Vessel is not in possession of such valid and up-to-date certificates to efficiency then Charterers may suspend hire for the time thereby lost and Owners to pay for all directly related expenses and incidental to and resulting from such failure. Vessel to work day and night if required by Charterers and all cranes to be at Charterers' disposal during loading and discharging, as required by Charterers. If the regulations of port or of labor unions prevent crew from opening or closing hatches, removing and replacing beams and hatches boards, shore labor to be paid by Charterers. In the event of disabled crane or cranes, or insufficient power to operate cranes, Owners to pay for suitable substitute shore engine(s) or crane(s) and also for any stevedores standby time occasioned thereby, hire of crane(s) not to exceed vessel hire. Hire to be deducted proportionally to the total number of operative hatches for all the time crane or cranes are unavailable due to disability or loss of power unless shore cranes have been provided and paid by Owners in which case hire to be paid in full. Where the Vessel is detained as a result of a disabled crane or cranes which detention would not have occurred had crane(s) been available in all times, then, the payment of hire to be adjusted accordingly as per Clause No.15"

### Clause No.59 Crew Service

Subject to local regulations permit, the following service in respect of loading and

- 12 -

**RIDER CLAUSES TO**
**M.V. "NANTONG NIKKA TBN 1"**
**CHARTER PARTY DATED 1st December 2006**

discharging, operation from officers and crew are included in hire.

1. Raising, lowering and rigging cranes and/or gangways in preparation for loading and discharging, if port regulation permits.
2. Opening and closing of hatches in connection with loading and discharging if local regulations allow, otherwise to be for Charterers' account.
3. Closing and opening of hatches in the event of weather which may adversely affect condition of cargo carried on board during loading and discharging, if port regulation permits.
4. Maintaining sufficient electric power and all cranes whilst loading and discharging including regular maintenance and shifting between berths.
5. Docking and undocking in connection with loading/discharging cargo or bunker. Necessary assistance in the Vessel's bunkering operation.
6. Officers and crew to shape up Vessel's hatches and cranes as much as possible prior to arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations subject to seaworthiness, weather condition and safety of crew.
7. Charterers pay to Master USD2,500 for crew work such as erecting/dismantling stanchions, lashing/unlashing/relashing deck cargo, and cargo mark officers (Charterers to provide paints), provided local regulation/port authorities permit.

The above service shall be considered as a minimum and done as Charterers servants and shall in no way be construed as and alternative to or reduction in the standard of services from officers and crew required under this Charter Party.

**Clause No.60 Charterers' Gear Maintenance**
The Vessel shall keep record of Charterers' gear, equipment and/or stores supplied to the Vessel and shall maintain same in good condition. Gear equipment and/or stores to be returned to Charterers upon their request at any time during the Charter (latest at final discharging port) is same good order and condition as when supplied, fair wear and tear accepted.

**Clause No.61 Deck Cargo**
Charterers have the option of loading cargo on deck and hatch covers at Shipper's /Charterers' risk and expenses and Vessel not to be responsible for any loss and/or damage howsoever caused. Vessel to carry full deck load, if required, in accordance with usual marine practice and safety regulations and the deck load will be limited by Vessel's strength stability and seaworthiness. All deck cargo is to be stowed, lashed and secured at Charterers' risk and expenses to Master's satisfaction and in accordance with all the appropriate regulations. All Bill(s) of Lading issued for cargo carried on deck are to state: "All cargo carried on deck at shippers and/or consignees' risk and expenses. Carrier not responsible for any loss or damage howsoever caused"

- 13 -

2.APR.2007  15:23    · 02 44 20 74914701                    NO.232    P.19/36

## RIDER CLAUSES TO
## M.V. "NANTONG NIKKA TBN 1"
## CHARTER PARTY DATED 1ʳᵗ December 2006

### Clause No.62 Capture/Seizure/Detention/Arrest
Should the Vessel be captured or seized or detained or arrested by any authority or by any legal process during the currency of this Charter Party for any reason attributable to the Owners, the payment of hire shall be suspended until the time of her release. Off-hire to be for any time actually lost. Any extra expenses incurred by and/or during such capture or seizure/or detention or arrest shall be for Owners account.

### Clause No.63 Bimco Double Banking Clause
(a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transshipment, loading or discharging of cargo and/or bunkering.

(b) The Charterers shall pay for and provide such assistance and equipment as may required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his opinion it is not safe to do so.

(d) The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

(e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

### Clause No.64 Lumpsum Amount for Cable/Entertainment/Victualling
Charterers to pay Owners lumpsum USD1,250 per month or pro rata for cable /entertainment/victualling, etc.

### Clause No.65 Time Calculation
The time for delivery/redelivery shall be adjusted to GMT.

-14 -

## RIDER CLAUSES TO
## M.V. "NANTONG NIKKA TBN 1"
## CHARTER PARTY DATED 1st December 2006

### Clause No.56 In Lieu Of Hold Cleaning

Charterers shall have the option to redeliver the vessel without cleaning of holds against paying the Owners a lumpsum of US$4,000 in lieu of such cleaning. However, Charterers shall arrange, at their own accout, dunnaga and bark removal/disposal by shore labor. Alternatively, subject to consent by crew and subject to port regulations, Charterers have the option of using crew for dunnage removal. Charterers shall remain responsible for the disposal and any cost related thereto.

### Clause No.67 Trim and Stability

Cargoes to be loaded and distributed in such a manner that the vessels bending moments, stress forces, trim and stability will not exceed permissible limitations. Vessel to be left in safe seaworthy trim for shifting between berth and all ports to Masters' satisfaction.

### Clause No.68 Discharge of Cargo without Presentation of Original Bill(s) of Lading

Owners allow Charterers to discharge cargo without presentation of Original Bill(s) of Lading by providing Owners with Charterers Letter of Indemnity in accordance with Owners P and I Club form and wording before discharging. Letter of Indemnity to be signed by Charterers only.

### Clause No.69 Weather Routing

Within the context of this Charter Party "good weather conditions" are to be taken as wind speed not exceeding Beaufort 4 (16 Knots maximum). The Charterers may supply an independent weather routing company service to the Master during voyage specified by the Charterers. The Master shall comply with the reporting procedure of the routing service selected by the Charterers. Evidence of weather conditions shall be taken from the Vessels deck logs in case of a dispute between the findings of appointed Wheatherrouting Services and the vessel's log books abstracts the Weatherrouting Services dates to be binding for both parties. Costs for such routing companies to be for Charterers' arrangement and expenses.

### Clause No.70 War Cancellation

If war breaks out between any two or more of following countries:
U.S.A., C.I.S., Peoples Republic of China, Germany, South Korea and Japan directly affecting the performance of the Charter Party, both Owners and Charterers shall have the option to cancel of the Charter whereupon the Charterers shall redeliver the Vessel to the Owners. If she has the cargo on board after discharge thereof at destination or if debarred from reaching or entering it, at a near open and safe port as directed by the Charterers, or if she has no cargo on board, at a port at which she stays, or if sea a near and safe port as directed by the Charterers in all cases

-15-

### RYDER CLAUSES TO
### M.V. "NANTONG NIKKA TBN 1"
### CHARTER PARTY DATED 1ˢᵗ December 2006

hire shall be paid until the Vessels redelivery.

#### Clause No.71 Quarantine
Normal quarantine time and expenses for the Vessel entering port shall be for the Charterers account, but any time of detention and expenses for quarantine due to pestilence, epidemics among or illness of captain, officers and crew shall be for Owners' account.

#### Clause No.72 Smuggling
Any delay, expenses and/or fines incurred on account of smuggling shall be for Owners account if caused by the officers and/or crew and shall be for the Charterers' account if caused by the Charterers' supercargo and/or their staff or agents.

#### Clause No.73 Additional Equipments/Fittings
The Charterers, subject to Owners' prior approval not to be unreasonably withheld, shall be at liberty to fit any additional equipment/fittings for loading, discharging and/or securing cargo and such fittings are not to affect the structure of the Vessel including coating in tanks etc. Such work shall be done at the Charterers' expenses and time and the Charterers shall remove such equipment and fitting and restore the Vessel to her original conditions including repair of coatings at their expenses and time prior redelivery.

Charterers option to weld padeyes under Master's supervision and subject to Master's approval, which not to be unreasonably withheld and Charterers to remove padeyes. Charterers further option to redeliver Vessel without removal of padeyes in consideration of Charterers to pay Owners USD10.00 per padeye.

Vessel has no cement holes on hatches, however, Charterers have the option to make holes in each hatch for loading cement in bulk at their time and expenses, subject to Builders' confirmation.

#### Clause No.74 U.S. Unique Bill(s) of Lading Identifier Clause
The Charterers warrant that each transport documents accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a unique Bill(s) of Lading Identifier as required by the U.S. Customs Regulations (19 Clause, part Section 4.7.A) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatscever which may arise and be made against them.

– 26 –

## RIDER CLAUSES TO
## M.V. "NANTONG NIKKA TBN 1"
## CHARTER PARTY DATED 1st December 2005

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for Charterers' account.

### Clause No.75 Admixture Clause

While Charterers have the option to load two or more cargoes, in the same hold, Charterers are to supply, erect, dismantle and dispose of any and all separations required at their risk and expenses.

Notwithstanding any other provisions in this Charter Party, any claims arising from contamination or admixture to cargo carried in the same hold to be for Charterers' account, Should Charterers be permitted to load containers, Owners are not to be responsible for stowage of cargo in containers, nor for cargo claims arising therefrom. Owners are not to be responsible for stuffing or unstuffing of containers.

### Clause No.76 IMO Clause

The Charterers are to provide the Master with any evidence he may reasonably require to show that the cargo is packed, labeled, loaded, stowed, carried and discharged in accordance with IMO regulations, failing which the Master is entitled to refuse to load such cargo, or if already loaded, to unload it at Charterers' risk and expenses, however, Charterers to be given reasonable amount of time to comply with Master's request prior Master, Owners taking corresponding action. In case local and/or national authorities require special documentation for any cargoes covered by IMO Code, Charterers are to list cargoes (always in accordance with the Charter Party-see also cargo exclusion Clause No.58) then they are to reimburse Owners for any extra expenses by Owners as a result of same.

