UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
INTERMARE TRANSPORT GMBH                         :
                                                 :
                                                 :
                          Plaintiff,             :          08 cv 3181 (WHP)
                                                 :
        - against -                              :          ECF CASE
                                                 :
NAMIREI-SHOWA CO., LTD., NAKANISHI KIKAI,        :
and SN NAVIGATION PANAMA a/k/a                   :
SN NAVIGATION S.A. OF PANAMA                     :
                                                 :
                          Defendants.            :
------------------------------------------------------------------------X

        ANNE C. LEVASSEUR, having been duly sworn, deposes and states the following upon

the penalties of perjury as per 28 U.S.C. § 1746:

        1.      I am a member admitted to the Bar of this Honorable Court and am an attorney in

the firm of Lennon, Murphy & Lennon LLC, attorneys for the Plaintiff Intermare Transport

GmbH.

        2.      I submit this Declaration in opposition to Motion to Vacate Maritime Attachment

and to Dismiss Plaintiff's Complaint filed by Nakanishi Kikai (hereinafter "Nakanishi").

        3.      Attached hereto as Exhibit 1 is a true and accurate copy of the Charter Party

dated April 16, 2007 between "Namirei-Showa or Nakanishi Kikai or their guaranteed nominee"

as Owners of Vessel TBN 1 and "Intermare Transport GmbH or their guaranteed nominee which

to be always guaranteed by Alfred C. Toepfer International GmbH" as charterers.

        4.      Attached hereto as Exhibit 2 is a true and accurate copy of the Charter Party dated

April 16, 2007 between "Namirei-Showa or Nakanishi Kikai or their guaranteed nominee" as

Owners of Vessel TBN 2 and "Intermare Transport GmbH or their guaranteed nominee which to be always guaranteed by Alfred C. Toepfer International GmbH" as charterers.

5.      Attached hereto as Exhibit 3 is a true and accurate copy of the Claim Form (arbitration) dated July 24, 2008 filed by Nakanishi in the High Court of Justice, Queen's Bench Division, Commercial Court, seeking, *inter alia,* a declaration that it is not a party to the London arbitration proceedings in relation to the Charter Parties dated April 16, 2007 and a declaration that it is not a party to either of the Charter Parties dated April 16, 2007.


Executed at Southport, CT this 4th day of September, 2008.


_Anne C. LeVasseur_
Anne C. LeVasseur

EXHIBIT 1

# ORIGINAL

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946



1  **This Charter Party,** made and concluded in *London* .................................................. ..................
2  Between *Namirei-Showa or Nakanishi Kikai or their guaranteed nominee* ...................................16th day of *April* ..................................192007
3  Owners of the good ................. Steamship/Motorship *M.V. 12,500 dwt single screw bulk carrier logs fitted TBN 1 (See Clause no. 52)* ...... of ......
4  of........................................tons gross register, and......................................................tons net register, having engines of ...........................................indicated horse power
5  and with hull, machinery and equipment in a thoroughly efficient state, and classed ................................................................
6  at.........................................of about........................................cubic feet bale capacity, and about.........................................................
7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,.................tons of 2240 lbs.
8  allowing a minimum of fifty tons) on a draft of........................................feet........................................inches on.........................................Summer freeboard, inclusive of permanent bunkers,
9  which are of the capacity of about........................................knots on a consumption of about........tons of best Welsh coal- best grade fuel oil - best grade Diesel oil, *All figures in the description are*
10 conditions about........knots on a consumption of about. tons of best Welsh coal- best grade fuel oil - best grade Diesel oil, *All figures in the description are*
   *"about" the figures given are shipyard's designed figures only which are believe to be correct but subject to re-confirmation at*
   *or soon after new building delivery and speed/consumption figure are also subject to re-confirmation at*
11 now ................................................................
12 .... *and Intermare Transport GMBH Hamburg or their guaranteed nominee which to be always guaranteed by Alfred C. Toepfer*
   *International GMBH* Charterers of the City of *Hamburg, Germany* ................................................................
13  **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14 about *(See Clause No. 36)* ................................................................
15 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
16 ................................................................ *within below mentioned trading limits.*
17 the fulfillment of this Charter Party.
18 Vessel to be at the disposal of the Charterers, at *dropping last outward sea pilot Yangzhou Ryuwa Shipbuilding Co., Ltd. (See Clause No.85).*
19 *Owners option Yangzhou Longchuan Shipbuilding Co., Ltd. or in* ................................................................
20 in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as
21 the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her *delivery arrival at first*
22 *load port after delivery* to be
   ready to receive *Charterers intended* cargo with clean-swept holds *(See Clause No. 31)* and tight, staunch, strong and in every way fitted for the service,
23 having water ballast, winches and
   donkey-boiler with sufficient steam power, or if not equipped with donkey-boiler, then other power sufficient to run all the winches at one and the same
24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25 dise, including petroleum or its products, in proper containers, excluding *(See Clause No. 55)*..............
   (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,
26 all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North
27 America, and/or United State of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico,
28 Mexico, and/or South America ................................................................ and/or Europe
   and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between
29 October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,
30 *in Institute Warranty Limits (See Clause No. 35)* excluding *(See Clause No. 41) via safe berth(s), safe port(s), safe*
   *storages(s), always afloat, always accessible*

   as the Charterers or their Agents shall direct, on the following conditions:

   **1.** That the Owners shall provide and pay for all provisions, wages, *immigration* and consular shipping and discharging fees of the Crew; shall pay for
   the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
   the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.

   **2.** That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages *except Great Belt,*
   *English Channel, German Bight, Malacca Straits, Sunda Strait* Agencies, Commissions, *Tallymen,* Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
   a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
   illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
   charter to be for Charterers account. All other fumigations to be for Charterers' account after vessel has been on charter for a continuous period
   of six months or more.
   Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
   Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
   for dunnage, they making good any damage thereto.

   **3.** That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
   board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ........................... tons and to be re-delivered with not less than ........................... tons and not more than ........................... tons. *(As per Clause No. 30)*

   **4.** That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 6,900 per day less 1.25 per cent total (see lines*

52 *172/173*) ................................................................................. United States Currency ~~per ton on vessel's total deadweight carrying capacity, including bunkers and~~

53 stores, ......................................................................... ~~summer freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at

54 and after the same rate for any part of a ~~month~~ *day*; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55 wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot at one safe port Aden/Japan range including*

56 *Indonesia, Vietnam, Thailand, PI, China, Taiwan and South Korea, Vancouver BC/Valparaiso range, Baltimore/Bahia Blanca range including Caribs/US Gulf, Skaw/Passero including Baltic, full Mediterranean and Black Sea, Australia/New Zealand range at any time day and night, Sunday and Holiday included* unless otherwise mutually agreed. *Charterers will make the best endeavour to redeliver vessel in Aden-Japan range* Charterers are to give Owners not less than 60/30/20/15/10 days

57 notice of vessels expected date of re-delivery, *and port*, and probable port 5/3/2/1 days definite notice of redelivery.

58    5.    Payment of said hire to be made in ~~New York~~ *(See Clause No. 78)* in cash in United States Currency, semi-monthly in advance *but first*

59 *payment including bunkers on delivery to be effected 15 days after vessel's delivery into time charter period*, and for the last half month or

60 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

61 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

62 hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

63 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~

64 ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

65 ~~to have the privilege of using vessel at once, such time used to count as hire.~~

66    Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject

67 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

68 of such advances.

69    6.    That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place that Charterers or their Agents may

70 direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely

71 lie aground.

72    7.    That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

73 commodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

74 ~~tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

75 .......................................... per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are

76 ~~incurred in the consequences of the carrying of passengers, Charterers are to bear such risk and expense.~~ *No passengers.*

77    8.    That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

78 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

79 agency, and Charterers are to load, stow, and trim *and discharging, lash, secure, dunnage* the cargo at their expense under the supervision of the

80 Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

81    9.    ~~That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on~~

82 ~~receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.~~ *(See Clause No. 56)*

83    10.    That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

84 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

85 rate of $10.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

86 ~~Clerks, Stevedore's Foremen, etc., Charterers paying at the current rate per meal, for all such victualling.~~ *(See Clause No. 64)*

87    11.    That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Char-

88 terers, their Agents or Supercargo, when required, with a true copy of daily Logs *in English*, showing the course of the vessel and distance run and the con-

89 sumption of fuel.

90    12.    That the Captain shall use diligence in caring for the ventilation of the cargo.

91    13.    ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ........................................................................................

...............................................................................................................................................................................

~~giving written notice thereof to the Owners or their Agents~~ ............................................... ~~days previous to the expiration of the first-named term, or any declared option,~~

92    14.    That if required by Charterers, time not to commence before *(See Clause No. 85)* ......................................................................... and should vessel

93 not have given written notice of readiness on or before ................................................................................................................. but not later than 4 p.m. Charterers or

94 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

95    15.    That in the event of the loss of time from deficiency *and/or default* of men or stores, *strike of officer and/or crew* fire, breakdown or

96 damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause

97 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

98 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

99 thereof, and all *directly incurred* extra expenses shall be deducted from the hire.

100    16.    That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

101 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

102 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

103    The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

104 purpose of saving life and property.

105    17.    That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons *in London* ~~at New York,~~

106 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for

107 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be *shipping* ~~commercial~~ men *and members of L.*

108 *M.A.A. arbitration in London according to L.M.A.A. rules, English Law London arbitration to apply.*

109    18.    That the Owners shall have a lien upon all cargoes, and all sub-freights *and/or sub-hires* for any amounts due under this Charter, including General Aver-

110 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any over~~paid~~ excess

112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.
114     19.  That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled *in London*, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
116 York-Antwerp Rules *1974 and any amendments thereto* 1924, at such port or place in the United States as may be selected by the carrier, and as to
matters not provided for by these
117 Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
118 United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
119 the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
120 bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121 or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122 required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
123 carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
124 place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
125 United States money.
126     In the event of accident, danger, damage, or disaster, before or after commencement of the voyage, resulting from any cause whatsoever,
127 whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the
128 goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
129 losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
130 goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
131 ships belonged to strangers.
132     Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. *It is understood that the*
*Charter hire is not to contribute to General Average.*
133     20.  Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the
134 cost of replacing same, to be allowed by Owners. *Bunkers used by the vessel while off-hire to be for Owners' account.*
135     21.  That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
13/ convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
13/ a of last painting, and payment of the hire to be suspended until she is again in proper state for the service.
38 *(See Clause No. 77)*
39 .................................................................................................................................................................
40 .................................................................................................................................................................
    22.  Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks *cranes*) capable of handling lifts *upto maximum capacity*
*in accordance with description clause (See Clause No. 52)* up to three tons, also
41 providing ropes, falls, slings and blocks *as on board*. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
42 same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *sufficient lights as onboard for*
*night work* and maintain same in efficient working order lanterns and oil for
13 night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
14 Charterers to have the use of any gear on board the vessel.
15     23.  *(See Clause No. 58)* Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and
discharging.
/6 steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,
/7 dock hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the
/8 port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
/9 insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
0 thereby.
2     24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
3 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
4 etc." in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
5 of which are to be included in all bills of lading issued hereunder:

U.S.A. Clause Paramount

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

Both-to-Blame Collision Clause

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
owners as part of their claim against the carrying ship or carrier. *United States, Canadian and General Clause Paramount as attached as*
*approximate in all Bills of Lading issued hereunder to be incorporated*
25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
port or to get out after having completed loading or discharging. *Vessel not to be required to force Ice nor follow ice breaker when inward*
*bound.*
26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
navigation of the vessel, *acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.
27.  A commission of *1.25* 2 1/2 per cent is payable by the Vessel and Owners to *Fairfield and 1.25 pct to Maersk Broker (UK) Ltd*
*payable by Charterers* on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
28.  An address commission of 2 1/2 per cent payable to ................................................... on the hire earned and paid under this Charter.

*Rider Clauses No. 29 to 93 both inclusive and additional clauses (from NEW BOTH TO BLAME COLLISION CLAUSE to BUNKER FUEL SULPHUR CONTENT CLAUSE) in pages 1 to 35, as attached hereto, are to be considered as an integral part of this Charter Party.*

**OWNERS:**

**CHARTERERS:**

~~This Charter Party is a computer-generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc, using software which is the copyright of Strategic Software Limited.~~

~~It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end-user as appropriate and not by the author.~~



**ORIGINAL**



**RIDER CLAUSES TO
M.V. "12,500 DWT TBN 1"
CHARTER PARTY DATED 16TH APRIL 2007**

### Clause No.29 Stevedore Damage

Charterers are not to be responsible for stevedore damage or other damage to the Vessel unless notified in writing by the Master at the time of occurrence of damage or as soon as possible thereafter, but within 48 hours from occurrence except in case of hidden damage which to be notified as soon as possible after discovery, but in any case not later than upon completion of the voyage and/or discharge during which the damage was incurred. Master shall cooperate with Charterers or their agents to obtain a written acknowledgment by the responsible parties causing damage unless the damage should have been made good, in the meantime, Owners to settle stevedore damages directly with stevedores but the Charterers to remain ultimately responsible. Although stevedores to be servants of the Charterers.

Charterers have the option of redelivering the Vessel without repairing stevedore damage which to be approved by independent surveyor provided such damage may remain for occasional repair when the ship is to dock for Owners account and same is to be done simultaneously with Owner's work that Charterers pay the actual cost of repair for stevedore damage, not the time used. All damages affecting Class seaworthiness and Vessels trading capabilities to be repaired by Charterers at Charterers' time and cost. The repair must be done up to Master's and Class surveyor's satisfaction.

### Clause No.30 Bunker Clause

Bunkers on delivery to be as on board but vessel to have on board sufficient bunkers to safely reach Singapore or equidistance at the Owners' actual purchase price, and bunkers on redelivery to be as on board but sufficient to reach nearest bunkering port at the Charterers' contract price. The Charterers are allowed to replenish bunkers before delivery at Charterers' expenses, and the Owners are allowed to replenish bunkers before redelivery at Owners' expenses subject to the Charterers' prior approval which not to be unreasonably withheld.
Wherever the word "fuel" appears in this Time Charter Party, same is understood to mean "bunkers".
Fuel Oil to confirm with ISO 8217 RMG 35, or RMH 35 in case RMG 35 is not physically available at the considered bunkering place.
Diesel Oil to confirm with ISO 8217 DMB.
Charterers have the option to supply RMF 180 CST in ports where no IFO 380CST is available.

### Clause No.31 Hold Cleaning

Hold Cleanness
On arrival at first loading port after delivery of dockyard Vessel's holds, to be clean, washed down by fresh water and dried up so as to receive/carry Charterers intended cargo in all respects free of salt, rust scale and previous cargo residues to satisfaction of the independent surveyors, should Vessel not be approved by

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 1"**
**CHARTER PARTY DATED 16TH APRIL 2007**

surveyor then the Vessel to be placed off-hire from the failure of inspection until Vessel is fully accepted and directly related expenses including bunkers consumed during off-hire incurred thereby to be for Owners account.

Intermediate Hold Cleaning

Provided local regulations/weather safely/time permit and if so required by Charterers, crew are to perform intermediate hold cleaning in Charterers time. Charterers to pay USD350 per hold if used payable to Master.
The crew will do such cleaning to the best of their ability with available equipment on board but totally without guarantee that the cargo holds will be accepted at the subsequent loadport(s). In case holds are not passed, Owners/Vessel shall not be responsible for any consequences arising therefrom and Vessel to remain on hire throughout. Fresh water used for washing down holds to be for Charterers account.

**Clause No.32 Watchmen**

Watchmen hired from shore for cargo to be for Charterers' account, for Vessel to be for Owners' account provided specifically ordered by Master. Compulsory watchmen to be for Charterers account.

**Clause No.33 On-Hire/Off-Hire Surveys**

A joint on-hire and off-hire to be carried upon delivery and redelivery to ascertain Vessel's conditions on delivery/redelivery and bunkers' quantity remaining on board on delivery/redelivery by a surveyor acceptable to both parties. Time for on-hire survey to be for Owners' account and for off-hire for Charterers' account but costs to be equally shared between both parties.

**Clause No.34 Redelivery**

A. It is agreed that Owners at port of redelivery are to take over the Vessel immediately ready, day or night Saturdays, Sundays included, on dropping last outward sea pilot. With reference to Clause 4, it is understood that redelivery notice(s) will be given by Time-Charterers in good faith and based upon information given to them.

B. If Vessel will load next cargo at same port as redelivery port, then redelivery to be when/where ready provided no hold cleaning to take place and provided loading can take place at the same berth immediately after completion.

**Clause No.35 Insurance**

All taxes on cargo and voyage freights to be for Charterers' account.
Ref. Line 32 and Clause 41 of "Trading Exclusion", Basic war insurance premium for worldwide trading shall be for Owners' account and premium for Hull and Machinery and officers/crew and crew war bonus, if any, due to Vessel's trading to the

**RIDER CLAUSES TO**
M.V. "12,500 DWT TBN 1"
**CHARTER PARTY DATED 16TH APRIL 2007**

restricted areas shall be for Charterers' account, but such trading always to be subject to Owners' prior approval. Insurance/extra insurance not to exceed official quotation by Lloyds underwriters, London, however, if such insurance is not obtainable commercially or through a government, the Owner shall have the right to refuse Vessel entering into war zone. In case a war risk situation develops after the Vessel has loaded a cargo, the terms of "CONWARTIME 2004" War clause to be applied. Any premium for blocking and trapping in war areas to be for Charterers' account.