### Clause No.77 Dry-Docking Clause

Charterers shall place the Vessel within the range of Singapore-Japan and Far East at a convenient time and place to be mutually agreed between Owners and Charterers for Owners' class drydocking survey once in three (3) years at Owners' request. Owners shall give at least three (3) months prior notice to Charterers. Owners shall have the right to place the Vessel in drydock at any time in case of emergency.

Payment of hire shall be suspended from dropping last outward sea pilot (D.L.O.S.P.) of Charterers' last port until Vessel is again efficient in the same or equivalent distance position. Bunker consumed incurred thereby to be for Owners' account.

### Clause No.78 Payments

Bunker value remaining on board on delivery to be paid within three(3) banking days after Vessel's delivery. Charterers are entitled to deduct estimate Owners' expenses /maximum USD600 per port and bunker value on redelivery from last

- 17 -

**RIDER CLAUSES TO**
**M.V. "NANTONG NIKKA TBN 1"**
**CHARTER PARTY DATED 1st December 2006**

sufficient hire. The time for delivery/redelivery shall be adjusted to GMT. Owners' bank account to be advised later when confirmed.

**Clause No.79 ISM Clause**

From the date of coming in force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that the Vessel and The company (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. Except as otherwise provided in this Charter Party, loss, damage, expenses or delay caused by failure on the part of The Company to comply with the ISM Code shall be for Owners' account.

**Clause No.80 Fumigation Clause**

Charterers are on written request permitted to fumigate Vessel's holds with or without cargo on board at loading and discharging port(s) or places en route at their risk and expenses and warrant that fumigants will not expose officers and crew as well as other persons on board the Vessel during and after the fumigation to any health hazard whatsoever and will comply with current IMO regulations, Charterers undertake to also pay Owners all necessary expenses incurred because of the fumigation including necessary expenses for accommodating and victualling Vessel's personnel ashore and to indemnify Owners in respect of any liability, loss, damage, or expenses which they may sustain because of the fumigation. Any time lost thereby counts as on-hire.

If requested by Charterers the Vessel is to be fumigated en route from loading port(s) to the first discharging port. The fumigation procedure involves the use of the product phosphine. If requested by Charterers, Owners/Master will not insist that a technician accompany the Vessel subject to Charterers' agreeable following to be added, for log loading

1. Charterers shall furnish Owners the Letter of Indemnity (*sample as per attached).
2. Charterers shall arrange proper training and documentation for crew in such manner satisfying IMO recommendations by fumigator.
3. Initial setting of fumigants shall be made by the fumigator without involving crew members.
4. Charterers shall supply proper equipment for fumigation which to be retained until complete discharging of the cargo. Charterers to provide all the necessary apparatuses if needed according to local regulation/IMO regulation.
5. Charterers shall remove residue of fumigant where possible at the first port of discharging after fumigation completed.
6. Charterers' fumigation company shall be available to Ship/Owners/Ship managers for information and advise during entire voyage of in-transit

## RIDER CLAUSES TO
## M.V. "NANTONG NIKKA TEN 1"
## CHARTER PARTY DATED 1ˢᵗ December 2006

fumigation.

"Sample of L.O.I.

Letter of Indemnity to be given in return for fumigation transit

"To the Owners, Master and Agent of the M.V.

Dear Sirs,

The above ship shall not be required to fumigate the holds for the cargo of log to be loaded at       · on or around        under the above Charter Party but notwithstanding the provisions of the above Charter Party, we hereby request you to comply with Charterers' order of fumigation while the Vessel, M.V.

is in transit to           for the above cargo of log.

In consideration of your complying with our above request, we hereby agree as follow:

1. To indemnify you, your servants and agent and to hold all of you harmless in respect of any liability, loss, damage or expenses of whatsoever nature that you may sustain by reason of the fumigation done in accordance with our request, where such losses, liabilities or damages are not already covered under Owners' existing insurance arrangements and providing such losses /liabilities /damages are not caused by negligence of Owners/Master and/or their servants.

2. In the event of any proceeding being commenced against you or any of your servants or agents in connection with fumigation done as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3. If, in connection with fumigation done as aforesaid, the Ship should be arrested or detained or should arrest or detention thereof be threatened, or should there by any interference in the use of trading of the Vessel (whether by virtue of a caveat being entered on the Ship's registry or otherwise however), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such Ship or property or to remove such interference and, to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest of detention or such interference may be justified.

4. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

5. This indemnity shall be governed by and construed in accordance Japanese law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the district court of Japan.

Yours faithfully,"

- 19 -

### RIDER CLAUSES TO
### M.V. "NANTONG NIKKA TBN 1"
### CHARTER PARTY DATED 1ˢᵗ December 2006

#### Clause No.81 Consumption of MDO
The vessel to have the liberty of using diesel oil when entering and leaving port and
for manœuvering in shallow narrow waters, canals and rivers.

Vessel does not burn MDO at sea. The starting of vessel's main engine, generators
and boilers are able to burn fuel oil however the Charterers agree that the
consumption of MDO for safety reasons (i.e. starting main engine, generators and
boiler as per page M1-2) is to be for their account. Owners calculate that MDO
consumption per month under normal operations is to be maximum 5 mt and same
to be reviewed after vessel has been operated for six months. .

#### Clause No.82 Charterers' Color
Charterers shall have privilege of flying their own funnel mark and deciding the
vessels name which to be, the Vessel shall be repainted in Owners funnel color
before termination of the Charter and the cost of re-painting shall be for Charterers'
account.

#### Clause No.83 Assignment
Acknowledgement and consent by Charterers for assignment of Charter Party and
Charter hire shall be given to Owners' financier(s) for finance purpose.

#### Clause No.84 I.T.F.
Owners guarantee that the Vessel's officers and crew on board are employed under
conditions approved by I.T.F. during the whole Charter period.

#### Clause No.85 The Laycan of the Vessel
1ˢᵗ August / 30ᵗʰ September 2009 to be narrowed to a 30 day spread at a mutually
agreeable date ex.Shipyards (Owners' intention: August 2009).

#### Clause No.86 Time Charter Period
Trading via safe port(s) safe anchorage(s) safe berth(s) for a Firm period of 7 years
with 2 months more or less in Charterers' option.

- Charterers' option further 11-13 Months (8th yr)
- Charterers' option further 11-13 Months (9th yr)
- Charterers' option further 11-13 Months (10th yr)

If declared, optional periods to commence on 1st day of 84th,96th and 108th
months respectively after delivery. Optional periods to be declared latest by the end
of the 82nd, 94th and 106th months after delivery respectively, however Charterers
to give minimum 60 days redelivery notice (in other words, if by the end of 82nd

**RIDER CLAUSES TO**
**M.V. "NANTONG NIKKA TBN 1"**
**CHARTER PARTY DATED 1ST December 2006**

month of the charter period, Charterers have not exercised their option for the 8th year, they cannot redeliver the vessel until the end of the 84th month).

**Clause 87    Law / Arbitration**

The parties to endeavor to resolve any disputes amicably however if this is not successful, all disputes from time to time arising out of the contract, shall unless the parties agree forthwith on a single arbitrator, be referred to the final arbitrament of two arbitrators carrying on business in London who shall be engaged in the shipping trade and be L.M.A.A. members, one to be appointed by each of the parties, with power to such arbitrators to appoint a third arbitrator.

Any charter party dispute must be made in writing and the arbitrator must be appointed within 12 (twelve) months after the completion of discharge of the respective voyage and where this provision is not complied with the dispute shall be extinguished and cease to exist. No award shall be questioned or invalidated on the grounds that any of the arbitrators is not qualified as above, unless objection to his acting be taken before the award is made. The charter party to be construed in accordance with English law and L.M.A.A. rules to apply.

For disputes where the total amount claimed by either party does not exceed US$50.000 the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association.

**Clause 88    Time bar**

Charterers shall be discharged and released from all liability in respect of any claim or claims which Owners may have under this Charter party and such claim shall be totally extinguished, unless such claims have been notified in detail to Charterers in writing accompanied by all available supporting documents (whether relating to liability or quantum or both) within 24 (twenty four) months from completion of discharge of the appropriate cargo under this Charter Party.

**Clause 89    Asian Gypsy Moth**

Asian Gypsy Moth is considered High Risk and therefore the vessel is prohibited to enter any port within a gypsy moth infected area, or anchored within 20 kilometres of the coastline of a gypsy moth infected area anytime during the egg laying months of July, August and September.

Gypsy moth infected areas for the purpose of these requirements currently include all Pacific Russian ports south of 60 degrees latitude and west of 147 degrees longitude.

- 21 -

2.5+9.2007  13:32     ka 44 28 74914781                              NO.298   P.26/35

### RIDER CLAUSES TO
### M.V. "NANTONG NIKKA TBN 1"
### CHARTER PARTY DATED 1st December 2006

Charterers must maintain a valid Certificate of Freedom from Gypsy Moth throughout the c/p. On redelivery owners are to receive a valid phytosanitary certificate confirming that the vessel is free of any Gypsy Moth.

Charterers are to comply with latest agricultural regulations in line with Australia, Canada, New Zealand, and USA. All costs associated herein are for Charterers' account.

#### Clause 90

All negotiations and eventual fixture, if any, to be kept strictly private and confidential among the parties directly involved.

#### Clause 91     Purchase Option

Charterers to have the option to purchase the vessel at any time after the end of the 7th year of the CP period at the following prices:

- At the end of the 7th year: USD 18.1 Million including  2pct total brokerage

- At the end of the 8th year: USD 17.1 Million including 2pct total brokerage

Charterers have the option to purchase the vessel any time between the end of 7th and the end of 8th year at the pro rata price between USD 18.1 Million and USD 17.1 Million.

Thereafter at prices reducing by USD 1 Million per annum or pro rata during the balance of the C/P including optional periods. Charterers to give minimum 3 months notice of exercising such option. Charterers may not exercise the option so as to take delivery of the vessel within 6 months after completion of any scheduled drydocking (DD or SS).