Charterers have the right to break Institute Warranty Limits subject to Owners' prior approval which not to be unreasonably withheld. Charterers to reimburse extra insurance premium incurred thereby but not higher than quoted by Lloyds London and only payable against original invoice.

**Clause No.36 Agents**

Charterers will have their agents to attend Owners' minor/normal husbandry affairs without charging separate agency fees, however should there be an extraordinary matter such as dry-dock, crew change, special survey, major repair, general average work for Owner's account, Owners shall employ Charterers' agents as Owners husbandry agents and pay agency as per local recognized tariff or Owners at their option shall appoint own husbandry agents at their expense.

**Clause No.37 Grace Period**

If there is any failure in punctual payment due to oversight or negligence or error or omission of Charterers' employee, Bankers or agents otherwise for any reason when there is absence of intention to fail to make payments as set out, Charterers shall be given by Owners three banking working days written notice to rectify the failure and when so rectified, the payment shall stand as punctual payment but if Charterers fail to rectify the payment within three banking working days, Owners to hold the option put Charterers on notice that they are going to withdraw the Vessel from the service.

**Clause No.38 Warranties**

Owners further warrant that this Vessel has not entered Cuban ports or place since 1st November 1962 nor will enter such port or place prior to delivery under this Charter Party. It is further understood that this Vessel is not blacklisted by Arab countries and also that Vessel has full bunkering privileges in the United States ports and in not restricted due to previous trading.

Vessel is not blacklisted by Canada/U.S.A. in relation to recent Yugoslavia etc.

Owners guarantee Vessel has not traded C.I.S. Pacific ports in the past 2 years.

**Clause No.39 Master's Instructions**

The Master is to conform with Charterers' or their representatives' or their agents' instructions and to execute the voyage(s) with the same due care and diligence as

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 1"**
**CHARTER PARTY DATED 16TH APRIL 2007**

If he was trading for Owners' own account. Charterers to furnish Master with voyage report forms and other relevant documents which the Master to return to Charterers reporting about voyages performed including log abstracts. Such documents to be written in English.

## Clause No.40 Condition Inspection

Charterers to have the option of holding a condition inspection including hose testing for checking hatchsealing integrity at any time during currency of this Charter Party, the Owners and Master giving every facility and assistance to carry out this inspection which to be carried out without interrupting the working of the Vessel and without incurring expenses for the Owners.

## Clause No.41 Trading Exclusion (Areas)

Trading area to be worldwide within IWL but excluding Israel, all Russian Pacific ports except see clause 89, Iraq, Cambodia, Kampuchea, Cuba, Salvador but Acajutla is allowed, Congo (Brazzaville), Somalia, Yemen, Liberia, North Korea, war or warlike zones and any countries banned/boycotted by U.S.A. or U.N..

Should political situation and practices of international shipping change, Charterers and Owners may discuss in a bonafide spirit to agree to include or exclude any countries.

Charterers have the option to break IWL subject to Owners prior consent, which not to be unreasonably withheld and Charterers to pay all extras as charged by vessel's insurance company against Owners' underwriters' net invoice, which not to exceed premia charged at Lloyds of London.

## Clause No.42 Return Premium

Charterers to have the benefit of any return insurance premium received by Owners from Underwriters as and when received from the Underwriters by reason of Vessel being in port for minimum of thirty (30) days provided Vessel is on-hire for such time. But Owners not to be held responsible for any deficiency in speed/consumption due to foul bottom as a result of prolonged stay in port. In case Vessel is off-hire for more than thirty (30) days consecutive days, Owners and Charterers mutually discuss and find amicable settlement as to how to perform the remaining period of this Charter Party.

## Clause No.43 Deviation/Off-Hire Clause

In the event of the Vessel deviating (which expression includes putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or for any purpose, unless caused by acts or omission or default of the Charterers, the hire shall be suspended as from the commencement of such deviation until the time when the Vessel is again ready and in as efficient

### RIDER CLAUSES TO
### M.V. "12,500 DWT TBN 1"
### CHARTER PARTY DATED 16TH APRIL 2007

state to resume her service from a position not less favorable to Charterers than that at which the deviation commenced. In the event of Vessel for any cause or for any purpose aforesaid, putting, onto any port other than the port for which she is bound on the instructions of Charterers, the port charge, pilotage and other expenses at such port shall be borne by Owners.

## Clause No.44 Certificates

Vessel to be in possession of the necessary certificates, including deratization certificate, to comply with safety and health regulations and all current requirements at all ports of call during the currency of this Charter Party. Vessel will comply with and be maintained in accordance with the requirements of the Commonwealth of Australia loading and unloading safety measure regulations, including Commonwealth of Australia Navigation regulations, order No. 12 of 1986, including regulations dated 8.8 1986 and all cargo gear to be approved by Australian Waterside Workers Federation. Vessel to be in possession of a valid and approved cargo gear certificates in accordance with American Cargo Gear regulations. Any time lost or expenses involved by not having or in obtaining such as valid or approved certificate to be for Owners' account. Owners assure Charterers that conditions aboard this Vessel conform with SOLAS 1974 (pertains to loading grain cargoes at United States' ports and the Vessels capacity plan should so indicate and refer to untrimmed hold ends) Vessel to have on board as approved grain loading certificate from the Vessels country of registry.

## Clause No.45 Safety Regulations

It is understood that Vessel will comply with any safety regulations and/or requirements in effect at all ports of loading and/or discharging, a particular reference is the United State Department of Labour safety and Health Regulations including as set forth in part III of the Federal Register. Should the Vessel not meet safety rules and regulations Owners will make immediate corrective measure and any stevedore standby time and other expenses involved including off-hire will be for the Owners' account.

## Clause No.46 Boycott Clause

Should the vessel be captured, seized, detained, arrested, or boycotted by any authority or by any legal process during the currency of this Charter Party, the payment of hire shall be suspended until the time of her release, and any extra expenses incurred by and/or during the above capture or seizure or detention or arrest shall be for Owners' account, unless such capture or seizure or detention or arrest is occasioned by any personal act or omission or default of the Charterers or their agents or by reason of cargo or calling port or trading under this Charter.

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 1"**
**CHARTER PARTY DATED 16ᵀᴴ APRIL 2007**

## Clause No.47 Oil Pollution clause-P and I Group Recommended Clause

Financial responsibility in respect of Oil Pollution

1. Owners warrant that throughout the currency of this Charter they will provide the Vessel with following certificates.

   A) Certificates issued pursuant to section 311(P) of the U.S. Federal Water Pollution Control Act, as amended (title 33 U.S. Code section 1321(p)

   B) Deleted

2. Notwithstanding anything whether printed or herein to the contrary.

   A) Save as required for compliance with paragraph 1 hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the Vessel lawfully to enter, remain in or leave any country, state or territory in performance of this Charter.

   B) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability, or expenses (including but not limited to the cost of any delay incurred by the Vessel as a result of any failure by Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of the Vessels inability to perform as aforesaid).

   C) Owners shall not be liable for any loss, damage, liability or expenses whatsoever and howsoever arising which Charterers and/or the holders of any Bill(s) of Lading issued pursuant to this may sustain by reason of the Vessel inability to perform as aforesaid.

3. Charterers warrant that the terms of this clause will be incorporated effectively into any Bill(s) of Lading issued pursuant to this Charter.

## Clause No.48 Grab Suitability

The Vessel will not be equipped with any grabs. Charterers may install grabs at their expenses and time. Charterers to have the right to use mechanical grabs for discharging cargoes, always within Vessel's crane lifting capacity and Master's approval which not to be unreasonably withheld. Charterers to pay to the Master lumpsum USD200 per month per grab for maintenance thereof by crew. Charterers also have the right to use bulldozers in Vessel's holds as deemed necessary by custom of the port, always subject within Vessel's tank top strength and Master's approval which not to be unreasonably withheld.

## Clause No.49 Protective Clause

The New Both-to-Blame Collision, The New Jason Clause and Voy War 2004, P and I Nuclear Clause, as applicable, are all to be considered as part of this Charter Party and Bill(s) of Lading shall be subject to all said clause. The U.S.A. and Canada, Clause Paramount as applicable, or the Hague Rules as enacted in countries other than the U.S.A. and Canada, as applicable, to be incorporated in all Bill(s) of Lading and this Charter.

# RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 1"
### CHARTER PARTY DATED 16TH APRIL 2007

## Clause No.50 Bill(s) of Lading

"No through Bill(s) of Lading to be issued

Neither the Charterers nor their agents permit the issue of any Bill(s) of Lading, Way Bill(s) or other documents evidencing a contract of carriage (whether or not signed on behalf of the Owners, or on the Charterers' behalf, or on behalf of any sub-Charterers) incorporating, whether or not compulsorily applicable, the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules. The Charterers shall indemnify the Owners against liability loss or damage which may result from any breach of the foregoing provisions of the clause"

Owners/Master to authorize Charterers and/or their agents to sign/release original Bill(s) of Lading if required by Charterers, but always in accordance to the mate receipts and tally receipt. Charterers to have option to use seawaybills if required by head Charterers. And Charterers hereby indemnify Owners for above.

## Clause No.51 Radio Clause

To be advised later.

## Clause No.52 Vessel's Description (figures all about)

1.      Name: Not decided
        Flag: Panama
        Port of Registry: Panama
        IMO Number: Not decided.


2. Single Deck Self Trimming Bulk Carrier
   If other type, please state
   Strengthened for Heavy Cargo: (NO) – Nos., (NOS) Hold may be empty.


3. Gearless or Geared – gear description:
   2 cranes each of maximum 30 metric tons SWL capacity at maximum outreach of about 9.7 meters from ship's side.


4. Built (year) / (month)    Place: Yangzhou Ryuwa Shipbuilding Co. Ltd. Or Yangzhou Longchuan Shipbuilding Co., Ltd.


5. DWAT

   Abt 12,900 metric tons on 8.661 (mld.) meters draft in fresh water, on TFW marks, TPC about 20.7

   Abt 12,550 metric tons on 8.488 (mld.) meters draft in fresh water, on F marks, TPC

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 1"**
**CHARTER PARTY DATED 16ᵀᴴ APRIL 2007**

about 20.8

Abt 12,950 metric tons on 8.473 (mld) meters draft in salt water, on T marks, TPC about 21.3

Abt 12,550 metric tons on 8,300 (mld.) meters draft in salt water, on S marks, TPC about 21.1

Abt 12,200 metric tons on 8.127 (mld.) meters draft in salt water, on W marks, TPC about 21.2

(Cargo and bunkers, which capacities are Abt. 720 metric tons IFO (at 96% per cent)

Fresh water, which capacity is     Abt. 110 metric tons MFO (at 96% per cent)

And constants not exceeding     Abt. 240 metric tons

           Abt 96 metric tons)

Panama deadweight: (DWAT) metric tons on 39'06" freshwater draft.

6. LOA: 121.90 meters
   LBP: 115.00 meters
   Beam: 20.60 meters
 GRT/NRT Suez:
 GRT/NRT Panama:

International GT/NT: Abt 7400 tons / Abt 4800 tons

7. Total grain subic in clear and unobstructed main holds only: Abt. 519,120 cubic feet

Grain cubic breakdown by hold:

    1) No.1 C.H. Abt. 144,790 cubic feet
    2) No.2 C.H. Abt 243,670 cubic feet
    3) No.3 C.H. Abt 130,660 cubic feet

8. Number of holds/hatches : 3/3
   Hatch sizes:
   1) 13.30 x 10.50 meters
   2) 28.00 x 10.50 meters
   3) 12.60 x 10.50 meters

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 1"**
**CHARTER PARTY DATED 16TH APRIL 2007**

Type of hatch covers: Holding & Hinge up type

9. Distance waterline to top of hatch covers or rail, mentioning which is higher in light ballast : abt 9.4 meters , in heavy ballast: abt 9.1 meters – number of floodable holds included: (NO) (NO. (HO)).

Distance waterline to highest point of ship (airdraft)
In light ballast: abt 31 meters
In heavy ballast: abt 30 meters

Distance tank top to top of hatch coaming 1.5 meters (At C.L).

10. Tank top strength:

1) No.1 C.H.
Uniform load          8.82 tons/m²
Local Strength        15.0 tons/m²
Steel Coil            30 t x 1 Layer (without key coil)

2) No.2 C.H.
Uniform load          8,.82 tons/m²
Local Strength        15.0 tons/m²
Steel Coil            30 t x 1 Layer (without key coil)

3) No.3 C.H.
Uniform load          8.82 tons/m²
Local Strength        15 tons/m²
Steel Coil            30 t x 1 Layer (without key coil)

11. Speed and consumption

Ballast: about (ball) knots on (con) metric tons IFO and about (con) metric tons MDO
Or about (ball) knots on (con) metric tons IFO and about (con) metric tons MDO
Laden: about (laden) knots on (con) metric tons IFO and about (con) metric tons MDO
Or about (laden) knots on (con) metric tons IFO and about (con) metric tons MDO
In port: about (con) metric tons MDO when idle

About (con) metric tons MDO when working 24 hours

Vessel burns IFO (180 or 380) CST (ISO 8217: 1996 (e) (RME25 or RMG35), but Charterers may supply

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 1"
## CHARTER PARTY DATED 16ᵀᴴ APRIL 2007

RMF 25 where RME25 is not available, in Brazil Owners to accept PETROBRAS specifications)respectively MDO (DMA or DMB) in main engine / auxiliaries.

12. Australia hold ladders fitted: Yes

    ITF fitted:

    Fitted for other special trades: please specify

13. Call sign: not decided

    Telex number: not decided

    Fax number: not decided

    Phone number: not decided

    Email: not decided

    Master's name: not decided

14. In all cases Owners warrant performing vessel complies with following stipulations:

- Vessel does not have any centerline bulk head or centerline beam and is free from any obstructions in vessel's holds and hatchways
- Is fully suitable for grab discharge
- Is fitted with weather tight hatch covers
- Is fully suitable for in-transit fumigation
- Is fully grain fitted in accordance with national and international regulations
- Is geared vessel: vessels' gear is in good working order and able to serve all vessel's holds/hatches
- Vessel at all times has onboard valid deadweight and capacity plans including calibration and trim table.

## Clause No.53 Australian Hold Ladders/Cranes

Vessel to be fitted with hold ladders in accordance with Australian Navigation Act on delivery and Owners to maintain same in efficient order during the currency of this Charter Party. Cranes to be constructed and maintained in accordance with Australian navigation Act.

## Clause No.54 Cargo Claims

Any liability to third parties for cargo claims be borne by Owners/Charterers in accordance with the Interclub NYPE agreement dated May 1984 and any subsequent amendments.

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 1"**
**CHARTER PARTY DATED 16TH APRIL, 2007**

## Clause No.55 Cargo Exclusions

The vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous, injurious, flammable or corrosive nature unless carried in accordance with the requirements or recommendations of the competent authorities of the country of the vessel's registry and of ports of shipment and discharge and of any intermediate countries or ports through whose waters the vessel must pass.

Notwithstanding provisions of above paragraph, Charterers have the option to load dangerous / injurious or inflammable goods upto 500 mt per voyage, provided same is packed/labeled/loaded/lashed and discharged in accordance with IMO as well as local/international regulations and always excluding IMO Class 1 and 7. Without prejudice to the generality of the foregoing, in addition the following are specifically excluded:

Livestock of any description, arms, ammunition, explosives (black powder, blasting caps, loaded bombs, detonators, dynamite, TNT), nuclear and radioactive materials and its waste, tar in bulk, turnings and motor blocks, hot briquetted iron, petroleum and it's by-products, pitch in bulk, borax in bulk, bitumen, quebracho, sodium sulphate, calcium hydrochloride, bonemeal, charcoal, turpentine, ferro silicon, resin, cotton, nitrate, lime, Chilean nitrate, copra, pond coal, pebbles, brown coal, Indian coal (well understood that it means coal loaded in India), sponge iron, asphalt, ammonium nitrate (but fertilizer grade which does not require $CO_2$ or inert gas system in cargo hold is permitted), naphtha and its products, direct reduced iron, direct reduced iron ore pellets, asbestos, fishmeal, wet hides, creosoted goods, calcium carbide, motor spirits, industrial waste, acids, and any other cargoes (except coal and sulphur) listed in Appendix B to BC Code.

The vessel is able to carry the following cargoes.