#### NEW BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the Vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

"If the Ship comes into collision with another Ship as a result of the negligence of

- 22 -

### RIDER CLAUSES TO
### M.V. "NANTONG NIKKA TEN 1"
### CHARTER PARTY DATED 1ST December 2006

the other Ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of this Ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying Ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying Ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying Ship or her Owners as part of their claim against the carrying Ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any Ship or Ships or object other than, or, in addition to, the colliding Ships or objects are at fault in respect to a collision or contact.

### GENERAL AVERAGE AND THE NEW JASON CLAUSE

General average shall be payable according to the York Antwarp Rules 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

### NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statue, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving Ship is owned or operated by the carrier, salvage shall be paid for as full as if the said salving Ship or Ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery.

### GENERAL PARAMOUNT CLAUSE

This Bill(s) of Lading shall have effect subject to the provision of any legislation relating to the Carriage of Goods by Sea which incorporates the rules relating to Bill(s) of Lading contained in the International convention dated Brussels 25th August, 1924, and which is compulsory applicable to the contract of carriage herein

– 23 –

### RIDER CLAUSES TO
### M.V. "NANTONG NIKKA TBN 1"
### CHARTER PARTY DATED 1st December 2006

contained. When no such enactment is in force in the country of shipment the
corresponding legislation of the country of destination shall apply, but in respect of
shipments to which no such enactments are compulsorily application the terms of
the Carriage of Good by Sea act,1924 of the United Kingdom or any statutory
modification or re-enactment thereof shall apply.

### U.S.A. CLAUSE PARAMOUNT

This Bill(s) of Lading shall have effect subject to the provisions of the Carriage of
Goods by Sea Act of the United States approved April 16th,1936 which shall be
deemed to be incorporated herein, and nothing herein contained shall be deemed
as surrender by the carrier of any of its right or immunities or an increase of any of
its responsibilities or liabilities under said act. The Provisions stated in said Act shall
(exit as may be otherwise specifically provided herein) govern before the good are
loaded on and after they are discharged from the Ship and throughout the entire
the goods are in custody of the carrier. The carrier shall not be liable in any capacity
whatsoever for any delay, non-delivery, or loss of or damage to the goods occurring
while the goods are not in the actual custody of the carrier.

### CANADIAN CLAUSE PARAMOUNT

All other terms, Provisions and conditions of the Canadian Water Carriage of Good
Act, 1936 and of the rules comprising schedule thereto are, so far as applicable, to
govern the contract contained in this Bill(s) of Lading and the ship owners are to be
entitled to the benefit of all privileges, rights and Immunities contained in such Act
and in the schedule thereto as if the same were herein specifically set out. If
anything herein contained be inconsistent with the said provisions, it shall to the
extent of such inconsistency and no further be null and void.

The carrier shall be under no responsibility whatsoever for loss of or damage to
goods howsoever and where-so-ever occurring when such loss or damage arise
prior to the loading in and/or subsequent to the discharge from the Carrier's Ship.

## WAR RISKS CLAUSE FOR TIME CHARTERS, 2004 (CONWARTIME 2004)

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners,
managers or other operators who are charged with the management of the Vessel,
and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported: war; act of war;
civil war; hostilities; revolution; rebellion; civil commotion; warlike operations;
laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious

– 24 –

NO.238    P.29/36

### RIDER CLAUSES TO
### M.V. "NANTONG NIKKA TBN 1"
### CHARTER PARTY DATED 1ˢᵗ December 2006

damage; blockades

(whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)  The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo,

crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c)  The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d).  (i)  The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii)  If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e)  If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of

– 25 –

2.APR.2007  19:33    00 44 20 74614701                                          NO.238    P.30/35

## RIDER CLAUSES TO
## M.V. "NANTONG NIKKA TBN 1"
## CHARTER PARTY DATED 1st December 2006

hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

Voy War 2004.

- 25 -

## RIDER CLAUSES TO
## M.V. "NANTONG NIKKA TEN 1"
## CHARTER PARTY DATED 1ˢᵗ December 2006

(a)  For the purpose of this Clause, the words:

(i)  "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii)  "War Risks" shall include any actual, threatened or reported:

War; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or

crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies
within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

(c)  The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are

– 27 –

2.APR.2007  15:32      08 44 22 74514701

NO.238    P.32/36

## RIDER CLAUSES TO
## M.V. "NANTONG NIKKA TBN 1"
## CHARTER PARTY DATED 1st December 2006

likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

(d) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(e) (i)  The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii)  If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, or in order to fulfil the Owners' obligation under this Contract of Carriage, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners within 14 days after receipt of the Owners f Invoice. If the Vessel discharges all of her cargo within an area subject to additional premiums as herein set forth, the Charterer

shall reimburse the Owners for the actual additional premiums paid which may accrue from completion of discharge until the Vessel leaves such area or areas referred to above. The Owners shall leave the area as soon as possible after

- 23 -

2.APR.2007  15:54    02 44 20 74914701                                    NO.238    P.33/36

## RIDER CLAUSES TO
## M.V. "NANTONG NIKKA TBN 1"
## CHARTER PARTY DATED 1ST December 2006

completion of discharge.

(f)  The Vessel shall have liberty:-

(i)  to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, of any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

(ii)  to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii)  to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject and to obey the orders and directions of those who are charged with their enforcement;

(iv)  to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v)  to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;

(vi)  where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

(g)  If in compliance with any of the provisions of sub-clauses (b) to (f) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

## ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by

- 29 –

### RIDER CLAUSES TO
### M.V. "NANTONG NIKKA TBN 1"
### CHARTER PARTY DATED 1st December 2006

the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002(MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners,

### RIDER CLAUSES TO
### M.V. "NANTONG NIKKA TBN 1"
### CHARTER PARTY DATED 1ˢᵗ December 2006

Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## U.S. CUSTOMS ADVANCE NOTIFICATIONS/AMS CLAUSE FOR THE CHARTER PARTIES

(a) If the Vessel loads or carriers cargo destined for the U.S. or passing U.S. ports in transit, the Charterers shall comply with the current U.S. Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purpose of such regulations and shall, in their own name, time and expense:

   i)   Have in place a SCAC (Standard Carrier Alpha Code);
   ii)   Have in place an ICB (International Carrier Bond);
   iii)   Provide the Owners with a timely confirmation of i) and ii) above; and
   iv)   Submit a cargo declaration by SMS (Automated Manifest System) to the U.S. Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners agent any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the U.S. Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## BUNKER FUEL SULPHUR CONTENT CLAUSE

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone. The Charterers also warrant that any bunker suppliers, bunker craft operators and

- 31 -

### RIDER CLAUSES TO
### M.V. "NANTONG NIKKA TEN 1"
### CHARTER PARTY DATED 1st December 2006

bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes. The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

    (i)  the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

    (ii)  the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone,

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessels' failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the E.U. and the U.S. Environmental Protection Agency.

[The End]

- 32 -

EXHIBIT 5

============================================================
14/12/2006 09:58:59 (GMT) by TIW          RefNum:TIW41350090
  From/To: Werner, Juergen/Alfred C. Toepfer (private)
============================================================


REF : SNM41350090
DATE: 14-12-2006
TIME: 09:58:58 (GMT)


MAERSK BROKER (UK) LTD.

Juergen/Simon

Good day,

re: ACTI / 12,500 nb

As per telcon, Tokyo have received the full mid-ship plans etc in a
very large bound file for these vessels which have been copied and
will be sent by DHL to your office - so you should get by Monday.

In the meantime, we have attatched the midship and general arrangement
plans as per your request.

Now for the response to the technical questions, with the replies from
the owners/Fairfield in capitals:

++

Cranes: Noted that Owners intend to fit the vessel with 2 cranes @ 30
ts swl each. In addition to mount 1 derrick to the crane house to
serve hold 1 at 30 ts.

UNFORTUNATELY THE CRANES CANNOT BE ALTERED, IT IS QUITE AN ESTABLISHED
DESIGN, AND YARD IS RELUCTANT TO AMMEND.

Hold design: Owners are pls to confirm that the holds are box shaped
and open hatch design in order to avoid any understow etc.

HOLDS ARE SEMI BOX SHAPED,  NOT OPEN HATCH - SEE ATTATCHED.

Noted that the vessel will be equipped with fixed/collapsible
stanchions. Owners pls to confirm that the vsl will be delivered with
full set of lashing material according to the latest regulations incl
Canada.

FULL LASHING EQUIPTMENT WILL BE MADE AVAILABLE.

Is the vessel designed for the carriage of containers and if so please
advise capacity nominal/14 ts homogenious.

VESSEL WILL NOT BE ABLE TO LOAD CONTAINERS.

is the bulkhead between the main engineroom and hold number 3 an A60

UNFORTUNATELY NOT..

Great Lakes Trading.

REVERTING HOWEVER CURRENTLY OWNERS DO NOT THINK LAKES TRADING IS A
PROBLEM.

++

Comments:
---------
Basically, the yard is very well established and therefore reluctant
to ammend their tried and tested designs. We understand that
Nakanishi-san is pushing hard for the above ammendments however,

7

Message Continues...

------------------------------------------------------------------------------

currently the owners are not yet in a position to agree to such
ammendments. This does not mean that it will not be changed in the
future but, Nakanishi-san does not want to deliver false promises to
Toepfer.

There was no reply on the hatches above but, we have been told that
the design is indeed pontoon hatch design as per the original specs.

One point on the cranes is that back in the begining of November when
we started to seriously discuss these ships, it appeared that some
variation to the cranes was obtainable which was basically as follows:

- 2 x 30t crs + 1 x 30t der
- 2 x 30t crs + 2 x 30t der
- 2 x 30t crs
- 3 x 30t crs

so our feeling is that on this basis it may be difficult to
incorporate a 60t crane. however, we note that there seems to be no
official response about if vessel will be equipped with a traverse so
that the 2 cranes can be used in a twin operation or not.