1) Coal - all cargo tanks
   (UN No.010)

2) Brown coal (Lignite) Briquettes - all cargo tanks
   (UN No.002)

3) Aluminium Ferrosilicon Powder – all cargo tanks
   (UN No.1395)

4) Aluminium Silicon Powder, Uncoated – all cargo tanks
   (UN No.1398)

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 1"**
<u>**CHARTER PARTY DATED 16TH APRIL 2007**</u>

5) Ferrous metal Boring, Shaving,
   Turning or Cutting - all cargo tanks
   (UN No.2793)

6) Ammonium Nitrate - not able to carry for all cargo tanks
   (UN No.1942)

7) Ammonium Nitrate Fertilizers – all cargo tanks
   (UN No. 2026-70)

8) Ammonium Nitrate Fertilizers – all cargo tanks
   (UN No.2071)

9) Seed Cake (a), containing vegetable oil, Meal,
   Oil Cake, Seed Expellers - all cargo tanks
   (UN No.1386)

10) Seed Cake (b), containing vegetable oil, Meal,
    Oil Cake, Seed Expellers (Mechanical) - all cargo tanks
    (UN No. 1386)

11) Seed Cake (b), containing vegetable oil, Meal,
    Oil Cake, Seed Expellers (Solvent) – all cargo tanks
    (UN No. 1386)

12) Seed Cake (c), containing vegetable oil, Meal,
    Oil Cake, Seed Expellers (Mechanical) - all cargo tanks
    (UN No. 2217)

13) Seed Cake (c), containing vegetable oil, Meal,
    Oil Cake, Seed Expellers (Solvent) – all cargo tanks
    (UN No. 2217)

14) Sulphur (lump or coarse grained) - all cargo tanks
    (UN No. 1350)

15) Zinc Ashes, Zinc Dross, Zinc Residues,
    Zinc Skimmings – all cargo tanks
    (UN No. 1435)

<u>In case of loading Salt</u>

Maximum two (2) cargoes of salt per year, but shall not be consecutive voyages
and shall not be last voyage before redelivery which is to be loaded, stowed, carried
and discharged strictly in accordance with applicable national/international
regulations and/or IMO Code and recommendations at Charterers'risk and expense.
If lime coating/washing of holds is required by Shippers and Owners, Charterers to

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 1"**
**CHARTER PARTY DATED 16TH APRIL 2007**

arrange following at the Charterers' time and expenses. To coat holds with lime which is supplied by Charterers to Master's satisfaction prior to loading salt and to arrange removal of the same to Master's satisfaction .Charterers may request the vessel's crew to perform above removal of lime paying lumpsum USD 400 bonus per hold in addition to regular intermediate hold cleaning fee, subject Owners and vessel shall not guarantee that holds will be sufficiently cleaned/accepted at next loading port.

## In case of loading Cement

Maximum two (2) cargoes of cement per year, but shall not be consecutive voyages and shall not be last voyage before redelivery. Charterers may request the vessel's crew to perform hold cleaning paying lumpsum USD 400 bonus per hold in addition to regular intermediate hold cleaning fee, subject Owners and vessel shall not guarantee that holds will be sufficiently cleaned/ accepted at next loading port. Charterers shall provide the vessel with one set each of a Water-Tobey and submerged pump to facilitate such extra works by the vessel's crew. Owners to seal all hatches where such cargo loaded by marine tape or similar tape if required by Charterers, but cost of such tape to be reimbursed by Charterers upon completion of loading. The vessel's bilge line will not be customarily used for discharge of bilge water after hold cleaning of cement.

## In case of loading Scrap

Charterers to have the option to load a maximum of two (2) cargoes of scrap per each trading year, but shall not be consecutive voyages and shall not be last voyage before redelivery, provided however that:

    (1)    The scrap mentioned herein is only limited to HMS 1 + 2 and shredded scrap specifically non-oily and always excluding motor blocks, turnings, metal borings and cuttings.

    (2)    Charterers undertake to use as few holds as possible provided the vessel's stability and stress permit.

    (3)    Charterers undertake that the first layer of scarp to be loaded is not to be released until touching the tanktop and not to be dumped/dropped during loading. The first layer of scrap to be loaded, stowed, trimmed to Master's satisfaction before loading the balance of the cargo.

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 1"**
**CHARTER PARTY DATED 16TH APRIL 2007**

## In case of loading Sulphur

Maximum two (2) cargoes of sulphur per year, but shall not be consecutive voyages and shall not be last voyage before redelivery which is to be loaded, stowed, carried, and discharged strictly in accordance with applicable national/ international regulations and/or IMO Code and recommendations at Charterers' risk and expense. If lime coating/washing of holds is required by Shippers and Owners, Charterers to arrange following at the Charterer's time and expenses. To coat holds with lime which is supplied by Charterers to Master's satisfaction prior to loading sulphur and to arrange removal of the lime to Master's satisfaction .Charterers may request the vessel's crew to perform above removal of lime paying lumpsum USD 400 bonus per hold in addition to regular intermediate hold cleaning fee, subject Owners and vessel shall not guarantee that holds will be sufficiently cleaned/accepted at next loading port.

## In case of loading Petcoke

Charterers have the liberty of carrying max 3 cargoes of non oily petroleum coke (whether it be full or part cargo), each year if exercised on following conditions:

a) The petroleum coke mentioned herein is only limited to the type of non-hazardous/non-dangerous green delayed type and/or calcined type.

b) If Charterers exercise such options, Charterers undertake to use the least number of holds possible, provided vessel's stability trim and stress permitting.

c) Such cargo to be loaded/stowed/trimmed/discharged strictly according latest IMO and/or any other latest regulations/rules applicable to such cargo.

d) Should any additional/special wash down of holds before loading be reasonably recommended/proposed/required by Master, Charterers undertake to arrange the same at their expense/time, however, Master and crew to always cooperate with Charterers.

e) After discharging Charterers to arrange at their expense/time any additional/special wash down of holds carrying such cargo by chemicals as Master reasonably considers if necessary, however, Master and crews to always cooperate with Charterers.

f) Such cargo not to be last cargo prior redelivery.

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 1"
## CHARTER PARTY DATED 16TH APRIL 2007

g) Any extra expenses resulting there from/incurred thereby and any detention through any of the above causes to be for Charterers' account.

### Clause No.56 Captain's Conduct

It is understood that if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers or Engineers, the Owners shall on receiving particulars of the complain, investigate same and if necessary make a change in the appointment but this provision does not affect the Charterers' rights to advance any claims or require arbitration under Clause No.17 of disputes regarding the conduct of the Master in prosecution of voyages and in carrying out the orders and directions of the Charterers.

### Clause No.57 Itinerary

Owners to keep Charterers regularly advised of Vessels' position, and particularly any changes to same, upto the time of delivery. In addition to the above general advise Owners are to give ETA of the vessel's delivery area/port on fixing and thereafter 3 days and 48/24 hours notice to Charterers.

### Clause No.58 Breakdown of Cargo Gear

Vessel's cargo gear and all other equipment shall comply with the regulations of the countries in which the Vessel will be employed and Owners are to ensure that the Vessel is at all times in possession of valid and up-to-date certificates of efficiency to comply with such regulations. If stevedores, longshoremen or other workmen are not permitted or refuse to work due to failure of Master and/or Owners and/or Owner's agents to comply with aforementioned regulations or because Vessel is not in possession of such valid and up-to-date certificates to efficiency then Charterers may suspend hire for the time thereby lost and Owners to pay for all directly related expenses and incidental to and resulting from such failure. Vessel to work day and night if required by Charterers and all cranes to be at Charterers' disposal during loading and discharging, as required by Charterers. If the regulations of port or of labor unions prevent crew from opening or closing hatches, removing and replacing beams and hatches boards, shore labor to be paid by Charterers. In the event of disabled crane or cranes, or insufficient power to operate cranes, Owners to pay for suitable substitute shore engine(s) or crane(s) and also for any stevedores standby time occasioned thereby, hire of crane(s) not to exceed vessel hire. Hire to be deducted proportionally to the total number of operative hatches for all the time crane or cranes are unavailable due to disability or loss of power unless shore cranes have been provided and paid by Owners in which case hire to be paid in full. Where the Vessel is detained as a result of a disabled crane or cranes which detention would not have occurred had crane(s) been available in all times, then, the payment of hire to be adjusted accordingly as per Clause No.15"

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 1"
## CHARTER PARTY DATED 16TH APRIL 2007

### Clause No.59 Crew Service

Subject to local regulations permit, the following service in respect of loading and discharging, operation from officers and crew are included in hire.

1. Raising, lowering and rigging cranes and/or gangways in preparation for loading and discharging, if port regulation permits.
2. Opening and closing of hatches in connection with loading and discharging if local regulations allow, otherwise to be for Charterers' account.
3. Closing and opening of hatches in the event of weather which may adversely affect condition of cargo carried on board during loading and discharging, if port regulation permits.
4. Maintaining sufficient electric power and all cranes whilst loading and discharging including regular maintenance and shifting between berths.
5. Docking and undocking in connection with loading/discharging cargo or bunker. Necessary assistance in the Vessel's bunkering operation.
6. Officers and crew to shape up Vessel's hatches and cranes as much as possible prior to arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations subject to seaworthiness, weather condition and safety of crew.
7. Charterers pay to Master USD1,750 for crew work such as erecting/dismantling stanchions, lashing/unlashing/relashing deck cargo, and cargo mark officers (Charterers to provide paints), provided local regulation/port authorities permit.

The above service shall be considered as a minimum and done as Charterers servants and shall in no way be construed as and alternative to or reduction in the standard of services from officers and crew required under this Charter Party.

### Clause No.60 Charterers' Gear Maintenance

The Vessel shall keep record of Charterers' gear, equipment and/or stores supplied to the Vessel and shall maintain same in good condition. Gear equipment and/or stores to be returned to Charterers upon their request at any time during the Charter (latest at final discharging port) is same good order and condition as when supplied, fair wear and tear accepted.

### Clause No.61 Deck Cargo

Charterers have the option of loading cargo on deck and hatch covers at Shipper's /Charterers' risk and expenses and Vessel not to be responsible for any loss and/or damage howsoever caused. Vessel to carry full deck load, if required, in accordance with usual marine practice and safety regulations and the deck load will be limited by Vessel's strength stability and seaworthiness. All deck cargo is to be stowed, lashed and secured at Charterers' risk and expenses to Master's satisfaction and in accordance with all the appropriate regulations. All Bill(s) of Lading issued for cargo carried on deck are to state: "All cargo carried on deck at shippers and/or

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 1"**
**CHARTER PARTY DATED 16TH APRIL 2007**

consignees' risk and expenses. Carrier not responsible for any loss or damage howsoever caused"

## Clause No.62 Capture/Seizure/Detention/Arrest

Should the Vessel be captured or seized or detained or arrested by any authority or by any legal process during the currency of this Charter Party for any reason attributable to the Owners, the payment of hire shall be suspended until the time of her release. Off-hire to be for any time actually lost. Any extra expenses incurred by and/or during such capture or seizure or detention or arrest shall be for Owners account.

## Clause No.63 Bimco Double Banking Clause

(a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transshipment, loading or discharging of cargo and/or bunkering.

(b) The Charterers shall pay for and provide such assistance and equipment as may required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his opinion it is not safe to do so.

(d) The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

(e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

## Clause No.64 Lumpsum Amount for Cable/Entertainment/Victualling

Charterers to pay Owners lumpsum USD1,150 per month or pro rata for cable /entertainment/victualling, etc.

## Clause No.65 Time Calculation

The time for delivery/redelivery shall be adjusted to GMT.

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 1"
## CHARTER PARTY DATED 16TH APRIL 2007

### Clause No.66 In Lieu Of Hold Cleaning

Charterers shall have the option to redeliver the vessel without cleaning of holds against paying the Owners a lumpsum of US$2,500 in lieu of such cleaning. However, Charterers shall arrange, at their own accout, dunnage and bark removal/disposal by shore labor. Alternatively, subject to consent by crew and subject to port regulations, Charterers have the option of using crew for dunnage removal. Charterers shall remain responsible for the disposal and any cost related thereto.

### Clause No.67 Trim and Stability

Cargoes to be loaded and distributed in such a manner that the vessels bending moments, stress forces, trim and stability will not exceed permissible limitations. Vessel to be left in safe seaworthy trim for shifting between berth and all ports to Masters' satisfaction.

### Clause No.68 Discharge of Cargo without Presentation of Original Bill(s) of Lading

Owners allow Charterers to discharge cargo without presentation of Original Bill(s) of Lading by providing Owners with Charterers Letter of Indemnity in accordance with Owners P and I Club form and wording before discharging. Letter of Indemnity to be signed by Charterers only.

### Clause No.69 Weather Routing

Within the context of this Charter Party "good weather conditions" are to be taken as wind speed not exceeding Beaufort 4 (16 Knots maximum). The Charterers may supply an independent weather routing company service to the Master during voyage specified by the Charterers. The Master shall comply with the reporting procedure of the routing service selected by the Charterers. Evidence of weather conditions shall be taken from the Vessels deck logs in case of a dispute between the findings of appointed Wheatherrouting Services and the vessel's log books abstracts the Weatherrouting Services dates to be binding for both parties. Costs for such routing companies to be for Charterers' arrangement and expenses.

### Clause No.70 War Cancellation

If war breaks out between any two or more of following countries:
U.S.A., C.I.S., Peoples Republic of China, Germany, South Korea and Japan directly affecting the performance of the Charter Party, both Owners and Charterers shall have the option to cancel of the Charter whereupon the Charterers shall redeliver the Vessel to the Owners. If she has the cargo on board after discharge thereof at destination or if debarred from reaching or entering it, at a near open and safe port as directed by the Charterers, or if she has no cargo on board, at a port at which

### RIDER CLAUSES TO
### M.V. "12,500 DWT TBN 1"
### CHARTER PARTY DATED 16TH APRIL 2007

she stays, or if sea a near and safe port as directed by the Charterers in all cases hire shall be paid until the Vessels redelivery.

### Clause No.71 Quarantine

Normal quarantine time and expenses for the Vessel entering port shall be for the Charterers account, but any time of detention and expenses for quarantine due to pestilence, epidemics among or illness of captain, officers and crew shall be for Owners' account.

### Clause No.72 Smuggling

Any delay, expenses and/or fines incurred on account of smuggling shall be for Owners account If caused by the officers and/or crew and shall be for the Charterers' account if caused by the Charterers' supercargo and/or their staff of agents.

### Clause No.73 Additional Equipments/Fittings

The Charterers, subject to Owners' prior approval not to be unreasonably withheld, shall be at liberty to fit any additional equipment/fittings for loading, discharging and/or securing cargo and such fittings are not to affect the structure of the Vessel including coating in tanks etc. Such work shall be done at the Charterers' expenses and time and the Charterers shall remove such equipment and fitting and restore the Vessel to her original conditions including repair of coatings at their expenses and time prior redelivery.

Charterers option to weld padeyes under Master's supervision and subject to Master's approval, which not to be unreasonably withheld and Charterers to remove padeyes. Charterers further option to redeliver Vessel without removal of padeyes in consideration of Charterers to pay Owners USD10.00 per padeye.

Vessel has no cement holes on hatches, however, Charterers have the option to make holes in each hatch for loading cement in bulk at their time and expenses, subject to Builders' confirmation.

### Clause No.74 U.S. Unique Bill(s) of Lading Identifier Clause

The Charterers warrant that each transport documents accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a unique Bill(s) of Lading identifier as required by the U.S. Customs Regulations (19 Clause, part Section 4.7.A) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 1"
## CHARTER PARTY DATED 16TH APRIL 2007

whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for Charterers' account.

## Clause No.75 Admixture Clause

While Charterers have the option to load two or more cargoes, in the same hold, Charterers are to supply, erect, dismantle and dispose of any and all separations required at their risk and expenses.

Notwithstanding any other provisions in this Charter Party, any claims arising from contamination or admixture to cargo carried in the same hold to be for Charterers' account. Should Charterers be permitted to load containers, Owners are not to be responsible for stowage of cargo in containers, nor for cargo claims arising therefrom. Owners are not to be responsible for stuffing or unstuffing of containers.

## Clause No.76 IMO Clause

The Charterers are to provide the Master with any evidence he may reasonably require to show that the cargo is packed, labeled, loaded, stowed, carried and discharged in accordance with IMO regulations, failing which the Master is entitled to refuse to load such cargo, or if already loaded, to unload it at Charterers' risk and expenses, however, Charterers to be given reasonable amount of time to comply with Master's request prior Master, Owners taking corresponding action. In case local and/or national authorities require special documentation for any cargoes covered by IMO Code, Charterers are to list cargoes (always in accordance with the Charter Party-see also cargo exclusion Clause No.58) then they are to reimburse Owners for any extra expenses by Owners as a result of same.

## Clause No.77 Dry-Docking Clause

Charterers shall place the Vessel within the range of Singapore-Japan and Far East at a convenient time and place to be mutually agreed between Owners and Charterers for Owners' class drydocking survey once in three (3) years at Owners' request. Owners shall give at least three (3) months prior notice to Charterers. Owners shall have the right to place the Vessel in drydock at any time in case of emergency.

Payment of hire shall be suspended from dropping last outward sea pilot (D.L.O.S.P.) of Charterers' last port until Vessel is again efficient in the same or equivalent distance position. Bunker consumed incurred thereby to be for Owners' account.

## Clause No.78 Payments

Bunker value remaining on board on delivery to be paid within three(3) banking days after Vessel's delivery. Charterers are entitled to deduct estimate Owners' expenses /maximum USD600 per port and bunker value on redelivery from last

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 1"
## CHARTER PARTY DATED 16TH APRIL 2007

sufficient hire. The time for delivery/redelivery shall be adjusted to GMT. Owners' bank account to be advised later when confirmed.