Pleased to hear.

regards
Simon Masters

dir line: 44 207 481 6006
mobile   : 44 7771 667 435
home     : 44 208 960 2271
email    : handy.uk@maerskbroker.com

--------------- End of Message ---------------

8

EXHIBIT 6

```
=========================================================================
12/01/2007 09:51:12 (GMT) by TIW        RefNum:TIW42350690
From/To: Werner, Juergen/Alfred C. Toepfer (private)
=========================================================================
```

REF : SNM42350689
DATE: 12-01-2007
TIME: 09:51:13 (GMT)


MAERSK BROKER (UK) LTD.

Juergen/Simon

Re: ACTI / 12,500 nb
--------------------

As per telcon just now, Owners are now offically asking for an
extention of subjects, as discussed we suggest 1 months extention
giving new date as the 15th of Febuary.

Owners were at pains today to highlight that they hope to be able to
conclude all the necessary outstanding points before the 15th Feb -
Nakanishi are pushing the Imabari based Ship Designer and are
confident to see design ammendments etc in the near future.

Nevertheless for safetys sake think 1 month extention is best.

Pleased to hear Chart's confirmation in return.

regards
Simon Masters

dir line: 44 207 481 6006
mobile  : 44 7771 667 435
home    : 44 208 960 2271
email   : handy.uk@maerskbroker.com




-------------- End of Message ---------------

9

EXHIBIT 7

```
=========================================================================
22/01/2007 09:58:23 (GMT) by TIW        RefNum:TIW42762005
  From/To: Maersk Broker (TYO)/Chartering/Dry Cargo
=========================================================================
```

ReplyTo: Chris Earp <drycargo.jp@maerskbroker.com>
From: Chris Earp <drycargo.jp@maerskbroker.com>
To: <drycargo.jp@maerskbroker.com>
Subject: 12,500/acti
Date: Mon, 22 Jan 2007 09:54:54 +0000


FROM: MAERSK BROKER JAPAN
DATE: 22-01-2007      TIME: 09:54:54 (GMT)      REF : CEA42760726

SUBJECT : 12,500/acti


snm/cea

re: 12,500 / acti

As mentioned Isshi-san met with Nakanishi-san this weekend and
discussed the below points:

* Mitsubishi Heavy's design department are now being outsourced to
alter the design as per Toepfer's requests. The owners are doing all
possible to accomodate Toepfer however please do not over encourage as
at this stage all is wog.

* Isshi-san has been given permission to speak directly with the
design company to speed up the process, we understand the Mitsubishi
guys are pretty efficient.

* Understand that changing the hatch covers is not possible as they
have already been ordered - owners are conscious not to delay the
delivery.

Regds,
Chris.

------------------------------------------------------------------
This message (including all attachments) is confidential and is
intended only for the above addressee(s). If you are not the intended
recipient, you must not read, print, retain, copy, distribute, or use
any of the information herein. If you receive this message in error,
please delete it and immediately notify the sender.


Although we have taken reasonable care to ensure that any attachments
to this e-mail are free of viruses, we make no representation and give
no warranty in this regard. You should accordingly scan any
attachments with appropriate up to date software.
------------------------------------------------------------------

--------------- End of Message ---------------

10

EXHIBIT 8

```
============================================================================
26/02/2007 15:19:55 (GMT) by TIW         RefNum:TIW44358094
   From/To: Werner, Juergen/Alfred C. Toepfer (private)
============================================================================
```

REF : SNM44358094
DATE: 26-02-2007
TIME: 15:20:00 (GMT)


MAERSK BROKER (UK) LTD.

Juergen/Simon

Re: ACTI / 12,500dwt NB
------------------------

Thanks yours.

we have received following from Fairfield....

qte//

Thanks for the Charterers' acceptance of the delivery
of the vessel through the additional charter rate to be
disccused which have informed Namirei-Showa and
Nakanishi Kikai.

Best regards,
Ishii
Fairfield Japan Ltd.

unqte//

Regarding addtional cost,reverting once available.

regards
Simon Masters

dir line: 44 207 481 6006
mobile  : 44 7771 667 435
home    : 44 208 960 2271
email   : handy.uk@maerskbroker.com




--------------- End of Message ---------------

11

EXHIBIT 9

--------------------------------------------------------------------------

Maersk Broker (UK) Limited
Direct Line: +44 207 481 6015


From: Werner, Jürgen <WernerJ@acti.de>
To: "Simon Masters" <drycargo.uk@maerskbroker.com>
Subject: AW: acti/12,500 nb
Date: Mon, 16 Apr 2007 11:54:00 +0200

Jonathan/Juergen

Good morning,

hope you had the same lovely weather in London over the weekend as we
had here in Hamburg and still have. What a shame to be in the office
and not sitting outside enjoying the sun.

Never mind. As Simon is following legal hearings you have to look
after his not yet finished tasks.

Have you got any reply on the outstanding points of our little ladies?
Also for the Golden Falcon Owners advised to come along with the
outstanding points today. Any feedback?

Also have discussed with Simon that we are looking for long term
employment of a mod pmax del prompt/onwards ww and long term means
considering periods up to 10 yrs which might be attractive to the one
or other Japanese Owners.
Plsd to have your thoughts.

Thks and brgds

-----Ursprüngliche Nachricht-----
Von: Simon Masters [mailto:drycargo.uk@maerskbroker.com]
Gesendet: Freitag, 13. April 2007 16:21
Betreff: acti/12,500 nb



REF : SNM46589761
DATE: 13-04-2007
TIME: 14:20:57 (GMT)


MAERSK BROKER (UK) LTD.

Juergen/Simon

C O R R E C T I O N


Re: Toepfer / 12,500dwt x 2 NB c/p dated 16th April 2007

Nakanishi Kikai 12,500 dwt - Toepfer
-------------------------------------

We are very pleased to clean recap as agreed below:-


- All negotiations and eventual fixture, if any, to be kept strictly
private and confidential among the parties directly involved.

- Owners : Namirei-Showa or Nakanishi Kikai or their guaranteed
  nominee.

- Charterers : Intermare Transport GMBH Hamburg or their guaranteed

**16**

Message Continues...

--------------------------------------------------------------------

nominee which to be always guaranteed by Alfred C.
Toepfer International GMBH Hamburg

- Vessel : Two(2)units of 12,500 DWT  Single Screw Bulk Carriers; logs
fitted. Outline particulars as attached but which to be corrected and
revised in accordance with the agreement reached on design change.

- Time Charter Period : Trading via safe port(s) safe anchorage(s)
safe berth(s) for a Firm period of 7 years with 2 months more or less
in Charterers' option.

-chopt further 11-13 Months (8th year)
-chopt further 11-13 Months (9th year)
-chopt further 11-13 Months (10th year)

   If declared, optional periods to commence on 1st day of 84th, 96th
and 108th months respectively after delivery. Optional periods to be
declared latest by the end of the 82nd, 94th and 106th months after
delivery respectively, however Charterers to give minimum 60 days
redelivery notice (in other words, if by the end of 82nd month of
the charter period, Charterers have not excercised their option for
the 8th year, they cannot redeliver the vessel until the end of the
84th month).

- Hire : USD 6,900 pd less 2.5pct total for each vessel(1.25pcts to
Fairfield, and 1.25pcts to Maersk Broker, No address commision)

- Delivery :

1st vessel - 1st Sep/30th Nov 2008 to be narrowed to a 30 days spread
at a mutually agreeable date ex.Shipyards (Owners' hope to produce
still within Jul/Aug 2008 agw)

2nd vessel - 1st Oct 2008/31st Dec 2008 to be narrowed to a 30 days
spread at a mutually agreeable date ex.Shipyards (Owners'intention:
please advise)

- Purchase option

Charterers to have the option to purchase the vessel at any time after
the end of the 7th year of the CP period at the following prices:
At the end of the 7th year: USD 9.35 Million incl 2pct ttl brokerage
At the end of the 8th year: USD 8.65 Million incl 2pct ttl brokerage
Charterers have the option to purchase the vessel any time between the
end of 7th and the end of 8th year at the pro rata price between USD
9.35 Million and USD 8.65 Million.

Thereafter at prices reducing by USD 0.8 Million per annum or pro rata
during the balance of the C/P including optional periods.
Charterers to give minimum 3 months notice of exercising such option.
Charterers may not exercise the option so as to take delivery of the
vessel within 6 months after completion of any scheduled drydocking(DD
or SS).

- Owners to confirm that should a 2008 Nantong Nikka 29,200 DWT
   positon become available then same position to be made available
   for account Intermare Transport GMBH Hamburug or their guaranteed
   nominee. All terms/details to be as per the 2009 positions, subject
   Owners'/Charterers' board approval + owners' financiers' approval.

Technical Remarks which to be part of negos:

Cranes: Owners confirm that each vessel to be fitted with 2 x 30t
   cranes.

Hatchcovers: Owners confirm that each of vessels 3 holds will be
         fitted with folding hydraulic type hatchcovers.

Logs fittings: Owners confirm that vessels will be fully fitted

**17**

Message Continues...

----------------------------------------------------------------

loggers with full set of lashing materials onboard.

A60 bulkhead: Owners confirm that vessels will each be fitted with an
             A60 bulkhead.

C/P Ammendments
---------------
As per proforma C/P Intermare/ Namirei-Showa or Nakanishi Kikai dated
1st December 2006 logically ammended and with the following
alterations:-

Line 14 - re delivery of the vessel "DLOSP Yangzhou Ryuwa Ship yard"

Line 55 - "on dropping last outward sea pilot at one safe port
          Aden/Japan range including Indonesia, Vietnam, Thailand, PI,
          China, Taiwan, and South Korea, Vancouver BC/Valparaiso
          range, Baltimore/Bahia Blanca range including Caribs/US
          Gulf, Skaw/Passero including Baltic, full Med and
          Black Sea, Australia/NZ range at any time day and night,
          Sunday and Holiday included,"

Line 56 - after "mutually agree" insert "charterers will make the best
          endeavour to redeliver vessel in Aden-Japan range"

Line 173 - Commission: Chrtrs to pay Maersk Broker and Owners to pay
           Fairfield commission.