### Clause No.79 ISM Clause

From the date of coming in force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that the Vessel and The company (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. Except as otherwise provided in this Charter Party, loss, damage, expenses or delay caused by failure on the part of The Company to comply with the ISM Code shall be for Owners' account.

### Clause No.80 Fumigation Clause

Charterers are on written request permitted to fumigate Vessel's holds with or without cargo on board at loading and discharging port(s) or places en route at their risk and expenses and warrant that fumigants will not expose officers and crew as well as other persons on board the Vessel during and after the fumigation to any health hazard whatsoever and will comply with current IMO regulations, Charterers undertake to also pay Owners all necessary expenses incurred because of the fumigation including necessary expenses for accommodating and victualling Vessel's personnel ashore and to indemnify Owners in respect of any liability, loss, damage, or expenses which they may sustain because of the fumigation. Any time lost thereby counts as on-hire.

If requested by Charterers the Vessel is to be fumigated en route from loading port(s) to the first discharging port. The fumigation procedure involves the use of the product phosphine. If requested by Charterers, Owners/Master will not insist that a technician accompany the Vessel subject to Charterers' agreeable following to be added, for log loading

1. Charterers shall furnish Owners the Letter of Indemnity (*sample as per attached).
2. Charterers shall arrange proper training and documentation for crew in such manner satisfying IMO recommendations by fumigator.
3. Initial setting of fumigants shall be made by the fumigator without involving crew members.
4. Charterers shall supply proper equipment for fumigation which to be retained until complete discharging of the cargo. Charterers to provide all the necessary apparatuses if needed according to local regulation/IMO regulation.
5. Charterers shall remove residue of fumigant where possible at the first port of discharging after fumigation completed.
6. Charterers' fumigation company shall be available to Ship/Owners/Ship managers for information and advise during entire voyage of in-transit

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 1"
## CHARTER PARTY DATED 16TH APRIL 2007

fumigation.

*Sample of L.O.I.

Letter of Indemnity to be given in return for fumigation transit

"To the Owners, Master and Agent of the M.V.

Dear Sirs,

The above ship shall not be required to fumigate the holds for the cargo of log to be loaded at        on or around        under the above Charter Party but notwithstanding the provisions of the above Charter Party, we hereby request you to comply with Charterers' order of fumigation while the Vessel, M.V.

is in transit to        for the above cargo of log.

In consideration of your complying with our above request, we hereby agree as follow:

1. To indemnify you, your servants and agent and to hold all of you harmless in respect of any liability, loss, damage or expenses of whatsoever nature that you may sustain by reason of the fumigation done in accordance with our request, where such losses, liabilities or damages are not already covered under Owners' existing insurance arrangements and providing such losses /liabilities /damages are not caused by negligence of Owners/Master and/or their servants.

2. In the event of any proceeding being commenced against you or any of your servants or agents in connection with fumigation done as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3. If, in connection with fumigation done as aforesaid, the Ship should be arrested or detained or should arrest or detention thereof be threatened, or should there by any interference in the use of trading of the Vessel (whether by virtue of a caveat being entered on the Ship's registry or otherwise however), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such Ship or properly or to remove such interference and, to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest of detention or such interference may be justified.

4. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

5. This indemnity shall be governed by and construed in accordance Japanese law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the district court of Japan.

Yours faithfully,"

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 1"**
**CHARTER PARTY DATED 16TH APRIL 2007**

## Clause No.81 Consumption of MDO

The vessel to have the liberty of using diesel oil when entering and leaving port and for maneuvering in shallow narrow waters, canals and rivers.

Vessel does not burn MDO at sea. The starting of vessel's main engine, generators and boilers are able to burn fuel oil however the Charterers agree that the consumption of MDO for safety reasons (i.e. starting main engine, generators and boiler as per page M1-2) is to be for their account. Owners calculate that MDO consumption per month under normal operations is to be maximum 5 mt and same to be reviewed after vessel has been operated for six months.

## Clause No.82 Charterers' Color

Charterers shall have privilege of flying their own funnel mark and deciding the vessels name which to be, the Vessel shall be repainted in Owners funnel color before termination of the Charter and the cost of re-painting shall be for Charterers' account.

## Clause No.83 Assignment

Acknowledgement and consent by Charterers for assignment of Charter Party and Charter hire shall be given to Owners' financier(s) for finance purpose.

## Clause No.84 I.T.F.

Owners guarantee that the Vessel's officers and crew on board are employed under conditions approved by I.T.F. during the whole Charter period.

## Clause No.85 The Laycan of the Vessel

1st September / 30th November 2008 to be narrowed to a 30 days spread at a mutually agreeable date ex.shipyards (Owners' hope to produce still within July / August 2008 agw).

## Clause No.86 Time Charter Period

Trading via safe port(s) safe anchorage(s) safe berth(s) for a Firm period of 7 years with 2 months more or less in Charterers' option.

- Charterers' option further 11-13 Months (8th year)
- Charterers' option further 11-13 Months (9th year)
- Charterers' option further 11-13 Months (10th year)

If declared, optional periods to commence on 1st day of 84th, 96th and 108th months respectively after delivery. Optional periods to be declared latest by the end of the 82nd, 94th and 106th months after delivery respectively, however Charterers

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 1"
## CHARTER PARTY DATED 16TH APRIL 2007

to give minimum 60 days redelivery notice (in other words, if by the end of 82nd month of the charter period, Charterers have not exercised their option for the 8th year, they cannot redeliver the vessel until the end of the 84th month).

### Clause 87    Law / Arbitration

The parties to endeavor to resolve any disputes amicably however if this is not successful, all disputes from time to time arising out of the contract, shall unless the parties agree forthwith on a single arbitrator, be referred to the final arbitrament of two arbitrators carrying on business in London who shall be engaged in the shipping trade and be L.M.A.A. members, one to be appointed by each of the parties, with power to such arbitrators to appoint a third arbitrator.

Any charter party dispute must be made in writing and the arbitrator must be appointed within 12 (twelve) months after the completion of discharge of the respective voyage and where this provision is not complied with the dispute shall be extinguished and cease to exist. No award shall be questioned or invalidated on the grounds that any of the arbitrators is not qualified as above, unless objection to his acting be taken before the award is made. The charter party to be construed in accordance with English law and L.M.A.A. rules to apply.

For disputes where the total amount claimed by either party does not exceed US$50.000 the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association.

### Clause 88    Time bar

Charterers shall be discharged and released from all liability in respect of any claim or claims which Owners may have under this Charter party and such claim shall be totally extinguished, unless such claims have been notified in detail to Charterers in writing accompanied by all available supporting documents (whether relating to liability or quantum or both) within 24 (twenty four) months from completion of discharge of the appropriate cargo under this Charter Party.

### Clause 89    Asian Gypsy Moth

Asian Gypsy Moth is considered High Risk and therefore the vessel is prohibited to enter any port within a gypsy moth infected area, or anchored within 20 kilometres of the coastline of a gypsy moth infected area anytime during the egg laying months of July, August and September.

Gypsy moth infected areas for the purpose of these requirements currently include all Pacific Russian ports south of 60 degrees latitude and west of 147 degrees

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 1"**
**CHARTER PARTY DATED 16<u>TH</u> APRIL 2007**

longitude.

Charterers must maintain a valid Certificate of Freedom from Gypsy Moth throughout the c/p. On redelivery owners are to receive a valid phytosanitary certificate confirming that the vessel is free of any Gypsy Moth.

Charterers are to comply with latest agricultural regulations in line with Australia, Canada, New Zealand, and USA. All costs associated herein are for Charterers' account.

**Clause 90**

All negotiations and eventual fixture, if any, to be kept strictly private and confidential among the parties directly involved.

**Clause 91     Purchase Option**

Charterers to have the option to purchase the vessel at any time after the end of the 7th year of the CP period at the following prices:

- At the end of the 7th year: USD 9.35 Million including 2pct total brokerage

- At the end of the 8th year: USD 8.65 Million including 2pct total brokerage

Charterers have the option to purchase the vessel any time between the end of 7th and the end of 8th year at the pro rata price between USD 9.35 Million and USD 8.65 Million.

Thereafter at prices reducing by USD 0.8 Million per annum or pro rata during the balance of the C/P including optional periods. Charterers to give minimum 3 months notice of exercising such option. Charterers may not exercise the option so as to take delivery of the vessel within 6 months after completion of any scheduled drydocking (DD or SS).

**Clause 92**

Owners to confirm that should a 2008 Nantong Nikka 29,200 DWT positon become available then same position to be made available for account Intermare Transport GMBH Hamburug or their guaranteed nominee. All terms/details to be as per the

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 1"
## CHARTER PARTY DATED 16TH APRIL 2007

2009 positions, subject Owners'/Charterers' board approval + owners' financiers' approval.

**Clause 93**

Cranes:        Owners confirm that the vessel to be fitted with 2 x 30t Cranes.

Hatchcovers:   Owners confirm that the vessel's 3 holds will be fitted with folding hydraulic type hatchcovers.

Logs fittings: Owners confirm that vessel will be a fully fitted logger with full set of lashing materials onboard.

A60 bulkhead:  Owners confirm that the vessel will be fitted with an A60 bulkhead.

Lakes Fitted:  Owners confirm that the vessel will be fully fitted for Great Lakes trade.

## NEW BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the Vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

"If the Ship comes into collision with another Ship as a result of the negligence of the other Ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of this Ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying Ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying Ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying Ship or her Owners as part of their claim against the carrying Ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any Ship or Ships or object other than, or, in addition to, the colliding Ships or objects are at fault in respect to a collision or contact.

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General average shall be payable according to the York Antwerp Rules 1974, but where the adjustment is made in accordance with the law and practice of the

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 1"**
**CHARTER PARTY DATED 16TH APRIL 2007**

United States of America, the following clause shall apply:

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statue, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving Ship is owned or operated by the carrier, salvage shall be paid for as full as if the said salving Ship or Ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery.

## GENERAL PARAMOUNT CLAUSE

This Bill(s) of Lading shall have effect subject to the provision of any legislation relating to the Carriage of Goods by Sea which incorporates the rules relating to Bill(s) of Lading contained in the International convention dated Brussels 25th August,1924, and which is compulsory applicable to the contract of carriage herein contained. When no such enactment is in force in the country of shipment the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily application the terms of the Carriage of Good by Sea act,1924 of the United Kingdom or any statutory modification or re-enactment thereof shall apply.

## U.S.A. CLAUSE PARAMOUNT

This Bill(s) of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16th,1936 which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed as surrender by the carrier of any of its right or immunities or an increase of any of its responsibilities or liabilities under said act. The Provisions stated in said Act shall (exit as may be otherwise specifically provided herein) govern before the good are loaded on and after they are discharged from the Ship and throughout the entire the goods are in custody of the carrier. The carrier shall not be liable in any capacity whatsoever for any delay, non-delivery, or loss of or damage to the goods occurring while the goods are not in the actual custody of the carrier.

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 1"**
**CHARTER PARTY DATED 16<u>TH</u> APRIL 2007**

## CANADIAN CLAUSE PARAMOUNT

All other terms, Provisions and conditions of the Canadian Water Carriage of Good Act, 1936 and of the rules comprising schedule thereto are, so far as applicable, to govern the contract contained in this Bill(s) of Lading and the ship owners are to be entitled to the benefit of all privileges, rights and immunities contained in such Act and in the schedule thereto as if the same were herein specifically set out. If anything herein contained be inconsistent with the said provisions, it shall to the extent of such inconsistency and no further be null and void.

The carrier shall be under no responsibility whatsoever for loss of or damage to goods howsoever and where-so-ever occurring when such loss or damage arise prior to the loading in and/or subsequent to the discharge from the Carrier's Ship.

## WAR RISKS CLAUSE FOR TIME CHARTERS, 2004 (CONWARTIME 2004)

(a)  For the purpose of this Clause, the words:

(i)  "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii)  "War Risks" shall include any actual, threatened or reported: war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades
(whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)  The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo,
crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c)  The Vessel shall not be required to load contraband cargo, or to pass through

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 1"
## CHARTER PARTY DATED 16TH APRIL 2007

any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d)  (i)  The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii)  If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e)  If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of
hire is due, or  upon redelivery, whichever occurs first.

(f)  The Vessel shall have liberty:-
(i)  to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii)  to comply with the order, directions or recommendations of any war  risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 1"**
**CHARTER PARTY DATED 16TH APRIL 2007**

are charged with their enforcement;

(iv)   to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v)   to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g)   If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h)   If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

### Voy War 2004.

(a)   For the purpose of this Clause, the words:

(i)   "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii)   "War Risks" shall include any actual, threatened or reported:

War; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or

crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)   If at any time before the Vessel commences loading, it appears that, in the

### RIDER CLAUSES TO
### M.V. "12,500 DWT TBN 1"
### CHARTER PARTY DATED 16TH APRIL 2007

reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies

within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

(c)  The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

(d)  If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 1"
## CHARTER PARTY DATED 16TH APRIL 2007

Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(e) (i)  The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii)  If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, or in order to fulfill the Owners' obligation under this Contract of Carriage, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners within 14 days after receipt of the Owners' f invoice. If the Vessel discharges all of her cargo within an area subject to additional premiums as herein set forth, the Charterer

shall reimburse the Owners for the actual additional premiums paid which may accrue from completion of discharge until the Vessel leaves such area or areas referred to above. The Owners shall leave the area as soon as possible after completion of discharge.

(f)  The Vessel shall have liberty:-

(i)  to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

(ii)  to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii)  to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 1"
## CHARTER PARTY DATED 16TH APRIL 2007

those who are   charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v)   to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;

(vi)   where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary   direction to the ordinary or customary route.

(g)   If in compliance with any of the provisions of sub-clauses (b) to (f) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfillment of the Contract of Carriage.

## ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002(MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms

### RIDER CLAUSES TO
### M.V. "12,500 DWT TBN 1"
### CHARTER PARTY DATED 16TH APRIL 2007

of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## U.S. CUSTOMS ADVANCE NOTIFICATIONS/AMS CLAUSE FOR THE CHARTER PARTIES

(a) If the Vessel loads or carriers cargo destined for the U.S. or passing U.S. ports in transit, the Charterers shall comply with the current U.S. Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purpose of such regulations and shall, in their own name, time and expense:

   i)   Have in place a SCAC (Standard Carrier Alpha Code);
   ii)  Have in place an ICB (International Carrier Bond);
   iii) Provide the Owners with a timely confirmation of i) and ii) above; and
   iv)  Submit a cargo declaration by SMS (Automated Manifest System) to the U.S. Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners agent any loss and/or damage whatsoever (including

**RIDER CLAUSES TO
M.V. "12,500 DWT TBN 1"
CHARTER PARTY DATED 16TH APRIL 2007**

consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the U.S. Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## BUNKER FUEL SULPHUR CONTENT CLAUSE

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone. The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes. The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay fines, costs or expenses arising or resulting from the Charterers' failure to comply wits this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:
    (i)  the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
    (ii)  the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.
Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessels' failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the E.U. and the U.S. Environmental Protection Agency.

EXHIBIT 2



**ORIGINAL**

# Time Charter

**GOVERNMENT FORM**

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946



1   **This Charter Party**, made and concluded in *London* ................................................ *16th* day of *April* ................ 19*2007*

2   Between *Namirei-Showa or Nakanishi Kikai or their guaranteed nominee* ................................................

3   Owners of the good ............ Steamship/Motorship *M.V. 12,500 dwt single screw bulk carrier logs fitted TBN 2 (See Clause no. 52)* ... of ....

4   of ................................ ~~tons gross register, and~~ ................................ ~~tons net register, having engines of~~ ................ ~~indicated horse power~~

5   ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed~~ ................

6   ~~at~~ ................ ~~of about~~ ................ ~~cubic feet bale capacity, and about~~ ................ ~~tons of 2240 lbs.~~

7   ~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity,~~

8   ~~allowing a minimum of fifty tons) on a draft of~~ ................ ~~feet~~ ................ ~~inches on~~ ................ ~~Summer freeboard, inclusive of permanent bunkers,~~

9   ~~which are of the capacity of about~~ ................ ~~tons of fuel, and capable of steaming, fully laden, under good weather~~

10   ~~conditions about~~ ~~knots on a consumption of about~~ ~~tons of best Welsh coal~~ ~~best grade fuel oil~~ ~~best grade Diesel oil,~~ *All figures in the description are*

    *"about" the figures given are shipyard's designed figures only which are believe to be correct but subject to re-confirmation at*

    *or soon after new building delivery and speed/consumption figure are also subject to re-confirmation.*

11   *now* ................................................

12   ...... *and Intermare Transport GMBH Hamburg or their guaranteed nominee which to be always guaranteed by Alfred C. Toepfer*

    *International GMBH* Charterers of the City of *Hamburg, Germany* ................................................

13   **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14   about *(See Clause No. 86)* ................................................

15   ................................................ ................................................ within below mentioned trading limits.

16   Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17   the fulfillment of this Charter Party.

18   Vessel to be placed at the disposal of the Charterers, at *dropping last outward sea pilot Yangzhou Ryuwa Shipbuilding Co., Ltd. or in* ............