Cl 31 - delete "500" insert "350"

Cl 52 - waiting for owners to revert with completed questionnaire

Cl 55 - cargo exclusions - delete "logs, lumber but Chrtrs have the
        option to load under deck"
        waiting for owners Class (ABS) to confirm whether Ammonium
        Nitrate No 2026-70 and 2071 can be loaded in all 3 holds

Cl 59 - para 7 delete "2000" insert "USD 1750"

Cl 64 - delete "1200" insert "1150"

Cl 66 - delete "3200" insert "2500"

+++

----END-----

Comments:-
----------
There was no discussion on the MOA during the negoiation however apart
from logical ammendments to the previous MOA there is no alterations
from Toepfer's side. Please confirm same from owners side. Otherwise
with Iishi san's forthcoming trip to Osaka this Monday we hope to
finalise the outstanding points on the Ammonium Nitrate, Lakes trading
and Mitsubishi Design's corrected vessels specs along with completed
questionnaire.

In the meantime we would like to take this opportunity to thank you
very much for your excellent support in concluding this fixture and
please reconfirm that above recap in line with your notes.

Thanks and regards
Simon Masters

dir line: 44 207 481 6006
mobile  : 44 7771 667 435
home    : 44 208 960 2271
email   : handy.uk@maerskbroker.com

18

------------------------------------------------------------

This message (including all attachments) is confidential and is
intended only for the above addressee(s). If you are not the intended
recipient, you must not read, print, retain, copy, distribute, or use
any of the information herein. If you receive this message in error,
please delete it and immediately notify the sender.


Although we have taken reasonable care to ensure that any attachments
to this e-mail are free of viruses, we make no representation and give
no warranty in this regard. You should accordingly scan any
attachments with appropriate up to date software.

------------------------------------------------------------

Alfred C. Toepfer International GmbH
Geschäftsführer: Jürgen Stephan (Vorsitzender), Michael Lazardzig
(Stv. Vorsitzender), Hartwig Fuchs, Carsten Højland, Dierk Overheu
Vorsitzender des Aufsichtsrates: Bruno Catton
Sitz der Gesellschaft: Hamburg
Handelsregister: AG Hamburg HRB 7873

CONFIDENTIALITY NOTICE
This e-mail and any files and/or attachments transmitted with it are
strictly confidential and intended solely for the use of the
addressee. They may contain privileged and confidential information
and, if you are not the intended recipient, you are hereby notified
that any dissemination or copying and any use or disclosure of the
information contained therein is strictly prohibited and may be
illegal. If you are not the intended recipient, please notify
mail@toepfer.com immediately and delete this message and any files
and/or attachments thereto.

This message (including all attachments) is confidential and is
intended only for the above addressee(s). If you are not the intended
recipient, you must not read, print, retain, copy, distribute, or use
any of the information herein. If you receive this message in error,
please delete it and immediately notify the sender.


Although we have taken reasonable care to ensure that any attachments
to this e-mail are free of viruses, we make no representation and give
no warranty in this regard. You should accordingly scan any
attachments with appropriate up to date software.

------------------------------------------------------------


Alfred C. Toepfer International GmbH

**19**

Page: 7
RefNum: 46662257
----------------------------------------------------------------------

Geschäftsführer: Jürgen Stephan (Vorsitzender), Michael Lazardzig (Stv. Vorsitzender), Hartwig Fuchs, Carsten Højland, Dierk Overheu
Vorsitzender des Aufsichtsrates: Bruno Catton
Sitz der Gesellschaft: Hamburg
Handelsregister: AG Hamburg HRB 7873

CONFIDENTIALITY NOTICE
This e-mail and any files and/or attachments transmitted with it are strictly confidential and intended solely for the use of the addressee. They may contain privileged and confidential information and, if you are not the intended recipient, you are hereby notified that any dissemination or copying and any use or disclosure of the information contained therein is strictly prohibited and may be illegal. If you are not the intended recipient, please notify mail@toepfer.com immediately and delete this message and any files and/or attachments thereto.

-------------- End of Message ---------------

20

EXHIBIT 10

```
=========================================================================
 21/05/2007 02:47:09 (GMT) by TIW      RefNum:TIW48402722
   From/To: Maersk Broker (TYO)/Chartering/Dry Cargo
=========================================================================
```

ReplyTo: Chris Earp <drycargo.jp@maerskbroker.com>
From: Chris Earp <drycargo.jp@maerskbroker.com>
To: "Maersk Broker (UK)" <drycargo.uk@maerskbroker.com>
Subject: 12,500dwt - signing toepfer
Date: Mon, 21 May 2007 02:47:03 +0000


FROM: MAERSK BROKER JAPAN
DATE: 21-05-2007      TIME: 02:47:03 (GMT)      REF : CEA48402718


SUBJECT : 12,500dwt - signing toepfer


Simon/chris

re: Toepfer 12,500 dwt - signing.

Better start looking for flights:

=quote=

Chris / Hans

Thanks - Good to talk to you, Will organize something suitable on the 28th.
Meantime, and if not already done so, please make sure you make a draft copy of
the c/p available, and if a nominee as counterpart, the relevant guarantor/s - I
understand the vessels are fixed with owners Namirei-Showa or Nakanishi Kikai (or
their guaranteed nominee). I will communicate details though Hamburg / Juergen
Werner, but would be great you be here yourself

Cheers
Hans




   -----Original Message-----
From: Chris Earp [mailto:drycargo.jp@maerskbroker.com]
Sent: Monday, May 21, 2007 10:15 AM
To: Adrichem, Hans van
Subject: 12,500dwt BC contract signing. - attatched.


Hans/Chris

re: 12,500dwt BC contract signing. - attatched.

Attached letter as discussed, below from Ishii-san.

Hopefully see you on the 28th

-------------------------------------------------
Chris Earp  - Maersk Broker Japan
Direct phone: +81-3-5213-2196 - Fax +81-3-5213-2162
Mobile phone: +81-90-5414-5227
E-mail      : drycargo.jp@maerskbroker.com
Website     : www.maerskbroker.com




----- Original Message -----                                    **21**


                                        Message Continues...
```

Page:2

RefNum:48402722

--------------------------------------------------------------------

From: Y Ishii - Fairfield Japan - office
To: Maersk JPN - Yutaka Yano ; drycargo.uk@maerskbroker.com
Sent: Friday, May 18, 2007 6:55 PM
Subject: 12,500tdw BC - contract


Dear Chris-san

Have received the attached letter from SN Navigation (Namirei-Showa)
which please convey Toepfer and please get their acceptance of
signing ceremony at Singapore on 28th.

Best regards,
Ishii
Fairifield Japan Ltd.

---

CONFIDENTIALITY NOTICE
This e-mail and any files and/or attachments transmitted with it are strictly
confidential and intended solely for the use of the addressee. They may contain
privileged and confidential information and, if you are not the intended
recipient, you are hereby notified that any dissemination or copying and any use
or disclosure of the information contained therein is strictly prohibited and may
be illegal. If you are not the intended recipient, please notify mail@toepfer.com
immediately and delete this message and any files and/or attachments thereto.


------------------------------------------------------------------

This message (including all attachments) is confidential and is
intended only for the above addressee(s). If you are not the intended
recipient, you must not read, print, retain, copy, distribute, or use
any of the information herein. If you receive this message in error,
please delete it and immediately notify the sender.


Although we have taken reasonable care to ensure that any attachments
to this e-mail are free of viruses, we make no representation and give
no warranty in this regard. You should accordingly scan any
attachments with appropriate up to date software.
------------------------------------------------------------------

-------------- End of Message ---------------

22

EXHIBIT 11

===================================================================
15/11/2007 07:43:58 (GMT) by SNM    RefNum:SNM60455057
  From/To: Maersk Broker (TYO)/Chartering/Dry Cargo
===================================================================

ReplyTo: Chris Earp <drycargo.jp@maerskbroker.com>
From: Chris Earp <drycargo.jp@maerskbroker.com>
To: "Maersk Broker (UK)" <drycargo.uk@maerskbroker.com>
Subject: Toepfer / Nantong Nikka 28,900dwts & 12,500dwts
Date: Thu, 15 Nov 2007 07:43:50 +0000


FROM: MAERSK BROKER JAPAN
DATE: 15-11-2007    TIME: 07:43:50 (GMT)    REF : CEA60455053


SUBJECT : Toepfer / Nantong Nikka 28,900dwts & 12,500dwts



Simon/Chris

re: Toepfer / Nantong Nikka 28,900dwts & 12,500dwts.

Following meeting can update asf:

- Fujihara-san, MD, Namirei-Showa
- Ishii-san    GM, Faifield Japan
- Cpl
- Cea
- Ysh


12,500 units.
==============

The shipyards who have been earmarked to make these ships are no
longer able to do so (Yangzhou Ryuwa or Yangzhou Longchuan), for
whatever reasons Owners now feel they have to look at an alternative
yard.

The alternative yard is Zhenjiang Yong'an Shipyard Co (see attached
brief description) which has only a proven record of building barges
however will begin to construct 6,500dwt ships.

Positively for these ships the engines, cranes and steel has already
been purchased (steel to deliver in december) and the owners are
'relatively' optimistic that they can be delived according to
schedule.

The design will not be altered because of the new yard.


Nanotng Nikka.
==============

The vessels blocks as we know are to be built at Nantong Nikka and
then to be subsequently assembled/built at Nantong Yahua.

Nantong Yahua is 100pct owned by Chinese, they have obviusly seen the
current market movement and think there is much more money to be
earned in stopping production the NN handys and subsequently building
other ships.

As it stands Nantong Yahua will build the first 2 vessels (first on on
charter to nyk) and perhaps the third position - thereafter is anyones
guess.

Of course Nakanishi-Kikai and Namirei-Showa have a contract with the
yard however unfortunately this does not seem to hold much water for
the Chinese who for whatever reason consider themselves free to
terminate production.

Nakanishi-Kikai inform us that they are now in the process of sourcing
a new yard capable of building the remaining positions in China, this

Message Continues...

------------------------------------------------------------------

of course throws up many difficulties. Firstly to find such a yard is
difficult and secondly pricewise the market has moved significantly
since the initial contract was signed with Nantong Yahua.

Positively both the main engines and the cranes have already been
sourced by Nakanishi-Kikai, the main engines are Hitachi and they have
14 option 4. This is the main leverage that Nakanishi-Kikai have, as
we know m/e are a rare commodity these days and they hope to be able
to use/trade them with another yard in order to secure/rent space to
build the remaining ships.

They are holding out hope that the above mentioned Zhenjiang Yong'an
will be able to build the remainder, this is by no means a certainty,
there also remains an issue over the vessel's classification (NK) at
this particular yard.

Certainly here there is more than meets the eye in terms of the
current relationship between Nakanishi-Kikai and Namirei-Showa, it is
understood that the two companies have personal difficulties due to
change in Namirei's top management - nevertheless this was not
discussed.

It was agreed that regular updates will be sent from the Owners on a
weekly basis towards the situations progression, Toepfer for their
part are understanding of the difficulties which have arisen - for the
timebeing at least.

To sum up, while we were preparing ourselves for a delay in delivery
we were not prepared for potential non performance issues -  we hope
this does not arrise and have confidence that the Owners are doing
their best to resolve this issue.

Also the NN c/p's have not been signed by either party.

Please pass an edited version onto Hamburg, will call.

Kind Regards,


---------------------------------------------------
Chris Earp  - Maersk Broker Japan
Direct phone: +81-3-5213-2196 - Fax +81-3-5213-2162
Mobile phone: +81-90-5414-5227
E-mail      : drycargo.jp@maerskbroker.com
Website     : www.maerskbroker.com

-------------------------------------------------------------------
This message (including all attachments) is confidential and is
intended only for the above addressee(s). If you are not the intended
recipient, you must not read, print, retain, copy, distribute, or use
any of the information herein. If you receive this message in error,
please delete it and immediately notify the sender.


Although we have taken reasonable care to ensure that any attachments
to this e-mail are free of viruses, we make no representation and give
no warranty in this regard. You should accordingly scan any
attachments with appropriate up to date software.
-------------------------------------------------------------------

EXHIBIT 12