19   *Owners option Yangzhou Longchuan Shipbuilding Co., Ltd. (See Clause No.85).* ................................................

20   ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~

21   ~~(the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her ~~delivery~~ *arrival at first*

    *load port after delivery* to be

22   ready to receive *Charterers intended* cargo with clean-swept holds *(See Clause No. 31)* and tight, staunch, strong and in every way fitted for the service,

    having water ballast, winches and

23   ~~donkey-boiler with sufficient steam power, or if not equipped with donkey-boiler, then~~ other power sufficient to run all the winches at one and the same

24   time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25   dise, including ~~petroleum or its products,~~ in proper containers, excluding *(See Clause No. 55)* ................

26   ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~

27   ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~

28   ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~

29   ~~Mexico, and/or South America~~ ................ ~~and/or Europe~~

30   ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~

31   ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~

32   *Within Institute Warranty Limits (See Clause No. 35)* excluding *(See Clause No. 41)* via safe berth(s), safe port(s), safe

33   anchorages(s), always afloat, always accessible ................................................

34   ................................................ ................................................

35   as the Charterers or their Agents shall direct, on the following conditions:

36      1.   That the Owners shall provide and pay for all provisions, wages, *Immigration* and consular shipping and discharging fees of the Crew; shall pay for

    the

37   insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

38   the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.

39      2.   That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages *except Great Belt,*

    *English Channel, German Bight, Malacca Straits, Sunda Strait* Agencies, Commissions, *Tallymen,*

40   Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

41   a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42   illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43   charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~

44   ~~of six months or more.~~

45     Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46   Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47   for dunnage, they making good any damage thereto.

48      3.   ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~

49   ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ ................ ~~tons and not more than~~

50   ................ ~~tons and to be re-delivered with not less than~~ ................ ~~tons and not more than~~ ................ ~~tons. (As per Clause No. 30)~~

51      4.   That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 6,900 per day less 1.25 per cent total (see lines*

52  *172/173)* .............................................................. United States Currency ~~per ton on vessel's total deadweight carrying capacity, including bunkers and~~
53  ~~stores, on~~ ............................. ~~summer freeboard, per Calendar Month~~, commencing on and from the day of her delivery, as aforesaid, and at
54  and after the same rate for any part of a ~~month~~ *day*; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) ~~at~~ *on dropping last outward sea pilot at one safe port Aden/Japan range including*
56  *Indonesia, Vietnam, Thailand, PI, China, Taiwan and South Korea, Vancouver BC/Valparaiso range, Baltimore/Bahia Blanca range including Caribs/US Gulf, Skaw/Passero including Baltic, full Mediterranean and Black Sea, Australia/New Zealand range at any time day and night, Sunday and Holiday included* unless otherwise mutually agreed. *Charterers will make the best endeavour to redeliver vessel in Aden-Japan range* Charterers are to give Owners not less than *60/30/20/15/10* days
57  notice of vessels expected date of re-delivery, *and port,* and probable port *5/3/2/1 days definite notice of redelivery.*
58  5. Payment of said hire to be made in ~~New York~~ *(See Clause No. 78)* in cash in United States Currency, ~~semi~~-monthly in advance *but first payment including bunkers on delivery to be effected 15 days after vessel's delivery into time charter period,* and for the last half month or
59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~
63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
64  ~~to have the privilege of using vessel at once, such time used to count as hire.~~
65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67  of such advances.
68  6. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place that Charterers or their Agents may
69  direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely
70  lie aground.
71  7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~
74  ~~paying Owners~~................................ ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~
75  ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~ *No passengers.*
76  8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency; and Charterers are to load, stow, and trim *and discharging, lash, secure, dunnage* the cargo at their expense under the supervision of the
79  Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts.
80  9. ~~That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on~~
81  ~~receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.~~ *(See Clause No. 56)*
82  10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84  rate of $10.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85  Clerks, Stevedore's Foreman, etc., ~~Charterers paying at the current rate per meal, for all such victualling.~~ *(See Clause No. 64)*
86  11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs *in English,* showing the course of the vessel and distance run and the con-
89  sumption of fuel.
90  12. That the Captain shall use diligence in caring for the ventilation of the cargo.
91  13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~.......................................................................................................
92  ............................................................................................................................................................................................................................................
93  ~~, giving written notice thereof to the Owners or their Agents~~.................................. ~~days previous to the expiration of the first named term, or any declared option.~~
94  14. That if required by Charterers, time not to commence before *(See Clause No. 85)*............................................................................................... ~~and should vessel~~
95  ~~, t have given written notice of readiness on or before~~ ............................................................................................. ~~but not later than 4 p.m.~~ Charterers or
96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97  15. That in the event of the loss of time from deficiency *and/or default* of men or stores, *strike of officer and/or crew* fire, breakdown or damages to hull, machinery or equipment,
98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
00  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
01  thereof, and all *directly incurred* extra expenses shall be deducted from the hire.
02  16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
03  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
04  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
05  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
06  purpose of saving life and property.
07  17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons *in London* ~~at New York,~~
08  one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
09  the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be *shipping* ~~commercial~~ men and *members of L. M.A.A. arbitration in London according to L.M.A.A. rules, English Law London arbitration to apply.*
.0  18. That the Owners shall have a lien upon all cargoes, and all sub-freights *and/or sub-hires* for any amounts due under this Charter, including General Aver-
1  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid ~~hire~~ or excess

112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113  might have priority over the title and interest of the owners in the vessel.

114      19.  That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115  Crew's proportion. General Average to be adjusted, stated and settled *in London*, according to Rules I to 15, inclusive, 17 to 22, inclusive, and Rule F of
116  York-Antwerp Rules *1974 and any amendments thereto* 1924, at such port or place in the United States as may be selected by the carrier, and as to
117  matters not provided for by these

118  Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
119  United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
120  the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
121  bond and such additional security as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
122  or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
123  required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
124  carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
125  place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
126  United States money.

127  In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,
128  whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the
129  goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
130  losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
131  goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
132  ships belonged to strangers.

133      Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. *It is understood that the*
      *Charter hire is not to contribute to General Average.*

134      20.  Fuel used by the vessel while off-hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the
135  cost of replacing same, to be allowed by Owners. *Bunkers used by the vessel while off-hire to be for Owners' account.*

136      21.  That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
137  convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
138  time of last painting, and payment of the hire to be suspended until she is again in proper state for the service. *(See Clause No. 77)*.............

139  .................................................................................................................................

140      22.  Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks *cranes*) capable of handling lifts *upto maximum capacity*
      *in accordance with description clause (See Clause No. 52)* up to three tons, also

141  providing ropes, falls, slings and blocks *as on board*. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142  same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *sufficient lights as onboard for*
      *night work and maintain same in efficient working order* lanterns and oil for

143  night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
144  Charterers to have the use of any gear on board the vessel.

145      23.  *(See Clause No. 58)* Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and
      discharging.

146  steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,
147  deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the
148  port, or labor unions, prevent crew from driving winches, shore-Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
149  insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150  thereby.

151      24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;
153  etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
154  of which are to be included in all bills of lading issued hereunder:

155                                                                 U. S. A. Clause Paramount

156  This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157  16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158  any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
159  be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

160                                                               Both to Blame Collision Clause

161  If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162  Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163  hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164  or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
165  carrying ship to her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
166  owners as part of their claim against the carrying ship or carrier. *United States, Canadian and General Clause Paramount as attached as*
      *approximate in all Bills of Lading issued hereunder to be incorporated.*

167      25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169  port or to get out after having completed loading or discharging. *Vessel not to be required to force ice nor follow ice breaker when inward*
      *bound.*

170      26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171  navigation of the vessel, *acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.

172      27.  A commission of *1.25* 2-1/2 per cent is payable to the Vessel and Owners to *Fairfield and 1.25 pct to Maersk Broker (UK) Ltd*
173  *payable by Charterers* ...........................................................................................................
174  on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175      28.  An address commission of 2-1/2 per cent payable to                                                            on the hire earned and paid under this Charter.



*Rider Clauses No. 29 to 93 both inclusive and additional clauses (from NEW BOTH TO BLAME COLLISION CLAUSE to BUNKER FUEL SULPHUR CONTENT CLAUSE) in pages 1 to 35, as attached hereto, are to be considered as an integral part of this Charter Party.*

**OWNERS:**

**CHARTERERS:**

~~This Charter Party is a computer-generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.~~

~~It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.~~





**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 2"**
**CHARTER PARTY DATED 16TH APRIL 2007**

### Clause No.29 Stevedore Damage

Charterers are not to be responsible for stevedore damage or other damage to the Vessel unless notified in writing by the Master at the time of occurrence of damage or as soon as possible thereafter, but within 48 hours from occurrence except in case of hidden damage which to be notified as soon as possible after discovery, but in any case not later than upon completion of the voyage and/or discharge during which the damage was incurred. Master shall cooperate with Charterers or their agents to obtain a written acknowledgment by the responsible parties causing damage unless the damage should have been made good, in the meantime, Owners to settle stevedore damages directly with stevedores but the Charterers to remain ultimately responsible. Although stevedores to be servants of the Charterers.

Charterers have the option of redelivering the Vessel without repairing stevedore damage which to be approved by independent surveyor provided such damage may remain for occasional repair when the ship is to dock for Owners account and same is to be done simultaneously with Owner's work that Charterers pay the actual cost of repair for stevedore damage, not the time used. All damages affecting Class seaworthiness and Vessels trading capabilities to be repaired by Charterers at Charterers' time and cost. The repair must be done up to Master's and Class surveyor's satisfaction.

### Clause No.30 Bunker Clause

Bunkers on delivery to be as on board but vessel to have on board sufficient bunkers to safely reach Singapore or equidistance at the Owners' actual purchase price, and bunkers on redelivery to be as on board but sufficient to reach nearest bunkering port at the Charterers' contract price. The Charterers are allowed to replenish bunkers before delivery at Charterers' expenses, and the Owners are allowed to replenish bunkers before redelivery at Owners' expenses subject to the Charterers' prior approval which not to be unreasonably withheld.
Wherever the word "fuel" appears in this Time Charter Party, same is understood to mean "bunkers".
Fuel Oil to confirm with ISO 8217 RMG 35, or RMH 35 in case RMG 35 is not physically available at the considered bunkering place.
Diesel Oil to confirm with ISO 8217 DMB.
Charterers have the option to supply RMF 180 CST in ports where no IFO 380CST is available.

### Clause No.31 Hold Cleaning

Hold Cleanness

On arrival at first loading port after delivery of dockyard Vessel's holds, to be clean, washed down by fresh water and dried up so as to receive/carry Charterers intended cargo in all respects free of salt, rust scale and previous cargo residues to satisfaction of the independent surveyors, should Vessel not be approved by

**RIDER CLAUSES TO
M.V. "12,500 DWT TBN 2"
CHARTER PARTY DATED 16TH APRIL 2007**

surveyor then the Vessel to be placed off-hire from the failure of inspection until Vessel is fully accepted and directly related expenses including bunkers consumed during off-hire incurred thereby to be for Owners account.

Intermediate Hold Cleaning
Provided local regulations/weather safely/time permit and if so required by Charterers, crew are to perform intermediate hold cleaning in Charterers time. Charterers to pay USD350 per hold if used payable to Master.
The crew will do such cleaning to the best of their ability with available equipment on board but totally without guarantee that the cargo holds will be accepted at the subsequent loadport(s). In case holds are not passed, Owners/Vessel shall not be responsible for any consequences arising therefrom and Vessel to remain on hire throughout. Fresh water used for washing down holds to be for Charterers account.

**Clause No.32 Watchmen**
Watchmen hired from shore for cargo to be for Charterers' account, for Vessel to be for Owners' account provided specifically ordered by Master. Compulsory watchmen to be for Charterers account.

**Clause No.33 On-Hire/Off-Hire Surveys**
A joint on-hire and off-hire to be carried upon delivery and redelivery to ascertain Vessel's conditions on delivery/redelivery and bunkers' quantity remaining on board on delivery/redelivery by a surveyor acceptable to both parties. Time for on- hire survey to be for Owners' account and for off-hire for Charterers' account but costs to be equally shared between both parties.

**Clause No.34 Redelivery**
   A. It is agreed that Owners at port of redelivery are to take over the Vessel immediately ready, day or night Saturdays, Sundays included, on dropping last outward sea pilot. With reference to Clause 4, it is understood that redelivery notice(s) will be given by Time-Charterers in good faith and based upon information given to them.

   B. If Vessel will load next cargo at same port as redelivery port, then redelivery to be when/where ready provided no hold cleaning to take place and provided loading can take place at the same berth immediately after completion.

**Clause No.35 Insurance**
All taxes on cargo and voyage freights to be for Charterers' account.
Ref. Line 32 and Clause 41 of "Trading Exclusion", Basic war insurance premium for worldwide trading shall be for Owners' account and premium for Hull and Machinery and officers/crew and crew war bonus, if any, due to Vessel's trading to the

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 2"
## CHARTER PARTY DATED 16<u>TH</u> APRIL 2007

restricted areas shall be for Charterers' account, but such trading always to be subject to Owners' prior approval. Insurance/extra insurance not to exceed official quotation by Lloyds underwriters, London, however, if such insurance is not obtainable commercially or through a government, the Owner shall have the right to refuse Vessel entering into war zone. In case a war risk situation develops after the Vessel has loaded a cargo, the terms of "CONWARTIME 2004" War clause to be applied. Any premium for blocking and trapping in war areas to be for Charterers' account.

Charterers have the right to break Institute Warranty Limits subject to Owners' prior approval which not to be unreasonably withheld. Charterers to reimburse extra insurance premium incurred thereby but not higher than quoted by Lloyds London and only payable against original invoice.

### Clause No.36 Agents
Charterers will have their agents to attend Owners' minor/normal husbandry affairs without charging separate agency fees, however should there be an extraordinary matter such as dry-dock, crew change, special survey, major repair, general average work for Owner's account, Owners shall employ Charterers' agents as Owners husbandry agents and pay agency as per local recognized tariff or Owners at their option shall appoint own husbandry agents at their expense.

### Clause No.37 Grace Period
If there is any failure in punctual payment due to oversight or negligence or error or omission of Charterers' employee, Bankers or agents otherwise for any reason when there is absence of intention to fail to make payments as set out, Charterers shall be given by Owners three banking working days written notice to rectify the failure and when so rectified, the payment shall stand as punctual payment but if Charterers fail to rectify the payment within three banking working days, Owners to hold the option put Charterers on notice that they are going to withdraw the Vessel from the service.

### Clause No.38 Warranties
Owners further warrant that this Vessel has not entered Cuban ports or place since 1<u>st</u> November 1962 nor will enter such port or place prior to delivery under this Charter Party. It is further understood that this Vessel is not blacklisted by Arab countries and also that Vessel has full bunkering privileges in the United States ports and in not restricted due to previous trading.
Vessel is not blacklisted by Canada/U.S.A. In relation to recent Yugoslavia etc.
Owners guarantee Vessel has not traded C.I.S. Pacific ports in the past 2 years.

### Clause No.39 Master's Instructions
The Master is to conform with Charterers' or their representatives' or their agents' instructions and to execute the voyage(s) with the same due care and diligence as

### RIDER CLAUSES TO
### M.V. "12,500 DWT TBN 2"
### CHARTER PARTY DATED 16TH APRIL 2007

If he was trading for Owners' own account. Charterers to furnish Master with voyage report forms and other relevant documents which the Master to return to Charterers reporting about voyages performed including log abstracts. Such documents to be written in English.

### Clause No.40 Condition Inspection

Charterers to have the option of holding a condition inspection including hose testing for checking hatchsealing integrity at any time during currency of this Charter Party, the Owners and Master giving every facility and assistance to carry out this inspection which to be carried out without interrupting the working of the Vessel and without incurring expenses for the Owners.

### Clause No.41 Trading Exclusion (Areas)

Trading area to be worldwide within IWL but excluding Israel, all Russian Pacific ports except see clause 89, Iraq, Cambodia, Kampuchea, Cuba, Salvador but Acajutla is allowed, Congo (Brazzaville), Somalia, Yemen, Liberia, North Korea, war or warlike zones and any countries banned/boycotted by U.S.A. or U.N..

Should political situation and practices of international shipping change, Charterers and Owners may discuss in a bonafide spirit to agree to include or exclude any countries.

Charterers have the option to break IWL subject to Owners prior consent, which not to be unreasonably withheld and Charterers to pay all extras as charged by vessel's insurance company against Owners' underwriters' net invoice, which not to exceed premia charged at Lloyds of London.

### Clause No.42 Return Premium

Charterers to have the benefit of any return insurance premium received by Owners from Underwriters as and when received from the Underwriters by reason of Vessel being in port for minimum of thirty (30) days provided Vessel is on-hire for such time. But Owners not to be held responsible for any deficiency in speed/consumption due to foul bottom as a result of prolonged stay in port. In case Vessel is off-hire for more than thirty (30) days consecutive days, Owners and Charterers mutually discuss and find amicable settlement as to how to perform the remaining period of this Charter Party.