```
=================================================================
20/11/2007 08:34:24 (GMT) by SNM      RefNum:60796875
  From/To: Maersk Broker (TYO)/Chartering/Dry Cargo
=================================================================
```

Simon/Chris
re: nantong nikka / toepfer

thanks yours, we are really pushing owners this side for reponses and somewhat suprisingly received the below, it
pertains mainly to the 12,500dwt ships however a step in the right direction.


=quote=

Have received the following e-mail from Namirei - Showa / Mr.Fujihara which please forward to the Charterers.

=QT=

Dear Sirs

    We, Namirei-Showa and Nakanishi Kikai and its guaranteed nominee, as owners , would like to response for your request dated 16th Nov. 2007 as follows :

    (1) 12,500dwts

    ① Shipbuilding Contract
    Done on 24th March 2007

    ② Building Structure
    Namirei-Showa, as a builder, rent the stock and facilities from Zhenjiang Yong'an Shipyard in China and construct the vessels by its own workers.

    Rental agreement has been completed on 5th Oct.2007 and 1st and 2d payment done on 15th and 31st Oct. 2007.

    ③ Class
    Contracted with ABS on 10th Aug. 2007

    ④ Equipment
    90% of equipments has been ordered, as of today, including engines, cranes, generators.
    1st engines has been already delivered in this Oct. and 2nd engines is scheduled to be delivered next March.

    ⑤ Steel
    Ordered in this Oct. and scheduled to be delivered to the yard in this Dec..

    ⑥ Construction Schedule
        Steel Cutting / Launch / Delivery

27

--------------- End of Message ---------------

1st vessel    Dec.2007    Jun.2008    Nov.2008
2nd vessel    Jan.2008    Aug.2008    Dec.2008

(2) 28,900dwts

We will just continue to negotiate with Nangton Yahua to complete shipbuilding contract  and to get financier's approval.

=UNQT=

Best regards,
Ishii
Fairfield Japan Ltd.


=unquote=


rgds,
chris

28

--------------- End of Message ---------------

EXHIBIT 13

```
28/12/2007 06:19:51 (GMT) by SNM    RefNum:SNM63485460
  From/To: Maersk Broker (TYO)/Chartering/Dry Cargo
```

ReplyTo: Yutaka Yano <drycargo.jp@maerskbroker.com>
From: Yutaka Yano <drycargo.jp@maerskbroker.com>
To: "Maersk Broker (UK)" <drycargo.uk@maerskbroker.com>
Subject: Toepfer / Nantong Nikka - 12,500 dwts + 29,200 dwts
Date: Fri, 28 Dec 2007 06:19:38 +0000


FROM: MAERSK BROKER JAPAN
DATE: 28-12-2007    TIME: 06:19:38 (GMT)    REF : YYA63485398


SUBJECT : Toepfer / Nantong Nikka - 12,500 dwts + 29,200 dwts

Simon / Yano

Toepfer / Nantong Nikka - 12,500 dwts + 29,200 dwts
====

We have received following from Ishii-san.

qte//

Have received the following update report from
Namirei - Showa.

12,500 BC
        This vessel will construct Nakanaishi Shipyard where
        Mr. Nakanishi have purchased.
        Namirei have cancelled the contract with
        Zhenjiang Yong'an Shipyard because the yard have
        too much bullish and very bad attitude against the
        contract.

30,000 BC
        Yahua are still refusing to construct 30k BC.
        Then Namirei and Nakanishi are planning to construct
        30k BC at Nakanishi Shipyard in China which is same yard
        of above (1).

Comment:
Anyway details of Nakanishi Shipyard and delivery timing for
the both vessel which have to check with Namirei and Nakanishi
in the early next year.

Best regards,
Ishii
Fairfield Japan Ltd.

unqte//

Understand Ishii-san have been trying to chase both Namirei and
Nakanishi during Christmas holidays in Europe, although they have been
busy due to end year greeting.
Hopefully we will be able to revert the details of Nakanishi Shipyard
and regarding signing of c/p early next year.

Best wishes for the New Year!


Thanks and Best Regards.

```
--------------------------------------------------------------
Yutaka Yano - Maersk Broker Japan
Direct phone: +81-3-5213-2164 - Fax +81-3-5213-2162
Mobile phone: +81-90-2782-1464
E-mail     : drycargo.jp@maerskbroker.com
Website    : www.maerskbroker.com
```


```
--------------------------------------------------------------
```

**29**

---------------------------------------------------------------------------

This message (including all attachments) is confidential and is
intended only for the above addressee(s). If you are not the intended
recipient, you must not read, print, retain, copy, distribute, or use
any of the information herein. If you receive this message in error,
please delete it and immediately notify the sender.


Although we have taken reasonable care to ensure that any attachments
to this e-mail are free of viruses, we make no representation and give
no warranty in this regard. You should accordingly scan any
attachments with appropriate up to date software.
---------------------------------------------------------------------------


-------------- End of Message ---------------

EXHIBIT 14

```
=========================================================
09/01/2008 08:47:05 (GMT) by SNM       RefNum:SNM64277624
  From/To: Maersk Broker (TYO)/Chartering/Dry Cargo
=========================================================
```

ReplyTo: Yutaka Yano <drycargo.jp@maerskbroker.com>
From: Yutaka Yano <drycargo.jp@maerskbroker.com>
To: "Maersk Broker (UK)" <drycargo.uk@maerskbroker.com>
Subject: Toepfer/Nantong Nikka - 29,000dwts + 12,500dwts
Date: Wed, 9 Jan 2008 08:46:51 +0000


FROM: MAERSK BROKER JAPAN
DATE: 09-01-2008      TIME: 08:46:51 (GMT)     REF : YYA64277610


SUBJECT : Toepfer/Nantong Nikka - 29,000dwts + 12,500dwts

Simon/Yano

Toepfer/Nantong Nikka - 29,000dwts + 12,500dwts
====

We have received address of Nakanishi Shipbuilding.

qte//

Name / Address of Nakanishi Shipbuilding is as follows:-

YANGZHOU NAKANISHI SHIPBUILDING CO., LTD.

ADDRESS : SOUTH OF RIVER, FUXIN HAMLET, SHIER WEI,
               YIZHENG CITY, JIANGSU.

TEL : +86-514-8363-0099
FAX : +86-514-8363-3099

Will revert Date of establishment, name of directors, and
record of constrcted vessel (if they have).

Best regards,
Y.Ishii
Fairfield Japan Ltd.

unqte//

Reverting further information once received.

Thanks and Best Regards.

---------------------------------------------------------------
Yutaka Yano - Maersk Broker Japan
Direct phone: +81-3-5213-2164 - Fax +81-3-5213-2162
Mobile phone: +81-90-2782-1464
E-mail      : drycargo.jp@maerskbroker.com
Website     : www.maerskbroker.com

---------------------------------------------------------------
This message (including all attachments) is confidential and is
intended only for the above addressee(s). If you are not the intended
recipient, you must not read, print, retain, copy, distribute, or use
any of the information herein. If you receive this message in error,
please delete it and immediately notify the sender.


Although we have taken reasonable care to ensure that any attachments
to this e-mail are free of viruses, we make no representation and give
no warranty in this regard. You should accordingly scan any
attachments with appropriate up to date software.
---------------------------------------------------------------

-------------- End of Message ---------------

**31**

EXHIBIT 15