### Clause No.43 Deviation/Off-Hire Clause

In the event of the Vessel deviating (which expression includes putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or for any purpose, unless caused by acts or omission or default of the Charterers, the hire shall be suspended as from the commencement of such deviation until the time when the Vessel is again ready and in as efficient

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 2"
## CHARTER PARTY DATED 16TH APRIL 2007

state to resume her service from a position not less favorable to Charterers than that at which the deviation commenced. In the event of Vessel for any cause or for any purpose aforesaid, putting, onto any port other than the port for which she is bound on the instructions of Charterers, the port charge, pilotage and other expenses at such port shall be borne by Owners.

### Clause No.44 Certificates

Vessel to be in possession of the necessary certificates, including deratization certificate, to comply with safety and health regulations and all current requirements at all ports of call during the currency of this Charter Party. Vessel will comply with and be maintained in accordance with the requirements of the Commonwealth of Australia loading and unloading safety measure regulations, including Commonwealth of Australia Navigation regulations, order No. 12 of 1986, including regulations dated 8.8 1986 and all cargo gear to be approved by Australian Waterside Workers Federation. Vessel to be in possession of a valid and approved cargo gear certificates in accordance with American Cargo Gear regulations. Any time lost or expenses involved by not having or in obtaining such as valid or approved certificate to be for Owners' account. Owners assure Charterers that conditions aboard this Vessel conform with SOLAS 1974 (pertains to loading grain cargoes at United States' ports and the Vessels capacity plan should so indicate and refer to untrimmed hold ends) Vessel to have on board as approved grain loading certificate from the Vessels country of registry.

### Clause No.45 Safety Regulations

It is understood that Vessel will comply with any safety regulations and/or requirements in effect at all ports of loading and/or discharging, a particular reference is the United State Department of Labour safety and Health Regulations including as set forth in part III of the Federal Register. Should the Vessel not meet safety rules and regulations Owners will make immediate corrective measure and any stevedore standby time and other expenses involved including off-hire will be for the Owners' account.

### Clause No.46 Boycott Clause

Should the vessel be captured, seized, detained, arrested, or boycotted by any authority or by any legal process during the currency of this Charter Party, the payment of hire shall be suspended until the time of her release, and any extra expenses incurred by and/or during the above capture or seizure or detention or arrest shall be for Owners' account, unless such capture or seizure or detention or arrest is occasioned by any personal act or omission or default of the Charterers or their agents or by reason of cargo or calling port or trading under this Charter.

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 2"
## CHARTER PARTY DATED 16TH APRIL 2007

### Clause No.47 Oil Pollution clause-P and I Group Recommended Clause

Financial responsibility in respect of Oil Pollution

1. Owners warrant that throughout the currency of this Charter they will provide the Vessel with following certificates.
    A) Certificates issued pursuant to section 311(P) of the U.S. Federal Water Pollution Control Act, as amended (title 33 U.S. Code section 1321(p)
    B) Deleted
2. Notwithstanding anything whether printed or herein to the contrary.
    A) Save as required for compliance with paragraph 1 hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the Vessel lawfully to enter, remain in or leave any country, state or territory in performance of this Charter.
    B) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability, or expenses (including but not limited to the cost of any delay incurred by the Vessel as a result of any failure by Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of the Vessels inability to perform as aforesaid).
    C) Owners shall not be liable for any loss, damage, liability or expenses whatsoever and howsoever arising which Charterers and/or the holders of any Bill(s) of Lading issued pursuant to this may sustain by reason of the Vessel inability to perform as aforesaid.
3. Charterers warrant that the terms of this clause will be incorporated effectively into any Bill(s) of Lading issued pursuant to this Charter.

### Clause No.48 Grab Suitability

The Vessel will not be equipped with any grabs. Charterers may install grabs at their expenses and time. Charterers to have the right to use mechanical grabs for discharging cargoes, always within Vessel's crane lifting capacity and Master's approval which not to be unreasonably withheld. Charterers to pay to the Master lumpsum USD200 per month per grab for maintenance thereof by crew.
Charterers also have the right to use bulldozers in Vessel's holds as deemed necessary by custom of the port, always subject within Vessel's tank top strength and Master's approval which not to be unreasonably withheld.

### Clause No.49 Protective Clause

The New Both-to-Blame Collision, The New Jason Clause and Voy War 2004, P and I Nuclear Clause, as applicable, are all to be considered as part of this Charter Party and Bill(s) of Lading shall be subject to all said clause. The U.S.A. and Canada, Clause Paramount as applicable, or the Hague Rules as enacted in countries other than the U.S.A. and Canada, as applicable, to be incorporated in all Bill(s) of Lading and this Charter.

### RIDER CLAUSES TO
### M.V. "12,500 DWT TBN 2"
### CHARTER PARTY DATED 16TH APRIL 2007

## Clause No.50 Bill(s) of Lading

"No through Bill(s) of Lading to be issued

Neither the Charterers nor their agents permit the issue of any Bill(s) of Lading, Way Bill(s) or other documents evidencing a contract of carriage (whether or not signed on behalf of the Owners, or on the Charterers' behalf, or on behalf of any sub-Charterers) incorporating, whether or not compulsorily applicable, the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules. The Charterers shall indemnify the Owners against liability loss or damage which may result from any breach of the foregoing provisions of the clause"

Owners/Master to authorize Charterers and/or their agents to sign/release original Bill(s) of Lading if required by Charterers, but always in accordance to the mate receipts and tally receipt. Charterers to have option to use seawaybills if required by head Charterers. And Charterers hereby indemnify Owners for above.

## Clause No.51 Radio Clause

To be advised later.

## Clause No.52 Vessel's Description (figures all about)

1.    Name: Not decided

      Flag: Panama

      Port of Registry: Panama

      IMO Number: Not decided.

2. Single Deck Self Trimming Bulk Carrier

      If other type, please state

      Strengthened for Heavy Cargo: (NO) – Nos., (NOS) Hold may be empty.

3. Gearless or Geared – gear description:

      2 cranes each of maximum 30 metric tons SWL capacity at maximum outreach of about 9.7 meters from ship's side.

4. Built (year) / (month)    Place: Yangzhou Ryuwa Shipbuilding Co. Ltd. Or Yangzhou Longchuan Shipbuilding Co., Ltd.

5. DWAT

      Abt 12,900 metric tons on 8.661 (mld.) meters draft in fresh water, on TFW marks, TPC about 20.7

      Abt 12,550 metric tons on 8.488 (mld.) meters draft in fresh water, on F marks, TPC

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 2"
## CHARTER PARTY DATED 16<u>TH</u> APRIL 2007

about 20.8

Abt 12,950 metric tons on 8.473 (mld) meters draft in salt water, on T marks, TPC about 21.3

Abt 12,550 metric tons on 8,300 (mld.) meters draft in salt water, on S marks, TPC about 21.1

Abt 12,200 metric tons on 8.127 (mld.) meters draft in salt water, on W marks, TPC about 21.2

(Cargo and bunkers, which capacities are Abt. 720 metric tons IFO (at 96% per cent)

|                                 | Abt. 110 metric tons MFO (at 96% per cent) |
| ------------------------------- | ------------------------------------------ |
| Fresh water, which capacity is  | Abt. 240 metric tons                       |
| And constants not exceeding     | Abt 96 metric tons)                        |

Panama deadweight: (DWAT) metric tons on 39'06" freshwater draft.

6. LOA: 121.90 meters
   LBP: 115.00 meters
   Beam: 20.60 meters
   GRT/NRT Suez:
   GRT/NRT Panama:

International GT/NT: Abt 7400 tons / Abt 4800 tons

7. Total grain subic in clear and unobstructed main holds only: Abt. 519,120 cubic feet

Grain cubic breakdown by hold:

   1) No.1 C.H. Abt. 144,790 cubic feet
   2) No.2 C.H. Abt 243,670 cubic feet
   3) No.3 C.H. Abt 130,660 cubic feet

8. Number of holds/hatches : 3/3
   Hatch sizes:
   1) 13.30 x 10.50 meters
   2) 28.00 x 10.50 meters
   3) 12.60 x 10.50 meters

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 2"
## CHARTER PARTY DATED 16TH APRIL 2007

Type of hatch covers: Holding & Hinge up type

9. Distance waterline to top of hatch covers or rail, mentioning which is higher in light ballast : abt 9.4 meters , in heavy ballast: abt 9.1 meters – number of floodable holds included: (NO) (NO. (HO)).

Distance waterline to highest point of ship (airdraft)

In light ballast: abt 31 meters

In heavy ballast: abt 30 meters

Distance tank top to top of hatch coaming 1.5 meters (At C.L.).

10. Tank top strength:

1) No.1 C.H.

| Uniform load | 8.82 tons/m² |
| Local Strength | 15.0 tons/m² |
| Steel Coil | 30 t x 1 Layer (without key coil) |

2) No.2 C.H.

| Uniform load | 8,.82 tons/m² |
| Local Strength | 15.0 tons/m² |
| Steel Coil | 30 t x 1 Layer (without key coil) |

3) No.3 C.H.

| Uniform load | 8.82 tons/m² |
| Local Strength | 15 tons/m² |
| Steel Coil | 30 t x 1 Layer (without key coil) |

11. Speed and consumption

Ballast: about (ball) knots on (con) metric tons IFO and about (con) metric tons MDO

Or about (ball) knots on (con) metric tons IFO and about (con) metric tons MDO

Laden: about (laden) knots on (con) metric tons IFO and about (con) metric tons MDO

Or about (laden) knots on (con) metric tons IFO and about (con) metric tons MDO

In port: about (con) metric tons MDO when idle

About (con) metric tons MDO when working 24 hours

Vessel burns IFO (180 or 380) CST (ISO 8217: 1996 (e) (RME25 or RMG35), but Charterers may supply

### RIDER CLAUSES TO
### M.V. "12,500 DWT TBN 2"
### CHARTER PARTY DATED 16TH APRIL 2007

RMF 25 where RME25 is not available, in Brazil Owners to accept PETROBRAS specifications)respectively MDO (DMA or DMB) in main engine / auxiliaries.

12. Australia hold ladders fitted: Yes

ITF fitted:

Fitted for other special trades: please specify

13. Call sign: not decided

Telex number: not decided

Fax number: not decided

Phone number: not decided

Email: not decided

Master's name: not decided

14. In all cases Owners warrant performing vessel complies with following stipulations:

- Vessel does not have any centerline bulk head or centerline beam and is free from any obstructions in vessel's holds and hatchways
- Is fully suitable for grab discharge
- Is fitted with weather tight hatch covers
- Is fully suitable for in-transit fumigation
- Is fully grain fitted in accordance with national and international regulations
- Is geared vessel: vessels' gear is in good working order and able to serve all vessel's holds/hatches
- Vessel at all times has onboard valid deadweight and capacity plans including calibration and trim table.

## Clause No.53 Australian Hold Ladders/Cranes

Vessel to be fitted with hold ladders in accordance with Australian Navigation Act on delivery and Owners to maintain same in efficient order during the currency of this Charter Party. Cranes to be constructed and maintained in accordance with Australian navigation Act.

## Clause No.54 Cargo Claims

Any liability to third parties for cargo claims be borne by Owners/Charterers in accordance with the Interclub NYPE agreement dated May 1984 and any subsequent amendments.

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 2"**
**CHARTER PARTY DATED 16TH APRIL 2007**

## Clause No.55 Cargo Exclusions

The vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous, injurious, flammable or corrosive nature unless carried in accordance with the requirements or recommendations of the competent authorities of the country of the vessel's registry and of ports of shipment and discharge and of any intermediate countries or ports through whose waters the vessel must pass.

Notwithstanding provisions of above paragraph, Charterers have the option to load dangerous / injurious or inflammable goods upto 500 mt per voyage, provided same is packed/labeled/loaded/lashed and discharged in accordance with IMO as well as local/international regulations and always excluding IMO Class 1 and 7. Without prejudice to the generality of the foregoing, in addition the following are specifically excluded:

Livestock of any description, arms, ammunition, explosives (black powder, blasting caps, loaded bombs, detonators, dynamite, TNT), nuclear and radioactive materials and its waste, tar in bulk, turnings and motor blocks, hot briquetted iron, petroleum and it's by-products, pitch in bulk, borax in bulk, bitumen, quebracho, sodium sulphate, calcium hydrochloride, bonemeal, charcoal, turpentine, ferro silicon, resin, cotton, nitrate, lime, Chilean nitrate, copra, pond coal, pebbles, brown coal, Indian coal (well understood that it means coal loaded in India), sponge iron, asphalt, ammonium nitrate (but fertilizer grade which does not require $CO_2$ or inert gas system in cargo hold is permitted), naphtha and its products, direct reduced iron, direct reduced iron ore pellets, asbestos, fishmeal, wet hides, creosoted goods, calcium carbide, motor spirits, industrial waste, acids, and any other cargoes (except coal and sulphur) listed in Appendix B to BC Code.

The vessel is able to carry the following cargoes.

1) Coal - all cargo tanks
   (UN No.010)
2) Brown coal (Lignite) Briquettes - all cargo tanks
   (UN No.002)
3) Alminium Ferrosilicon Powder – all cargo tanks
   (UN No.1395)
4) Alminium Silicon Powder, Uncoated – all cargo tanks
   (UN No.1398)

**RIDER CLAUSES TO
M.V. "12,500 DWT TBN 2"
CHARTER PARTY DATED 16TH APRIL 2007**

5) Ferrosus metal Boring, Shaving,
   Turning or Cutting - all cargo tanks
   (UN No.2793)

6) Ammonium Nitrate - not able to carry for all cargo tanks
   (UN No.1942)

7) Ammonium Nitrate Fertilizers – all cargo tanks
   (UN No. 2026-70)

8) Ammonium Nitrate Fertilizers – all cargo tanks
   (UN No.2071)

9) Seed Cake (a), containing vegetable oil, Meal,
   Oil Cake, Seed Expellers - all cargo tanks
   (UN No.1386)

10) Seed Cake (b), containing vegetable oil, Meal,
    Oil Cake, Seed Expellers (Mechanical) - all cargo tanks
    (UN No. 1386)

11) Seed Cake (b), containing vegetable oil, Meal,
    Oil Cake, Seed Expellers (Solvent) – all cargo tanks
    (UN No. 1386)

12) Seed Cake (c), containing vegetable oil, Meal,
    Oil Cake, Seed Expellers (Mechanical) - all cargo tanks
    (UN No. 2217)

13) Seed Cake (c), containing vegetable oil, Meal,
    Oil Cake, Seed Expellers (Solvent) – all cargo tanks
    (UN No. 2217)

14) Sulphur (lump or coarse grained) - all cargo tanks
    (UN No. 1350)

15) Zinc Ashes, Zinc Dross, Zinc Residues,
    Zinc Skimmings – all cargo tanks
    (UN No. 1435)

## In case of loading Salt

Maximum two (2) cargoes of salt per year, but shall not be consecutive voyages
and shall not be last voyage before redelivery which is to be loaded, stowed, carried
and discharged strictly in accordance with applicable national/international
regulations and/or IMO Code and recommendations at Charterers'risk and expense.
If lime coating/washing of holds is required by Shippers and Owners, Charterers to

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 2"**
**CHARTER PARTY DATED 16TH APRIL 2007**

arrange following at the Charterers' time and expenses. To coat holds with lime which is supplied by Charterers to Master's satisfaction prior to loading salt and to arrange removal of the same to Master's satisfaction .Charterers may request the vessel's crew to perform above removal of lime paying lumpsum USD 400 bonus per hold in addition to regular intermediate hold cleaning fee, subject Owners and vessel shall not guarantee that holds will be sufficiently cleaned/accepted at next loading port.

### In case of loading Cement

Maximum two (2) cargoes of cement per year, but shall not be consecutive voyages and shall not be last voyage before redelivery. Charterers may request the vessel's crew to perform hold cleaning paying lumpsum USD 400 bonus per hold in addition to regular intermediate hold cleaning fee, subject Owners and vessel shall not guarantee that holds will be sufficiently cleaned/ accepted at next loading port. Charterers shall provide the vessel with one set each of a Water-Tobey and submerged pump to facilitate such extra works by the vessel's crew. Owners to seal all hatches where such cargo loaded by marine tape or similar tape if required by Charterers, but cost of such tape to be reimbursed by Charterers upon completion of loading. The vessel's bilge line will not be customarily used for discharge of bilge water after hold cleaning of cement.

### In case of loading Scrap

Charterers to have the option to load a maximum of two (2) cargoes of scrap per each trading year, but shall not be consecutive voyages and shall not be last voyage before redelivery, provided however that:

(1)     The scrap mentioned herein is only limited to HMS 1 + 2 and shredded scrap specifically non-oily and always excluding motor blocks, turnings, metal borings and cuttings.

(2)     Charterers undertake to use as few holds as possible provided the vessel's stability and stress permit.

(3)     Charterers undertake that the first layer of scarp to be loaded is not to be released until touching the tanktop and not to be dumped/dropped during loading. The first layer of scrap to be loaded, stowed, trimmed to Master's satisfaction before loading the balance of the cargo.