```
11/01/2008 11:53:34 (GMT) by SNM    RefNum:SNM64553821
  From/To: Werner, Juergen/Alfred C. Toepfer (private)
```

REF : SNM64553820
DATE: 11-01-2008
TIME: 11:53:34 (GMT)


MAERSK BROKER (UK) LTD.

Juergen + Hanfried/Simon

As per telcon, following recvd from Tokyo today:-

qte

Toepfer / Nantong Nikka
====

We had the meeting with Ishii-san today and informed Toepfer's
position.

Ishii-san has fully understood same but he has also been struggling
owners' slow response.

Just got a phone from Ishii-san who have managed to talk with owners
and can update as follows.

-12,500dwt
Namirei have been trying to have contract with Nakanishi Shipyard
until yesterday but had to temporize negotiation since Zhenjiang
Yong'an Shipyard have come back to Namirei and asking them to build at
the yard. Namirei will have to negotiate with Zhenjiang Yong'an next
week again.

In this connection, unless Namirei have fixed the yard who are finally
building 2 x 12,500dwt, the schedule of steel cutting/
launching/delivery is uncertain and unable to estimate.

They will try their best to finalize building contract as soon as
possible.


-29,200dwt

Namirei is still pushing Nantong Yahua to construct 29,200dwts but
they are still refusing to perform contract.
In the meantime, Namirei is also negotiating with Nakanishi Shipyard
for Toepfer's position but understand at the moment negotiation so far
is not going well due to tight building schedule at Nakanishi who also
have to perform their contract with their buyers as first priority.
However, as broker understand Namirei will keep trying to conclude
with Nakanishi earliest possible.


+++

Furthermore, MB and Fairfield will keep giving pressure to both
Namirei and Nakanishi and will try to set up meeting with both as soon
as possible. So far understood Nakanishi would go to china next week,
thus possibly end of Jan which please note.


Thanks and Best Regards.

unqte


regards
Simon Masters

dir line: 44 207 481 6006
mobile  : 44 7771 667 435
home    : 44 208 960 2271
email   : handy.uk@maerskbroker.com

32

--------------- End of Message ---------------

33

EXHIBIT 16

18/01/2008 09:13:20 (GMT) by SNM    RefNum:SNM65176120
From/To: Maersk Broker (TYO)/Chartering/Dry Cargo

ReplyTo: Yutaka Yano <drycargo.jp@maerskbroker.com>
From: Yutaka Yano <drycargo.jp@maerskbroker.com>
To: <drycargo.jp@maerskbroker.com>
Subject: Toepfer/Nantong Nikka - 29,200dwts+12,500dwts
Date: Fri, 18 Jan 2008 09:13:11 +0000


FROM: MAERSK BROKER JAPAN
DATE: 18-01-2008    TIME: 09:13:11 (GMT)    REF : YYA65175991


SUBJECT : Toepfer/Nantong Nikka - 29,200dwts+12,500dwts

Simon/Yano

Toepfer/Nantong Nikka - 29,200dwts+12,500dwts
======

Just talked Ishii-san on the phone who is on biz trip, and learned
that he managed to talk with Nakanishi-san who is in china now.

We learned Nakanishi-san's comment which summarized as follow.

-They are still under construction of their 1st 29,200dwt for NYK
Global which will be delivered in March/April 2008.

-Unless the 1st vessel delivered, the financier will not be able to
finance for Nakanishi.

-Nakanishi Shipyard is under construction where Nakanishi-san is
willing to build Toepfer's 2x29,000dwts.

-Nakanishi and Namirei are still in discussion same and willing to
cooperate each other however since Nakanishi is very busy schedule on
building NYK's vessel and Namirei is in discussion with Chinese yard
and financier, they have not had a time to discuss in details yet.

-At the moment, Nakanishi-san cannot inform/or even estimate 29,200dwt
schedule which is not only Toepfer's but also all the others.
Nakanishi-san would like to make full schedule as soon as possible but
he thinks it takes at least 1 month or after NYK vessel delivery.

-Nakanishi-san also had a comment for resale of 3-4 x 29,200dwt.
He admitted the fact and advised that it was in order to build the
already contracted vessels since Nantong Yahua has been rejecting to
build the others and building cost has been dramatically increased.
Otherwise, Nantong Nikka project cannot be proceeded further due to
financial problem.

-Nakanishi-san is kindly asking Toepfer to understand the situation.

end

+++

In the meantime, Ishii-san catched Namirei's mic who is in the meeting
with bank and learned still in discussion for this.
Mic said sorry but Namire is not able to reply today.

Will push Namirei to reply next monday.


Thanks and Best Regards.

---------------------------------------------------------------
Yutaka Yano - Maersk Broker Japan
Direct phone: +81-3-5213-2164 - Fax +81-3-5213-2162
Mobile phone: +81-90-2782-1464
E-mail    : drycargo.jp@maerskbroker.com
Website   : www.maerskbroker.com

34

Message Continues...

Page 2                                    RefNum:65176120

------------------------------------------------------------------

------------------------------------------------------------------

This message (including all attachments) is confidential and is
intended only for the above addressee(s). If you are not the intended
recipient, you must not read, print, retain, copy, distribute, or use
any of the information herein. If you receive this message in error,
please delete it and immediately notify the sender.


Although we have taken reasonable care to ensure that any attachments
to this e-mail are free of viruses, we make no representation and give
no warranty in this regard. You should accordingly scan any
attachments with appropriate up to date software.

------------------------------------------------------------------


--------------- End of Message ---------------

35

EXHIBIT 17

3 CLOTH STREET   TEL +44(0)20 7600 2333
BARBICAN         FAX +44(0)20 7600 0108
LONDON           DX 46621 BARBICAN
EC1A 7NP         mail@middletonpotts.co.uk
                 www.middletonpotts.co.uk

# MIDDLETON POTTS
## SOLICITORS

| | |
|---|---|
| DAVID LUCAS | ROBERT WILSON |
| DAVID GODFREY | PHILLIP D'COSTA |
| DAVID RABAGLIATI | PAUL TAYLOR[†] |
| STEPHEN MORRALL | |
| ANDREW MEADS | CONSULTANTS |
| FRED KONYNENBURG | CHRISTOPHER POTTS |
| ANTHONY HALL-JONES | PATRICK HANN |
| EDWIN CHEYNEY | HAZEL ALTON |

## FAX TRANSMISSION

PLEASE ADVISE IMMEDIATELY BY TELEPHONE
FAX, E-MAIL OR TELEX IF ANY PART OF THIS
TRANSMISSION FAILED OR WAS ILLEGIBLE

| FROM /<br>OUR REF | PNT/FK/1034-117 | DATE | 10 March 2008 |
|---|---|---|---|
| TO<br>ATTN | Namirei-Showa Co., Ltd Osaka<br>Mr Chuji Fujihara | FAX NO<br>REF | 00 81 72 243 0552 |
| CC | Nakanishi Kikai | FAX NO<br>REF | 00 81 77 163 0075 |
| CC<br>C/O<br><br>ATTN | S N Navigation S.A. Panama<br>Namirei-Showa Co. Ltd<br>Osaka/Nakanishi Kikai<br>R Shuzo Watanabe/Mr Takuro<br>Fujimoto/Mr Chuji | FAX NO<br>REF | 00 81 72 243 0259 |
| CC<br>ATTN | Maersk Broker (UK) Ltd London<br>Mr Simon Masters | FAX NO<br>REF | 020 7481 4686 |
| CC<br>ATTN | Fairfield Japan Ltd Tokyo<br>Yoshi Y. Ishii | FAX NO<br>REF | 00 81 33434 8479 |
| PAGES<br>(INCL) | 2 | | |

Dear Sirs,

## M.V. "12,500 DWT SINGLE SCREW BULK CARRIER LOGS FITTED TBN1" CHARTERPARTY DATED 16.04.07

Pursuant to the abovementioned charterparty, Intermare Transport GmbH agreed to charter from Namirei-Showa Co or Nakanishi Kikai or your guaranteed nominee M.V. "12,500 DWT single screw bulk carrier TBN1". TBN1 was to be built at the Yangzhou Yard and, upon delivery, to be chartered by our company with a subsequent option to purchase.

This fax message is confidential and for use by the addressee only and may be legally privileged. If the message is received by anyone other than the addressee, please destroy it and notify the sender immediately.

Middleton Potts is regulated by the Solicitors Regulation Authority
[†] Qualified as a Solicitor and an Avocat à la Cour (Paris)

276924

2

However, pursuant to your written notice dated 13 February 2008, you repudiated the above charterparty, evincing a clear and unequivocal intention not to perform your duties thereunder:

> "*Regrettably are forced to inform you that we do not see any possibility for us to perform our duties as per the agreed charterparties*".

We accepted your repudiation by our notice of 25 February 2008, thereby terminating the charterparty, subject to a general reservation of all rights.

We hereby notify you that we have today referred all disputes under the above charterparty to arbitration in accordance with the LMAA Terms, pursuant to clause 17 of the charterparty, by appointing Patrick O'Donovan of Churcham House, 1 Bridgeman Road, Teddington, Middx TW11 9AJ as our clients' Arbitrator. Patrick O'Donovan has accepted the appointment.

Pursuant to Article 8 of the LMAA Terms, you are hereby requested to appoint your Arbitrator within 14 days of today.

Regards

*Middleton Potts*

**MIDDLETON POTTS**

```
≠  ≠  ≠  COMMUNICATION RESULT REPORT ( 10.MAR. 2008 13:03 ) ≠  ≠  ≠

                                                              TTI  MIDDLETON_POTTS

TRANSMITTED/STORED 10. MAR. 2008 12:49
FILE MODE         OPTION          ADDRESS                    RESULT     PAGE
--------------------------------------------------------------------------------
0585 MEMORY TX                    0081722430552              OK         2/2
                                  0081771630075              OK         2/2
                                  0081722430259              OK         2/2
                                  02074814686                OK         2/2
                                  0081334348479              OK         2/2