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 2"**
**CHARTER PARTY DATED 16TH APRIL 2007**

### In case of loading Sulphur

Maximum two (2) cargoes of sulphur per year, but shall not be consecutive voyages and shall not be last voyage before redelivery which is to be loaded, stowed, carried, and discharged strictly in accordance with applicable national/ international regulations and/or IMO Code and recommendations at Charterers' risk and expense. If lime coating/washing of holds is required by Shippers and Owners, Charterers to arrange following at the Charterer's time and expenses. To coat holds with lime which is supplied by Charterers to Master's satisfaction prior to loading sulphur and to arrange removal of the lime to Master's satisfaction. Charterers may request the vessel's crew to perform above removal of lime paying lumpsum USD 400 bonus per hold in addition to regular intermediate hold cleaning fee, subject Owners and vessel shall not guarantee that holds will be sufficiently cleaned/accepted at next loading port.

### In case of loading Petcoke

Charterers have the liberty of carrying max 3 cargoes of non oily petroleum coke (whether it be full or part cargo), each year if exercised on following conditions:

a) The petroleum coke mentioned herein is only limited to the type of non-hazardous/non-dangerous green delayed type and/or calcined type.

b) If Charterers exercise such options, Charterers undertake to use the least number of holds possible, provided vessel's stability trim and stress permitting.

c) Such cargo to be loaded/stowed/trimmed/discharged strictly according latest IMO and/or any other latest regulations/rules applicable to such cargo.

d) Should any additional/special wash down of holds before loading be reasonably recommended/proposed/required by Master, Charterers undertake to arrange the same at their expense/time, however, Master and crew to always cooperate with Charterers.

e) After discharging Charterers to arrange at their expense/time any additional/special wash down of holds carrying such cargo by chemicals as Master reasonably considers if necessary, however, Master and crews to always cooperate with Charterers.

f) Such cargo not to be last cargo prior redelivery.

### RIDER CLAUSES TO
### M.V. "12,500 DWT TBN 2"
### CHARTER PARTY DATED 16TH APRIL 2007

g) Any extra expenses resulting there from/incurred thereby and any detention through any of the above causes to be for Charterers' account.

## Clause No.56 Captain's Conduct

It is understood that if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers or Engineers, the Owners shall on receiving particulars of the complain, investigate same and if necessary make a change in the appointment but this provision does not affect the Charterers' rights to advance any claims or require arbitration under Clause No.17 of disputes regarding the conduct of the Master in prosecution of voyages and in carrying out the orders and directions of the Charterers.

## Clause No.57 Itinerary

Owners to keep Charterers regularly advised of Vessels' position, and particularly any changes to same, upto the time of delivery. In addition to the above general advise Owners are to give ETA of the vessel's delivery area/port on fixing and thereafter 3 days and 48/24 hours notice to Charterers.

## Clause No.58 Breakdown of Cargo Gear

Vessel's cargo gear and all other equipment shall comply with the regulations of the countries in which the Vessel will be employed and Owners are to ensure that the Vessel is at all times in possession of valid and up-to-date certificates of efficiency to comply with such regulations. If stevedores, longshoremen or other workmen are not permitted or refuse to work due to failure of Master and/or Owners and/or Owner's agents to comply with aforementioned regulations or because Vessel is not in possession of such valid and up-to-date certificates to efficiency then Charterers may suspend hire for the time thereby lost and Owners to pay for all directly related expenses and incidental to and resulting from such failure. Vessel to work day and night if required by Charterers and all cranes to be at Charterers' disposal during loading and discharging, as required by Charterers. If the regulations of port or of labor unions prevent crew from opening or closing hatches, removing and replacing beams and hatches boards, shore labor to be paid by Charterers. In the event of disabled crane or cranes, or insufficient power to operate cranes, Owners to pay for suitable substitute shore engine(s) or crane(s) and also for any stevedores standby time occasioned thereby, hire of crane(s) not to exceed vessel hire. Hire to be deducted proportionally to the total number of operative hatches for all the time crane or cranes are unavailable due to disability or loss of power unless shore cranes have been provided and paid by Owners in which case hire to be paid in full. Where the Vessel is detained as a result of a disabled crane or cranes which detention would not have occurred had crane(s) been available in all times, then, the payment of hire to be adjusted accordingly as per Clause No.15"

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 2"
## CHARTER PARTY DATED 16TH APRIL 2007

### Clause No.59 Crew Service
Subject to local regulations permit, the following service in respect of loading and discharging, operation from officers and crew are included in hire.

1. Raising, lowering and rigging cranes and/or gangways in preparation for loading and discharging, if port regulation permits.
2. Opening and closing of hatches in connection with loading and discharging if local regulations allow, otherwise to be for Charterers' account.
3. Closing and opening of hatches in the event of weather which may adversely affect condition of cargo carried on board during loading and discharging, if port regulation permits.
4. Maintaining sufficient electric power and all cranes whilst loading and discharging including regular maintenance and shifting between berths.
5. Docking and undocking in connection with loading/discharging cargo or bunker. Necessary assistance in the Vessel's bunkering operation.
6. Officers and crew to shape up Vessel's hatches and cranes as much as possible prior to arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations subject to seaworthiness, weather condition and safety of crew.
7. Charterers pay to Master USD1,750 for crew work such as erecting/dismantling stanchions, lashing/unlashing/relashing deck cargo, and cargo mark officers (Charterers to provide paints), provided local regulation/port authorities permit.

The above service shall be considered as a minimum and done as Charterers servants and shall in no way be construed as and alternative to or reduction in the standard of services from officers and crew required under this Charter Party.

### Clause No.60 Charterers' Gear Maintenance
The Vessel shall keep record of Charterers' gear, equipment and/or stores supplied to the Vessel and shall maintain same in good condition. Gear equipment and/or stores to be returned to Charterers upon their request at any time during the Charter (latest at final discharging port) is same good order and condition as when supplied, fair wear and tear accepted.

### Clause No.61 Deck Cargo
Charterers have the option of loading cargo on deck and hatch covers at Shipper's /Charterers' risk and expenses and Vessel not to be responsible for any loss and/or damage howsoever caused. Vessel to carry full deck load, if required, in accordance with usual marine practice and safety regulations and the deck load will be limited by Vessel's strength stability and seaworthiness. All deck cargo is to be stowed, lashed and secured at Charterers' risk and expenses to Master's satisfaction and in accordance with all the appropriate regulations. All Bill(s) of Lading issued for cargo carried on deck are to state: "All cargo carried on deck at shippers and/or

**RIDER CLAUSES TO
M.V. "12,500 DWT TBN 2"
CHARTER PARTY DATED 16TH APRIL 2007**

consignees' risk and expenses. Carrier not responsible for any loss or damage
howsoever caused"

## Clause No.62 Capture/Seizure/Detention/Arrest

Should the Vessel be captured or seized or detained or arrested by any authority or
by any legal process during the currency of this Charter Party for any reason
attributable to the Owners, the payment of hire shall be suspended until the time of
her release. Off-hire to be for any time actually lost. Any extra expenses incurred
by and/or during such capture or seizure or detention or arrest shall be for Owners
account.

## Clause No.63 Bimco Double Banking Clause

(a) The Charterers shall have the right, where and when it is customary and safe
for vessels of similar size and type to do so, to order the Vessel to go, lie or remain
alongside another vessel or vessels of any size or description whatsoever or to
order such vessels to come and remain alongside at such safe dock, wharf,
anchorage or other place for transshipment, loading or discharging of cargo and/or
bunkering.

(b) The Charterers shall pay for and provide such assistance and equipment as may
required to enable any of the operations mentioned in this clause safely to be
completed and shall give the Owners such advance notice as they reasonably can of
the details of any such operations.

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it
is expressly agreed that the Master shall have the right to refuse to allow the Vessel
to perform as provided in (a) and (b) if in his opinion it is not safe to do so.

(d) The Owners shall be entited to insure any deductible under the Vessel's hull
policy and the Charterers shall reimburse the Owners any additional premium(s)
required by the Vessel's Underwriters and/or the cost of insuring any deductible
under the Vessel's hull policy.

(e) The Charterers shall further indemnify the Owners for any costs, damage and
liabilities resulting from such operation. The Vessel shall remain on hire for any time
lost including periods for repairs as a result of such operation.

## Clause No.64 Lumpsum Amount for Cable/Entertainment/Victualling

Charterers to pay Owners lumpsum USD1,150 per month or pro rata for cable
/entertainment/victualling, etc.

## Clause No.65 Time Calculation

The time for delivery/redelivery shall be adjusted to GMT.

**RIDER CLAUSES TO
M.V. "12,500 DWT TBN 2"
CHARTER PARTY DATED 16TH APRIL 2007**

## Clause No.66 In Lieu Of Hold Cleaning

Charterers shall have the option to redeliver the vessel without cleaning of holds against paying the Owners a lumpsum of US$2,500 in lieu of such cleaning. However, Charterers shall arrange, at their own accout, dunnage and bark removal/disposal by shore labor. Alternatively, subject to consent by crew and subject to port regulations, Charterers have the option of using crew for dunnage removal. Charterers shall remain responsible for the disposal and any cost related thereto.

## Clause No.67 Trim and Stability

Cargoes to be loaded and distributed in such a manner that the vessels bending moments, stress forces, trim and stability will not exceed permissible limitations. Vessel to be left in safe seaworthy trim for shifting between berth and all ports to Masters' satisfaction.

## Clause No.68 Discharge of Cargo without Presentation of Original Bill(s) of Lading

Owners allow Charterers to discharge cargo without presentation of Original Bill(s) of Lading by providing Owners with Charterers Letter of Indemnity in accordance with Owners P and I Club form and wording before discharging. Letter of Indemnity to be signed by Charterers only.

## Clause No.69 Weather Routing

Within the context of this Charter Party "good weather conditions" are to be taken as wind speed not exceeding Beaufort 4 (16 Knots maximum). The Charterers may supply an independent weather routing company service to the Master during voyage specified by the Charterers. The Master shall comply with the reporting procedure of the routing service selected by the Charterers. Evidence of weather conditions shall be taken from the Vessels deck logs in case of a dispute between the findings of appointed Wheatherrouting Services and the vessel's log books abstracts the Weatherrouting Services dates to be binding for both parties. Costs for such routing companies to be for Charterers' arrangement and expenses.

## Clause No.70 War Cancellation

If war breaks out between any two or more of following countries:
U.S.A., C.I.S., Peoples Republic of China, Germany, South Korea and Japan directly affecting the performance of the Charter Party, both Owners and Charterers shall have the option to cancel of the Charter whereupon the Charterers shall redeliver the Vessel to the Owners. If she has the cargo on board after discharge thereof at destination or if debarred from reaching or entering it, at a near open and safe port as directed by the Charterers, or if she has no cargo on board, at a port at which

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 2"
## CHARTER PARTY DATED 16TH APRIL 2007

she stays, or if sea a near and safe port as directed by the Charterers in all cases hire shall be paid until the Vessels redelivery.

### Clause No.71 Quarantine

Normal quarantine time and expenses for the Vessel entering port shall be for the Charterers account, but any time of detention and expenses for quarantine due to pestilence, epidemics among or illness of captain, officers and crew shall be for Owners' account.

### Clause No.72 Smuggling

Any delay, expenses and/or fines incurred on account of smuggling shall be for Owners account if caused by the officers and/or crew and shall be for the Charterers' account if caused by the Charterers' supercargo and/or their staff of agents.

### Clause No.73 Additional Equipments/Fittings

The Charterers, subject to Owners' prior approval not to be unreasonably withheld, shall be at liberty to fit any additional equipment/fittings for loading, discharging and/or securing cargo and such fittings are not to affect the structure of the Vessel including coating in tanks etc. Such work shall be done at the Charterers' expenses and time and the Charterers shall remove such equipment and fitting and restore the Vessel to her original conditions including repair of coatings at their expenses and time prior redelivery.

Charterers option to weld padeyes under Master's supervision and subject to Master's approval, which not to be unreasonably withheld and Charterers to remove padeyes. Charterers further option to redeliver Vessel without removal of padeyes in consideration of Charterers to pay Owners USD10.00 per padeye.

Vessel has no cement holes on hatches, however, Charterers have the option to make holes in each hatch for loading cement in bulk at their time and expenses, subject to Builders' confirmation.

### Clause No.74 U.S. Unique Bill(s) of Lading Identifier Clause

The Charterers warrant that each transport documents accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a unique Bill(s) of Lading identifier as required by the U.S. Customs Regulations (19 Clause, part Section 4.7.A) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims

### RIDER CLAUSES TO
### M.V. "12,500 DWT TBN 2"
### CHARTER PARTY DATED 16TH APRIL 2007

whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for Charterers' account.

## Clause No.75 Admixture Clause

While Charterers have the option to load two or more cargoes, in the same hold, Charterers are to supply, erect, dismantle and dispose of any and all separations required at their risk and expenses.

Notwithstanding any other provisions in this Charter Party, any claims arising from contamination or admixture to cargo carried in the same hold to be for Charterers' account. Should Charterers be permitted to load containers, Owners are not to be responsible for stowage of cargo in containers, nor for cargo claims arising therefrom. Owners are not to be responsible for stuffing or unstuffing of containers.

## Clause No.76 IMO Clause

The Charterers are to provide the Master with any evidence he may reasonably require to show that the cargo is packed, labeled, loaded, stowed, carried and discharged in accordance with IMO regulations, failing which the Master is entitled to refuse to load such cargo, or if already loaded, to unload it at Charterers' risk and expenses, however, Charterers to be given reasonable amount of time to comply with Master's request prior Master, Owners taking corresponding action. In case local and/or national authorities require special documentation for any cargoes covered by IMO Code, Charterers are to list cargoes (always in accordance with the Charter Party-see also cargo exclusion Clause No.58) then they are to reimburse Owners for any extra expenses by Owners as a result of same.

## Clause No.77 Dry-Docking Clause

Charterers shall place the Vessel within the range of Singapore-Japan and Far East at a convenient time and place to be mutually agreed between Owners and Charterers for Owners' class drydocking survey once in three (3) years at Owners' request. Owners shall give at least three (3) months prior notice to Charterers. Owners shall have the right to place the Vessel in drydock at any time in case of emergency.

Payment of hire shall be suspended from dropping last outward sea pilot (D.L.O.S.P.) of Charterers' last port until Vessel is again efficient in the same or equivalent distance position. Bunker consumed incurred thereby to be for Owners' account.

## Clause No.78 Payments

Bunker value remaining on board on delivery to be paid within three(3) banking days after Vessel's delivery. Charterers are entitled to deduct estimate Owners' expenses /maximum USD600 per port and bunker value on redelivery from last

### RIDER CLAUSES TO
### M.V. "12,500 DWT TBN 2"
### CHARTER PARTY DATED 16TH APRIL 2007

sufficient hire. The time for delivery/redelivery shall be adjusted to GMT. Owners' bank account to be advised later when confirmed.

## Clause No.79 ISM Clause

From the date of coming in force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that the Vessel and The company (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. Except as otherwise provided in this Charter Party, loss, damage, expenses or delay caused by failure on the part of The Company to comply with the ISM Code shall be for Owners' account.

## Clause No.80 Fumigation Clause

Charterers are on written request permitted to fumigate Vessel's holds with or without cargo on board at loading and discharging port(s) or places en route at their risk and expenses and warrant that fumigants will not expose officers and crew as well as other persons on board the Vessel during and after the fumigation to any health hazard whatsoever and will comply with current IMO regulations, Charterers undertake to also pay Owners all necessary expenses incurred because of the fumigation including necessary expenses for accommodating and victualling Vessel's personnel ashore and to indemnify Owners in respect of any liability, loss, damage, or expenses which they may sustain because of the fumigation. Any time lost thereby counts as on-hire.

If requested by Charterers the Vessel is to be fumigated en route from loading port(s) to the first discharging port. The fumigation procedure involves the use of the product phosphine. If requested by Charterers, Owners/Master will not insist that a technician accompany the Vessel subject to Charterers' agreeable following to be added, for log loading

1. Charterers shall furnish Owners the Letter of Indemnity (*sample as per attached).
2. Charterers shall arrange proper training and documentation for crew in such manner satisfying IMO recommendations by fumigator.
3. Initial setting of fumigants shall be made by the fumigator without involving crew members.
4. Charterers shall supply proper equipment for fumigation which to be retained until complete discharging of the cargo. Charterers to provide all the necessary apparatuses if needed according to local regulation/IMO regulation.
5. Charterers shall remove residue of fumigant where possible at the first port of discharging after fumigation completed.
6. Charterers' fumigation company shall be available to Ship/Owners/Ship managers for information and advise during entire voyage of in-transit

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 2"
## CHARTER PARTY DATED 16TH APRIL 2007

fumigation.

*Sample of L.O.I.

Letter of Indemnity to be given in return for fumigation transit

"To the Owners, Master and Agent of the M.V.

Dear Sirs,

The above ship shall not be required to fumigate the holds for the cargo of log to be loaded at          on or around          under the above Charter Party but notwithstanding the provisions of the above Charter Party, we hereby request you to comply with Charterers' order of fumigation while the Vessel, M.V.

is in transit to          for the above cargo of log.

In consideration of your complying with our above request, we hereby agree as follow:

1. To indemnify you, your servants and agent and to hold all of you harmless in respect of any liability, loss, damage or expenses of whatsoever nature that you may sustain by reason of the fumigation done in accordance with our request, where such losses, liabilities or damages are not already covered under Owners' existing insurance arrangements and providing such losses /liabilities /damages are not caused by negligence of Owners/Master and/or their servants.