--------------------------------------------------------------------------------
REASON FOR ERROR
E-1) HANG UP OR LINE FAIL                  E-2) BUSY
E-3) NO ANSWER                             E-4) NO FACSIMILE CONNECTION
```

3 CLOTH STREET   TEL +44(0)20 7600 2333
BARBICAN         FAX +44(0)20 7600 0108
LONDON           DX 46621 BARBICAN
EC1A 7NP         mail@middletonpotts.co.uk
                 www.middletonpotts.co.uk

**M I D D L E T O N   P O T T S**
S O L I C I T O R S

FAX TRANSMISSION

| | |
|---|---|
| DAVID LUCAS | ROBERT WILSON |
| DAVID GODFREY | PHILLIP D'COSTA |
| DAVID RAMAGLIATI | PAUL TAYLOR[1] |
| STEPHEN MORRALL | |
| ANDREW MEADS | CONSULTANTS |
| FRED KONYNENBURG | CHRISTOPHER POTTS |
| ANTHONY HALL-JONES | PATRICK HANN |
| EDWIN CHEYNEY | HAZEL ALTON |

PLEASE ADVISE IMMEDIATELY BY TELEPHONE
FAX, E-MAIL OR TELEX IF ANY PART OF THIS
TRANSMISSION FAILED OR WAS ILLEGIBLE

| FROM /<br>OUR REF | PNT/FK/1034-117 | DATE | 10 March 2008 |
|---|---|---|---|
| TO<br>ATTN | Namirei-Showa Co., Ltd Osaka<br>Mr Chuji Fujihara | FAX NO<br>REF | 00 81 72 243 0552 |
| CC | Nakanishi Kikai | FAX NO<br>REF | 00 81 77 163 0075 |
| CC<br>C/O<br>ATTN | S N Navigation S.A. Panama<br>Namirei-Showa Co. Ltd<br>Osaka/Nakanishi Kikai<br>R. Shuzo Watanabe/Mr Takuro<br>Fujimoto/Mr Chuji | FAX NO<br>REF | 00 81 72 243 0259 |
| CC<br>ATTN | Maersk Broker (UK) Ltd London<br>Mr Simon Masters | FAX NO<br>REF | 020 7481 4686 |
| CC<br>ATTN | Fairfield Japan Ltd Tokyo<br>Yoshi Y. Ishii | FAX NO<br>REF | 00 81 33434 8479 |
| PAGES<br>(INCL) | 2 | | |

Dear Sirs,

**M.V. "12,500 DWT SINGLE SCREW BULK CARRIER LOGS FITTED TBN1"**
**CHARTERPARTY DATED 16.04.07**

Pursuant to the abovementioned charterparty, Intermare Transport GmbH agreed to charter from Namirei-Showa Co or Nakanishi Kikai or your guaranteed nominee M.V. "12,500 DWT single screw bulk carrier TBN1". TBN1 was to be built at the Yangzhou Yard and, upon delivery, to be chartered by our company with a subsequent option to purchase.

This fax message is confidential and for use by the addressee only and may be legally privileged. If the message is received by anyone other than the addressee, please destroy it and notify the sender immediately.

Middleton Potts is regulated by the Solicitors Regulation Authority
[1] Qualified as a Solicitor and an Avocat à la Cour (Paris)

276924

| 3 CLOTH STREET | TEL +44(0)20 7600 2333 |
| BARBICAN | FAX +44(0)20 7600 0108 |
| LONDON | DX 46621 BARBICAN |
| EC1A 7NP | mail@middletonpotts.co.uk |
| | www.middletonpotts.co.uk |

# MIDDLETON POTTS
## SOLICITORS

| DAVID LUCAS | ROBERT WILSON |
| DAVID GODFREY | PHILLIP D'COSTA |
| DAVID RABAGLIATI | PAUL TAYLOR[1] |
| STEPHEN MORRALL | |
| ANDREW MEADS | *CONSULTANTS* |
| FRED KONYNENBURG | CHRISTOPHER POTTS |
| ANTHONY HALL-JONES | PATRICK HANN |
| EDWIN CHEYNEY | HAZEL ALTON |

## FAX TRANSMISSION

PLEASE ADVISE IMMEDIATELY BY TELEPHONE
FAX, E-MAIL OR TELEX IF ANY PART OF THIS
TRANSMISSION FAILED OR WAS ILLEGIBLE

| FROM / OUR REF | PNT/FK/1034-117 | DATE | 10 March 2008 |
|---|---|---|---|
| TO ATTN | Namirei-Showa Co., Ltd Osaka Mr Chuji Fujihara | FAX NO REF | 00 81 72 243 0552 |
| CC | Nakanishi Kikai | FAX NO REF | 00 81 77 163 0075 |
| CC C/O ATTN | S N Navigation S.A. Panama Namirei-Showa Co. Ltd Osaka/Nakanishi Kikai R Shuzo Watanabe/Mr Takuro Fujimoto/Mr Chuji | FAX NO REF | 00 81 72 243 0259 |
| CC ATTN | Maersk Broker (UK) Ltd London Mr Simon Masters | FAX NO REF | 020 7481 4686 |
| CC ATTN | Fairfield Japan Ltd Tokyo Yoshi Y. Ishii | FAX NO REF | 00 81 33434 8479 |
| PAGES (INCL) | 2 | | |

Dear Sirs,

## M.V. "12,500 DWT SINGLE SCREW BULK CARRIER LOGS FITTED TBN2" CHARTERPARTY DATED 16.04.07

Pursuant to the abovementioned charterparty, Intermare Transport GmbH agreed to charter from Namirei-Showa Co or Nakanishi Kikai or your guaranteed nominee M.V. "12,500 DWT single screw bulk carrier TBN2". TBN2 was to be built at the Yangzhou Yard and, upon delivery, to be chartered by our company with a subsequent option to purchase.

This fax message is confidential and for use by the addressee only and may be legally privileged. If the message is received by anyone other than the addressee, please destroy it and notify the sender immediately.

Middleton Potts is regulated by the Solicitors Regulation Authority
[1] Qualified as a Solicitor and an Avocat à la Cour (Paris)

276924

However, pursuant to your written notice dated 13 February 2008, you repudiated the above charterparty, evincing a clear and unequivocal intention not to perform your duties thereunder:

> *"Regrettably are forced to inform you that we do not see any possibility for us to perform our duties as per the agreed charterparties".*

We accepted your repudiation by our notice of 25 February 2008, thereby terminating the charterparty, subject to a general reservation of all rights.

We hereby notify you that we have today referred all disputes under the above charterparty to arbitration in accordance with the LMAA Terms, pursuant to clause 17 of the charterparty, by appointing Patrick O'Donovan of Churcham House, 1 Bridgeman Road, Teddington, Middx TW11 9AJ as our clients' Arbitrator. Patrick O'Donovan has accepted the appointment.

Pursuant to Article 8 of the LMAA Terms, you are hereby requested to appoint your Arbitrator within 14 days of today.

Regards

*Middleton Potts*

**MIDDLETON POTTS**

```
x  x  x   COMMUNICATION RESULT REPORT ( 10.MAR.2008 12:59 )  x  x  x
```

TTI  MIDDLETON_POTTS

```
TRANSMITTED/STORED 10.MAR.2008 12:50
FILE MODE        OPTION              ADDRESS                    RESULT      PAGE
-------------------------------------------------------------------------------
0586 MEMORY TX                       0081722430552             OK          2/2
                                     0081771630075             OK          2/2
                                     0081722430259             OK          2/2
                                     02074814686               OK          2/2
                                     0081334348479             OK          2/2
```

```
REASON FOR ERROR
E-1) HANG UP OR LINE FAIL                    E-2) BUSY
E-3) NO ANSWER                               E-4) NO FACSIMILE CONNECTION
```

3 CLOTH STREET    TEL +44(0)20 7600 2333          MIDDLETON POTTS
BARBICAN          FAX +44(0)20 7600 0108              SOLICITORS
LONDON            DX 46621 BARBICAN
EC1A 7NP          mail@middletonpotts.co.uk
                  www.middletonpotts.co.uk      DAVID LUCAS          ROBERT WILSON
                                                DAVID GODFREY        PHILLIP D'COSTA
FAX TRANSMISSION                                DAVID RABAGLIATI     PAUL TAYLOR[1]
                                                STEPHEN MORRALL
                                                ANDREW MEADS         CONSULTANTS
                                                FRED KONYNENBURG     CHRISTOPHER POTTS
                                                ANTHONY HALL-JONES   PATRICK HANN
                                                EDWIN CHEYNEY        HAZEL ALTON

PLEASE ADVISE IMMEDIATELY BY TELEPHONE
FAX, E-MAIL OR TELEX IF ANY PART OF THIS
TRANSMISSION FAILED OR WAS ILLEGIBLE

| FROM / OUR REF | PNT/FK/1034-117 | DATE | 10 March 2008 |
|---|---|---|---|
| TO ATTN | Namirei-Showa Co., Ltd Osaka Mr Chuji Fujihara | FAX NO REF | 00 81 72 243 0552 |
| CC | Nakanishi Kikai | FAX NO REF | 00 81 77 163 0075 |
| CC C/O ATTN | S N Navigation S.A. Panama Namirei-Showa Co. Ltd Osaka/Nakanishi Kikai R Shuzo Watanabe/Mr Takuro Fujimoto/Mr Chuji | FAX NO REF | 00 81 72 243 0259 |
| CC ATTN | Maersk Broker (UK) Ltd London Mr Simon Masters | FAX NO REF | 020 7481 4686 |
| CC ATTN | Fairfield Japan Ltd Tokyo Yoshi Y. Ishii | FAX NO REF | 00 81 33434 8479 |
| PAGES (INCL) | 2 | | |

Dear Sirs,

**M.V. "12,500 DWT SINGLE SCREW BULK CARRIER LOGS FITTED TBN2" CHARTERPARTY DATED 16.04.07**

Pursuant to the abovementioned charterparty, Intermare Transport GmbH agreed to charter from Namirei-Showa Co or Nakanishi Kikai or your guaranteed nominee M.V. "12,500 DWT single screw bulk carrier TBN2". TBN2 was to be built at the Yangzhou Yard and, upon delivery, to be chartered by our company with a subsequent option to purchase.

This fax message is confidential and for use by the addressee only and may be legally privileged. If the message is received by anyone other than the addressee, please destroy it and notify the sender immediately.

Middleton Potts is regulated by the Solicitors Regulation Authority
[1] Qualified us a Solicitor and an Avocat à la Cour (Paris)

276924