2. In the event of any proceeding being commenced against you or any of your servants or agents in connection with fumigation done as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3. If, in connection with fumigation done as aforesaid, the Ship should be arrested or detained or should arrest or detention thereof be threatened, or should there by any interference in the use of trading of the Vessel (whether by virtue of a caveat being entered on the Ship's registry or otherwise however), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such Ship or properly or to remove such interference and, to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest of detention or such interference may be justified.

4. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

5. This indemnity shall be governed by and construed in accordance Japanese law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the district court of Japan.

Yours faithfully,"

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 2"
## CHARTER PARTY DATED 16TH APRIL 2007

### Clause No.81 Consumption of MDO

The vessel to have the liberty of using diesel oil when entering and leaving port and for maneuvering in shallow narrow waters, canals and rivers.

Vessel does not burn MDO at sea. The starting of vessel's main engine, generators and boilers are able to burn fuel oil however the Charterers agree that the consumption of MDO for safety reasons (i.e. starting main engine, generators and boiler as per page M1-2) is to be for their account. Owners calculate that MDO consumption per month under normal operations is to be maximum 5 mt and same to be reviewed after vessel has been operated for six months.

### Clause No.82 Charterers' Color

Charterers shall have privilege of flying their own funnel mark and deciding the vessels name which to be, the Vessel shall be repainted in Owners funnel color before termination of the Charter and the cost of re-painting shall be for Charterers' account.

### Clause No.83 Assignment

Acknowledgement and consent by Charterers for assignment of Charter Party and Charter hire shall be given to Owners' financier(s) for finance purpose.

### Clause No.84 I.T.F.

Owners guarantee that the Vessel's officers and crew on board are employed under conditions approved by I.T.F. during the whole Charter period.

### Clause No.85 The Laycan of the Vessel

1st October / 31st December 2008 to be narrowed to a 30 days spread at a mutually agreeable date ex.shipyards.

### Clause No.86 Time Charter Period

Trading via safe port(s) safe anchorage(s) safe berth(s) for a Firm period of 7 years with 2 months more or less in Charterers' option.

- Charterers' option further 11-13 Months (8th year)
- Charterers' option further 11-13 Months (9th year)
- Charterers' option further 11-13 Months (10th year)

If declared, optional periods to commence on 1st day of 84th, 96th and 108th months respectively after delivery. Optional periods to be declared latest by the end of the 82nd, 94th and 106th months after delivery respectively, however Charterers to give minimum 60 days redelivery notice (in other words, if by the end of 82nd

**RIDER CLAUSES TO
M.V. "12,500 DWT TBN 2"
CHARTER PARTY DATED 16<u>TH</u> APRIL 2007**

month of the charter period, Charterers have not exercised their option for the 8th
year, they cannot redeliver the vessel until the end of the 84th month).

## Clause 87    Law / Arbitration

The parties to endeavor to resolve any disputes amicably however if this is not
successful, all disputes from time to time arising out of the contract, shall unless
the parties agree forthwith on a single arbitrator, be referred to the final
arbitrament of two arbitrators carrying on business in London who shall be engaged
in the shipping trade and be L.M.A.A. members, one to be appointed by each of the
parties, with power to such arbitrators to appoint a third arbitrator.

Any charter party dispute must be made in writing and the arbitrator must be
appointed within 12 (twelve) months after the completion of discharge of the
respective voyage and where this provision is not complied with the dispute shall be
extinguished and cease to exist. No award shall be questioned or invalidated on
the grounds that any of the arbitrators is not qualified as above, unless objection to
his acting be taken before the award is made. The charter party to be construed in
accordance with English law and L.M.A.A. rules to apply.

For disputes where the total amount claimed by either party does not exceed
US$50.000 the arbitration shall be conducted in accordance with the Small Claims
Procedure of the London Maritime Arbitrators Association.

## Clause 88    Time bar

Charterers shall be discharged and released from all liability in respect of any claim
or claims which Owners may have under this Charter party and such claim shall be
totally extinguished, unless such claims have been notified in detail to Charterers in
writing accompanied by all available supporting documents (whether relating to
liability or quantum or both) within 24 (twenty four) months from completion of
discharge of the appropriate cargo under this Charter Party.

## Clause 89    Asian Gypsy Moth

Asian Gypsy Moth is considered High Risk and therefore the vessel is prohibited to
enter any port within a gypsy moth infected area, or anchored within 20 kilometres
of the coastline of a gypsy moth infected area anytime during the egg laying
months of July, August and September.

Gypsy moth infected areas for the purpose of these requirements currently include
all Pacific Russian ports south of 60 degrees latitude and west of 147 degrees
longitude.

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 2"**
**CHARTER PARTY DATED 16TH APRIL 2007**

Charterers must maintain a valid Certificate of Freedom from Gypsy Moth throughout the c/p. On redelivery owners are to receive a valid phytosanitary certificate confirming that the vessel is free of any Gypsy Moth.

Charterers are to comply with latest agricultural regulations in line with Australia, Canada, New Zealand, and USA. All costs associated herein are for Charterers' account.

### Clause 90

All negotiations and eventual fixture, if any, to be kept strictly private and confidential among the parties directly involved.

### Clause 91     Purchase Option

Charterers to have the option to purchase the vessel at any time after the end of the 7th year of the CP period at the following prices:

- At the end of the 7th year: USD 9.35 Million including 2pct total brokerage

- At the end of the 8th year: USD 8.65 Million including 2pct total brokerage

Charterers have the option to purchase the vessel any time between the end of 7th and the end of 8th year at the pro rata price between USD 9.35 Million and USD 8.65 Million.

Thereafter at prices reducing by USD 0.8 Million per annum or pro rata during the balance of the C/P including optional periods. Charterers to give minimum 3 months notice of exercising such option. Charterers may not exercise the option so as to take delivery of the vessel within 6 months after completion of any scheduled drydocking (DD or SS).

### Clause 92

Owners to confirm that should a 2008 Nantong Nikka 29,200 DWT position become available then same position to be made available for account Intermare Transport GMBH Hamburug or their guaranteed nominee. All terms/details to be as per the 2009 positions, subject Owners'/Charterers' board approval + owners' financiers'

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 2"
## CHARTER PARTY DATED 16TH APRIL 2007

approval.

**Clause 93**

Cranes:      Owners confirm that the vessel to be fitted with 2 x 30t Cranes.

Hatchcovers:   Owners confirm that the vessel's 3 holds will be fitted with
folding hydraulic type hatchcovers.

Logs fittings:  Owners confirm that vessel will be a fully fitted logger with full set
of lashing materials onboard.

A60 bulkhead: Owners confirm that the vessel will be fitted with an A60
bulkhead.

Lakes Fitted:  Owners confirm that the vessel will be fully fitted for Great Lakes
trade.

# NEW BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the Vessel is involved while performing this
Charter Party falls to be determined in accordance with the laws of the United
States of America, the following clause shall apply:

"If the Ship comes into collision with another Ship as a result of the negligence of
the other Ship and any act, neglect or default of the Master, mariner, pilot or the
servants of the carrier in the navigation or in the management of this Ship, the
Owners of the goods carried hereunder will indemnify the carrier against all loss or
liability to the other or non-carrying Ship or her Owners in so far as such loss or
liability represents loss of or damage to or any claim whatsoever of the Owners of
the said goods, paid or payable by the other or non-carrying Ship or her Owners to
the Owners of the said goods and set off, recouped or recovered by the other or
non-carrying Ship or her Owners as part of their claim against the carrying Ship or
carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in
charge of any Ship or Ships or object other than, or, in addition to, the colliding
Ships or objects are at fault in respect to a collision or contact.

# GENERAL AVERAGE AND THE NEW JASON CLAUSE

General average shall be payable according to the York Antwerp Rules 1974, but
where the adjustment is made in accordance with the law and practice of the
United States of America, the following clause shall apply:

RIDER CLAUSES TO
M.V. "12,500 DWT TBN 2"
CHARTER PARTY DATED 16TH APRIL 2007

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statue, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving Ship is owned or operated by the carrier, salvage shall be paid for as full as if the said salving Ship or Ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery.

## GENERAL PARAMOUNT CLAUSE

This Bill(s) of Lading shall have effect subject to the provision of any legislation relating to the Carriage of Goods by Sea which incorporates the rules relating to Bill(s) of Lading contained in the International convention dated Brussels 25th August,1924, and which is compulsory applicable to the contract of carriage herein contained. When no such enactment is in force in the country of shipment the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily application the terms of the Carriage of Good by Sea act,1924 of the United Kingdom or any statutory modification or re-enactment thereof shall apply.

## U.S.A. CLAUSE PARAMOUNT

This Bill(s) of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16th,1936 which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed as surrender by the carrier of any of its right or immunities or an increase of any of its responsibilities or liabilities under said act. The Provisions stated in said Act shall (exit as may be otherwise specifically provided herein) govern before the good are loaded on and after they are discharged from the Ship and throughout the entire the goods are in custody of the carrier. The carrier shall not be liable in any capacity whatsoever for any delay, non-delivery, or loss of or damage to the goods occurring while the goods are not in the actual custody of the carrier.

## CANADIAN CLAUSE PARAMOUNT

All other terms, Provisions and conditions of the Canadian Water Carriage of Good

### RIDER CLAUSES TO
### M.V. "12,500 DWT TBN 2"
### CHARTER PARTY DATED 16TH APRIL 2007

Act, 1936 and of the rules comprising schedule thereto are, so far as applicable, to govern the contract contained in this Bill(s) of Lading and the ship owners are to be entitled to the benefit of all privileges, rights and immunities contained in such Act and in the schedule thereto as if the same were herein specifically set out. If anything herein contained be inconsistent with the said provisions, it shall to the extent of such inconsistency and no further be null and void.

The carrier shall be under no responsibility whatsoever for loss of or damage to goods howsoever and where-so-ever occurring when such loss or damage arise prior to the loading in and/or subsequent to the discharge from the Carrier's Ship.

## WAR RISKS CLAUSE FOR TIME CHARTERS, 2004 (CONWARTIME 2004)

(a)  For the purpose of this Clause, the words:

(i)  "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii)  "War Risks" shall include any actual, threatened or reported: war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades
(whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)  The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo,
crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c)  The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or

### RIDER CLAUSES TO
### M.V. "12,500 DWT TBN 2"
### CHARTER PARTY DATED 16TH APRIL 2007

against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d)  (i)  The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii)  If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e)  If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or  upon redelivery, whichever occurs first.

(f)  The Vessel shall have liberty:-
(i)  to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii)  to comply with the order, directions or recommendations of any war  risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

### RIDER CLAUSES TO
### M.V. "12,500 DWT TBN 2"
### <u>CHARTER PARTY DATED 16TH APRIL 2007</u>

(iv)  to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v)  to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g)  If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h)  If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

**Voy War 2004.**

(a)  For the purpose of this Clause, the words:

(i)  "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii)  "War Risks" shall include any actual, threatened or reported:

War; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or
crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel,

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 2"
## CHARTER PARTY DATED 16TH APRIL 2007

her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies
within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

(c)  The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted
for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

(d)  If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 2"
## CHARTER PARTY DATED 16TH APRIL 2007

additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(e) (i)  The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and  Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii)  If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, or in order to fulfill the Owners' obligation under this Contract of Carriage, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners within 14 days after receipt of the Owners f invoice. If the Vessel discharges all of her cargo within an area subject to additional premiums as herein set forth, the Charterer
shall reimburse the Owners for the actual additional premiums paid which may accrue from completion of discharge until the Vessel leaves such area or areas referred to above. The Owners shall leave the area as soon as possible after completion of discharge.

(f)  The Vessel shall have liberty:-

(i)   to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

(ii)  to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii)  to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are  charged with their enforcement;

## RIDER CLAUSES TO
## M.V. "12,500 DWT TBN 2"
## CHARTER PARTY DATED 16<u>TH</u> APRIL 2007

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;

(vi) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

(g) If in compliance with any of the provisions of sub-clauses (b) to (f) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfillment of the Contract of Carriage.

## ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002(MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the

### RIDER CLAUSES TO
### M.V. "12,500 DWT TBN 2"
### CHARTER PARTY DATED 16TH APRIL 2007

Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## U.S. CUSTOMS ADVANCE NOTIFICATIONS/AMS CLAUSE FOR THE CHARTER PARTIES

(a) If the Vessel loads or carriers cargo destined for the U.S. or passing U.S. ports in transit, the Charterers shall comply with the current U.S. Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purpose of such regulations and shall, in their own name, time and expense:

   i)    Have in place a SCAC (Standard Carrier Alpha Code);
   ii)   Have in place an ICB (International Carrier Bond);
   iii)  Provide the Owners with a timely confirmation of i) and ii) above; and
   iv)   Submit a cargo declaration by SMS (Automated Manifest System) to the U.S. Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners agent any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising

**RIDER CLAUSES TO**
**M.V. "12,500 DWT TBN 2"**
**CHARTER PARTY DATED 16TH APRIL 2007**

from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the U.S. Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## BUNKER FUEL SULPHUR CONTENT CLAUSE

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone. The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes. The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay fines, costs or expenses arising or resulting from the Charterers' failure to comply wits this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:
  (i)  the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
  (ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.
Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessels' failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the E.U. and the U.S. Environmental Protection Agency.

EXHIBIT 3



# Claim Form
## (arbitration)

NOT FOR SERVICE OUT
OF THE JURISDICTION

| In the High Court of Justice |
| Queen's Bench Division |
| Commercial Court |

|  | for court use only |
|---|---|
| Claim No. | 2008 Folio No.  751 |
| Issue date | 24TH JULY 2008 |

In an arbitration claim between

Claimant

**NAKANISHI KIKAI KOGYOSHO LTD**



Defendant

**INTERMARE TRANSPORT GMBH**

In the matter of an alleged arbitration between

Claimant    INTERMARE TRANSPORT GMBH

Respondent    NAMIREI-SHOWA CO LTD and/or NAKANISHI KIKAI KOGYOSHO LTD and/
or SN NAVIGATION S.A. OF PANAMA

Defendant's
names and
address

**INTERMARE TRANSPORT GMBH**
Ferdinandstraße 5
D-20095 Hamburg
Germany

(Claimants in arbitration)

| ☐ This claim will be heard on: |
| |
| at        am/pm |
| |
| ☐ This claim is made without notice. |

The court office at

When corresponding with the court, please address forms or letters to the Court Manager and quote the case number.

N8 Claim form (arbitration)

Remedy claimed and grounds on which claim is made:

| Claim No. | 2008 Folio No. |
| --- | --- |
| | |

## Declarations, Injunction and/or Other Relief under Section 72 of the Arbitration Act 1996

The Claimant claims the following relief against the Defendant under Section 72 of the Arbitration Act 1996:

1. A declaration that it is not a party to two alleged London arbitrations ("the Alleged Arbitrations") allegedly commenced by the Defendant on or about 10th March 2008 in relation to and/or under: (i) a charterparty dated 16th April 2007 for a "M.V. 12,500 dwt single screw bulk carrier logs fitted TBN 1" ("the TBN1 Charterparty"); and (ii) a charterparty dated 16th April 2007 for a "M.V. 12,500 dwt single screw bulk carrier logs fitted TBN 2" ("the TBN2 Charterparty").

2. A declaration that there is no valid arbitration agreement between the Claimant and the Defendant in relation to or in any way concerning: (i) the TBN1 Charterparty; or (ii) the TBN2 Charterparty; or (iii) any contract.

3. A declaration that the Claimant is not a party to (i) the TBN1 Charterparty or (ii) the TBN2 Charterparty; or (iii) any contract with the Defendant.

4. An injunction restraining the Defendant from proceeding with the Alleged Arbitrations or any arbitration against the Claimant.

The Defendant has taken no part in the Alleged Arbitrations.

## Service of this Claim Form

Pursuant to Middleton Potts Solicitors' fax of 26th June 2008, this Arbitration Claim Form is to be served on the Defendant c/o Middleton Potts Solicitors, the solicitors for the Defendant in the Alleged Arbitrations, at their offices at 3 Cloth Street, Barbican, London EC1A 7NP.

| Claim No. | 2008 Folio No. |
|-----------|----------------|

The Claimant seeks an order for costs against:

the Defendant, **INTERMARE TRANSPORT GMBH.**

## Witness Statement

The Claimant further relies on the witness statement of Mr Masami Nakanishi dated  24 July 2008 filed herewith.

Does or will your claim include any issues under the Hunan Rights Act 1998?          NO

Statement of Truth
*(I believe)(The Claimant believes) that the facts stated in these particulars of claim are true.
* I am duly authorised by the claimant to sign this statement

Full name  DAVID HUGHES

Name of claimant's solicitor's firm    JACKSON PARTON

signed _____          position or office held  Partner

*Claimant's solicitor                    (if signing on behalf of firm or company)

*delete as appropriate

JACKSON PARTON,
4th Floor, 1 Alie Street
London E1 8DE
Tel: 020 7702 0085
Fax:  020 7702 0858

Claimant's or claimant's solicitor's address to
which documents should be sent if different from
overleaf. If you are prepared to accept service by
DX, fax or e-mail, please add details.